JUDGE KAPLAN

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK**

------------------------------------- X

ASSOCIATION OF PROPRIETARY
COLLEGES,

    2501 Jerome Ave,
    Bronx, New York, 10468

               Plaintiffs,

        v.

ARNE DUNCAN, in his official capacity as
Secretary of the Department of Education,

    Office of the Secretary
    400 Maryland Avenue, SW
    Washington, D.C. 20202, and

THE DEPARTMENT OF EDUCATION,

    400 Maryland Avenue, SW
    Washington, D.C. 20202,

              Defendants.

------------------------------------- X



14 CV 8838

Case No. _____

## COMPLAINT FOR
## <u>DECLARATORY AND INJUNCTIVE RELIEF</u>

**TABLE OF CONTENTS**

Page

THE PARTIES...................................................................................................7

JURISDICTION AND VENUE ......................................................................8

APPLICABLE FACTS .....................................................................................9

I.      STATE REGULATION OF PROPRIETARY EDUCATIONAL
        INSTITUTIONS IN NEW YORK.................................................................9

II.     THE IMPORTANCE OF PROPRIETARY EDUCATIONAL INSTITUTIONS  IN NEW
        YORK AND THROUGHOUT THE COUNTRY.........................................10

III.    BACKGROUND OF THE HEA STUDENT LOAN PROVISIONS ...............14

IV.     THE DEPARTMENT'S DEFECTIVE RULE-MAKING PROCESS ...............14

        A.      The Department's First Flawed Attempt At Promulgating GE Rules ...................14

        B.      The Department's Current GE Negotiated Rulemaking.............................15

        C.      The NPRM And The Department's Attempt To Restrict Informed Comment .....17

V.      THE FINAL UNLAWFUL GAINFUL EMPLOYMENT REGULATIONS ...................20

        A.      Debt/Earnings And Debt/Discretionary Income Rates.........................................21

        B.      Program Cohort Default Rates.....................................................................22

        C.      Unexplained Draconian Changes From The 2011 GE Rules ...............................22

                1.      Passing Rates ......................................................................................23

                2.      Eligibility Measured Based On Three  Years Of Results Rather Than Four
                        Years ......................................................................................................23

                3.      Excluding Non-Title IV Users From The Rule.........................................24

        D.      The Reporting And Disclosure Requirements .......................................................24

        E.      The Certification Requirements.............................................................................25

VI.     THE GE RULES VIOLATE THE DUE PROCESS CLAUSE.................................27

VII.    THE GE RULES EXCEED THE DEPARTMENT'S AUTHORITY UNDER THE HEA32

VIII.   THE GE RULES VIOLATE THE HEA'S PROHIBITION AGAINST THE CREATION
        OR MAINTENANCE OF DATABASES CONTAINING CERTAIN STUDENT
        INFORMATION...........................................................................................................35

IX.     THE GE RULES VIOLATE THE ADMINISTRATIVE PROCEDURE ACT...............36

        A.      The Department Repeatedly Violated Its Own  Information Quality Guidelines In
                Promulgating The GE Rules .................................................................................36

        B.      The Department Violated The APA Because It Did  Not Use The Best Available
                Data In Developing Regulations...........................................................................38

C.    The GE Rules Are Arbitrary And Capricious Because They Are Counter To The Regulatory System Developed And Enforced By The New York State Board Of Regents That Sets Requirements For The Degree Programs Offered By APC Member Colleges ...................................................................................................39

D.    The GE Rules Are Arbitrary And Capricious Because They Principally Measure Factors That Are Not Related To The Effectiveness Of The Programs ...............40

E.    The Department's Use Of Earnings So Soon After The Students' Graduation To Calculate The D/E Rates Is Irrational ........................................................................43

F.    The Use Of The 8 Percent And 20 Percent Thresholds In The D/E Rates, Based On Irrelevant And Outdated Mortgage Practices, Is Arbitrary And Capricious...47

G.    The GE Rules Are Arbitrary And Capricious Because They Use SSA Data And A Methodology That Improperly Underestimates Earnings...................................51

H.    The GE Rules Are Arbitrary And Capricious Because They Do Not Make Any Adjustment For Economic Cycles .......................................................................53

I.    The GE Rules Are Arbitrary And Capricious Because They Exclude Non-Title IV Students................................................................................................................55

J.    The GE Rules Are Arbitrary And Capricious Because They Do Not Include A Graduation Rate Requirement................................................................................57

K.    The GE Rules Are Arbitrary And Capricious Because They Allow Programs To Pass Where Fewer Than 50% Of The Graduates Borrow Regardless Of Whether The Program Otherwise Meets The D/E Rates' Thresholds...............................57

L.    The GE Rules Are Irrational Because They Disproportionately Harm Well Performing Programs At Proprietary Colleges And Inexplicably Exempt Programs At Poorly Performing Public Colleges. ...............................................57

M.    The GE Rules Are Arbitrary And Capricious Because They Will Mislead Students And The Public ........................................................................................58

N.    The GE Rules Are Arbitrary And Capricious Because They Hold GE Programs Responsible For Students' Personal Choices.........................................................58

O.    The GE Rules Are Arbitrary And Capricious Because They Are Inconsistent With The Department's Prior Interpretation..........................................................59

IRREPARABLE HARM ...........................................................................................................60

CLAIMS FOR RELIEF .............................................................................................................62

First Claim For Relief: No Statutory Authority To Impose A Regulatory Regime Inconsistent With State Regulation...................................................................62

Second Claim For Relief: The GE Rules' Failure To Make Allowances For The New York State Regulatory Scheme Applicable To APC Members Is Arbitrary, Capricious, And Otherwise Contrary To Law ........................................................63

Third Claim For Relief: Use Of SSA Data Violates Due Process ....................................64

Fourth Claim For Relief: GE Rules' Retroactivity Violates Due Process........................65

Fifth Claim For Relief:  Certification Provisions Violate Due Process.............................65

Sixth Claim For Relief:  No Statutory Authority For GE Rules........................................66

Seventh Claim For Relief:  Violation of 20 U.S.C. § 1015c ............................................67

Eighth Claim For Relief:  Improper Procedure In Adopting  |The GE Rules And
        Disclosure and Reporting Requirements ...............................................................68

Ninth Claim For Relief:  The GE Rules Are Arbitrary, Capricious, And Otherwise
        Contrary To Law...................................................................................................68

PRAYER FOR RELIEF ............................................................................................................71

The Association of Proprietary Colleges ("APC"), through counsel, for its complaint against the defendants, Arne Duncan, in his official capacity as Secretary of Education ("Secretary"), and the United States Department of Education (collectively, the "Department"), hereby states as follows:

## NATURE OF THE ACTION

1.      On October 31, 2014, the Department published new final regulations with the supposed purpose of identifying certain programs that do not prepare students for so-called "gainful employment." Among other things, those new regulations ("GE Rules") (79 Fed. Reg. 64,890 *et seq.*) (to be codified at 34 C.F.R. § 600.2 *et seq.*) impose new, untested, and draconian metrics specifying the circumstances in which the Department may punish educational institutions receiving federal student aid funding for the performance of their students in the first few years after the students leave college. These new regulations apply to thousands of institutions and tens of thousands of educational programs, affect the lives of millions of students, and will dictate the distribution of billions of dollars in federal student financial aid.

2.      Given the importance and impact of these new regulations, one would have thought that the Department would have rested the regulations on a firm constitutional and statutory basis, commissioned careful studies, engaged in substantial peer review of its proposals, rigorously determined the likely effect of the regulations, and provided full information to the educational community. Shockingly, the Department did none of these things.

3.      Rather, the GE Rules are unconstitutional, violate the enabling statute, and are arbitrary and capricious. Indeed, the Department simply ignored scores of comments filed in response to the Department's Notice of Proposed Rulemaking ("NPRM") detailing the numerous violations of applicable legal standards, and instead issued final regulations that continued to present the same flawed metrics.

4.      Those metrics center around the so-called Debt to Earnings Rates ("D/E Rates"), which measure the debt incurred by students in a program as a percentage of their income in the first few years after graduation.  If the percentage exceeds the parameters set by the Department, the program fails the D/E Rates and the program's current students become ineligible to continue to receive federal student aid funding, the death knell for almost all programs.

5.      The GE Rules create a Rube Goldberg eligibility maze, the absurd effects of which demonstrate that the Rules are irrational, arbitrary, and capricious and that they do not, in fact, measure whether programs prepare their students for gainful employment.  For example:

> The *nationwide average* D/E Rates for bachelor degree programs at *all schools* calculated under a comparable methodology is 13% (public (12%), private (16%), and proprietary (13%)), well above the 8% the Department has established as passing;

> The D/E metric is based in many cases on student earnings beginning 18 to 30 months after graduation, when their earnings are at the lowest, and irrationally ignores the substantial additional income resulting from college education that later accrues to graduates;

> Federal District Court law clerks (at JSP-11 level) from top law schools flunk the annual D/E Rate – their annual debt to earnings ratio exceeds 8%;

> Programs with a 0% graduation rate can pass the metrics, while programs with a 100% graduation rate can flunk;

> In fact, 89% of the programs at public colleges subject to the rule are exempt simply because they do not graduate enough students, while the programs at the public institutions with the highest default rates and number of defaulters pass the rule close to 100% of the time;

> The Rules improperly exclude many of the best and most affluent students from the ratios by omitting those who do not receive Title IV funding;

> The D/E methodology does not annualize graduates' salaries, so that a graduate obtaining a $60,000/ year job in November is attributed only $10,000 earnings for purposes of calculating D/E Rates;

> While the Department claims that one of the purposes of the Rules is to give institutions a chance to improve, the retroactive nature of the D/E Rate formula,

-2-

which looks back at least three years and often up to ten full years to measure the educational debt of graduates, renders this purpose impossible to achieve; and

➢ Even "the transition period," which the Department holds out as offering programs a chance to improve, does not permit a program to improve since it still uses the debt of graduates from periods before the Rules take effect.

6. These are but a few of the irrational and legally flawed attributes of the GE Rules that render them incapable of passing legal muster under applicable constitutional, statutory, and administrative law scrutiny. Indeed, the Department, contrary to statute, is attempting to set itself up as a "national school board," dictating which programs APC colleges can in effect offer, thereby usurping the authority of the New York State Board of Regents, which regulates APC colleges. The GE Rules must be vacated for numerous reasons:

7. *First*, the GE Rules are unconstitutional. They violate institutions' Fifth Amendment Due Process rights by, among other things, improperly failing to provide institutions with the bedrock constitutional right to see the evidence used against them. Instead, the Department relies on Social Security Administration ("SSA") information regarding former students' income to calculate the D/E Rates, which the Department does not provide to affected institutions. Thus, an institution is unable to challenge the accuracy of the Department's data.

8. Compounding this Due Process violation, the Department not only fails to provide SSA information, but it improperly grants the SSA information a "presumption" of correctness. This too violates due process. The SSA information is wholly unreliable in this context.

9. Moreover, the GE Rules violate the Due Process Clause because the Department does not even specify which earnings year it will use to calculate the annual earnings used in the D/E Rates. The GE Rules refer obliquely only to "the most currently available" earnings, denying institutions the ability to evaluate their compliance with the Rules. 79 Fed. Reg. 65,009 (to be codified at 668.404(c)).

10.    *Second,* the GE Rules exceed the Department's statutory authority, in the process violating numerous principles of statutory interpretation, Congress' legislative intent, and the statutory scheme through which the Department administers the federal student financial assistance programs under Title IV of the Higher Education Act of 1965 ("Title IV Programs" and "HEA"). The Department seeks to impose this new Orwellian regime based on a single phrase that has been in the HEA for decades prior to the Department's recent revelation as to its purported meaning. The unambiguous meaning of that short, single phrase — defining certain eligible programs as a program of training to prepare students for "gainful employment" in a recognized profession (20 U.S.C. §§ 1001(b)(1), 1002(b)(1)(A)(i), (c)(1)(A), and 1088(b)(1)(A)(i)) — does not even come close to authorizing the Department to determine whether an educational program prepares students for gainful employment based on complicated debt-driven post-graduation metrics that it took hundreds of pages in the Federal Register to explain. Indeed, the word "debt" does not even appear in the statutory language.

11.    Moreover, Congress never intended for the Department, under the guise of "gainful employment," to usurp the authority of the New York State Board of Regents, which preceded the Department's creation by over a hundred years. As detailed below, the GE Rules force the APC colleges into programmatic choices diametrically opposed to the directives of the Board of Regents.

12.    *Third,* the GE Rules are arbitrary and capricious. Astoundingly, given the importance of the GE Rules, the Department adopted untested one-off metrics, failed to conform the GE Rules to any accepted methodology, and conducted no appropriate studies to test how the metrics would actually function, while the research that it did perform was careless if not deliberately misleading, all in violation of its own Information Quality Guidelines.

13.     In light of the Department's failures, APC, as well as other parties, commissioned well-informed, substantial studies by well-respected experts. Those studies demonstrate that the GE Rules are arbitrary and capricious for a number of reasons, including the following.

14.     *First,* the GE Rules substantially measure factors irrelevant to how well an educational program prepares students for "gainful employment." Instead, they measure student characteristics, including the race and socioeconomic status of the program's students.

15.     The Parthenon Group's analysis of the gainful employment metrics (attached hereto as Exhibit 1) demonstrates that these student characteristics, such as the race and socioeconomic status of students completing a gainful employment program, substantially dictate how well that program fares under the metrics that the GE Rules adopt:

> Using publicly-available data, Parthenon demonstrates that student characteristic variables explain nearly half (47%) of the variance in the annual debt-to-earnings rate for gainful employment health programs. . . . . *These outcomes show that the ratios that ED has proposed for the GE Rule[s] are a good measure of student characteristics, but they fail as a measure of whether the programs prepare students for gainful employment.*

Parthenon Report at 2 (emphasis added). No rule that errs in measuring what it is supposed to measure at least 47% of the time can possibly pass arbitrary and capricious review.

16.     Also, the D/E Rates cannot be measuring whether programs, in the Department's words, "provide quality education and training to their students that lead to earnings that will allow students to pay back their student loan debts" (79 Fed. Reg. 64,890) when:

> ➢     almost all of the programs at public institutions whose student loan cohort default rates ("CDRs") *exceed* their graduation rates pass under the D/E metrics. (A list of all such institutions is attached hereto as Exhibit 2); and
> ➢     The D/E Rates are negatively correlated with the now abandoned program cohort default rate metric ("pCDR"), which measured the percentage of the students in a program who defaulted on their loan obligations within approximately three years of graduation. *This negative correlation means that graduates in programs that flunk the D/E Rates are actually more likely* to pay back their loans.

17.     Indeed, the D/E Rates, like the emperor in the fairytale, have no clothes:  the Department has presented *no evidence, no study, no expert opinion* that these one-off, untested metrics measure "quality education and training" leading to the ability to pay back student loans.

18.     *Second,* equally non-sensical is the GE Rules' process to evaluate a program's success by measuring graduates' income from as little *as 18 months after graduation*, when graduates' income is at its lowest.  As common sense suggests, and expert studies by, among others, the U.S. Census Bureau and the Federal Reserve, establish that period does not accurately reflect the increase in income that students enjoy as a result of post-secondary education.

19.     *Third,* the GE Rules unreasonably apply a simplified, dated version of *mortgage industry practices* to set the critical standards for the passing thresholds of the D/E Rates.  The Department failed to offer any credible explanation why it makes any sense to apply mortgage industry practices to educational investment decisions.  And the coup-de-grace to adopting the 8% mortgage metric (supposedly the percentage of earnings left over to pay educational debt after the graduate pays his or her mortgage debt) for use in the annual D/E Rate is the Department's utter failure to offer any evidence that most of these recent graduates actually have a mortgage *18 months* after they graduate when the Department's metric kicks in.

20.     *Fourth,* while the Department is fond of stating that one purpose of the Rules is to "[e]nsure that institutions have a meaningful opportunity and reasonable time to improve their programs" (79 Fed. Reg. 64,891), the D/E Rates are based on student loans that were taken out at least three years, and often up to ten years, before the Rules take effect.  The Rules do not provide any practical solution for the woefully retroactive nature of these calculations.

21.     Finally, the Department promulgated certain provisions (the "Reporting and Disclosure Requirements") (79 Fed. Reg. 65,013 – 65,015) (to be codified at 34 C.F.R. §

668.411-412) as part of the GE Rules mandating that institutions meet a wide range of detailed reporting and disclosure requirements that are overly burdensome, vague, and which institutions are unable to comply with in some cases. These provisions are likewise arbitrary and capricious.

22.     The Department's stated intention in promulgating the GE Rules was to measure programs' success in preparing students for well-paying jobs. Instead, in a fit of anti-proprietary school zealotry, it has adopted economically non-sensical regulations that good programs cannot pass, that violate colleges' constitutional rights, that exceed the Department's statutory authority, and that are an unfortunate exemplar of arbitrary and capricious action.

## THE PARTIES

23.     Founded in 1978, Plaintiff APC is an education corporation, a non-profit legal corporate entity, approved by the Regents of the University of the State of New York. The members whom it represents include 23 degree-granting institutions with 34 campuses throughout New York. Its principal place of business is located in the Bronx, New York. All of the APC colleges are accredited by the New York Board of Regents, Middle States Commission on Higher Education, or other approved accreditors.

24.     All of APC's members are "eligible institutions" that administer Title IV Program funds and are subject to the GE Rules. Thus, as detailed below, the GE Rules challenged in this Complaint directly and immediately have caused and will cause serious injury to APC and its members, including loss of eligibility for some programs, forcing colleges to divert significant resources away from educational offerings for students toward compliance issues, and denial of constitutional rights. These imminent injuries are directly and immediately traceable to the Defendants' promulgation of the GE Rules, and would be redressed by the relief sought herein, including a judgment vacating the challenged rules. Each of APC's member colleges would have standing to sue defendants in their own right to prevent the injuries that these Rules will

inflict. The interests that APC seeks to protect in filing this lawsuit are germane to its organizational purposes, including ensuring that students have access to higher education, seeking a rational and fair national and statewide regulatory structure, supporting its member institutions against regulations that could improperly render their programs ineligible for federal aid, and improving access to educational opportunities that prepare students to graduate fully prepared to contribute and succeed in the job marketplace. Neither the claims asserted nor the relief requested here requires the participation of individual APC members.

25. Defendant Arne Duncan is the Secretary of Education, who is sued in his official capacity. His official address is 400 Maryland Ave., SW, Washington, D.C. 20202. In that capacity, he has overall responsibility for the management and operation of the Department and promulgation of the Department's regulations, including the GE Rules.

26. The Department of Education is an agency of the executive branch of the United States Government. The Department, in its current form, was created by the Department of Education Organization Act of 1979, 20 U.S.C. § 3401 *et seq.* Accordingly, it is subject to the provisions of the Administrative Procedure Act. *See* 5 U.S.C. § 551(1).

## JURISDICTION AND VENUE

27. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it arises under the Constitution and laws of the United States, including the Administrative Procedure Act, 5 U.S.C. § 500 *et seq.* The Court is authorized to issue the non-monetary relief sought herein pursuant to 5 U.S.C. §§ 702, 705, and 706.

28. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e)(1)(C) because this is an action against an officer and an agency of the United States and Plaintiff APC resides in and has its principal place of business in this District.

**APPLICABLE FACTS**

I.   **State Regulation Of Proprietary Educational Institutions In New York**

29.   All colleges and universities in New York – public, non-profit independent and for-profit proprietary – are members of the University of the State of New York (the "University"), an entity established by the New York State constitution in 1784. The University is governed by the New York State Board of Regents (the "Board of Regents" or "Regents").

30.   The Board of Regents is responsible for the general supervision of all educational activities within New York State. Since the late 1800s, the Board of Regents has established and enforced rules and strict standards for approving degree-granting authority and registration of individual programs and curricula offered by colleges and universities.

31.   The Board of Regents and the Commissioner of Education serve as a nationally recognized accrediting agency for 24 institutions of higher education in New York, six of which are proprietary degree-granting institutions and three of which are APC members. The Board of Regents was recognized by the federal government in 1952 and today it is the only state board of education to be recognized as an institutional accrediting body. Accreditation by the Board of Regents results in these institutions being eligible to participate in the federal Title IV Programs.

32.   New York State distinguishes between educational institutions whose mission is educating students to be lifelong learners versus educating them for a specific career or job. The Board of Regents does not consider APC members to be vocational or career-focused since they have authorized all members to offer degrees and hold them to the same strict standards as all public and non-profit independent colleges.

33.   Today, the Board of Regents oversees 37 degree-granting proprietary colleges that operate on 52 campuses. Unlike some proprietary schools in other states, these proprietary colleges are subject to the same rules and regulations as all degree-granting institutions (such as

the State University of New York, City University of New York), and non-profit independent (i.e., Columbia University, New York University, Cornell University, Syracuse University), and are overseen by the Office of Higher Education.

34.     Colleges and universities in New York State must obtain approval and register every curriculum creditable toward a degree.  To be registered, a college must show evidence of careful planning, institutional goals and objectives, alignment with the Regents Statewide Plan for the Development of Postsecondary Education, financial resources, adequate classrooms and equipment, as well as faculty that have the required training, earned degrees and classroom experience.  Undergraduate degrees offered in New York are distinguished by the minimum amount of liberal arts content, as the Board of Regents defines that concept, required for each degree.  Importantly, the liberal arts courses cannot be narrowly directed toward "specific occupational or professional objectives." *Liberal Arts and Sciences,* New York State Education Department, http://www.mec.cuny.edu/Office-of-Academic-Affairs/Curriculum-Committee/ forms/defintion-of-liberal-arts-courses.aspx.

35.     The Board of Regents also oversees about 250 non-degree granting proprietary schools that are subject to their own set of rules and regulations that are focused on specific careers and ensuring students have the necessary skills to secure meaningful employment.

## II.     The Importance of Proprietary Educational Institutions In New York And Throughout The Country

36.     Proprietary institutions are an indispensable component of higher education in the United States, with a current enrollment of over 3.7 million students.  Proprietary institutions play an especially important role in educating minorities, women, first-generation college students, and non-traditional students (such as adult students with full-time employment and

childcare responsibilities), whose educational needs have not been met by traditional public and non-profit universities.

37.    In New York, the APC colleges serve more than 43,000 students per year, offering students the opportunity to choose from more than 350 associate, bachelor, master, and doctoral degree programs in both traditional and emerging fields.  APC and its members strive to improve access to education for those who aspire to obtain a college degree, including minority students, women, and adults returning to college.  APC colleges provide students with a clear path to lifelong career opportunities and offer the business community employable, highly educated graduates.  Many of the APC member colleges have been family-operated and owned for three or more generations, all of the APC member colleges have been operating for at least 21 years, and six APC members were founded in the 19th century.

38.    According to the latest data prepared and published by the New York State Education Department, in 2012, students attending proprietary colleges graduated at a much higher rate than those attending public colleges and, in many instances at a higher rate than at non-profit independent colleges, as summarized in the following chart:

| 2012 New York State Graduate Rates, by Sector | | | | | |
|---|---|---|---|---|---|
| Sector | Percentage of On-time Graduates, All Associate Degree Students | Percentage of On-time Graduates, Associate Degree Students with Disabilities | Percentage of On-time Graduates, Hispanic Associate Degree Students | Percentage of On-time Graduates, Black Associate Degree Students | Percentage of On-time Graduates, All Bachelor's Degree Students |
| Proprietary | 28.5% | 37.0% | 27.3% | 26.5% | 42.7% |
| Independent | 21.5% | 16.9% | 16.3% | 14.3% | 56.1% |
| SUNY | 11.7% | 5.8% | 5.4% | 3.6% | 47.2% |
| CUNY | 3.0% | 2.6% | 2.0% | 2.1% | 20.0% |

Source: http://www.highered.nysed.gov/oris/gradrates/

39.     Private sector colleges and universities in New York, many of whom are APC members, also make important economic and social contributions in New York. In 2011-2012, these institutions employed approximately 9,273 full-time equivalents in New York, generating more than $163.63 million in direct tax revenue to the state on an annual basis; paid almost half a billion dollars in employee wages; and created a direct economic impact of $751 million.

40.     The contributions of APC's member colleges are exemplified by the following three colleges: The School of Visual Arts, LIM College, and Monroe College.

41.     The School of Visual Arts ("SVA") has a campus at 209 East 23rd Street, New York, NY. Founded in 1947, the college currently offers numerous fine arts undergraduate and graduate programs. SVA has over 1,000 faculty members consisting of renowned artists, critics, designers, historians, and writers who are active and respected in their fields. SVA has earned wide recognition for its outstanding programs, students and faculty. In 2012, U.S. News & World Report designated SVA Graduate School as one of its Best Graduate Schools for Fine Arts, Graphic Design, Industrial Design, Multimedia/Visual Communications, Painting, and Photography. The Art Directors Club, an organization that recognizes achievements in advertising and design, has named SVA its "School of the Year" for the past four years.

42.     LIM College, located at 12 East 53rd Street, New York, NY, prepares students for careers in all aspects of the fashion business. LIM's midtown Manhattan location allows the school to immerse its students in the fashion world, with internships, guest speakers, and on-site visits. LIM College's professors are all well-versed in the industry with many serving as consultants, buyers, and marketing professionals. In September 2014, LIM College had its 75th Anniversary celebration, during which it received numerous accolades from New York officials, including a proclamation from the mayor that September 25, 2014 was LIM College Day in New

York City. *New York Government Leaders Salute LIM College on its 75th Anniversary,* LIM

College, http://www.limcollege.edu/news/15168.aspx.

43.     Monroe College was founded in 1933 with the goal of educating men and women

for success.   Monroe currently has two campuses in New York: the Bronx campus, located at

2501 Jerome Avenue, Bronx, NY; and the New Rochelle Campus, located at 434 Main Street,

New Rochelle, NY.   The total enrollment at Monroe College is just over 7,000 students.   The

College has received numerous accolades for its strong academic programs and services to its

diverse student population.   U.S. News & World Report ranked Monroe College as the "Most

Affordable Private College in New York State," and ranked Monroe's online bachelor's degree

program third in the state, with tuition that is one-quarter the costs of its rivals.   Monroe has been

commended for its high graduation rates.   U.S. Department of Education data for 2012 found that

Monroe's combined campuses rank 25th in the country for graduating African-American students

with associate degrees.   U.S. News & World Report also found that Monroe College is the

leading regional institution for graduation rates, considerably exceeding the expected rate of

educational institutions with comparable student demographics.   Monroe College graduates

approximately 80 students for every graduate at two nearby public community colleges.

44.     Higher education is essential to economic success in the United States, and

proprietary institutions are ensuring that pathways to a higher degree are open to all individuals,

not just the traditional 18- to 22-year-olds who are generally served by public and non-profit

institutions.   Without the proprietary sector, large segments of the American population would

not have access to education programs that are tailored to their particular life circumstances and

that are designed to prepare them for careers in high-demand fields.

III.    **Background of the HEA Student Loan Provisions**

45.    The Higher Education Act of 1965 ("HEA"), 20 U.S.C. § 1001 *et seq.*, was promulgated to "strengthen the educational resources of our colleges and universities and to provide financial assistance for students in post-secondary and higher education." Pub. L. No. 89–329, 79 Stat. 1219.  Originally, only "a public or other nonprofit institution" could be an "eligible institution" under the HEA, a necessary status for an institution to participate in the HEA's student loan program (originally a loan insurance program).  HEA § 435(a)(4) (1965).

46.    In 1992, Congress adopted the current eligibility definitions.  "Proprietary institution[s] of higher education" (i.e., for-profit schools) and "postsecondary vocational institution[s]" (either public or non-profit) are both now required to provide "an eligible program of training to prepare students for gainful employment in a recognized occupation." 20 U.S.C. §§ 1002(b)(1)(A)(i), (c)(1)(A)).  An "eligible program" is defined as "a program of training to prepare students for gainful employment in a recognized profession."   20 U.S.C. § 1088(b)(1)(A)(i).  Postsecondary vocational institutions consist primarily of public community colleges.

47.    As a result, the GE Rules apply to virtually all educational programs at proprietary institutions (with one exception that is not material to this Complaint) and to non-degree programs at public or non-profit institutions.

IV.    **The Department's Defective Rule-Making Process**

A.    **The Department's First Flawed Attempt At Promulgating GE Rules**

48.    In 2010, the Department initiated its first round of negotiated rulemaking that gave rise to the first set of gainful employment rules (the "2011 GE Rules"), which were largely vacated in a district court decision, but that nonetheless remain the model for the current 2014 GE Rules.  That initial negotiated rulemaking was riddled with improprieties.  For example:

49.     The public record assembled through Freedom of Information Act ("FOIA") requests revealed more than 100 communications and several in-person meetings between Department officials and short sellers (i.e., traders who bet that the stock of publicly-traded education companies would decline), including discussions of the potential effects of the new GE Rules on stock prices of publicly-traded proprietary schools. The Department's Inspector General thereafter commenced a leak investigation. *See* Peter Schroder, *Audit to Determine Whether College Reg Was Leaked to Wall Street*, The Hill (June 13, 2011), http://thehill.com/policy/finance/166087-dept-of-education-ig-looking-into-wall-street.

50.     In July 2011, the Department made its first failed attempt at issuing GE Rules. In initiating a pattern that continued through the current round of GE Rules, the Department failed to hire any experts to provide advice regarding the regulations, failed to have the proposed regulations peer reviewed, and failed to comply with its own Information Quality Guidelines.

**B.     The Department's Current GE Negotiated Rulemaking**

51.     After promulgation of the 2011 GE Rules, a court challenge was filed, and the United States District Court for the District of Columbia vacated the 2011 GE Rules, finding that a critical debt repayment standard (the "Repayment Rate" metric) "was not based upon any facts at all." *Ass'n of Private Sector Colls. & Univs. v. Duncan*, 870 F. Supp. 2d 133, 154 (D.D.C. 2012). The court held that because the Department had not provided a "reasonable explanation" for its regulation, "the court must conclude that it was chosen arbitrarily." *Id.* The Department did not appeal this ruling.

52.     The Department employed the same careless analytical skills in the current GE rulemaking that it displayed in the last one. For example, in the 2011 GE rulemaking, the Department initially stated that only 1% of the variation in the loan Repayment Rate was attributable to the percentage of minority students in a program. However, after litigation was

initiated challenging the published rule, the Department acknowledged that its prior calculations were way off, admitting that 20% of the variance was explained by the percentage of minority students and that 23% of the total variance was explained by the percentage receiving Pell grants.

53.     Moreover, the Department's disregard of APA rulemaking requirements is further evidenced by its conduct in a parallel Department rulemaking regarding compensation practices. On appeal after an initial adverse ruling, the District of Columbia Circuit instructed the Department to "address the deficiencies in its initial rulemaking . . . ." But the District Court again reversed the Department because it "failed to explain its ban on graduation-based compensation or respond to commenters' concerns about the impact of the enrollment-based compensation ban on minority recruitment." *Ass'n of Private Sector Colls. & Univs. v. Duncan*, No. 14-cv-277, slip op. at 16-17 (D.D.C. Oct. 2, 2014) (citing *Ass'n of Private Sector Colls. & Univs. v. Duncan*, 681 F. 3d 427, 449 (D.C. Cir. 2012)).

54.     In June 2013, the Department convened a second negotiated rulemaking (the "Negotiated Rulemaking") to consider a new set of GE Rules leading to the final rules at issue in this Complaint.  In convening the Negotiated Rulemaking, the Department included only two representatives from the proprietary sector out of the 15 negotiators, even though the GE Rules predominately relate to those institutions.

55.     Among other changes from 2011, the Department abandoned entirely the loan "Repayment Rate" metric it had defended so vociferously as proper in 2011 (thereby conceding that the metric it had chosen was incapable of passing judicial scrutiny), and substituted a different metric (described below), the so-called "Program Cohort Default Rate" ("pCDR"), which it has now abandoned in the final Rules as well.  In addition, it made numerous other

significant changes to its prior 2011 GE Rules, virtually all of which imposed a more draconian standard on those schools subject to the regulation.

56.    In the Negotiated Rulemaking, the negotiators advised the Department of numerous problems with the draft rules, including the fact that the proposed GE Rules:

>     permitted a school with a 0% graduation rate to pass the metrics (the APC negotiator noted that programs at public institutions with on-time graduation rates of less than 1% routinely will pass the proposed metric);

>     could render ineligible a program that had a 100% graduation rate, all of whose enrolled students fully met their obligations to repay their loans;

>     permitted a program in which all borrowers had earnings below the benchmark to pass because relatively few students in the program borrow;

>     permitted a program where all students who borrow default on their loans to pass because less than 50% of the graduates borrowed;

>     did not provide an opportunity for programs to improve despite the existence of an illusory transition period; and

>     penalized schools for educating poor and minority students, who because of lack of family resources were more likely to borrow more money than richer students.

57.    Not surprisingly, given the Department's deeply flawed proposals, the negotiators were unable to reach consensus.

58.    The Department did not comply with the requisite standards in the Negotiated Rulemaking.   Among other things, the Department did not provide for a comprehensive discussion and exchange of information, did not provide data in a timely manner, did not take into account the information received, and did not properly consider the comments of the public.

### C.    The NPRM And The Department's Attempt To Restrict Informed Comment

59.    Thereafter, despite the absence of any documented justification for any radical departure from the existing regulations, and ignoring the numerous flaws in its proposals, on

March 25, 2014, the Department issued an NPRM containing the proposed final GE Rules, with

essentially the same substance as that discussed in the final round of the Negotiated Rulemaking.

60.     The Department attempted to impede informed review and comment on the GE

Rules in numerous ways.

61.     *First*, even though the Department had published a set of informational GE Rates

("2012 Informational Rates") (purportedly to help institutions understand how the proposed rule

would work), the Department failed to provide adequate back-up data it used to calculate these

2012 Informational Rates.  This lack of information impeded the ability of many institutions to

provide informed comment on whether the GE Rules do what the Department purports they will

do (actually measure whether programs prepare their students for gainful employment).

62.     By way of contrast, in June 2012, when the Department distributed the 2011

Gainful Employment Informational Rates in connection with the 2011 GE Rules, it provided the

supporting back-up information so that institutions could review the Department's calculations

under those prior formulas, better understand how the data flowed into the rates, and test the

accuracy of those rates.  The Department provides no explanation of why it refused to provide

that same level of data for the current GE Rules.

63.     The 2012 Informational Rates make clear that the Department itself does not have

the most basic information necessary to gauge the effect of such elaborate Rules.  In the

preamble to the NPRM, the Department estimated that there are approximately 50,000 gainful

employment educational programs in the country that will be subject to the GE Rules.  79 Fed.

Reg. 16,433.  However, in Appendix A to the final GE Rules, the Department acknowledged that

it only had information for 37,589 gainful employment programs for fiscal year 2010 (79 Fed.

Reg. 65,037), which leaves more than 12,000 programs totally unaccounted for in the statistics.

64.     Moreover, the Department was only able to calculate D/E Rates for the 5,539 programs that met the minimum cohort size of 30 for the 2012 Informational Rates calculations during the two-year cohort period (FYs 2008–2009). 79 Fed. Reg. 65,038. This calculation is flawed because the Department did not even gather data for the four-year cohort period. Furthermore, the Department provided no information as to whether the programs it did measure were in any sense representative of the larger universe of programs it did not measure.

65.     The Department's failure to provide complete and accurate information contradicts its own Information Quality Guidelines, which provide that "influential information," such as that at issue here, must be "accompanied by supporting documentation that allows an external user to understand clearly the information and be able to reproduce it, or understand the steps involved in reproducing it." *Information Quality Guidelines*, U.S. Dept. of Education, at 10, http://www2.ed.gov/policy/gen/guid/iq/infoqualguide.pdf ("Quality Guidelines").

66.     To promulgate a sweeping rule based on such inherently insufficient data is arbitrary and capricious. It is unreasonable for the Department to move forward with such a new rule, based on untested metrics, when it ran calculations for only 15% of gainful employment programs.

67.     *Second,* the Department has refused to timely respond to multiple FOIA requests. APC's counsel asked the Department for its methodologies and other documentation related to the GE metrics in four FOIA requests submitted on April 8, 2014. Recognizing the short time period for the colleges to review the documentation and provide well-informed comments, the FOIA requests were supplemented with an expedited processing request. The Department denied the expedited processing request on April 17, 2014, stating that the requests did not in its opinion demonstrate a "compelling need."

-19-

68.     *Third,* the Department did not timely provide information in response to FOIA requests pertinent to regression models that the Department developed to test the impact of student characteristics on the GE Rules.  Information as to the Department's regression models is highly significant to the Department's claim that student demographics have a minimal effect on the D/E Rates.  As discussed in the accompanying Parthenon Group expert report, Parthenon also made numerous efforts to access the Department's regression model data in an attempt to reproduce its analysis.  The Department refused to discuss any specifics about the regression models and failed to respond to Parthenon's own FOIA request on the subject.

69.     Finally, on September 18, 2014, more than five months after the FOIA request, and long after the deadline to submit comments on the proposed rule, the Department did release limited information to APC's counsel relating to its regression models, but failed to provide any information regarding the additional regression models in the final Rules.

## V.     The Final Unlawful Gainful Employment Regulations

70.     While the GE Rules resemble the 2011 GE Rules in name, they make highly material changes to the prior rules.  Almost all of the changes, without adequate explanation, tighten the eligibility standards from those that the Department included in the 2011 GE Rules.  Certain standards that the Department stoutly explained and defended as the height of reasonableness in its rulemaking of three years ago have been arbitrarily discarded in favor of new, tougher ones, without supportive data to explain such a reworking.

71.     The GE Rules base continued eligibility of gainful employment programs on numeric measures to be calculated each year by the Department.  The principal elements of the metrics follow.

A.    **Debt/Earnings And Debt/Discretionary Income Rates**

72.    The D/E Rates consists of two novel, untested, and complex financial calculations, referred to collectively as the debt-to-earnings or D/E Rates.  One is a debt-to-annual earnings rate ("annual D/E Rate") and the second is a debt-to-discretionary income rate ("discretionary D/E Rate").  A program that passes either one of these rates is considered passing under the D/E Rates.  The D/E Rates are based on data for those students who received Title IV funding and completed the program in a particular two-year period (or, if there are fewer than 30 such students, a four-year period), which is called a "cohort."  In both cases, the income figures used in these rates are derived from data received from the SSA for a year that could begin as little as 18 months after graduation.  79 Fed. Reg. 65,008 (to be codified at 34 C.F.R. § 668.403).

73.    The annual D/E Rate measures the percentage of a cohort's annual earnings that is used to service the cohort's educational debt (calculated as the median of institutional and private loans as well as Title IV loans), using a formula that sets an arbitrary interest rate and amortization period for the loans.  It is calculated by dividing (a) the estimated annual payment necessary to service the cohort's median educational debt outstanding as of the dates of student graduation by (b) their mean or median annual earnings approximately two to three years after graduation.  Gainful employment programs pass if the annual D/E Rate is less than or equal to 8%; programs fail if the annual D/E Rate is greater than 12%.  79 Fed. Reg. 65,008 (to be codified at 34 C.F.R. § 668.403).

74.    The second (discretionary income) rate measures the percentage of the cohort's discretionary earnings used to service the cohort's educational debt.  It is calculated by dividing (a) the estimated annual payment necessary to service the cohort's median educational debt outstanding as of the dates of student graduation by (b) the portion of the mean or median annual earnings that exceeds 150% of the Federal poverty level of a single person during the year at

issue. Gainful employment programs pass if the discretionary D/E Rate is less than or equal to 20%. Programs fail if the discretionary D/E Rate is greater than 30%. 79 Fed. Reg. 65,008 (to be codified at 34 C.F.R. § 668.403).

75.     Programs that do not have a passing annual D/E Rate or discretionary D/E Rate, but have an annual D/E Rate between 8% and 12% or a discretionary D/E Rate between 20% and 30%, are considered in the "zone." A program would become ineligible to provide Title IV aid to its students if it (i) fails the D/E Rates in any two out of three consecutive years or it (ii) is in the zone, or combines failing and zone rates, for four consecutive years. 79 Fed. Reg. 65,008 (to be codified at 34 C.F.R. § 668.403).

**B.     Program Cohort Default Rates**

76.     The NPRM contained another numeric measure called the program cohort default rate ("pCDR"), which apparently was intended to replace the court-voided loan repayment rate. The Department abandoned the pCDR and it is not included in the final GE Rules.

77.     The pCDR was based on the percentage of borrowers enrolled in a program who default on their Title IV loans within approximately three years after those loans enter repayment. The Department abandoned pCDR because "[g]iven the wealth of feedback we received on this issue through the comments, we believe further study is necessary . . . ." 79 Fed. Reg. 65,098. This same conclusion should have been reached with respect to the untested D/E Rates, which violate well-established economic principles and have less support than the pCDR.

**C.     Unexplained Draconian Changes From The 2011 GE Rules**

78.     The Department made numerous unsupported and draconian changes from the standards that were employed in the 2011 GE Rules. The Department's failure to provide any basis for such drastic changes represents the very definition of arbitrary and capricious action.

### 1.   Passing Rates

79.     Under the 2011 GE Rules, a program passed if it had an annual D/E Rate below 12% or a discretionary D/E Rate below 30%.  76 Fed. Reg. 34,448.  By tightening those thresholds to 8% and 20%, the new GE Rules change the required earnings of program graduates by a much greater margin.  Under the formula for an annual D/E Rate, graduate earnings will need to increase by a full 50% for the same program with the same amount of educational debt to pass under the new measure.  The Department did not identify any changed facts explaining why such a massive increase was necessary or appropriate.

80.     Although the GE Rules create zone rates and a transition period, these provisions offer no real opportunity for improvement due to the retroactive nature of the measurement system (discussed below).  In reality, in order to meet the D/E Rates' thresholds in the first years under the GE Rule, programs will have to meet the new 8% and 20% measures (e.g.,  somehow boost their graduates' earnings by 50%) to maintain Title IV eligibility.

### 2.   Eligibility Measured Based On Three Years Of Results Rather Than Four Years

81.     The 2011 GE Rules provided a four-year period to measure the eligibility of gainful employment programs, providing institutions with more time to take concrete steps (such as developing new scholarship programs to replace loans) to reach a passing score in four years before losing Title IV eligibility.  76 Fed. Reg. 34,449.

82.     The Department changed this period to three years in the GE Rules so that, in actuality, programs can lose eligibility in just two years and can be required to issue warnings to their students after just one year.  79 Fed. Reg. 65,008 (to be codified at 34 C.F.R. § 668.404).  Thus, programs have a shorter time period to take steps to bring their programs to passing scores.

### 3. Excluding Non-Title IV Users From The Rule

83. The 2011 Rules, in mirroring the plain language of the statute, included all students graduating from a program. The new GE Rules exclude non-Title IV recipients in the measurement of program quality. For some APC members, this change is the difference between a passing program and a failing program. These APC member programs have not changed since 2011; the only change is in the Department's exclusion of non-Title IV students.

84. Since non-Title IV users by definition took no loans, their exclusion drives up the median debt used in the D/E metrics and requires a much higher salary to pass. There is no justification for institutions to be punished for providing full scholarships for students or tuition waivers for children of employees, for example. During the Negotiated Rulemaking, proposals were made to permit institutions to include non-Title IV users in a manner that would not violate any statutory provision. The Department arbitrarily and capriciously rejected these proposals.

### D. The Reporting And Disclosure Requirements

85. The GE Rules have provisions (the Reporting Requirements, 34 C.F.R. § 668.411, and the Disclosure Requirements, 34 C.F.R. § 686.412) that improperly require institutions to report and disclose a plethora of information on websites and in promotional materials in a manner that violates institutions' due process rights and are arbitrary and capricious because they serve no meaningful purpose.

86. Under the GE Rules, all promotional materials that identify a GE program by name or otherwise promote the program must include the disclosure template or, where time or space constraints demand, a link to the disclosure template. These requirements are vague and unduly burdensome because the term "promotional materials" is broadly defined to include, at a minimum "an institution's catalogs, invitations, flyers, billboards, and advertising on or through radio, television, print media, the Internet, and social media." 79 Fed. Reg. 65,014 (to be

codified at 34 C.F.R. § 668.412(d)(2)). The overly broad definition is riddled with ambiguity that makes it impossible for an educational institution to reasonably know what is expected of it.

87. The Reporting and Disclosure Requirements are also arbitrary and capricious because they impose burdensome reporting requirements on institutions that fail to serve their stated purpose – to promote informed decision-making by students and their families. When a proprietary college and public college offer the same degree program in the same market, only the proprietary college is required to make these disclosures. Thus, the students are deprived of information for the same degree program offered by the public institution, which is affirmatively misleading since the completion rate and other information about the public institution is obviously relevant to the Department's stated goal of promoting informed decision-making.

88. Finally, the required statement in the student warnings that "[t]he Department based these standards on the amounts students borrow for enrollment in this program and their reported earnings" (79 Fed. Reg. 65,012 (34 C.F.R. § 668.410(a)(2)) is arbitrary and capricious because the statement is false. Since the Department used the arbitrary standard of "median" student debt, it is not actually capturing the amount that students borrow. A program where *all* the students who borrow have a D/E Rate of 30% will still pass as long as more than half the students in the program did not borrow.

### E.   The Certification Requirements

89. The 2014 GE Rules include new certification rules that were not required under the 2011 GE Rules. Under the new requirements, each institution must certify that each eligible GE Program meets any necessary state professional licensure and certification requirements in the state in which the institution is located or in which the institution is otherwise required to obtain state approval under 34 C.F.R. § 600.9. 79 Fed. Reg. 65,019 (to be codified at 34 C.F.R. § 668.414).

-25-

90.     Basing the certification requirements for GE programs on 34 C.F.R. § 600.9 is arbitrary and capricious for at least two reasons.  *First,* if the Department's purpose in requiring institutions to certify that their programs lead to licensure in a state is to protect Title IV funds and prevent harm to students, such a requirement should apply equally to *all* eligible degree programs at all institutions, not just degree programs at for-profit institutions.   For the Department to attempt to impose this requirement only on for-profit degree programs through the GE Rules simply reflects the Department's anti-proprietary school bias.

91.     *Second,* basing the certification requirements for GE programs on an unrelated regulation at 34 C.F.R. § 600.9 is arbitrary and capricious and also violates APC members' due process rights.  Rather than simply specifying the states where the program must be approved, the Department is tying the GE Rules to a regulation that is vague and subject to extensive debate in its own right.   Section 600.9 has been a source of such confusion within the Department that the effective date has been delayed *for four consecutive years.*  The ultimate scope of Section 600.9 is uncertain, it is subject to a negotiated rulemaking, and may be expanded significantly in the next year to include online programs.   Indeed, the Department already has proposed and then withdrawn such an expansion of the rule.

92.     For example, it may be impossible for certain programs to concurrently meet the differing professional licensure requirements in multiple states.  The Department acknowledged this conflict, but did not resolve the problem.   79 Fed. Reg. 64,992.  However, even while recognizing the risk inherent in requiring institutions to meet professional licensure requirements across several states, rather than addressing the problem, the Department chose to base the certification requirement on Section 600.9 – a regulation that is itself in transition.   Thus,

institutions are left entirely in the dark with respect to what the GE Rules will actually require as to these state certification requirements and equally unsure of how to meet those requirements.

93.   The certification requirements under the GE Rules must be invalidated as arbitrary and capricious, and as an impermissible violation of APC members' Due Process rights because member colleges cannot reasonably determine how to comply with the requirements.

## VI.   The GE Rules Violate The Due Process Clause

94.   APC and its member institutions have a property and liberty interest in continued Title IV eligibility that entitles them to protection under the Due Process Clause of the United States Constitution.   The GE Rules violate their due process rights in numerous respects, including the following:

95.   *First*, the GE Rules violate bedrock due process principles because they create a regulatory framework in which the institutions may be stripped of their protected liberty and property interests without the required meaningful notice or hearing.

96.   Meaningful notice requires disclosure of the underlying evidence, without which it would be impossible for a party to present an effective challenge.   The GE Rules violate due process because they do not give institutions access to the SSA data used to calculate the D/E Rates.   Under Section 668.404(c) of the GE Rules:

> The Secretary obtains from the Social Security Administration (SSA) . . . the most currently available mean and median annual earnings of the students who completed the GE program during the cohort period . . . .

Fed. Reg. 65,009 (to be codified at 34 C.F.R. § 668.404(c)).

97.   However, the GE Rules prevent institutions from having access to the student-level earnings information the SSA provides to the Department on an aggregate level.   In this way, the earnings are calculated using a double-blind process that eliminates any means of verifying the figures that SSA provides to the Department.   Any challenge to the program's

earning information obtained from SSA would be limited to offering "evidence showing that a student should be included on or removed from the list," or "correct[ing] or updat[ing]" entries on the list. 79 Fed. Reg. 65,010 (to be codified at 34 C.F.R. § 668.405(c)). In other words, programs will be punished based on evidence that they never get to see. This stands in stark contrast to the requirements of due process.

98.    The GE Rules' alternative administrative appeal, which envisions a herculean survey of earnings, does not provide a viable means to vindicate institutions' constitutional rights, and in any event does not comport with due process because a school still does not get to even see the evidence used against it and the Department has not published the standards to be used to prepare or review such surveys. Moreover, the GE Rules do not provide any standard by which an institution's alternative appeal will be evaluated. The GE Rules sanction programs based on evidence they never get to see and fail to provide any meaningful way to challenge the sanction.

99.    *Second*, the GE Rules violate due process because they improperly presume that SSA data accurately represents gainful employment program graduates' earnings. Due process prohibits a federal agency from establishing evidentiary presumptions unless there is a sound and rational connection between the proved and inferred facts.

100.    The Department's reliance on SSA earnings data to calculate the D/E Rates violates these due process principles because the SSA earnings data, which is extracted from the SSA Master Earnings File ("MEF"), is inaccurate in critical respects, including the following:

101.    The MEF does not include earnings of many graduates who work in occupations where they are self-employed or whose earnings include tips. The SSA data underrepresents tip income and self-employment income by large amounts.

102.    In addition, the SSA data is systematically inaccurate for purposes of the D/E Rates.  For example, the SSA imputes zero earnings where earnings data is missing even though statistical methods are available, and commonly used by many other agencies, to impute earnings in such circumstances.  The Department does not provide a reasonable explanation for why it cannot impute earnings, while acknowledging that "other agencies, and the Department itself, may in some circumstances impute values for missing data in various calculations . . . . ."  79 Fed. Reg. 64,958.  Assigning zero earnings to individuals with missing data creates tremendous bias in the data relied upon by the Department.  And the Department's use of this methodology is inexplicable because it contravenes 30 years of advancements in imputation methodologies.

103.    All of these flaws in the SSA data are magnified because, under the GE Rules, the Secretary "does not consider [a]ny objection to the mean or median annual earnings that SSA provided to the Secretary." 79 Fed. Reg. 65,010 (to be codified at 34 C.F.R. § 668.405(f)(3)(i)).

104.    *Third,* the GE Rules are impermissibly retroactive because they impair an institution's vested right in the Title IV eligibility of its educational programs based on conduct that long precedes the effective date.  Thus, actions that occurred years before the GE Rules were published will largely determine whether a program passes or fails the D/E Rates.

105.    Also, if the first set of data results in an institution's program receiving a failing D/E Rate, the GE Rules require a harsh warning to students that will start a downward spiral of program failure even though the institution has begun to take steps to remediate the problem, which would ultimately hurt students.  In fact, the harshness and illogic of the Rules is illustrated by the fact that even if the institution stops charging tuition the moment it learns of a failing program, that program is still likely to fail.

106.    Depending on the number of students who complete the program in a given year, the D/E Rates may be calculated using information for students who graduated in a "two-year cohort period" or a "four-year cohort period" to reach the minimum of 30 completers in the measurement. 79 Fed. Reg. 65,009 (to be codified at 34 C.F.R. § 668.404(f)(1)). For example, for the 2014-2015 GE rates (the first set of rates the Department plans to publish), the two-year cohort period would use data from students who graduated as early as the 2010-2011 award year (July 1, 2010 to June 30, 2011) and the four-year cohort period would use data from students who graduated as early as the 2008-2009 award year.

107.    For a typical four-year bachelor degree program measured based on the two-year cohort, this rate will be based on students who enrolled and took out their first loans four years prior to graduation, which dates back to 2006-2007. For a small bachelor degree program, this rate will be based on students who enrolled and took out their first loans four years prior to graduation, which dates all the way back to 2004-2005. This penalizes institutions for conduct that occurred a full ten years before the GE Rules would take effect, which is a staggering example of retroactive rulemaking.

108.    For a typical two-year associate degree program, the picture is only slightly different. The first set of D/E Rates would be based on loans that students received when they enrolled in the first year of their program, or 2008-2009 using the two-year cohort period and 2006-2007 using the four-year cohort period.

109.    To calculate rates based on the loans that students received many years before the GE Rules can take effect impermissibly makes a party liable for past conduct because a program could lose its eligibility based on such loans. This is extremely prejudicial to APC members.

110.   Contrary to the Department's claims, the transition period does not cure the Rules' retroactivity problem and is almost completely illusory.   The transition period just changes one thing in the calculation – it alters the period that the Department uses to measure student debt.   Under the final Rules, "For a GE program that is failing or in the zone for any award year during the transition period, in addition to calculating the regular D/E rates the Department will calculate alternate, or transitional, D/E rates using the median loan debt of the students who completed the program during the most recently completed award year instead of the median loan debt for the two-year cohort." 79 Fed. Reg. 64,948. The final Rules expand the transition period so that this option would be available for five to seven years into the future, depending on the length of the program.   79 Fed. Reg. 64,949.   However, extending the transition period into the future does nothing to solve the source of the problem.   In fact, institutions will be notified in 2016 of their rates and the transition period requires them to use the debt of graduates who graduated in 2014-2015, effectively making the transition period useless since institutions still cannot affect the loans of students who graduated the year before. Even if an institution replaced all student loans with full scholarships as soon as it was notified of a failing degree program, that program would still be doomed to a loss of eligibility since, even under the transition period, the debt used in the rates was "baked in" years before.

111.   The Department's suggestion that institutions should have predicted its future thought processes and anticipated if, when, and in what form the Department would revive these Rules is pure fancy.   79 Fed. Reg. 64,925.   The Department cannot solve its retroactivity problem by ascribing clairvoyant, time-traveling powers to institutions.

112.   *Fourth,* the GE Rules violate the Due Process Clause because the regulations are vague and ambiguous, such that the institutions subject to the GE Rules cannot reasonably

determine what is expected of them.  For example, the certification provisions and the disclosure provisions are both unclear as to the conduct that satisfies these regulations.  Moreover, the GE Rules do not provide the necessary specificity in defining the year in which earnings will be measured.  The new GE Rules are vague, specifying only that the earnings will be taken from "the most currently available" data.  79 Fed. Reg. 65,009 (to be codified at 668.404(c)).  The GE Rules themselves do not specify which year and whether the year in question is the calendar year or the Title IV award year.

**VII.   The GE Rules Exceed the Department's Authority Under The HEA**

113.    The Department's power to promulgate regulations is limited to the authority delegated by Congress.  Regulations in excess of that authority are ultra vires and unlawful.

114.    The Department has exceeded its authority in promulgating the GE Rules.  In an effort to impose unreasonable restrictions on proprietary institutions, the Department has improperly seized upon the incidental phrase "gainful employment" in the HEA and attempted to transform it into carte blanche authorization for the GE Rules.

115.    The GE Rules exceed the Department's statutory authority, violate the HEA's purpose, and conflict with the statutory scheme for multiple reasons, including the following.

116.    *First*, Congress did not intend, under the guise of the phrase "prepare students for gainful employment in a recognized occupation," to authorize the Department to usurp the authority of state regulatory bodies, such as the New York Board of Regents, in determining the courses that meet acceptable educational standards for degree-granting proprietary institutions.

117.    *Second*, the HEA's definition of an eligible institution as one that "provides an eligible program of training to prepare students for gainful employment" has a plain and unambiguous meaning.  20 U.S.C. § 1002(b), (c).  In expressing its clear intent, Congress has not authorized the Department to determine whether an educational program prepares students for

-32-

gainful employment based on complicated, debt-driven post-graduation metrics that do not include a graduation requirement and that took hundreds of Federal Register pages to explain. The relevant portions of the statute do not even mention the word "debt."

118.     *Third*, even if Congress had implicitly granted the Department authority to interpret the phrase, the GE Rules are an unreasonable interpretation of the statute and violate numerous principles of statutory interpretation, ignore contrary congressional statements, and are contrary to the legislative history of the statute.

119.     *Fourth*, the GE Rules violate the gainful employment provision because that provision does not authorize the Department to exclude students who are not receiving Title IV aid.  The phrase "prepare students for gainful employment" by its unambiguous terms applies to all "students," and does not exclude "non-Title IV students."  Some APC member colleges have programs where close to 50% of the graduates did not receive Title IV aid and are gainfully employed with no debt.  These programs should not be unfairly punished for giving scholarships or allowing children and spouses of employees to attend for no cost.

120.     *Fifth*, the Department's interpretation conflicts with the HEA's statutory framework.  Not only does the Department's interpretation undermine the institutional CDR metric, it also usurps the traditional role of accrediting bodies, to which Congress has explicitly assigned responsibility for evaluating "student achievement." 20 U.S.C. § 1099b(a).  Indeed, the Department's own website confirms that recognized "accrediting bodies" are "*reliable authorities concerning the quality of education or training* offered by the institutions of higher education or *higher education programs* they accredit." *Accreditation in the United States,* U.S. Dept. of Education, https://www2.ed.gov/admins/finaid/accred/index.html?exp=0 (emphasis added).  Further, it violates Congress' stated intent not to regulate tuition.

121.   *Sixth,* the Department's interpretation impermissibly interferes with the institutions' curriculum and program of instruction and administration in violation of 20 U.S.C. § 3403(b) because it essentially dictates the subject matter focus and length of programs that will be affordable and successful under the metrics of the GE Rules.

122.   *Seventh,* the Department's interpretation impermissibly conflicts with the HEA's requirements that proprietary institutions that participate in the Title IV Programs receive at least 10% of their revenues from sources other than Title IV funds.  20 U.S.C. § 1094(a)(24).  This "90-10" rule restricts many institutions' ability to lower their tuition.  If these institutions were to dramatically lower their costs, many students would be able to pay the entirety of their tuition with Title IV funds, which would put the institutions in jeopardy of violating the 90-10 rule.

123.   *Eighth,* the GE Rules violate 20 U.S.C. § 1094(c), which governs institutions' right to a hearing when their eligibility to participate in any Title IV program is subject to limitation, suspension, or termination.   Under 34 C.F.R. § 668.406, the appeal process for challenging the Department's determination that an institution is failing or in the zone with respect to the D/E metrics, the Secretary is authorized to review the appeal and issue a final determination, *without* providing an impartial hearing.  79 Fed. Reg. 65,012.

124.   This abbreviated and restrictive appeals process violates 20 U.S.C. § 1094(c)(1)(F), which affords institutions "reasonable notice and opportunity for a hearing" *before* the Secretary may limit, suspend, or terminate an institution's participation in the Title IV Programs.  Thus, the GE Rules impermissibly exceed the Department's statutory authority.

125.   Finally, the other provisions upon which the Department relies for its authority in promulgating the GE Rules cannot support its attempt to rewrite the GE statute.

**VIII.  The GE Rules Violate The HEA's Prohibition Against The Creation Or Maintenance Of Databases Containing Certain Student Information.**

126.    In calculating a student's loan debt for the D/E Rates, the Department includes Title IV loans *and* private education loans that the student borrowed to attend the GE program. 79 Fed. Reg. 65,013 (to be codified at 34 C.F.R. § 668.411). Covered institutions are obligated to report this information to the Department each year, which the Department will maintain within the National Student Loan Database System ("NSLDS"). 79 Fed. Reg. 65,037.

127.    The Department's effort to compile data concerning students' private education loans, even in an existing database, violates the federal statute, 20 U.S.C. § 1015c, prohibiting the creation or maintenance of federal databases containing certain student data.

128.    Section 1015c addressed a growing concern over privacy protections for students pursuing higher education. H.R. Rep. No. 109-231 (2005). Under Section 1015c, the Department is precluded from creating new "Federal database[s] of personally identifiable information" about students as well as maintaining any such preexisting database that is not "necessary for the operation of programs authorized by" Titles II, IV, or VII of the Higher Education Act, or already collected as of August 14, 2008. 20 U.S.C. §§ 1015c(a); 1015c(b)(1); *see Ass'n of Private Sector Colls. & Univs. v. Duncan*, 930 F. Supp. 2d 210, 214 (D.D.C. 2013).

129.    The Reporting Requirements violate this prohibition by requiring institutions to report information regarding private, non-federal loans to be maintained in the NSLDS database. The overall purpose of 20 U.S.C. § 1015c(a) has never included the collection of information on loans offered outside of Title IV or other federal programs.

**IX.    The GE Rules Violate The Administrative Procedure Act**

130.    The Administrative Procedure Act ("APA") requires that agency actions that are "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law" or unsupported by substantial evidence be set aside.  5 U.S.C. § 706(2).

131.    To satisfy this standard, among other things, the Department must examine the relevant data; must articulate a satisfactory explanation for its action, including a rational connection between the facts found and the choice made; cogently explain why it has exercised its discretion in a given manner; follow its own regulations and procedures; and, when undertaking a change in policy, provide a reasoned explanation for disregarding facts and circumstances that underlay or were engendered by the prior policy.

132.    When an agency offers an explanation for its decision that runs counter to the evidence before the agency, or is unsupported by substantial evidence, its decision is arbitrary.  Not only must an agency's decreed result be within the scope of its lawful authority, but the process by which it reaches that result must be logical and rational.  Further, agencies must base their regulations on the best available data and statistical methods.  Finally, when the agency's conclusion rests on a predictive judgment, it must nonetheless undergird that predictive judgment with evidence for that judgment to survive arbitrary and capricious review.

133.    The GE Rules violate the APA and the relevant legal requirements in numerous respects, including the following.

**A.    The Department Repeatedly Violated Its Own Information Quality Guidelines In Promulgating The GE Rules**

134.    To comply with the APA, an agency must follow its own procedures.  To ensure that information the federal government uses is accurate and reliable, in 2000 Congress passed the Data Quality Act, which provided for each applicable Federal agency to "issue guidelines

ensuring and maximizing the quality, objectivity, utility, and integrity of information (including statistical information) . . . ." Pub. L. No. 106-554, Section 515.

135.    Subsequently, in October 2002, the Department published its Quality Guidelines. 67 Fed. Reg. 62,043-44. They state that "[t]o make sound decisions, the Department intends to accept and use only information that is accurate and reliable." Quality Guidelines at 2.

136.    The Quality Guidelines seek to ensure the "*accuracy, reliability, and unbiased nature of information*" upon which the Department relies. Quality Guidelines at 5 (emphasis added). In furtherance of this goal, the Quality Guidelines impose a number of specific "minimum" requirements. These include the requirement that the Department use "state of the art methodologies" or "modern statistical techniques," in this case for the purpose of evaluating the benefits of an investment in education; "present conclusions that are strongly supported by the data" and "acknowledge any shortcomings or explicit errors in any data that is included;" "confirm and document the reliability of the data;" and subject information products to "peer review." Quality Guidelines at 5-7.

137.    The Quality Guidelines impose especially rigorous requirements with respect to "influential information," defined as information "reasonably likely to have a clear and substantial impact on public policies or private sector decisions if disseminated." Quality Guidelines at 9. The GE Rules constitute "influential information."

138.    As set forth below, a review of the methodology the Department employed and relevant comments of multiple expert economists filed in connection with the NPRM conclusively establishes that the Department violated the APA and its own Quality Guidelines. Among other things, the Department employed improper methodologies, relied upon

unrepresentative and misleading data, failed to acknowledge the very substantial shortcomings in the information and data, and failed to have the information and methodologies peer reviewed.

**B.   The Department Violated The APA Because It Did Not Use The Best Available Data In Developing Regulations**

139.   Federal courts have consistently held that agencies must use the best available data when promulgating regulations to comply with the APA's arbitrary and capricious standard. Because the Department failed to use the best available data, despite having access to all of the necessary information and being required to do so by its own Quality Guidelines, the GE Rules are arbitrary and capricious.

140.   *First*, the Department utilized a flawed methodology that did not accurately analyze the impact of the proposed GE Rules on program eligibility.   When an appropriate methodology is used, the estimates of failing programs is much higher:  up to almost one-half of all students in for-profit colleges are in programs that could lose Title IV eligibility.

141.   *Second*, the Department's flawed methodology is further demonstrated by data released by public Texas post-secondary institutions, which demonstrates that 28% of all programs would either fail or score in the warning zone under the D/E Rates.  This figure rises to 54%, an actual majority of all programs, if the D/E Rate formulas are applied to those graduates who borrowed to finance their education.   Schneider, M., *American Enterprise Institute. Are Graduates from Public Universities Gainfully Employed?  Analyzing Student Loan Debt and Gainful Employment* (2014).

142.   The Department dismissed not only the Texas data but its own studies, all of which show that a large percentage of programs in all sectors fail the D/E Rates.  In response to these studies, the Department could have determined the nationwide rate for all sectors by

conducting its own study for all institutions, thereby providing important information on the reasonableness of the D/E Rates. The Department declined to do so.

143.   *Third,* the Department incorrectly assumes (with no evidentiary back-up) that most of the students whose programs fail will find an alternative. To the contrary, the GE Rules will deny postsecondary education to between one and four million students by 2020.

**C.   The GE Rules Are Arbitrary And Capricious Because They Are Counter To The Regulatory System Developed And Enforced By The New York State Board Of Regents That Sets Requirements For The Degree Programs Offered By APC Member Colleges**

144.   In promulgating the GE Rules, the Department arbitrarily and capriciously failed to consider that the APC colleges, as degree-granting institutions, are subject to directives of the New York State Board of Regents. The Board of Regents requires APC members to comply with the same regulations, offer the same types of programs, and function in the same manner as the other public and private non-profit educational institutions that it regulates.

145.   As previously discussed, the Board of Regents treats degree-granting and non-degree institutions differently. The Board of Regents authorized APC members to offer degrees and, as such, APC members are not considered vocational or career focused. On the contrary, APC members are required to register all programs, undergo a thorough examination of curriculum, faculty, classrooms, and financial resources to support the program, and depending on the level and type of degree, offer a minimum number of liberal arts credits.

146.   Based on its comprehensive and demanding requirements, the Board of Regents is the only state educational authorizing agency that the Department has recognized as an institutional accrediting agency, which means that the Department recognizes and relies on the Board of Regents to evaluate the quality of academic programs and determine that the programs are of a sufficient academic quality to qualify for Title IV Program funding.

147.    As described above, the metrics of the GE Rules are directly contrary to the Board of Regents' standards since those metrics would measure the success of a program based on the earnings of its completers shortly after graduation and would penalize institutions for offering well-developed, broadly based curricula that prepare students for a lifetime career since those curricula would entail longer programs, which necessarily requires students to borrow more and incur higher levels of educational debt.

148.    The GE Rules fail to provide any flexible adjustments for proprietary colleges whose state regulators require them to offer broad-based degree programs with significant liberal arts components that are not intended for short-term vocational goals.  As described above, the GE metrics are directly to the contrary, measure the success of a program only a few years after graduation, and do not contain any provisions, such as a carve-out for colleges whose state regulators require them to offer broad based degree programs, that would appropriately take into account the state-based regulation.

149.    The Department's failure to provide appropriate latitude for the APC institutions subject to state regulation as degree-granting institutions is arbitrary and capricious.

### D.    The GE Rules Are Arbitrary And Capricious Because They Principally Measure Factors That Are Not Related To The Effectiveness Of The Programs

150.    The GE Rules are arbitrary and capricious because they do not measure what they are supposed to measure.  The Department's own flawed regression analyses, as well as the more comprehensive study by The Parthenon Group, establish that the GE Rules' metrics substantially measure student characteristics, such as family income, rather than an educational program's ability to prepare students for gainful employment.  The GE Rules merely reflect the characteristics of students enrolled in the gainful employment programs.  Thus, they do not serve as a satisfactory proxy to evaluate the programs.

151.    *First*, with respect to the D/E Rates, the Department concluded under its flawed regression analysis that only 1% of the variance was attributable to student characteristics of Pell Grant status (as a proxy for income) and minority status, and 36% of the variance was attributable to a mixture of student characteristics and other variables such as educational sector (i.e., public, non-profit, for-profit). 79 Fed. Reg. 65,041-42.

152.    The sole fact that the Department found that over one-third of the variance under the D/E Rates was attributable to non-program quality factors is sufficient to render the GE Rules arbitrary and capricious. In fact, the GE Rules are actually much worse than that.

153.    It is well-established that a number of student characteristics in addition to race and Pell Grant status also impact student outcomes. A report from the Department's own National Center for Education Statistics ("NCES") identified seven major risk factors for student success within higher education: "delayed enrollment, part-time attendance, financial independence, having dependents other than a spouse, being single parents, working full time while enrolled, and failing to graduate from high school." Parthenon Report at 6.

154.    Similarly, a 2012 Department analysis showed that race, gender, and income were all significant factors in predicting whether a student would obtain a degree, with the odds of completing a degree being 32% lower for males, 43% lower for black students, and 25% lower for Hispanic students. *Id.*

155.    Despite this fact, the Department in the NPRM omitted a host of student characteristic variables known to affect student outcomes from its analysis.

156.    To address these flaws in the Department's methodology, Parthenon ran a more robust regression analysis correcting for variables that the Department omitted. Parthenon's study conclusively determined that 47% of the variance in the annual D/E Rates were explained

by student characteristics, including minority status (black, Hispanic, American Indian), gender, age, Pell eligibility, average aid, enrollment status, and degree level:

> We found that these student characteristic variables explain nearly half (47%) of the variance in the annual debt-to-earnings rate within our sample. This is not a mere statistical trifle. This is more than 20 times as large as the 2% that ED asserted. It is also more than the 36% suggested when ED included variables in their model such as sector that are not related to student characteristics. *Our finding demonstrates that the annual debt-to-earnings rate that ED has included in the GE Rule[s] is a good measure of student characteristics, but it fails as a measure of whether the programs prepare their students for gainful employment.*

*Id.* at 13 (emphasis added).

157.    A chart showing Parthenon's findings with respect to the D/E Rates, compared to the Department's "simple" (i.e., using two variables) analysis is reproduced here:



**Annual Debt to Earnings**
**Institution-Level Data Regression**

*Source: Parthenon Institution-Level Annual Debt-to-Earnings Regression Model*

158.    Parthenon's findings demonstrate that the GE Rules are arbitrary and capricious:

*The correct, statistically valid approach shows that the ratios that ED has proposed for its GE Rule[s] are a good measure of the characteristics of the students enrolled in the programs, but the ratios in the proposed GE Rules do not do what they claim to do – they fail to measure whether programs succeed in preparing their students for gainful employment.*

ED has not acknowledged or will not acknowledge that the effect of the proposed gainful employment regulation will amount to *educational red-lining that discriminates against exactly the students that ED is trying to include as part of their Completion Agenda* to restore America to its position as "having the highest proportion of college graduates in the world." *If this proposed regulation becomes final, it will be the neediest students who will suffer.*

Parthenon Report at 19 (emphasis added).

159.    No rule that errs in measuring what it is supposed to measure almost half the time can possibly pass arbitrary and capricious review.   Indeed, there is no evidence that the Department's GE Rules measure a program's ability to prepare its students for gainful employment at all.

160.    Although the Department has abandoned the pCDR, its careless analysis of the impact of student characteristics on pCDRs is symptomatic.   Parthenon did a more robust regression analysis, employing additional student characteristics that the Department had not included in its analysis.  *That analysis showed that the expanded list of student demographics explained 63% of the variance on that particular metric.*  Parthenon Report at 17.

161.    The Department's abandonment of the pCDR reinforces the arbitrary nature of its conduct.  The sheer fact that it concluded as of the NPRM in March 2014 that the pCDR was an important and valid measure, and then changed its mind six months later to conclude "further study" is required before adopting the pCDR, is just one more indication that the Department is rushing with GE metrics that do not survive rational analysis.  79 Fed. Reg. 64,915.

**E.    The Department's Use Of Earnings So Soon After The Students' Graduation To Calculate The D/E Rates Is Irrational**

162.    The GE Rules, including the D/E Rates, are supposed to measure if gainful employment programs provide "quality education and training to their students that lead to earnings that will allow students to pay back their student loan debts." 79 Fed. Reg. 64,890.

163.    The Department's decision to measure earnings a short period after graduation (as little as 18 to 30 months), despite the well-documented increases in student income that continue for decades after graduation, is contrary to universally accepted economic methodology and, according to a leading economist, "economically irrational." First Report of Professor Bradford Cornell ("First Cornell Report"), at 4 (submitted herewith as Exhibit 3). The Department's decision to employ such a short period of time violates the APA and its own Quality Guidelines.

164.    *First,* the Department, in addressing whether education is of sufficient quality to allow for the repayment of student debt, is required to examine the relevant data. Indeed, the Department, in the 2010 NPRM, noted the well-documented effect that education has on earnings, increasing income "by as much as 43 percent between the first few years out of post-secondary education and the sixth to tenth years out." 75 Fed. Reg. 43,666. Numerous publicly available studies are to the same effect, including those of the U.S. Census Bureau, and the Department has acknowledged this fact in the final GE Rules. 79 Fed. Reg. 64,914.

165.    These conclusions demonstrate the arbitrariness of the Department's GE Rules, which focus on a short window of time that often begins just 18 to 30 months after graduation, and ignore the long-term economic payoff of higher education. The Department wholly failed to provide a reasonable explanation for why it chose such a short period of time.

166.    Moreover, the Department failed to take into account the additional benefits of a higher education that accrue over time, including increased work-life expectancies, improved health, transfer of knowledge, less reliance on transfer payments, lower incarceration rates, and payment of more taxes.

167.    *Second,* to pass APA scrutiny, there must be a rational connection between the facts found and the choice made. Since the effect of education is to increase earnings "by as

much as 43 percent between the first few years out of post-secondary education and the sixth to tenth years out" (75 Fed. Reg. 43,666), then it is arbitrary and capricious to judge the value of that education in a period that could begin as little as 18 months after graduation.

168.   Basic and well-established economic theory provides that in measuring the value of a given investment, such as an investment in education, one looks to the stream of income to be provided *as a result of the investment over its lifespan*.  Thus, to appropriately measure the value of an educational program, one should examine the difference between (a) the income over their working lives of those who did not obtain the additional education and (b) the income over their working lives of those who did.  To properly measure this enhancement, it is this delta in lifetime income (reduced to present value) that should have been compared to the debt incurred, the difference being the net present value of the investment.  If the net present value is positive, then basic economic theory teaches that it makes sense to undertake the investment.  First Cornell Report at 10-12.

169.   Numerous researchers have concluded that this is proper methodology to evaluate the benefits from education, including those at the Federal Reserve.  For example, the Federal Reserve researchers, employing the same methodology as APC's expert, concluded (as did APC's expert) that there is a very substantial net present value to a college degree, and thus it remains an excellent investment, but that the time required to recoup the costs is approximately ten years.   Jaison R. Abel & Richard Deitz, *The Value of a College Degree*, libertystreeteconomics.newyorkfed.org/2014/09/the-value-of-a-college-degree.html#.VBj4eC5dUxM.

170.   However, the Department's GE methodology is "irrational" and "fundamentally flawed" because "instead of considering the value derived from an education over the working

life of the programs' graduates, it values the programs based on the graduates' income for just a few short years after graduation." First Cornell Report at 5.

171.    The Department did not even acknowledge that a net present value analysis is the appropriate methodology for measuring the value of an educational investment, although it was clearly familiar with the methodology.   Indeed, the Department used a "net present value" ("NPV") analysis only when providing the methodology for net budget impact and for costs, benefits, and transfers, not when addressing the GE metrics themselves.  79 Fed. Reg. 65,079.

172.    Professor Cornell conducted a net present value analysis of the benefits of education at proprietary colleges.   His study demonstrates that post-secondary education at a proprietary institution "is expected to yield substantial tangible positive economic return on investment even after financing costs are taken into account" (*id.* at 19), as reflected in the below chart:



Note: This analysis uses the expected federal student loan interest rate of 4.66% for the 2014-15 academic year for undergraduate students as the financing cost to calculate the net present value.
Sources: U.S. Census Bureau's Current Survey 2006-2008; the College Board; U.S. Bureau of Labor Statistics; Survey of Professional Forecasters; US Treasury Department; New America Foundation

173. The Department's proposed shorter time periods do not begin to capture this long-term economic benefit of earning a degree, and falsely indicate that "investment in post-secondary education at proprietary institutions would almost always appear to be a losing proposition." *Id.* at 20. Tellingly, the analysis shows that programs that would fail the GE Rules' illogical and draconian metrics shortly after graduation would nonetheless have passing rates if the D/E Rates were calculated a few years later.

174. The Department offers no cogent explanation for its selection of an artificially curtailed period that is not reflective of the value of the education that students obtain. The Department's use of this truncated measurement period is arbitrary and capricious, fails to accurately measure program performance, and creates a clear harm to graduates and the communities in which they work. It also violates the Department's own Quality Guidelines, which require the Department to use a "state of the art methodology" or a "modern statistical technique." Quality Guidelines at 5-7. The Department's one-off methodology is neither.

F.    **The Use Of The 8 Percent And 20 Percent Thresholds In The D/E Rates, Based On Irrelevant And Outdated Mortgage Practices, Is Arbitrary And Capricious**

175. In proposing the two D/E Rates, the Department failed to provide a rational basis for the use of the 8% annual earnings measure and the 20% discretionary income measure.

176. *First*, the Department falsely asserted that it based the passing thresholds for the discretionary income rate and the annual earnings rate on "expert recommendations," (79 Fed. Reg. 65,096), when in fact it did not communicate with a single outside expert regarding the thresholds. In response to FOIA Request No. 14-01083-F (attached hereto as Exhibit 4), which asked for "all documents (including but not limited to correspondence, emails, handouts, summaries or reports) exchanged between the U.S. Department of Education and the 'experts' from whom the Department states that it received 'recommendations,'" the Department's belated

response (attached hereto as Exhibit 5) stated that it was "unfortunately" unable to locate any records and that nothing exists outside of the NPRM.

177. The Department's own Quality Guidelines require that "significant informational products" be peer reviewed. The GE Rules, which affect millions of students and billions of dollars in federal aid, are obviously significant. Not only did the Department violate these Guidelines, but its failure to consult appropriate experts reveals that the GE Rules were simply cobbled together by various unknown parties at the Department.

178. *Second,* the Department principally based these metrics on the 2006 study entitled *How Much Debt is Too Much? Defining Benchmarks for Managing* by Sandy Baum and Saul Schwartz (hereinafter "Baum & Schwartz"), which recited that those metrics appeared to be based on *mortgage practices.* 79 Fed. Reg. 64,919. Yet, Baum and Schwartz, in the very study on which the Department relies, concluded that mortgage practices have no relevance to educational debt:

> [Using] ratios historically used for mortgage qualification as a benchmark for manageable student loan borrowing *has no particular merit or justification.*

Baum & Schwartz, at 3 (emphasis added).

179. *Third,* there is no rational connection between mortgage industry practices and the evaluation of the quality of educational programs. The 8% standard is based on the difference between (a) the so-called "front-end" ratio (of projected mortgage payments to current gross income) and (b) the "back-end" ratio (of total credit commitments to gross income), the difference between those numbers being 8%. This projected difference is theoretically the sum available for non-mortgage debt, such as student loans. However, as Professor Cornell found, the "Department's reliance on mortgage practices for its selection of the 8% and 20% metrics is economically irrational and entirely unsupported":

[T]he Department offers no data to support its assumption that mortgage debt has any relevance to students a few years out of school, the point at which a student's debt to income ratio is assessed for purposes of measuring program quality. Consequently, it appears that the Department has not complied with its own Quality Guidelines. These Quality Guidelines mandate that the Department should "present conclusions that are strongly supported by the data" and "acknowledge any shortcomings or explicit errors in any data that is [sic] included." In this case, the proposal to adopt mortgage lending practices to evaluate program quality based on a student's income a few years out of school is unsupported by any data.

Second Cornell Report, at 5 and 9-10 (submitted herewith as Exhibit 6).

180.    Indeed, not only is the Department's basic assumption unfounded, it is simply wrong. Obviously, if most students do not own a home, and are thus not subject to mortgage payments, the 8% ratio has no relevance whatsoever. And that is indeed the case. As reported in a recent study of the Federal Reserve Bank of New York, in 2013, less than 22% of people nationwide age 27 to 30 who had student loans also had home-secured debt. Meta Brown *et al.*, *Just Released: Young Student Loan Borrowers Remained on the Sidelines of the Housing Market in 2013*, Federal Reserve Bank of New York: Liberty Street Economics (May 13, 2014), http://libertystreeteconomics.newyorkfed.org/2014/05/just-released-young-student-loan-borrowers-remained-on-the-sidelines-of-the-housing-market-in-2013.html#.U4Tm2_ldW4I.

181.    Moreover, the Department's own data shows that the average bachelor degree graduates at non-profit institutions and public institutions have, respectively, 16% and 12% debt-to-earnings ratios in the first year after graduation, well above the Department's 8% passing threshold. *Degrees of Debt*, U.S. Department of Education, National Center for Educational Statistics (2013).

182.    Thus, by the Department's measure, *most* public and non-profit institutions are not successfully preparing their students for gainful employment. Any test that would lead to

this absurd result is surely arbitrary and capricious. The GE Rules, if applied to the educational sector as a whole, would eviscerate the entire American post-secondary educational system.

183.   *Fourth,* the Department's application of mortgage practices to a rule relating to educational programs and student loans just a few years after graduation is irrational because:

> mortgage practices do not consider the fact that a graduate's income is expected to increase substantially over the fifteen years following graduation. This increase in income makes it easier for that graduate to make payments on that debt, and consequently better reflects the long-term value of the educational program.

Second Cornell Report at 10. Baum & Schwartz, on which the Department principally relies, reached the same conclusion, finding that the 8% metric fails to account for the fact that student borrowers are likely to have much higher incomes over time and that "[t]he percentage of income that borrowers can reasonably be expected to devote to student debt repayment increases with income." Baum & Schwartz, at 3. Consequently, programs that fail the GE Rules' metrics for students a few years out of school will later pass. *See* Second Cornell Report at 12.

184.   However, the Department again has failed to provide any reasoned basis for its choice of limiting the application of the GE Rules' metrics to programs for students just a few years out of school, and its choice of the 18 to 30 month period after students' graduation to commence application of those metrics is totally arbitrary and capricious.

185.   *Fifth,* the Department's use of mortgage practices is flawed because it ignores the important fundamental distinctions between the purchase of a home and an investment in education. Indeed, in contrast to home ownership, which does not increase the student's income (but results in higher expenses), purchasing an education by the Department's own admission dramatically *increases income.* "A rational economic actor may be willing to sacrifice and incur

a high debt-to-earnings ratio in the near term to increase their expected lifetime earnings." Second Cornell Report, at 12.

186.    *Sixth*, the 8% and 20% thresholds that the Department relies upon are at least ten-years old and out-of-date.  The single more recent study upon which the Department relies, a 2012 study by Avery and Turner, merely cited Baum and Schwartz and acknowledged a "2003 GAO study that set the benchmark at 10 percent."  79 Fed. Reg. 65,036.  "If a mortgage lending practice were to be used to determine a D/E Rate, the BLS data implies that a significantly higher threshold for student debt service, in the range of 18% to 20%, would be supportable."  Second Cornell Report at 16.  The Department arbitrarily and capriciously and without explanation chose to rely on the outdated mortgage thresholds rather than those supportable by current data.

187.    Finally, the Department is required to provide a reasoned explanation for a change in policy.  Here, the Department acted arbitrarily by reducing the 12% and 30% thresholds for passing the D/E Rates in the 2011 GE Rules to the proposed 8% and 20% thresholds, and by substituting a "zone" that is neither passing nor failing, without any rational explanation.  The change in the passing thresholds is not a mere tweak.  Among other things, it effectively requires institutions to hold tuition and debt levels steady and then, on top of that, requires that their graduates have 50% higher earnings than the previous thresholds to pass the GE metrics.

**G.    The GE Rules Are Arbitrary And Capricious Because They Use
SSA Data And A Methodology That Improperly Underestimates Earnings**

188.    The GE Rules are arbitrary and capricious because they rely on SSA earnings data to calculate the D/E Rates that does a very poor job of accurately capturing actual earnings.  Moreover, the methodology the GE Rules employ for calculating earnings causes downward bias in earnings.  *See* Eric Bettinger, *Imputation of Income Under Gainful Employment*, at 14 (2014) ("Bettinger Report") (attached as Exhibit 7).

189.    *First*, the data that the Department uses to calculate programs' D/E Rates is inaccurate due to underreported income. In 2012, the IRS released a report that estimated that individuals underreported their individual business income tax liability by $122 billion. *See Tax Gap for Tax Year 2006*, Internal Revenue Service, http://www.irs.gov/pub/newsroom/overview_tax_gap_2006.pdf. The magnitude of this error establishes that the Department's presumption of accuracy of SSA data is not reasonable.

190.    Moreover, the MEF underreports earnings for self-employed individuals receiving tip income, which historically has been underreported by as much as 59%. Bettinger Report at 9. This makes a significant impact on D/E Rate calculations, because many of these individuals receive training from gainful employment programs at proprietary institutions.

191.    *Second*, the Department's reliance on the SSA MEF earnings data is also arbitrary and capricious because that data is incomplete. SSA imputes earnings of zero to individuals for whom the agency does not have earnings information. SSA reports received through FOIA requests indicate that approximately 12% of graduates in certain test runs of the D/E Rates were assigned zero earnings for the purpose of gainful employment computations.

192.    *Third*, the Department's use of this flawed methodology is all the more shocking because it contravenes "30 years of scientific advancements in imputation methodologies," as well as the established practices of many other federal and state agencies. *Id.* at 12, 14. In his report, Dr. Bettinger explains that survey and administrative data frequently have missing values, as in the data set analyzed by the Department. To address this deficiency in the data set, statisticians impute values to obtain unbiased calculations instead of substituting a "zero" value. Indeed, the assumption to use a zero value in such situations actually creates bias. *Id.* at 13-14.

193.    *Fourth,* the timeline by which the SSA annual earnings are calculated differs significantly from an award year (July 1 to June 30). The GE Rules instruct the Department to calculate the D/E Rates "[f]or each award year." 79 Fed. Reg. at 65,008 (to be codified at 34 C.F.R. § 668.403(b)). The Department calculates the earnings portion of the D/E Rates by "obtain[ing] from the Social Security Administration (SSA) . . . the most currently available mean and median annual earnings of the students who completed the GE program during the cohort period and who are not excluded." 79 Fed. Reg. at 65,009 (to be codified at 34 C.F.R. § 668.404(c)). On information and belief, the Department intends the term "annual earnings" to take its plain meaning—earnings earned during the calendar year.

194.    However, the GE Rules provide no means to adjust the D/E Rates for graduates who obtain employment in the middle of year. Without some mechanism to prorate partial-year incomes, the GE Rules treat programs that produce graduates who earn $60,000 annually, but commenced working in the last two months of the year, the same as programs whose graduates worked a full year but earn $10,000 annually. This result is arbitrary, capricious, and irrational.

195.    For all these reasons, the Department's presumption that the SSA data is valid is arbitrary, capricious, inaccurate, and unsupported by substantial evidence, and its methodology flawed and irrational.

### H.    The GE Rules Are Arbitrary And Capricious Because They Do Not Make Any Adjustment For Economic Cycles

196.    The GE Rules also do not provide for any adjustment based on geographic differences or economic cycles, such as the most recent recession. The unemployment rate for 2008 bachelor degree graduates, at the onset of the recession, was approximately twice as high as the unemployment rate of comparable graduates in prior cycles. *The Condition of Education 2013: Labor Force Participation and Unemployment Rates by Educational Attainment,* U.S.

Department of Education, National Center for Education Statistics, (May 2013), http://nces.ed.gov/pubsearch/pubsinfo.asp?pubid=2013037. This chart excerpted from the First Cornell Report illustrates the difference in the national employment rate between 2007 and 2014:



197.    Because unemployed cohort members would almost certainly have zero earnings in a given year, the D/E Rates would increase accordingly. The short cohort periods would cause programs to fail the GE Rules metric due to variability in the unemployment rate for the overall economy. The result is that good programs may fail during poor economic conditions, and bad programs pass during good economic conditions.

198.    The Department's explanation for disregarding economic cycles, which are universally recognized as a recurring element of our economy, is that it is "unlikely" that "[a]n otherwise passing program" would "fall in the zone for four consecutive years due to an economic downturn or fluctuations within the local labor markets," because the average length of recessions since 1945 is 11.1 months. 79 Fed. Reg. 64,920, 64,924, 64,926. However, the Department offers no data to back up this assumption. Indeed, the Department simply ignores a wealth of studies showing that recessions typically have lingering effects on the economy for many years, long after the official recession has ended.

199.    The Department's failure to account for economic cycles in the GE Rules is arbitrary, capricious, unsupported by substantial evidence, and irrational.

## I.    The GE Rules Are Arbitrary And Capricious Because They Exclude Non-Title IV Students

200.    The GE Rules are arbitrary and capricious and without rational basis because they exclude students who do not receive Title IV funding from the calculation of the D/E Rates.

201.    *First*, the Department has failed to provide any explanation for whether it accounted for this exclusion of data for non-Title IV certain students in designing the GE Rules' metrics and, if so, how. If an agency disregards a significant set of facts (in this case, the underlying earnings data related to non-Title IV students), the agency must provide justification for the standard to be applied to the modified set of facts.

202.    *Second*, the Department's new GE Rules implicitly rest on findings that contradict its prior policy, but the Department never explains how its current policy could possibly comport with its prior conclusion. Indeed, the Department had concluded that inclusion of non-Title IV students was so important to the integrity of the GE Rules that it told the District Court that *it could not proceed* with the GE Rules without the non-Title IV data because it would be "unable to calculate a program's repayment rate and debt-to-income ratios, even for informational purposes, without the data that was to be reported." *Ass'n of Private Sector Colls. & Univs. v. Duncan*, 930 F. Supp. 2d 210, 221 (D.D.C. 2013). And at the outset of the NPRM, the Department acknowledges that limiting the definition of "student" to those individuals who received Title IV Program funds is "a significant difference between the proposed regulations and the 2011 regulations." 75 Fed. Reg. 16,433.

203.    The Department did not substantively address the issue in the Preamble to the final Rule. 79 Fed. Reg. 64,896. However, in the NPRM, the Department attempted to justify

excluding non-Title IV students on the grounds that its new approach "aligned with the court's interpretation in *APSCU v. Duncan*" of relevant law regarding the Department's authority to maintain records in its NSLDS.  75 Fed. Reg. 16,438.

204.    An attempt to align itself with a court decision that held the Department could not legally collect private student information does not authorize the Department to arbitrarily proceed without the data, nor absolve the Department from its obligation to articulate a satisfactory explanation for its action.  It has failed to do so in promulgating the new GE Rules, and therefore, the Rules must be considered arbitrary and capricious.

205.    *Third*, the exclusion of non-Title IV recipients is arbitrary and capricious because it increases the variability by decreasing the population of the students measured.  For example, in a program with 80 graduates per year, if fewer than 30 graduates received Title IV funding over four years, the program is not subject to evaluation under the D/E Rates, even if the program entirely failed in preparing the graduates for employment.

206.    *Fourth*, the exclusion of non-Title IV students from the metrics is arbitrary and capricious because it will significantly skew outcomes.  Moreover, the skewing is sure to drive up the D/E Rates because students who do not receive Title IV funds probably have little if any debt.  Thus, by excluding such students, the Department would also drive up the D/E Rates to the disadvantage of the institutions that offer gainful employment programs.

207.    Thus, there is no rational basis to evaluate gainful employment programs based on a fraction of a program's student body, and the Department's decision to implement the GE Rules despite the fact it could not include non-Title IV students is arbitrary and capricious.

**J.      The GE Rules Are Arbitrary And Capricious**
**Because They Do Not Include A Graduation Rate Requirement**

208.      Virtually every analysis of whether an academic program is successful includes an examination of its graduation rates.  If students do not complete a program, it is much more difficult to achieve gainful employment in their field.  When coupled with the GE Rules' requirement of 30 completers, the Department's decision to exclude graduation rates from the GE metrics is arbitrary and capricious because it perniciously provides institutions a disincentive to improve their graduation rates.  This is not a theoretical problem:  89% of the programs at public colleges subject to these Rules are exempt in the first year simply because not enough students graduate.

**K.      The GE Rules Are Arbitrary And Capricious Because They Allow**
**Programs To Pass Where Fewer Than 50% Of The Graduates**
**Borrow Regardless Of Whether The Program Otherwise Meets**
**The D/E Rates' Thresholds.**

209.      The GE Rules are supposedly intended to prevent institutions from saddling students with debt they can't afford.  Inexplicably, the D/E Rates' metrics fail to protect borrowers by automatically passing any program where less than 50% of the students borrow.  Thus, a program with 100 graduates where 49 took Title IV loans will automatically pass even if all 49 borrowers default, have a 20% debt to earnings rate, and earn low salaries.

**L.      The GE Rules Are Irrational Because They Disproportionately**
**Harm Well Performing Programs At Proprietary Colleges And**
**Inexplicably Exempt Programs At Poorly Performing Public Colleges.**

210.      Programs at APC member colleges with a history of excellence with high graduation rates and low default rates will fail the GE Rules, while almost every program at the public colleges with the highest default rates, lowest graduation rates, highest

number of defaulters and default rates higher than graduation rates, will pass the GE Rules. This result is arbitrary and capricious.

### M.    The GE Rules Are Arbitrary And Capricious Because They Will Mislead Students And The Public

211.    The GE Rules require debt to earnings data and extensive additional disclosures from GE programs, while failing to require the same disclosures from identical public and non-profit degree programs. Most APC members compete almost exclusively with public and non-profit colleges. The GE Rules require disclosure of data for APC college programs, but do not require the same data for public and non-profit programs. Students considering a degree program from an APC college may choose not to attend because of the data disclosed, but they may attend a public or non-profit college program with worse D/E Rates, worse default rates, and worse repayment rates because the Department has refused to require disclosure by these other institutions.

### N.    The GE Rules Are Arbitrary And Capricious Because They Hold GE Programs Responsible For Students' Personal Choices

212.    The GE Rules arbitrarily use student earnings as a proxy to measure a program's quality. As discussed in numerous comments to the NPRM, the GE Rules punish GE programs for the personal decisions of their students, choices over which the institutions and the GE programs exercise no control.

213.    After completing a GE program, a student may choose to accept a lower salary for numerous reasons unrelated to the quality of the education, such as a desire to work in the non-profit field, become a homemaker, not enter the workforce to take care of a sick relative, accept an apprenticeship that pays poorly in the short term but promises high pay in the long term, or be forced into a non-employed status as a result of personal injury or illness that prevents the student from working (short of permanent disability).

214.   The Department's response to commenters' concerns was simply to deny the obvious. The Department claims that somehow the D/E Rates do not "hold[] schools responsible for a student's career decisions." 79 Fed. Reg. 64,895. The Department opines without evidence that: "In examining programs generating an unusually large number of graduates without full-time employment, the Department believes it is reasonable to attribute this outcome less to individual student choices than to the performance of the program itself." 79 Fed. Reg. 64,926.

215.   The Department's refusal to account for graduates' circumstances such as childbirth, illness, caretaker needs, and the like that could impact their employment is unreasonable. The Department's ideologically driven GE Rules arbitrarily adopt standards that do not consider any of these matters, regardless of whether those standards actually measure program quality or a student's return on his or her educational investment.

### O.   The GE Rules Are Arbitrary And Capricious Because They Are Inconsistent With The Department's Prior Interpretation

216.   The Department acted arbitrarily and capriciously in adopting the GE Rules because those rules depart from the Department's prior position in numerous respects with no explanation, including the following:

217.   *First,* prior to promulgating the 2011 GE Rules, the Department considered only whether a program prepared students for a job that pays, not elaborate student debt equations, when determining whether a program was eligible for Title IV funds. Since the Department adopted the "a job that pays" interpretation, Congress has amended the HEA several times without revising the gainful employment language. Drastically departing from previous precedent without adequate explanation renders the GE Rules arbitrary and capricious.

218.   *Second,* the current GE Rules are also arbitrary and capricious because they inexplicably depart from the metrics that the Department so vociferously defended less than

three years ago. Under the prior 2011 GE Rules, a program would pass if it had a 12% or lower D/E Rate. Now, without adequate explanation, the Department has tightened that passing threshold to 8%, which has the effect of increasing the income necessary to pass with the same level of debt by 50%. The Department has provided no explanation as to why its definition of what it means to be gainfully employed has changed in such a short period.

## IRREPARABLE HARM

219.   The GE Rules are causing, and will continue to cause, irreparable harm to APC and its members, thereby entitling them to declaratory and injunctive relief for multiple reasons, including the following:

220.   *First*, the denial of constitutional rights constitutes immediate and irreparable harm. As described above, the GE Rules constitute a clear violation of due process rights.

221.   *Second*, the existence of the GE Rules is causing turmoil, expense, and enormous time and effort, as APC and its member colleges struggle to determine how to comply with the unreasonable GE Rules and take other steps in an attempt to ameliorate the effects of the GE Rules. Significant resources that were previously devoted to educational offerings for students must now be diverted to compliance and litigation issues that will arise as a result of the GE Rules' vague and overbroad scope, which has caused and will continue to cause APC and its members to incur significant and unrecoverable costs.

222.   *Third*, the GE Rules directly mandate the imposition of draconian penalties and the loss of eligibility of federal aid for programs at APC member colleges resulting from application of irrational, arbitrary, and capricious metrics. Moreover, the GE Rules require numerous additional disclosures and reporting by APC member colleges under complex, ambiguous, and irrational reporting requirements. Because it will be very difficult, if not

impossible, to avoid errors and inconsistencies in complying with these new detailed reporting requirements, APC member colleges are likely to face disproportionate, extreme sanctions.

223.    For these and other reasons, the GE Rules are directly and immediately causing and will continue to cause APC and its member colleges immediate and irreparable harm, entitling them to declaratory and permanent injunctive relief.

## CLAIMS FOR RELIEF

### First Claim For Relief

#### No Statutory Authority To Impose
#### A Regulatory Regime Inconsistent With State Regulation

224.   APC repeats, realleges, and incorporates by reference each of the preceding paragraphs as though fully set forth herein.

225.   The GE Rules improperly exceed the statutory authority Congress granted to the Defendants and violate Congressional intent, thereby entitling APC to relief pursuant to 5 U.S.C. § 706(2).

226.   Among other things, Congress never intended, under the guise of the phrase "prepare students for gainful employment in a recognized occupation," to permit the Department to usurp the authority of the New York State Board of Regents to establish regulations and strict educational standards determining whether programs meet acceptable educational standards.

227.   To the contrary, the HEA expressly prohibits "any department, agency, officer, or employee of the United States [from] exercis[ing] any direction, supervision, or control over the curriculum, program of instruction, administration, or personnel of any educational institution, school, or school system." 20 U.S.C. § 1232a.  The GE Rules violate this provision because they in effect dictate which programs an institution can provide.  The GE Rules set the Department up as a "national school board," a result Congress specifically sought to prohibit by the passage of 20 U.S.C. § 1232a.

228.   Accordingly, the GE Rules are in excess of statutory authority, jurisdiction, and limitations and are not in accordance with law, in violation of 5 U.S.C. § 706(2), including without limitation §§ 706(2)(A) and 706(2)(C).

**Second Claim For Relief**

**The GE Rules' Failure To Make Allowances For
The New York State Regulatory Scheme Applicable To APC
Members Is Arbitrary, Capricious, And Otherwise Contrary To Law**

229. APC repeats, realleges, and incorporates by reference each of the preceding paragraphs as though fully set forth herein.

230. The GE Rules' failure to take into account the regulatory scheme applicable to APC members is arbitrary, capricious, and otherwise contrary to law, thereby entitling APC to relief pursuant to 5 U.S.C. § 706(2).

231. The Department, in promulgating the irrational and flawed GE Rules, impermissibly did not consider that the APC colleges are degree-granting institutions regulated by the New York State Board of Regents. The Board of Regents has adopted stringent rules requiring APC members to comply with the same rules and regulations, offer the same types of programs and courses, and essentially function in the same manner as the other public and private non-profit educational institutions that it regulates.

232. Among other things, the Board of Regents mandates, by type and level of degree, a minimum number of liberal arts credits that "shall not be directed toward specific occupational or professional objectives." Approval and review of programs includes a review of curricula, faculty, financial resources, and infrastructure that supports the goals and objectives of the program. The Board of Regents examines programs offered by colleges and universities to ensure colleges and universities are offering programs that meet high educational standards.

233. The GE Rules are inconsistent with New York's requirements for degree-granting institutions and would essentially require APC members to focus on short-term programs designed to obtain the highest salary immediately after graduation, rather than programs that

provide students with the ability to think, communicate effectively and provide the foundation for lifelong learning.

234.    As described above, the GE metrics are directly to the contrary, measure the success of a program only a few years after graduation, and do not contain any provisions, such as a carve-out for proprietary colleges whose state regulators require them to offer broad based degree programs, that would appropriately take into account the state-based regulation.

235.    Accordingly, the GE Rules are arbitrary, capricious, an abuse of discretion, lack substantial evidence, or otherwise are not in accordance with law, in violation of 5 U.S.C. § 706(2), including without limitation §§ 706(2)(A) and 706(2)(C).

### Third Claim For Relief

### Use Of SSA Data Violates Due Process

236.    APC repeats, realleges, and incorporates by reference each of the preceding paragraphs as though fully set forth herein.

237.    The GE Rules violate Plaintiffs' rights under the Due Process Clause of the United States Constitution because of, among other things, the following:

238.    The GE Rules violate APC's and its members' Fifth Amendment right to due process of law because they do not provide eligible institutions with the right to notice and a meaningful hearing, do not provide them with the right to see the evidence against them, and do not articulate any standards to guide the Secretary's discretion in imposing a penalty, by among other things:

    a.    failing to provide a meaningful hearing;

    b.    failing to give institutions access to the SSA data used to calculate the debt-to-earnings metric;

    c.   improperly presuming that SSA data accurately represents gainful employment program graduates' earnings when the data does not;

    d.   precluding the Department from considering "[a]ny objection to the mean or median annual earnings that SSA provided to the Secretary" (79 Fed. Reg. 65,010 (to be codified at 34 C.F.R. § 668.405(f)(3)(i)); and

    e.   impermissibly imposing vague and ambiguous standards so that schools cannot reasonably determine what is expected of them.

239.    Accordingly, the GE Rules are contrary to constitutional right, power, privilege, or immunity, in violation of 5 U.S.C. § 706(2), including without limitation § 706(2)(B).

## Fourth Claim For Relief

## GE Rules' Retroactivity Violates Due Process

240.    APC repeats, realleges, and incorporates by reference each of the preceding paragraphs as though fully set forth herein.

241.    The GE Rules violate APC's and its members' Fifth Amendment right to due process of law because they are impermissibly retroactive.

242.    Accordingly, the GE Rules are contrary to constitutional right, power, privilege, or immunity, in violation of 5 U.S.C. § 706(2), including without limitation § 706(2)(B).

## Fifth Claim For Relief

## Certification Provisions Violate Due Process

243.    APC repeats, realleges, and incorporates by reference each of the preceding paragraphs as though fully set forth herein.

244.    The certification provisions in the GE Rules violate Plaintiffs' rights under the Due Process Clause of the United States Constitution because of, among other things, the following:

245.    The certification provisions in the GE Rules violate APC's and its members' Fifth Amendment right to due process of law because they do not provide eligible institutions with the right to notice and a meaningful hearing, and do not articulate any standards to guide the Secretary's discretion in imposing a penalty, by, among other things, imposing a certification requirement on educational institutions that is vague and ambiguous. The certification requirement leaves schools unable to reasonably determine what is expected of them when certifying that their programs meet certain professional licensure requirements.

246.    Accordingly, the GE Rules are contrary to constitutional right, power, privilege, or immunity, in violation of 5 U.S.C. § 706(2), including without limitation § 706(2)(B).

### Sixth Claim For Relief

### No Statutory Authority For GE Rules

247.    APC repeats, realleges, and incorporates by reference each of the preceding paragraphs as though fully set forth herein.

248.    The GE Rules improperly exceed the statutory authority Congress granted to the Defendants and violate the limitations Congress imposed, thereby entitling APC to relief pursuant to 5 U.S.C. § 706(2).

249.    Among other things, the GE Rules exceed the Defendants' statutory authority, violate statutory limitations imposed on the Defendants, and are otherwise contrary to law because, among other things, the GE Rules:

a.    permit the Defendants to impose automatic sanctions including loss of eligibility without the required notice and opportunity for a hearing required by 20 U.S.C. § 1094;

b.    exceed the Department's authority because, among other things, 20 U.S.C §§ 1001(b)(1), 1002(b)(1)(A)(i), 1002(c)(1)(A), and 1088(b)(1)(A)(i), do not

authorize the Department to determine whether an educational program prepares students for gainful employment in a recognized occupation based on the GE metrics; and

c.    conflict with the statutory framework and usurp the traditional role of accrediting bodies, to which Congress has explicitly assigned responsibility for evaluating "student achievement." 20 U.S.C. § 1099b(a).

250.    Accordingly, the GE Rules are in excess of statutory authority, jurisdiction, and limitations and are not in accordance with law, in violation of 5 U.S.C. § 706(2), including without limitation §§ 706(2)(A) and 706(2)(C).

**Seventh Claim For Relief**

**Violation of 20 U.S.C. § 1015c**

251.    APC repeats, realleges, and incorporates by reference each of the preceding paragraphs as though fully set forth herein.

252.    The GE Rules improperly exceed the statutory authority Congress granted to the Defendants and violate the limitations Congress imposed, thereby entitling APC to relief pursuant to 5 U.S.C. § 706(2).

253.    Among other things, the GE Rules exceed the Defendants' statutory authority, violate statutory limitations imposed on the Defendants, and are otherwise contrary to law because 20 U.S.C. § 1015c precludes the Department from collecting any information on non-Title IV loans.

254.    Accordingly, the GE Rules are in excess of statutory authority, jurisdiction, and limitations and are not in accordance with law, in violation of 5 U.S.C. § 706(2), including without limitation §§ 706(2)(A) and 706(2)(C).

## Eighth Claim For Relief

### Improper Procedure In Adopting
### [The GE Rules And Disclosure and Reporting Requirements

255.    APC repeats, realleges, and incorporates by reference each of the preceding paragraphs as though fully set forth herein.

256.    The Defendants violated the provisions of 20 U.S.C. § 1098a and 5 U.S.C. § 553(c) by failing to observe the procedures set forth therein, thereby entitling APC to relief pursuant to 5 U.S.C. § 706(2).

257.    Among other things, the Defendants did not provide for a comprehensive discussion and exchange of information, did not provide comprehensive data tailored to the new metrics as it did just three years earlier with respect to the prior rule, did not take into account the information received, did not properly consider the comments of the public, and improperly adopted a truncated timetable to discourage public comment.

258.    Accordingly, the GE Rules are arbitrary, capricious, an abuse of discretion, lack substantial evidence, or otherwise are not in accordance with law, in violation of 5 U.S.C. § 706(2), including without limitation §§ 706(2)(A) and 706(2)(D).

## Ninth Claim For Relief

### The GE Rules Are Arbitrary,
### Capricious, And Otherwise Contrary To Law

259.    APC repeats, realleges, and incorporates by reference each of the preceding paragraphs as though fully set forth herein.

260.    The GE Rules are arbitrary, capricious, unsupported by substantial evidence, and otherwise contrary to law in numerous respects, thereby entitling APC to relief pursuant to 5 U.S.C. § 706(2).  The Department, in promulgating the irrational and flawed GE Rules, did not examine the relevant data; did not base their regulations on the best available data and statistical

methods; failed to articulate a satisfactory explanation for its action, including a rational connection between the facts found and the choice made; failed to cogently explain why it has exercised its discretion in a given manner; and failed to provide a reasoned explanation for disregarding facts and circumstances that underlay or were engendered by the prior policy. Moreover, the explanation for the GE Rules offered by the Department runs counter to the evidence before the agency and is unsupported by substantial evidence. The GE Rules are not within the scope of the Department's lawful authority, and the process by which it reached the conclusions contained in the GE Rules is illogical and irrational.

261.    In this regard, among other things, the Department, in promulgating the GE Rules, arbitrarily, capriciously, and without justification:

        a.        violated its own Quality Guidelines;

        b.     failed to use the best available data, used a flawed regression analysis, and failed to properly evaluate and consider the magnitude of the effect of the GE Rules on students and institutions because it employed flawed evaluation techniques;

        c.     failed to make appropriate allowances for the fact that APC members are degree-granting institutions regulated by the New York Board of Regents, which has imposed requirements on the APC institutions inconsistent with the GE Rules;

        d.     crafted deeply flawed and illogical metrics that, rather than measuring whether a program provides an education leading to gainful employment, substantially measure student characteristics, such as race and social economic status, without any evidence that the D/E Rates measure whether a program provides an education leading to gainful employment;

e.   violated well-accepted economic and statistical principles in promulgating regulations that irrationally and improperly are based on students' income just a few years out of school;

f.   irrationally adopted 8 % and 20 % thresholds for the D/E metrics that rely on irrelevant and outdated mortgage practices that were rejected as a standard for measuring manageable student debt by the very study on which they rely;

g.   improperly mandated the use of inaccurate SSA data to measure student income, and then provided the inaccurate data with a presumption of correctness that an institution cannot challenge;

h.   impermissibly presumed, in calculating the D/E Rates, that most students in every program receive a majority of unsubsidized federal loans, which carry a higher interest rate that subsidized federal loans;

i.   improperly failed to make any adjustment in the GE Rules to account for economic cycles;

j.   improperly excluded students who do not receive Title IV funding from the data set from which the GE metrics are calculated;

k.   failed to include a graduation rate in the GE metrics;

l.   provided for automatically passing programs where fewer than 50% of the students borrow;

m.   irrationally harm well performing programs at proprietary colleges and exempt programs at poor performing public colleges;

n.   adopted regulations that are inconsistent with the Department's prior GE Rules;

o.     adopted regulations that illogically impose sanctions on institutions for students'
choices that have no bearing on whether they offered programs preparing students
for gainful employment;

p.     failed to provide any explanation for the draconian changes between the 2014 GE
Rules and the prior 2011 GE Rules; and

q.     impermissibly imposed a certification requirement on educational institutions that
is vague and ambiguous, leaving schools unable to reasonably determine what is
expected of them when certifying that their programs meet certain professional
licensure requirements.

262.     Accordingly, the GE Rules are arbitrary, capricious, an abuse of discretion, lack
substantial evidence, or otherwise are not in accordance with law, in violation of 5 U.S.C.
§ 706(2), including without limitation § 706(2)(A).

## PRAYER FOR RELIEF

Wherefore, APC respectfully requests that this Court:

(a)     Declare that the GE Rules are unconstitutional, exceed the Defendants' authority,
are arbitrary and capricious, are unsupported by substantial evidence, and otherwise are contrary
to law;

(b)     Hold unlawful, vacate, and set aside the GE Rules;

(c)     Declare that any action taken by Defendants pursuant to the GE Rules, are null
and void;

(d)     Enjoin the Defendants and their officers, employees, and agents from
implementing, applying, or taking any action whatsoever pursuant to the GE Rules;

(e)     Issue all process necessary and appropriate to postpone the effective date of the
GE Rules, and to maintain the status quo pending the conclusion of this case;

(f)     Award APC its costs and reasonable attorneys' fees as authorized and appropriate; and

(g)     Award such other relief as may be just and proper.

Dated:  New York, New York
        November 6, 2014

                                Respectfully submitted,

                                COOLEY LLP

                                By:

                                    William Schwartz
                                    Michael Blasie

                                1114 Avenue of the Americas
                                New York, New York  10036-7798
                                Tel:    (212) 479-6200
                                Email: wschwartz@cooley.com