**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
                                                 :

ASSOCIATION OF PROPRIETARY        :
COLLEGES,                                :       Case No.  14-cv-8838-LAK
                                              :

                    Plaintiff,        :
               v.                  :
                                              :

ARNE DUNCAN, in his official capacity   :
as Secretary of the Department of Education,  :
                                            :

                    and               :
                                              :

THE DEPARTMENT OF EDUCATION,      :
                                            :

                    Defendants.    :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

# MEMORANDUM OF LAW IN SUPPORT
## OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ....................................................................... iii

I. PRELIMINARY STATEMENT ............................................................ 1

II. APPLICABLE FACTS ........................................................................ 4

    A.    Background Of GE Rules. ............................................................ 4

    B.    The Current GE Rules. ............................................................... 5

    C.    The APC Colleges. ..................................................................... 7

III. SUMMARY JUDGMENT STANDARD ............................................. 8

IV. ARGUMENT ....................................................................................... 8

    A.    THE GE RULES VIOLATE THE DUE PROCESS CLAUSE ........................... 8

        1.    Educational Institutions Have A Due Process Right With Respect To The Continuing Title IV Eligibility Of Their Programs. ..................... 8

        2.    The GE Rules Violate Due Process Because The Department Denies Institutions The Right To See The Evidence Used Against Them. ...................... 9

        3.    The GE Rules Violate Due Process Because The Department Improperly Presumes That The SSA Earnings Data Is Accurate. ........... 12

        4.    The GE Rules Violate Due Process Because They Punish Institutions Retroactively For Prior Conduct. .......................... 14

    B.    THE GE RULES EXCEED THE DEPARTMENT'S AUTHORITY. .............. 18

        1.    Standard of Review. .............................................................. 18

        2.    The HEA's Plain Language Forecloses The Department's Interpretation. .................................................................. 19

        3.    Numerous Canons Of Construction Establish That The Department Has Exceeded Its Statutory Authority. ........................ 22

        4.    The Legislative History Establishes That Congress Did Not Intend To Empower The Department To Deny Eligibility Based On Its Conclusion Regarding The Quality Of An Educational Program. .......... 27

    C.    THE GE RULES ARE ULTRA VIRES BECAUSE THEY VIOLATE OTHER NON-GAINFUL EMPLOYMENT PROVISIONS OF THE HEA. ...................... 29

        1.    The GE Rules Violate Federal Law Deferring To The Educational Standards Of State Authorities, Such As The Board Of Regents. ........... 29

        2.    The GE Rules Violate Congress's Prohibition On The Creation Of Student Information Databases. ............................................. 30

3.      The GE Rules Violate The HEA By Denying Institutions The
        Statutory Right To A Hearing Prior To A Limitation Of Eligibility. ...... 31

D.      THE GE RULES VIOLATE THE ADMINISTRATIVE PROCEDURE
        ACT. ................................................................................................... 32

        1.      The Administrative Procedure Act Standard Of Review. ....................... 32

        2.      The GE Rules Are Arbitrary And Capricious Because There Is No
                Evidence They Measure Program Quality. .............................................. 33

        3.      The GE Rules Employ An Irrational Methodology. ................................ 37

        4.      The D/E Rates' Use Of 8 Percent And 20 Percent Thresholds,
                Based On Irrelevant Mortgage Practices, Is Arbitrary And
                Capricious. ............................................................................................ 42

        5.      The D/E Rates' Use Of SSA Data Is Arbitrary And Capricious. ........... 46

        6.      The GE Rules Produce Irrational Results. .............................................. 47

        7.      The GE Rules Improperly Exclude Non-Title IV Students. ................... 50

        8.      The GE Rules Are Arbitrary And Capricious Because They Are
                Inconsistent With The Department's Prior Interpretation. ..................... 52

        9.      The D/E Rates Irrationally Make No Allowance For Economic
                Cycles. .................................................................................................. 52

V.  CONCLUSION ................................................................................................ 54

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*In re Acad. for Jewish Educ.*,
  No. 94-11-EA, 1994 WL 1026087 (Dep't of Ed. Mar. 23, 1994) ..........................................27

*Allentown Mack Sales & Serv., Inc. v. NLRB*,
  522 U.S. 359, 118 S. Ct. 818 (1998) .......................................................................32, 37, 47

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242, 106 S. Ct. 2505 (1986) .............................................................................8

*Andre v. Chater*,
  910 F. Supp. 1352 (S.D. Ind. 1995) ...............................................................................47

*Ass'n of Private Colls. & Univs. v. Duncan*,
  870 F. Supp. 2d 133 (D.D.C. 2012) .........................................................................*passim*

*Ass'n of Private Sector Colls. & Univs. v. Duncan*,
  930 F. Supp. 2d 210 (D.D.C. 2013) ...........................................................................31, 51

*Ass'n of Private Sector Colls. & Univs. v. Duncan*,
  No. 14-cv-277, slip op. (D.D.C. Oct. 2, 2014) .........................................................*passim*

*Baystate Med. Ctr. v. Leavitt*,
  545 F. Supp. 2d 20 (D.D.C. 2008) .................................................................................14

*Begay v. United States*,
  553 U.S. 137, 128 S. Ct. 1581 (2008) .............................................................................21

*Bergamo v. Commodity Futures Trading Comm'n*,
  192 F.3d 78 (2d Cir. 1999) .............................................................................................33

*Bowen v. Georgetown Univ. Hosp.*,
  488 U.S. 204, 109 S. Ct. 468 (1988) .........................................................................19, 22

*Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*,
  419 U.S. 281, 95 S. Ct. 438 (1974) ...........................................................................10, 11

*Boyle v. United States*,
  556 U.S. 938, 129 S. Ct. 2237 (2009) .............................................................................20

*C.I.R. v. Keystone Consol. Indus., Inc.*,
  508 U.S. 152, 113 S. Ct. 2006 (1993) .............................................................................22

*Caldwell v. Spears*,
  973 F. Supp. 406 (S.D.N.Y. 1997) .................................................................................19

*Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*,
    467 U.S. 837, 104 S. Ct. 2778 (1984)................................................................18, 19

*Cohen v. JP Morgan Chase & Co.*,
    498 F.3d 111 (2d Cir. 2007)................................................................19, 20, 21, 22

*Colo. Indian Tribes v. Nat'l Indian Gaming Comm'n*,
    466 F.3d 134 (D.C. Cir. 2006)................................................................................25

*Commodity Futures Trading Comm'n v. Schor*,
    478 U.S. 833, 106 S. Ct. 3245 (1986)....................................................................26

*Cont'l Training Serv., Inc. v. Cavazos*,
    893 F.2d 877 (7th Cir. 1990) ...................................................................................9

*Cooper v. Salazar*,
    No. 98 C 2930, 2001 WL 1351121 (N.D. Ill. Nov. 1, 2001)...................................11

*Dodd v. United States*,
    545 U.S. 353, 125 S. Ct. 2478 (2005).....................................................................21

*Escalera v. New York City Hous. Auth.*,
    425 F.2d 853 (2d Cir. 1970)....................................................................................10

*F.C.C. v. Fox Television Stations, Inc.*,
    556 U.S. 502, 129 S. Ct. 1800 (2009).....................................................................33

*FDA v. Brown & Williamson Tobacco Corp.*,
    529 U.S. 120, 120 S. Ct. 1291 (2000).................................................................23, 24

*Fed. Election Comm'n v. Hall-Tyner Election Campaign Comm.*,
    524 F. Supp. 955 (S.D.N.Y. 1981), *aff'd*, 678 F.2d 416 (2d Cir. 1982) ...................4

*Franklin Nat'l Bank v. New York*,
    347 U.S. 373, 74 S. Ct. 550 (1954).........................................................................26

*Friends of Boundary Waters Wilderness v. Bosworth*,
    437 F.3d 815 (8th Cir. 2006) ..................................................................................37

*Goldberg v. Kelly*,
    397 U.S. 254, 90 S. Ct. 1011 (1970).....................................................................9, 10

*Grimes v. Vitalink Commc'ns Corp.*,
    No. 12334, 1997 WL 538676 (Del. Ch. Aug. 28, 1997) ........................................39

*Guertin v. U.S.*,
    743 F.3d 382 (2d Cir. 2014)....................................................................................33

*Hearth, Patio & Barbecue Ass'n v. U.S. Dep't of Energy,*
    706 F.3d 499 (D.C. Cir. 2013) ...................................................................................25

*Hedges v. Obama,*
    724 F.3d 170 (2d Cir. 2013) ...................................................................................18

*Hem v. Maurer,*
    458 F.3d 1185 (10th Cir. 2006) ...............................................................................15

*High Sierra Hikers Assn v. Weingardt,*
    521 F. Supp. 2d 1065 (N.D. Cal. 2007) ...................................................................37

*Ind. Mich. Power Co. v. Dep't of Energy*,
    88 F.3d 1272 (D.C. Cir. 1996) ................................................................................19

*Interboro Inst., Inc. v. Maurer,*
    956 F. Supp. 188 (N.D.N.Y. 1997) ...........................................................................9

*Islander E. Pipeline Co., LLC v. Conn. Dep't of Envtl. Prot.*,
    482 F.3d 79 (2d Cir. 2006) ......................................................................................42

*Landgraf v. USI Film Prods.*,
    511 U.S. 244, 114 S. Ct. 1483 (1994) ...............................................................15, 16

*Link v. Receivers of Seaboard Air Line Ry. Co.*,
    73 F.2d 149 (4th Cir. 1934) .....................................................................................15

*Mathews v. Eldridge,*
    424 U.S. 319, 96 S. Ct. 893 (1976) ...........................................................................9

*MCI Telecomms. Corp. v. Am. Tel. & Tel. Co.*,
    512 U.S. 218, 114 S. Ct. 2231-32 (1994) ................................................................23

*In re Methyl Tertiary Butyl Ether (MTBE) Products Liab. Litig.,*
    No. 07 CIV. 10470, 2013 WL 6869410 (S.D.N.Y. Dec. 30, 2013)..........................4

*Midtown Sch. of Bus., Inc. v. Foley,*
    No. 90-CV-172, 1990 WL 21287 (N.D.N.Y. Feb. 26, 1990) ....................................9

*Mildred Elley Bus. Sch., Inc. v. Riley*,
    975 F. Supp. 434 (N.D.N.Y. 1997) ...........................................................................9

*Mitchell v. Lara,*
    11 CIV. 1540 LBS, 2011 WL 5075117 (S.D.N.Y. Oct. 25, 2011)..........................33

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29, 103 S. Ct. 2856 (1983)...............................................32, 34, 38, 49

*Nat'l Audubon Soc'y. v. Hoffman*,
    132 F.3d 7 (2d Cir. 1997) ..................................................................................42

*Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*,
    545 U.S. 967, 125 S. Ct. 2688 (2005) ...........................................................33, 45

*Natural Res. Def. Council, Inc. v. U.S. Food & Drug Admin.*,
    884 F. Supp. 2d 127 (S.D.N.Y. 2011) .............................................................18

*New York ex rel. New York State Office of Children & Family Servs. v.*
    *U.S. Dep't of Health & Human Services' Admin. for Children & Families*,
    556 F.3d 90 (2d Cir. 2009) ................................................................................27

*NLRB v. Baptist Hosp., Inc.*,
    442 U.S. 773, 99 S. Ct. 2598 (1979) ................................................................12

*NLRB v. Curtin Matheson Scientific, Inc.*,
    494 U.S. 775, 110 S. Ct. 1542 (1990) ..............................................................12

*Ohio Bell Tel. Co v. Pub. Utils. Commc'n of Ohio*,
    301 U.S. 292, 57 S. Ct. 724 (1937) ..................................................................10

*Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.*,
    469 U.S. 189, 105 S. Ct. 658 (1985) ................................................................19

*Parnell v. Rapides Parish Sch. Bd.*,
    425 F. Supp. 399 (W.D. La. 1976) .....................................................................9

*Picca v. Mukasey*,
    512 F.3d 75 (2d Cir. 2008) ................................................................................33

*Pierpoint v. Barnes*,
    94 F.3d 813 (2d Cir. 1996) ................................................................................28

*Pro Schs., Inc. v. Riley*,
    824 F. Supp. 1314 (E.D. Wis. 1993) ..................................................................9

*Rock of Ages Corp. v. Sec'y of Labor*,
    170 F.3d 148 (2d Cir. 1999) ..............................................................................47

*U.S. ex rel. Romano v. New York Presbyterian*,
    426 F. Supp. 2d 174 (S.D.N.Y. 2006) ................................................................8

*S. Dakota v. U.S. Dep't of Interior*,
    787 F. Supp. 2d 981 (D.S.D. 2011) ..................................................................11

*Sch. Dist. of City of Pontiac v. Sec'y of U.S. Dep't of Educ.*,
    584 F.3d 253 (6th Cir. 2009) ............................................................................23

*Sweet v. Sheahan*,
    235 F.3d 80 (2d Cir. 2000) ................................................................................. 15, 22

*Taylor v. Am. Specialty Retailing Grp., Inc.*,
    No. CIV.A. 19239, 2003 WL 21753752 (Del. Ch. July 25, 2003) ......................... 39

*Townley v. Heckler*,
    748 F.2d 109 (2d Cir. 1984) ....................................................................................... 10

*Veltri v. Abbott Severance Pay Plan for Employees of Kos Pharms.*,
    Civ. A. No. 08-00915 (PGS), 2013 WL 396127 (D.N.J. Jan. 30, 2013) ................ 47

*Wheeler v. Barrera*,
    417 U.S. 402, 94 S. Ct. 2274 (1974) ......................................................................... 29

*Whitman v. Am. Trucking Ass'ns, Inc.*,
    531 U.S. 457, 121 S. Ct. 903 (2001) ......................................................................... 23

*Williston Basin Interstate Pipeline Co. v. F.E.R.C.*,
    165 F.3d 54 (D.C. Cir. 1999) ...................................................................................... 11

*Yale-New Haven Hosp. v. Leavitt*,
    470 F.3d 71 (2d Cir. 2006) ......................................................................................... 42

*Yepes-Prado v. U.S. I.N.S.*,
    10 F.3d 1363 (9th Cir. 1993) ...................................................................................... 47

*Zia Hospice, Inc. v. Sebelius*,
    793 F. Supp. 2d 1289 (D.N.M. 2011) ........................................................................ 47

**Federal Statutes**

5 U.S.C. § 706(2) ................................................................................................................ 32

20 U.S.C. § 1001 ................................................................................................................. 4

20 U.S.C. § 1002 ........................................................................................................ 4, 5, 26

20 U.S.C. § 1015c ......................................................................................................... 30, 31

20 U.S.C. § 1036 ............................................................................................................... 22

20 U.S.C. § 1085 ......................................................................................................... 23, 25

20 U.S.C. § 1087e ............................................................................................................. 25

20 U.S.C. § 1088 ........................................................................................................ *passim*

20 U.S.C. § 1092 ............................................................................................................... 10

20 U.S.C. § 1092b ...................................................................................................31

20 U.S.C. § 1094 ..........................................................................................23, 26, 31

20 U.S.C. § 1099b ...................................................................................................24

20 U.S.C. § 1099c ...................................................................................................23

20 U.S.C. § 1134c ...................................................................................................22

20 U.S.C. § 1135c ...................................................................................................22

20 U.S.C. § 1161g ...................................................................................................22

20 U.S.C. § 1161l-3 .................................................................................................25

20 U.S.C. § 1232a ...................................................................................................29

20 U.S.C. § 2008 .....................................................................................................22

20 U.S.C. § 3403 .....................................................................................................29

20 U.S.C. § 4706 .....................................................................................................22

20 U.S.C. § 5605 .....................................................................................................22

26 U.S.C. § 6103 .....................................................................................................11

Pub. L. No. 88-210, § 8, 77 Stat. 403 (1963),Vocational Education Act .....................25

**State Statutes**

N.Y. Comp. Codes R. & Regs. tit. 8, § 52.1 (2014) ...................................................29

N.Y. Educ. Law § 5001 (2014)..................................................................................29

**Regulations**

34 C.F.R. § 600.5 ....................................................................................................26

34 C.F.R. § 602 .......................................................................................................24

34 C.F.R. § 668.8 .....................................................................................................27

34 C.F.R. § 668.88 ...................................................................................................32

34 C.F.R. § 668.402 ............................................................................................21, 53

34 C.F.R. § 668.403 ..........................................................................................6, 7, 46

34 C.F.R. § 668.404 ...............................................................................6, 16 38, 46, 48

34 C.F.R. § 668.405 ...............................................................................6, 10, 12

34 C.F.R. § 668.406 ...............................................................................11, 12

34 C.F.R. § 668.410 ...............................................................................7, 32, 50

34 C.F.R. § 668.412 ...............................................................................49

34 C.F.R. § 668.415 ...............................................................................8

79 Fed. Reg. 16,426, *et. seq.* (Mar. 25, 2014), Notice of Proposed Rulemaking ........................43

79 Fed. Reg. 64,890, *et. seq.* (Oct. 31, 2014), Final Gainful Employment Rules ................ *passim*

**Legislative History**

H. Rep. No. 6468, 89th Cong. (1965), National Vocational Student Loan
    Insurance Act of 1965, *Hearings Before the Select Subcomm. on
    Education of the Comm. on Education and Labor, First Session* ...............................25, 28, 29

H. Rep. No. 89-308, 89th Cong. (1965), National Vocational Student Loan
    Insurance Act of 1965 .........................................................................28

S. Rep. No. 89-758, 89th Cong. (1965), National Vocation Student Loan
    Insurance Act of 1965 .........................................................................27, 28

S. Rep. No. 92-346, 92nd Cong. (1971), Education Amendments of 1971 .................................20

**Secondary Sources**

Jaison R. Abel and Richard Deitz, *The Value of a College Degree*,
    http://libertystreeteconomics.newyorkfed.org/2014/09/the-value-of-a-college-
    degree.html#.VMFsvkfF_HV ........................................................................39

Association of Community College Trustees & American Association of Community
    Colleges, *Comments on Gainful Employment Rule* (May 27, 2014) ......................................48

Association of Proprietary Colleges, *Comments on Gainful Employment Notice
    of Proposed Rulemaking* (May 27, 2014) ........................................................ *passim*

Association of Proprietary Colleges, *Gainful Employment's Failing Grade*,
    http://gainfulemployment.apc-colleges.org/gainful-employments-failing-grade/ .................32

Association of Proprietary Colleges, *Member Colleges*, http://www.apc-
    colleges.org/main/member-colleges/ ........................................................7

Association of Proprietary Colleges, *Submission to U.S. Office of Management and Budget* (Oct. 9, 2014).......................................................................50

Sandy Baum & Marie O'Malley, *College on Credit: How Borrowers Perceive Their Education,* Journal of Student Financial Aid (2003) ....................43

Sandy Baum & Saul Schwartz, *How Much Debt Is Too Much? Defining Benchmarks For Managing Student Debt*, The College Board (2006) ..........................43, 44, 45

Gary S. Becker, *Human Capital: A Theoretical and Empirical Analysis with Special Reference to Education* (2d ed. 1975), http://www.nber.org/chapters/c3734.pdf ..................39

Eric Bettinger, *Imputation of Income Under Gainful Employment* (May 2014)....................13, 14

Meta Brown et al., *Just Released: Young Student Loan Borrowers Remained on the Sidelines of the Housing Market in 2013*, Federal Reserve Bank of New York: Liberty Street Economics (May 13, 2014), http://libertystreeteconomics.newyorkfed.org/2014/05/just-released-young-student -loan-borrowers-remained-on-the-sidelines-of-the-housing-market-in-2013.html#.U4Tm2_ldW4I.......................................................................44

Bureau of Labor Statistics, *Labor Force Statistics from the Current Population Survey*, http://data.bls.gov/timeseries/LNS14000000..............................................54

BusinessDictionary.com, http://www.businessdictionary.com/definition/gainful-employment.html .......................................................................20

Lewis Carroll, *Alice's Adventures in Wonderland*, https://ebooks.adelaide.edu.au/c/carroll/lewis/alice/chapter12.html ........................................9

Susan Choy et al., *Ten years After College: Comparing the Employment Experiences of 1992-93 Bachelor's Degree Recipients With Academic and Career-Oriented Majors,* http://nces.ed.gov/pubs2008/2008155.pdf.................................................38

Collins Dictionary, http://www.collinsdictionary.com/dictionary/english/gainful-employment?showCookiePolicy=true .......................................................................20

Consumer Financial Protection Bureau, *Summary of the Ability-to-Repay and Qualified Mortgage Rule and the Concurrent Proposal,* http://files.consumerfinance.gov/f/201301_cfpb_ability-to-repay-summary.pdf..................45

Bradford Cornell, *First Expert Report of Professor Bradford Cornell Regarding Proposed Gainful Employment Regulation* (May 27, 2014)......................... *passim*

Bradford Cornell, *Second Expert Report of Professor Bradford Cornell Regarding Proposed Gainful Employment Regulation* (May 27, 2014)....................44, 45, 49

Fannie Mae, *Selling Guide: Debt-to-Income Ratios* (2014),
 https://www.fanniemae.com/content/guide/selling/b3/6/02.html ...........................................45

Jonathan Guryan & Matthew Thompson, *Report on the Proposed Gainful
 Employment Regulation*, Charles River Associates (2014) .....................................4, 41, 49, 53

Illinois Student Assistance Commission, *Increasing College Access or Just Increasing
 Debt? A Discussion About Raising Student Loan Limits and the Impact on
 Illinois Students* (2001) .........................................................................................................43

Internal Revenue Service, *Tax Gap for Tax Year 2006,*
 http://www.irs.gov/pub/newsroom/overview_tax_gap_2006.pdf .........................................14

Mark Kantrowitz, *U.S. Department of Education Proposes Stricter Gainful
 Employment Rule* (April 2014) ..............................................................................................48

Longman Dictionary of Contemporary English,
 http://www.ldoceonline.com/dictionary/gainful ....................................................................20

Brian P. McCall, *Human Capital: A Theoretical and Empirical Analysis
 with Special Reference to Education* (2d ed. 1975) ................................................................39

Monroe College, *Comments on Gainful Employment Rule* (May 27, 2014) .................................4

National Center of Educational Statistics, *Glossary,*
 http://nces.ed.gov/statprog/2002/glossary.asp .......................................................................12

National Center of Educational Statistics, *NCES Standard 2-2-1,*
 http://nces.ed.gov/statprog/2002/std2_2.asp ..........................................................................12

New York State Education Department, *Graduation Rates,*
 http://www.highered.nysed.gov/oris/gradrates/ .........................................................................8

New York State Education Department, *Policy Statement on Liberal Arts
 and Sciences,* http://www.highered.nysed.gov/ocue/lrp/liberalarts.htm ...............................30

New York State Education Department, *Summary of New York Statutory
 and Regulatory Provisions Relating to Higher Education,*
 http://www.highered.nysed.gov/swp/#summary ....................................................................30

New York State Department of Labor, *Labor Force and Unemployment Data,*
 http://labor.ny.gov/stats/LSLAUS.shtm..................................................................................54

New York State Education Department, *Summary of New York Statutory and
 Regulatory Provisions Relating to Higher Education,*
 http://www.highered.nysed.gov/swp/#summary ....................................................................30

Oxford Advanced Learner's Dictionary,
    http://www.oxfordlearnersdictionaries.com/us/definition/english/gainful ............................20

Chris Ross & Nigel Gault, *Gainful Employment Rule Measures the Characteristics
    of the Students, Not the Effectiveness of the Programs* (May 2014) .........................35, 36, 50

Mark Schneider, *Are Graduates from Public Universities Gainfully Employed?*,
    American Enterprise Institute (May 2014) ......................................................................48, 51

Peter Schroder, *Audit to Determine Whether College Reg Was Leaked to Wall Street*,
    The Hill (2011), http://thehill.com/policy/finance/166087-dept-of-education-ig-
    looking-into-wall-street..............................................................................................................5

James H. Stock and Mark W. Watson, *Introduction to Econometrics:
    First Edition* (2003) .................................................................................................................36

U.S. Department of Education, *2012 GE Informational Rates*, (March 2014),
    http://www2.ed.gov/policy/highered/reg/hearulemaking/2012/
    gainfulemployment.html.............................................................................................................7

U.S. Department of Education, *A New System of College Ratings – Invitation
    to Comment* (Dec. 2014), http://www2.ed.gov/documents/college-affordability/
    framework-invitation-comment.pdf..........................................................................................41

U.S. Department of Education, *Accreditation in the United States*,
    https://www2.ed.gov/admins/finaid/accred/index.html?exp=0 ...............................................24

U.S. Department of Education, *Accreditation in the United States*,
    https://www2.ed.gov/admins/finaid/accred/accreditation_pg2.html#U.S ..............................24

U.S. Department of Education, *Defendants' Reply in Support of Their Cross-Motion for
    Summary Judgment, as filed in Ass'n of Private Sector Colls. & Univs. v. Duncan*,
    No. 1:11-cv-01314-RC, (D.D.C. Mar. 19, 2013) ....................................................................52

U.S. Department of Education, *Information Quality Guidelines*,
    http://www2.ed.gov/policy/gen/guid/iq/infoqualguide.pdf ..............................................33, 37

U.S. Department of Education, *Letter to N. Carroll* (Sept. 15, 2014) .........................................42

U.S. Department of Education, *Obama Administration Announces Final Rules to Protect
    Students from Poor-Performing Career College Programs* (Oct. 30, 2014)
    http://www.ed.gov/news/press-releases/obama-administration-announces-
    final-rules-protect-students-poor-performing-care .................................................................15

Webster's Third New International Dictionary (1965)

## I. <u>PRELIMINARY STATEMENT</u>

On October 31, 2014, the United States Department of Education and its Secretary (collectively, "the Department"), published final regulations with the purported purpose of identifying certain educational programs that do not "prepare students" for so-called "gainful employment."  That phrase, contained in the Higher Education Act ("HEA") for nearly 50 years, establishes eligibility criteria for programs at certain institutions to receive federal financial aid. *See* 20 U.S.C. § 1088(b).  This is the Department's second attempt to interpret the phrase and to promulgate such rules; a federal court struck its first attempt in 2012 as arbitrary and capricious.

The new rules ("the GE Rules"), effective July 1, 2015, must also be vacated.  The GE Rules impose new, untested, and methodologically unsound metrics that will punish educational institutions if their students do not make an arbitrarily determined amount of money starting as early as 18 months after graduation.  Those metrics are based on the so-called Debt to Earnings Rates ("D/E Rates"), which the Department illogically bases on mortgage practices and which ironically permit programs with poor graduation rates to avoid measurement under the new rates. They are calculated from *government information* that institutions *never get to see*, and measure the ratio between the debt incurred by students in a program and their income in the first few years after graduation (when their income is at its lowest).  If the resulting percentage exceeds the D/E Rates' arbitrary thresholds, the program fails and becomes ineligible for federal student aid, disrupting the students' lives and imposing a death sentence on the program.

The GE Rules apply to tens of thousands of educational programs, affect the lives of millions of students, and will dictate the distribution of billions of dollars in federal student financial aid.  Given the importance of these new regulations, one would think that the Department would rest the regulations on firm constitutional and statutory bases; commission

careful studies; employ reliable methodologies; and rigorously determine the likely effect of the regulations.  The Department did none of these things.  Rather, the Department's fundamentally flawed GE regime is unconstitutional, statutorily unauthorized, arbitrary and capricious, and deliberately structured to undermine proprietary educational institutions.  As shown below, the GE Rules must be vacated on multiple independent grounds, including the following.

*First*, the GE Rules are unconstitutional.  They violate institutions' Fifth Amendment Due Process rights by denying them the bedrock constitutional right to see the evidence used to make adverse, and potentially lethal, determinations concerning their programs.  Instead, they rely on confidential Social Security Administration ("SSA") information regarding former students' income to calculate the D/E Rates that the affected institutions never get to see.

*Second,* the GE Rules, which effectively dictate which programs an institution can offer based on graduate income and debt, are statutorily unauthorized.  The Department contends that the GE Rules "assess whether programs provide quality education" (79 Fed. Reg. 64,890), yet Congress never gave it the right to dictate schools' curricula on this basis.  Indeed, the relevant HEA provisions do not mention "program quality," "debt," or "income," the lynchpins of the new rules.  Rather, accreditors (such as the New York State Board of Regents ("the Regents"), which regulates Plaintiff's member colleges) have curricula oversight responsibility.

The Department seeks to impose its expansive new regime based on a short simple phrase that had been in the HEA for almost 50 years prior to the Department's recent revelation as to its purported meaning – "to prepare students" for "gainful employment" in a recognized profession (20 U.S.C. § 1088(b)(1)(A)(i)).  The unambiguous meaning of that phrase is to prepare students for jobs that pay, and that is precisely how it has been understood for the last 50 years.  The Department's transmogrification of that language into a program of training that "*leads* to a job"

with "an *income level that exceeds their educational debt by a certain percentage* to be determined by the Department" rewrites the statute and violates clear congressional intent.

*Third*, Congress never intended for the Department, under the guise of "gainful employment," to usurp the Regents' authority.  The GE Rules force Plaintiff Association of Proprietary Colleges ("APC") members into programmatic choices diametrically opposed to the Regents' directives.  The GE Rules effectively force APC colleges to revise their curricula to focus on instruction that prepares students for jobs that pay the most money 18 months after graduation – when the GE metrics begin to test earnings – rather than preparing students for long-term, successful careers, with increased earnings over time.

*Fourth,* the GE Rules are arbitrary, capricious, and unsupported by substantial evidence. Astoundingly, given the GE Rules' importance and the fact that this is the Department's second attempt to promulgate them, the Department adopted metrics that fail to conform to any accepted methodology.  For example:

> ➢ While the Department's stated basis for the GE Rules is to measure program quality, the Department presented *no evidence* that they do so.  Indeed, regression analyses (including the Department's own) establish that *almost half the variation in program performance* under the D/E Rates is based not on program quality, but rather on *student demographics, such as family income, sex, race, and ethnicity*. Effectively, the Department has established a programmatic eligibility metric that eliminates programs serving the neediest students.

> ➢ As common sense suggests and the Department admitted in the draft framework for its Postsecondary Institutional Ratings System (at 12), "long-term earnings outcomes more closely correlate with an individual's lifetime earnings and are thus a better proxy for career success."  Yet the GE Rules non-sensically evaluate a program's success by measuring graduates' income as little *as 18 months after graduation*, when graduates' income is at its lowest.

> ➢ The Department bases the specific 8% threshold to pass the annual D/E Rate on *mortgage practices* (supposedly the percentage of income available for educational debt after paying one's mortgage), but the Department utterly fails to offer any evidence that most of these recent graduates even have a mortgage *18 months* after they graduate when the GE Rules' metrics kick in.

> ➢ The GE Rules produce illogical results.  For example, a program that has a 0% graduation rate and a 100% default rate can pass, while a program with a 100% graduation rate and a 0% default rate can fail.  And the *majority* of degree students in all schools (public, private, and proprietary) do not pass the D/E Rates.

The GE Rules fail on every level.  Their Rube Goldberg structure results from the Department's improper machinations to undermine proprietary colleges, while at the same time imposing metrics that protect politically favored community colleges.[1]  The consequences of these ill-conceived and untested GE Rules are devastating:  in the next ten years, "between 2 and 7.5 million students will be denied access" to postsecondary education.[2]

## II.  APPLICABLE FACTS[3]

### A.  Background Of GE Rules.

On October 31, 2014, the Department issued the final GE Rules for those programs ("GE Programs") subject to the statutory "gainful employment" requirement.  79 Fed. Reg. 64,890 *et seq.*  These include degree programs at proprietary institutions such as the APC colleges, while including only non-degree programs at public and non-profit colleges.[4]

---

[1]  Of the ten public colleges with the highest number of defaulters in the nation, no programs fail the D/E Rates.  *Comments on Gainful Employment Rule,* Monroe College ("Monroe Comments") (May 27, 2014), at 18 (AR-H-063752).  "AR" denotes Administrative Record cites.  Documents in the Administrative Record relied upon by the parties will be included in the Joint Appendix in AR numerical order, to be filed on April 17, 2015 in accordance with this Court's December 19, 2014 order.

[2]  *See* Jonathan Guryan & Matthew Thompson, *Report on the Proposed Gainful Employment Regulation,* Charles River Associates (2014) ("CRA Rpt."), at i (AR-G-001816).

[3]  Accompanying this brief is: (i) a statement of undisputed material facts pursuant to Local Civ. R. 56.1; ("Plaintiff's R. 56.1 Statement") and (ii) the Declaration of Alyssa T. Saunders authenticating the evidence relied upon herein.  APC respectfully requests that the Court take judicial notice of publicly available documents cited herein.  *See, e.g., In re Methyl Tertiary Butyl Ether (MTBE) Products Liab. Litig.,* No. 07 CIV. 10470, 2013 WL 6869410, at *4 (S.D.N.Y. Dec. 30, 2013); *Fed. Election Comm'n v. Hall-Tyner Election Campaign Comm.*, 524 F. Supp. 955, 959 (S.D.N.Y. 1981), *aff'd*, 678 F.2d 416 (2d Cir. 1982).

[4]  20 U.S.C. § 1001 establishes the requirement that public and non-profit institutions must provide training to prepare students for gainful employment, but limits the requirement to non-degree programs only.  20 U.S.C. § 1001(b)(1) defines an "institution of higher education" to include "any [public or other nonprofit institution] that provides not less than a 1-year program of training to prepare students for gainful employment in a recognized occupation . . . ."  20 U.S.C. § 1002(c) in turn uses the same definition under § 1001 to define "postsecondary vocational institution[s]" for the purposes of

The current GE Rules are the Department's second attempt to promulgate GE regulations. A federal district court vacated its initial attempt (the "2011 Rules") before the rules' effective date because one of their critical metrics, the "Repayment Rate," was "not based on any facts at all." *Ass'n of Private Colls. & Univs. v. Duncan*, 870 F. Supp. 2d 133, 154 (D.D.C. 2012) ("*APSCU*"). Nonetheless, they remain the model for the current GE Rules.[5]

Numerous problems tainted the Department's 2011 rulemaking. For example, the Department engaged in careless data analysis, initially stating that only 1% of the variation in the Loan Repayment Rate was attributable to the percentage of minority students in a program. After a court challenge, it acknowledged that its prior calculations were way off, and that the variation was 20%.[6] Inexplicably, it now repeats the same type of mistakes in this rulemaking.

**B.    The Current GE Rules.**

The current D/E Rates consist of two untested and complex financial calculations, referred to collectively as the debt-to-earnings or D/E Rates, that the Department contends "assess whether programs *provide quality education*" to enable their students "to pay back their student loan debts." 79 Fed. Reg. 64,890 (emphasis added). One is a debt-to-annual earnings rate ("annual D/E Rate") and the second is a debt-to-discretionary income rate ("discretionary D/E Rate"). A program must pass at least one of these two D/E Rates every year.

---

participating in student financial aid programs. Thus, only non-degree programs at non-profit and public institutions are subject to the GE Rules. There is no similar limitation to the gainful employment requirement in the definition of "proprietary institution of higher education" (i.e. for-profit schools) in 20 U.S.C. § 1002(b); both degree and non-degree programs at proprietary schools are subject to the GE Rules. An eligible "gainful employment" program is defined as "a program of training to prepare students for gainful employment in a recognized profession." 20 U.S.C. § 1088(b)(1)(A)(i).

[5]   *See also APSCU v. Duncan*, No. 14-cv-277, slip op. at 16-17 (D.D.C. Oct. 2, 2014). (reversing Department in contemporaneous rulemaking because it "failed to explain" its position on regulation).

[6]   *See* Decl. of Eduardo Ochoa, dated Dec. 13, 2011, *filed in APSCU*. Allegations of communications between Department officials and short-sellers (who bet against the stock of publicly-traded education companies) also caused the Department's Inspector General to commence a "leak" investigation. Peter Schroder, *Audit to Determine Whether College Reg Was Leaked to Wall Street*, The Hill (2011), http://thehill.com/policy/finance/166087-dept-of-education-ig-looking-into-wall-street.

However, unlike the 2011 Rules, which judged programs based on all students graduating from a program, both D/E Rates in the new GE Rules are based on data concerning only those students who received federal student aid funds under Title IV of the HEA ("Title IV") and completed the program in a particular two-year period (or, if there are fewer than 30 such students, a four-year period), which group is called a "cohort."  In both cases, the income figures are derived from SSA data for a year that could begin as little as 18 months after graduation.  79 Fed. Reg. 64,929, 65,009 (34 C.F.R. § 668.404).   The GE Rules expressly provide that institutions cannot challenge the SSA data.  79 Fed. Reg. 65,010 (34 C.F.R. § 668.405(f)(3)(i)).

The annual D/E Rate purportedly measures the percentage of a cohort's annual earnings that is used to service the cohort's educational debt (calculated as the median of institutional, private, and Title IV loans), using a formula that sets an assumed interest rate and amortization period for the loans.[7]  Programs pass if the annual D/E Rate is less than or equal to 8% and fail if the annual D/E Rate is greater than 12%.  79 Fed. Reg. 65,008 (34 C.F.R. § 668.403).

The discretionary D/E Rate purportedly measures the percentage of the cohort's discretionary earnings used to service the cohort's educational debt.[8]  Programs pass if the discretionary D/E Rate is less than or equal to 20% and fail if the discretionary D/E Rate is greater than 30%.  79 Fed. Reg. 65,008 (34 C.F.R. § 668.403).

Programs that do not have a passing annual or discretionary D/E Rate, but have an annual D/E Rate between 8% and 12% or a discretionary D/E Rate between 20% and 30%, are considered in the "zone."  A program is ineligible to provide Title IV aid to its students if it (i)

---

[7]  It is calculated by dividing (a) the estimated annual payment necessary to service the cohort's median educational debt outstanding as of the dates of student graduation by (b) their mean or median annual earnings starting as early as 18 months after graduation.

[8]  It is calculated by dividing (a) the estimated annual payment necessary to service the cohort's median educational debt outstanding as of the dates of student graduation by (b) the portion of the mean or median annual earnings that exceeds 150% of the federal poverty level of a single person during the year at issue.

fails the D/E Rates in any two out of three consecutive years or it (ii) is in the zone, or combines failing and zone rates, for four consecutive years.  79 Fed. Reg. 65,008 (34 C.F.R. § 668.403). The GE Rules also impose extensive reporting and disclosure requirements on institutions.

Despite having higher graduation rates, lower default rates, and other outcomes that are superior to identical degree programs at public and non-profit colleges, many APC college programs will not pass the D/E Rates.  In March 2014, the Department released the "2012 GE Informational Rates" [9] that approximate the expected D/E Rates results.  Of 208 APC programs receiving these rates, 27% were in the zone and 26% fail.  *Id.*  If a GE program fails in one year, it must provide a warning to current and prospective students regarding the potential future loss of Title IV eligibility.[10]

## C.     The APC Colleges.

Plaintiff APC is a non-profit education corporation whose members include 23 degree-granting proprietary institutions with 34 campuses throughout New York, serving more than 40,000 students per year.   All of the APC colleges are accredited by the Regents or other approved accreditors; are "eligible institutions" that administer federal Title IV student aid; and are subject to the GE Rules.  Many APC colleges have been family-operated and owned for three or more generations, all of them have been operating for at least 21 years, and six were founded in the 19th century.  APC colleges offer more than 350 degree programs, and the overwhelming majority of their academic offerings lead to associate degrees or bachelor degrees.[11]

---

[9]     *Available at*  http://www2.ed.gov/policy/highered/reg/hearulemaking/2012/gainfulemployment.html (AR-C-000167-002609).  An excerpt of APC members' rates will be provided in the Joint Appendix.

[10]    *See* 79 Fed. Reg. 65,012 (34 C.F.R § 668.410).  These warnings would be extremely injurious to APC colleges since they would provide a powerful incentive for students to transfer to or to enroll in other programs, even if those other programs had inferior outcomes.

[11]    *Comments on Gainful Employment Notice of Proposed Rulemaking*, APC ("APC Comments") (May 27, 2014), at 6 (AR-H-109026); *see Member Colleges*, APC, http://www.apc-colleges.org/main/member-colleges/.

According to recent New York State Education Department ("NYSED") data, students attending New York proprietary colleges graduated on time at a much higher rate than those attending public colleges and, in many instances, at a higher rate than at non-profit colleges:

| 2012 New York State On-time Graduation Rates, by Sector | | | | | |
|---|---|---|---|---|---|
| Sector | All Assoc. Degree Students | Assoc. Degree Students with Disabilities | Hispanic Assoc. Degree Students | Black Assoc. Degree Students | All Bachelor Degree Students |
| Proprietary | 28.5% | 37.0% | 27.3% | 26.5% | 42.7% |
| Non-Profit | 21.5% | 16.9% | 16.3% | 14.3% | 56.1% |
| SUNY | 11.7% | 5.8% | 5.4% | 3.6% | 47.2% |
| CUNY | 3.0% | 2.6% | 2.0% | 2.1% | 20.0% |

*Graduation Rates*, NYSED, http://www.highered.nysed.gov/oris/gradrates/.

### III.  SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  Once the moving party demonstrates "the absence of a genuine issue of material fact," "[t]he burden is then on the non-moving party to set forth specific facts raising a genuine issue of fact for trial." *U.S. ex rel. Romano v. New York Presbyterian*, 426 F. Supp. 2d 174, 177 (S.D.N.Y. 2006).  "Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986).

### IV.  ARGUMENT

#### A.    THE GE RULES VIOLATE THE DUE PROCESS CLAUSE.

##### 1.    Educational Institutions Have A Due Process Right With Respect To The Continuing Title IV Eligibility Of Their Programs.

The Due Process clause[12] embraces one of the central propositions of our democracy: that before the government can deprive a person of "'liberty' or 'property' interests," it must

_____

[12]  We are mindful of the principle that the Court should not ordinarily decide a constitutional question where there is an alternative non-constitutional basis for disposing of the case.  Nonetheless, given the GE Rules' July 1, 2015 effective date, the severability provision (34 C.F.R. § 668.415), and the dispositive

accord the person a fundamentally fair opportunity to present its case.  *Mathews v. Eldridge*, 424 U.S. 319, 332-33, 96 S. Ct. 893, 901-02 (1976).  Here, the GE Rules must satisfy this due process requirement because educational institutions have "both a liberty and a property interest" in "not hav[ing] their eligibility [for Title IV funding] cut off . . . ."  *Cont'l Training Serv., Inc. v. Cavazos*, 893 F.2d 877, 893 (7th Cir. 1990); *see Mildred Elley Bus. Sch., Inc. v. Riley*, 975 F. Supp. 434, 439 (N.D.N.Y. 1997) (eligibility to participate in federal loan program "is a property interest protected by the Constitution").  Federal courts in New York have similarly concluded schools have a property interest in continued eligibility for state-funded student loan programs, entitling them to due process protection before the state can take any adverse action.[13]

Due process requires that the government provide adequate notice and a meaningful opportunity to be heard, which must be "at a meaningful time and in a meaningful manner."  *Goldberg v. Kelly*, 397 U.S. 254, 267, 90 S. Ct. 1011, 1020 (1970) (quotations and citations omitted).  The GE Rules violate this fundamental tenet in multiple ways.

## 2.   The GE Rules Violate Due Process Because The Department Denies Institutions The Right To See The Evidence Used Against Them.

Even under the Queen of Hearts' view of due process ("Sentence first – verdict afterwards"), the defendant gets *to see* the evidence before the sentence.[14]  Here, the Department has deprived educational institutions of even that bedrock constitutional right, and has also done away with the need for a hearing by forbidding any objection to the accuracy of the

_____

constitutional issues, even if this Court determined that some or all of the GE Rules were invalid on non-constitutional grounds, we respectfully submit that this Court should also resolve the constitutional questions.  *See, e.g., Parnell v. Rapides Parish Sch. Bd.*, 425 F. Supp. 399, 404 (W.D. La. 1976).

[13]   *See Interboro Inst., Inc. v. Maurer*, 956 F. Supp. 188, 197 (N.D.N.Y. 1997) (participation in state student loan program "is a property interest"); *Midtown Sch. of Bus., Inc. v. Foley*, No. 90-CV-172, 1990 WL 21287, *6 (N.D.N.Y. Feb. 26, 1990) (same); *see also Pro Schs., Inc. v. Riley*, 824 F. Supp. 1314, 1321 (E.D. Wis. 1993) (same).

[14]   Lewis  Carroll,  *Alice's  Adventures  in  Wonderland*,  Chapter  XII, https://ebooks.adelaide.edu.au/c/carroll/lewis/alice/chapter12.html.

Department's evidence.[15]  This does not even meet the Queen of Hearts' standard.  Rather, due process has long required that a party to an agency proceeding "is entitled . . . to be apprised of the factual material on which the agency relies for decision so that he may rebut it."  *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 288 n.4, 95 S. Ct. 438, 443 (1974); s*ee Goldberg*, 397 U.S. at 271, 90 S. Ct. 1022 (eligibility decision must rest solely on "evidence adduced" at hearing); *Escalera v. New York City Hous. Auth.*, 425 F.2d 853, 862 (2d Cir. 1970) (same); *Townley v. Heckler*, 748 F.2d 109, 114 (2d Cir. 1984) (same).

The GE Rules violate due process because the Department does not provide the affected institutions with the evidence by which these institutions will be measured:  the underlying SSA earnings data used to calculate the D/E Rates.[16]  Moreover, the Department will "not consider – [a]ny objection to the mean or median annual earnings that SSA provided" to the Department. 34 C.F.R. § 668.405(f)(3)(i).  Thus, in violation of bedrock due process rights, the GE Rules will punish institutions based on evidence they never get to see.

The Department offers three principal defenses to these due process violations.  *First*, it disingenuously claims, citing *Bowman*, that the "procedure we use here apprises the institution of the factual material on which we base our determination . . . ."  79 Fed. Reg. 64,957.  It obviously does not.  Rather, the Department is "reporting its conclusion, *but not the underlying proofs*," condemned by the Supreme Court as "not the fair hearing essential to due process." *Ohio Bell Tel. Co v. Pub. Utils. Commc'n of Ohio*, 301 U.S. 292, 300, 57 S. Ct. 724, 728-29 (1937) (emphasis added), *cited by Bowman,* 419 U.S. at 288 n.4, 95 S. Ct. at 443 n.4.  *See also*

---

[15]  Refusal to provide a hearing also violates 20 U.S.C. § 1092(c)(1)(F).  *See infra* Section IV.C.3.

[16]   The GE Rules require institutions to provide the Department a list of all students and graduates by educational program.  The Department then submits the list to the SSA, which in turn supplies a *single* "aggregate" number for (i) the reported earnings of the student who allegedly represents the median of the cohort and (ii) the alleged mean earnings of the cohort.  34 C.F.R. § 668.405(d), (e).  The institution has no ability to verify the accuracy of either number.

*Cooper v. Salazar*, No. 98 C 2930, 2001 WL 1351121, at *7 (N.D. Ill. Nov. 1, 2001) ("no meaningful opportunity to oppose" evidence in non-disclosed investigative files).

*Second*, the Department astonishingly contends that the use of SSA data does not violate due process because it is "barred from disclosing" the individual identifying information by privacy statutes.  79 Fed. Reg. 64,957.[17]  This is akin to arguing that if wiretap recordings have been suppressed, the government can nonetheless use summaries of the information contained therein.  Such a principle would eviscerate due process and is, of course, not the law.

*Third*, the Department claims that the GE Rules' alternative administrative appeal process, which foists upon the victim of the government's secret information the burden and cost of developing its own evidence, provides a viable means for institutions to vindicate their constitutional rights.  *See* 34 C.F.R. § 668.406.  It cites no case even remotely suggesting such a principle, and indeed *Bowman* rejected this contention years ago:  an affected person is entitled, without qualification, to be "*apprised of the factual material on which the agency relies for decision . . . .*"  *Bowman*, 419 U.S. at 288 n.4, 95 S. Ct. at 433 n.4 (emphasis added); s*ee Williston Basin Interstate Pipeline Co. v. F.E.R.C.*, 165 F.3d 54, 64 (D.C. Cir. 1999) (reliance on "economy-wide projection based on GDP data" without having presented the data violates due process); *S. Dakota v. U.S. Dep't of Interior*, 787 F. Supp. 2d 981, 996 (D.S.D. 2011) (same).

In any event, the two alternative appeal mechanisms do not cure the due process violation.  For example, the first appeal mechanism involves accessing the relevant earnings information from a "State-sponsored data system."  34 C.F.R. § 668.406(b).  The Department essentially concedes this is not a viable alternative because such databases "may not be readily

---

[17]  Specifically, 26 U.S.C. § 6103 prohibits SSA from disclosing individual earnings information even to the Department.  Consequently, the Department has created an eligibility metric based on data even it cannot access.  This is akin to criminal charges being brought against a defendant based on evidence the prosecution has not seen or evaluated.  This likewise cannot comport with due process.

available to some institutions because of their location or the characteristics of the data collected and stored." 79 Fed. Reg. 64,957.  In plain English, this means many states (including New York) do not have databases that collect income information, eliminating any appeal right.  In fact, the Department itself provided a lengthy list of the shortcomings of an appeal that relies on State-sponsored data systems.  79 Fed. Reg. 16,461.[18]

### 3.   The GE Rules Violate Due Process Because The Department Improperly Presumes That The SSA Earnings Data Is Accurate.

The GE Rules violate due process by improperly presuming that the SSA earnings data accurately represents GE program graduates' earnings.  *See* 34 C.F.R. § 668.405(f)(3)(i).  Due process prohibits an agency from establishing evidentiary presumptions unless "proof of one fact renders the existence of another fact so probable that it is sensible and timesaving to assume the truth of [the inferred] fact . . . until the adversary disproves it.'"  *NLRB v. Curtin Matheson Scientific, Inc.*, 494 U.S. 775, 788-89, 110 S. Ct. 1542, 1550 (1990) (internal quotation omitted); *see NLRB v. Baptist Hosp., Inc.*, 442 U.S. 773, 787, 99 S. Ct. 2598, 2606 (1979) (same).

The Department's use of the SSA Master Earnings File ("MEF") for the purpose of calculating the D/E Rates (a purpose for which it was not designed) violates these due process principles for two reasons.  *First,* the MEF earnings data is systematically inaccurate for purposes of the D/E Rates because, contrary to standard practice, SSA improperly imputes zero earnings to individuals for whom earnings information is missing (e.g., due to inconsistencies in identifying information, such as Social Security numbers).  Stanford University Professor and

---

[18]  The second alternative is equally illusory:  a "universe" survey of the school's students conducted "in accordance with standards" of the Department's National Center of Educational Statistics ("NCES").  34 C.F.R. § 668.406(b), (c).  The NCES "universe" standard is excessively stringent, involving "the collection of data covering *all known units* in a population (i.e. a census)."  *Glossary*, NCES, http://nces.ed.gov/statprog/2002/glossary.asp (emphasis added); *NCES Standard 2-2-1*, NCES, http://nces.ed.gov/statprog/2002/std2_2.asp.  Many institutions lack the resources to comply with these standards, many students will not be locatable, and most students will refuse to provide the required confidential income information, all of which make it impossible to submit an alternative appeal.

statistics expert Dr. Eric Bettinger found that this practice "ignores 30 years of scientific advancements in imputation methodologies," contravenes the methodological standards of the Department's own NCES (which cautions that imputing zero "will underestimate" true numbers), and is a practice that "no other government agency" employs.  Eric Bettinger, *Imputation of Income Under Gainful Employment* ("Bettinger Rpt.") (May 2014), at 10-13 (AR-H-109277-109280).  As Dr. Bettinger concluded:

> [M]y unequivocal expert opinion is that SSA's imputation of zeroes for gainful employment computations runs counter to acceptable statistical methods and would be expected to result in underestimation of both the mean and median calculations under the proposed gainful employment regulation . . . .

*Id.* at 14 (AR-H-109281); *see id.* at 10 (AR-H-109277) (imputation of zeroes results in a downward bias).  The MEF was not methodologically designed for the calculation of D/E Rates.

This imputation of zeroes is no trivial matter.  According to the Department's own calculations, 11.4% of all individuals (over 906,000 graduates) verified for purposes of calculating informational D/E Rates or testing the SSA data system were imputed with zero earnings.  *See* 79 Fed. Reg. 64,954.[19]  Dr. Bettinger concluded that the effect of this improper imputation was substantial.  Once corrected, "19 percent of programs that previously failed the debt to income test now pass it, and 9 percent of programs that previously failed the debt to discretionary income test now pass it."  Bettinger Rpt. at 11 (AR-H-109278).  For these reasons, the Department's reliance on SSA data violates APC members' due process rights.

The Department obliquely admits that "misreported and underreported earnings can have some effect on the earnings data," and that "other agencies, and the Department itself" may sometimes "impute values for missing data in various calculations."  79 Fed. Reg. 64,955-58.  In

---

[19]  The enormous number of zero imputations results from the inability of the SSA to match earnings from the suspended earnings file with specific individuals (79 Fed. Reg. 64,953), as well as other causes, such as graduates who receive Title IV but are from other countries, and return home to work after graduation.

fact, the Department:  (i) fails to identify a single federal agency that imputes zeroes; (ii) does not dispute that 48 states impute income rather than zeros for missing information; and (iii) does not dispute that imputation of zeros creates a downward bias.[20]  And it offers no legitimate explanation of why a modern imputation technique could not have been employed.  Thus, the presumption that the SSA data is accurate is not reasonable, and it violates due process.  Finally, for the same reasons, the Department has failed to use "the most reliable data available," as it is required to do.  *Baystate Med. Ctr. v. Leavitt,* 545 F. Supp. 2d 20, 41 (D.D.C. 2008).

*Second,* the MEF is unreliable because it does not capture self-employed or tip earnings of many proprietary institution graduates.[21]  In a complete non-sequitur, the Department contends that is not a "concern" because federal law requires individuals to report their income.  79 Fed. Reg. 64,955-56.  But that does not change the undisputed fact that many people do not report all of their income, rendering the Department's reliance on the MEF improper.

### 4.   The GE Rules Violate Due Process Because They Punish Institutions Retroactively For Prior Conduct.

The GE Rules are impermissibly retroactive in violation of due process because they rely on student debt incurred as long as 10 years before their effective date to calculate D/E Rates, and thus impair (or terminate) an institution's vested right in its Title IV eligibility based on

---

[20]  Bettinger Rpt. at 8-10 (AR-A-000397-000399).  Rather, the Department opines (without citation to any authority) that in light of the 2010 and 2011 unemployment rates, "the incidence of zero earnings in the SSA records is neither unexpected nor of such a magnitude . . . as to demonstrate that the SSA MEF database is unreliable . . . ."  79 Fed. Reg. 64,594-95.  The lynchpin of this assumption – that there is substantial overlap between (i) graduates who are unemployed and have zero earnings for the year and (ii) the MEF files for which there is simply no earnings information so that the SSA imputes zero earnings – is complete speculation, and in any event disproven by the very statistics the Department cites.  In 2011, the 7,128,598 individuals without matched earnings information (to which the SSA would impute $0 income) actually had over $70 billion in reported income in the earnings suspense file, an *average* of almost $10,000 per person.  *See* 79 Fed. Reg. 64,953.  This fact necessarily establishes that many of those unmatched individuals had income.

[21]  *See* Bettinger Rpt. at 9 (AR-A-000397), citing *Tax Gap for Tax Year 2006*, IRS, http://www.irs.gov/pub/newsroom/overview_tax_gap_2006.pdf ($122 billion in underreported income).

conduct that precedes the GE Rules' July 1, 2015 effective date by a decade.  *See Hem v. Maurer*, 458 F.3d 1185, 1190 (10th Cir. 2006) (due process "'compromised by retroactive legislation'"); *Link v. Receivers of Seaboard Air Line Ry. Co.*, 73 F.2d 149, 152 (4th Cir. 1934) (same).  It is fundamentally unfair punish a program based on loans the institution disbursed years before the GE Rules were adopted because a school cannot conform its conduct to the GE Rules prior to the Rules' effective date.  The Supreme Court in *Landgraf v. USI Film Prods.*, 511 U.S. 244, 280, 114 S. Ct. 1483, 1505 (1994), established a two-part test to determine whether application of a law or regulation to conduct occurring prior to enactment violates the Due Process Clause's "interests in fair notice and repose."  *Id.* at 266, 114 S. Ct. at 1497.

First, the court must establish whether Congress "expressly prescribed" the statute's or regulation's proper reach.  *Id.*  Here, Congress never authorized the GE Rules to begin with, but in any event never provided clear "intent" for the GE Rules to be based on conduct that occurred years before the Rules' effective date (or even the date they were proposed).  Thus, there are no grounds to overturn the "strong presumption [that] exists against the retroactive application of regulations."  *Sweet v. Sheahan*, 235 F.3d 80, 88 (2d Cir. 2000).

*Second*, if Congress did not expressly prescribe its reach, the court must determine:

> whether the new statute would have retroactive effect, *i.e.*, whether it would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed.

*Landgraf*, 511 at 280, 114 S. Ct. at 1505.  Despite the Department's claim that "[a]ll programs *will have the opportunity to make immediate changes* that could help them avoid sanctions,"[22] the Department has done just the opposite by devising rate formulas for degree programs that are

---

[22]   *Obama Administration Announces Final Rules to Protect Students from Poor-Performing Career College Programs*, U.S. Dep't of Educ. (Oct. 30, 2014) (emphasis added), http://www.ed.gov/news/press-releases/obama-administration-announces-final-rules-protect-students-poor-performing-care.

based entirely on debt that students incurred long before the GE Rules' effective date. For bachelor degree programs, where students generally start to borrow when they enroll four years prior to graduation, the results are astounding:

| Reachback To Freshmen Year Loans Used In D/E Rates – Bachelor Degrees | | | |
|---|---|---|---|
| Year For Which D/E Rates  Are Calculated | 2014-15 | 2015-16 | 2016-17 |
| First Freshmen Year Loans For 2-Year Cohort | 2007-08 | 2008-09 | 2009-10 |
| Reachback Period From Effective Date of GE Rules To Freshmen Year Loans For 2-Year Cohort | 8 Years | 7 Years | 6 Years |
| First Freshmen Year Loans For 4-Year Cohort | 2005-06 | 2006-07 | 2007-08 |
| Reachback Period From Effective Date of GE Rules To Freshmen Year Loans For 4-Year Cohort | 10 Years | 9 Years | 8 Years |

*See* 34 C.F.R. § 668.404(g). *Thus, actions that occurred 10 years before the GE Rules' effective date may determine whether a program passes or fails the D/E Rates*. The GE Rules meet the *Landgraf* test because they:  (i) "impair rights a party possessed when he acted" and "increase a party's liability for past conduct"; and (ii) "impose new duties with respect to transactions already completed" by requiring schools to issue warnings based on events that occurred prior to the rules' implementation. *Landgraf*, 511 at 280, 114 S. Ct. at 1505; s*ee* 34 C.F.R. § 668.410.

The Department claims the GE Rules are not retroactive for two reasons. *First*, principally relying upon various D.C. federal cases, it contends that "the results would not be used to undo past eligibility." 79 Fed. Reg. 64,896. However, retroactivity is not limited to undoing past eligibility; rather, the standard prohibits "new legal consequences," and the loss of eligibility based on applying the new GE metrics to student debt incurred in the past is certainly a major new consequence.[23] *Landgraf*, 511 U.S. at 270, 114 S. Ct. at 1499. The D.C. cases are also inapposite because, unlike New York federal cases, the D.C. Circuit does not recognize a property interest in Title IV eligibility.

---

[23]  The Department estimates that over 700 programs will become ineligible because they will fail the D/E Rates and over 1,200 programs may become ineligible because they fall in the zone. 79 Fed. Reg. 64,995.

*Second,* the Department mistakenly claims that the so-called "transition period" cures any retroactivity problem.  *See* 79 Fed. Reg. 64,925.  The transition period allows a school to substitute the debt of more recent graduates (for the single "most recently completed award year"), for the debt of past graduates.  However, the GE Rules are still retroactive because even in the first four years of the transition period, one or more years of the debt used to evaluate a bachelor degree program would be disbursed prior to the effective date of the Rules:

| Reachback To Freshmen Year Loans Used In D/E Transition Period Rates – Bachelor Degrees | | | | |
|---|---|---|---|---|
| Year For Which D/E Rates Are Calculated | 2014-2015 | 2015-2016 | 2016-2017 | 2017-2018 |
| Year Used To Identify Graduates To Measure Debt In Transition Rates | 2014-2015 | 2015-2016 | 2016-2017 | 2017-2018 |
| Freshmen Year Loans Used In Transition Rates | 2011-2012 | 2012-2013 | 2013-2014 | 2014-2015 |
| Reachback Period from Effective Date of GE Rules to Freshmen Year Loans | 4 Years | 3 Years | 2 Years | 1 Year |

The transition period does not even offer partial relief at the time the GE Rules take effect because the first transition year (the 2014-15 award year) precedes their effective date.[24]

Thus, the Department's disingenuous position that the GE Rules were designed to allow institutions "a meaningful opportunity and reasonable time to improve their programs" (79 Fed. Reg. 64,891) is utterly false.  Consider this:  if a school took the most dramatic action possible on July 1, 2015, by offering full scholarships, cancelling all loans, and offering the education for free, it would be to no avail.  The data used to calculate the first set of D/E Rates was baked-in long before the Department proposed the GE Rules, and the transition period provides no relief.

---

[24]  *See* 79 Fed. Reg. 64,948.  The Department's suggestion that there is no retroactivity problem because institutions should have predicted the parameters of the future GE Rules (79 Fed. Reg. 64,925) is nonsensical.  The Department cannot solve the GE Rules' retroactivity problem by ascribing time traveling/clairvoyant powers to schools so that they would have known the provisions of rules that had not yet been published (which, notably, are remarkably different than those that came before).

**B.**     **THE GE RULES EXCEED THE DEPARTMENT'S AUTHORITY.**

This case is a classic example of Mark Twain's cautionary statement regarding agency interpretation of statutes:

> *The departmental interpreters of the laws, in Washington, . . . can always be depended on to take any reasonably good law and interpret the common sense all out of it.*

In adopting the phrase "prepare students for gainful employment" 50 years ago, Congress had a narrow objective:   to specify the *category* of programs eligible for Title IV funding.   The Department has transmogrified this simple phrase into an unrecognizable behemoth purporting to evaluate program "*quality*" by measuring students' supposed ability to repay their loans based on complex income and debt metrics.  As shown below, Congress did not intend this result.

**1.**     **Standard of Review.**

Under the framework in *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S. Ct. 2778 (1984), in evaluating an agency's construction of a statute, courts begin by considering whether Congress has spoken to the precise question at issue. Courts "must give effect to the unambiguously expressed intent of Congress" and "reject administrative constructions which are contrary to clear congressional intent." *Id*. at 843, 104 S. Ct. at 2782 & n.9.  In conducting *Chevron* analyses*,* courts look first to the plain meaning of the statutory language, including "structure and grammar of the provision," to determine if the statutory language is ambiguous with respect to the precise question at issue.  *Natural Res. Def. Council, Inc. v. U.S. Food & Drug Admin.*, 884 F. Supp. 2d 127, 141 (S.D.N.Y. 2011).  If the statutory language is clear, then "judicial inquiry is complete."  *Hedges v. Obama*, 724 F.3d 170, 189 (2d Cir. 2013) (Kaplan, J., sitting by designation).

If the language is ambiguous, the Second Circuit employs a further analysis to determine if Congressional intent can be determined *before* deferring to the agency's interpretation:

> If the statutory language is ambiguous, however, we will "resort first to canons of statutory construction, and, if the meaning remains ambiguous, to legislative history" to see if these "interpretive clues" permit us to identify Congress's clear intent.  If we still cannot conclude that Congress has "directly addressed the precise question at issue," we will proceed to *Chevron* step two, which instructs us to defer to an agency's interpretation of the statute, so long as it is "reasonable."

*Cohen v. JP Morgan Chase & Co.,* 498 F.3d 111, 116 (2d Cir. 2007) (citations omitted).

An "agency's power to promulgate legislative regulations is limited to the authority delegated by Congress."  *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208, 109 S. Ct. 468, 471 (1988); *see Caldwell v. Spears*, 973 F. Supp. 406, 408-09 (S.D.N.Y. 1997) (Kaplan, J.) (court owes no deference to regulations "that are based upon an impermissible construction of the statute" and such a regulation "is invalid.").  As shown below, Congress never intended to grant the Department authority to measure the quality of GE programs.  Moreover, even if the Department's interpretation passes *Chevron* step one (which it cannot), its interpretation is still unreasonable and fails *Chevron* step two for the reasons that follow.

2. **The HEA's Plain Language Forecloses The Department's Interpretation.**

Statutory construction must begin with "the assumption that the ordinary meaning of [the statutory] language accurately expresses the legislative purpose."  *Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.*, 469 U.S. 189, 194, 105 S. Ct. 658, 661 (1985).  The Department's construction must be "plausible," and thus an outlier meaning is insufficient.  *Cohen,* 498 F.3d at 120.  The Department cannot, in the guise of interpreting a statute, ignore certain words, and "rewrite" it to impose distinct requirements not contemplated by Congress.  *Ind. Mich. Power Co. v. Dep't of Energy*, 88 F.3d 1272, 1276 (D.C. Cir. 1996).

The Department's construction cannot pass this test for three reasons.  *First*, the Court's task at *Chevron* step one is not simply to interpret individual words but to construe statutes, and

19

thus "statutory language must be read in context since a phrase gathers meaning from the words around it."  *Cohen*, 498 F.3d at 117.  Here, the HEA's operative phrase is not, as the Department contends, merely "gainful employment in a recognized profession"; rather, it is the phrase defining an eligible program as one that "provides a program of training *to prepare* students for *gainful employment* in a recognized profession."  20 U.S.C. §1088(b)(1)(A)(i) (emphasis added).

The construction of that phrase thus requires an examination of the phrase "to prepare" used in conjunction with the phrase "gainful employment."   The customary and accepted meaning of the phrase "to prepare" is obvious, and an eligible program is one that "prepare[s] students" by "equip[ping] [them] with necessary knowledge and skill"[25] in the program area.

Turning to "gainful employment," the use of the two words together has a standard definition:  a job that pays,[26] often used to distinguish such a paying job from non-paying volunteer work.[27]   Indeed, the 1965 version of *Webster's Third New International Dictionary*, routinely relied upon by courts for statutory interpretation, defines "a [gainful] occupation" as one "providing an income."  *Id.* at 928.  *See, e.g., Boyle v. United States*, 556 U.S. 938, 946, 129

---

[25]   "To prepare" meant in 1965 (when the term came into the HEA) "to make ready beforehand for some purpose," or, in reference to education, "to equip with necessary knowledge and skill (as for a specific profession, occupation, or test)."  *Webster's Third New International Dictionary*, at 1790 (1965).

[26]   *See Webster's Third New International Dictionary*, at 928 (1965) (defining gainful as "providing an income   <a   [gainful]   occupation>");   *Gainful   Employment,*   BusinessDictionary.com, http://www.businessdictionary.com/definition/gainful-employment.html (defining "gainful employment" as "an employment situation where the employee receives consistent work and payment from the employer");   *Gainful,*   Longman   Dictionary   of   Contemporary   English*,* http://www.ldoceonline.com/dictionary/gainful (defining gainful employment as "formal work or activity for   which   you   are   paid");   *Gainful,*   Oxford   Advanced   Learner's   Dictionary, http://www.oxfordlearnersdictionaries.com/us/definition/english/gainful (defining "gainful" as "used to describe useful work that you are paid for");   *Gainful Employment,*   Collins Dictionary*,* http://www.collinsdictionary.com/dictionary/english/gainful-employment?showCookiePolicy=true (defining gainful employment as "an occupation that pays an income")

[27]   *See, e.g.*, S. Rep. No. 92-346, at 75 (1971) (amendment needed to deem that training for volunteer firemen constitutes training for gainful employment because, since they serve "without compensation, they are not gainfully employed").

S. Ct. 2237, 2244 (2009) (relying on *Webster's Third New International Dictionary*); *Begay v. United States*, 553 U.S. 137, 144, 128 S. Ct. 1581, 1586 (2008) (same).

*Second,* there is no competing common sense, "plausible" construction of the full phrase that can possibly authorize the Department's attempt to impose this elaborate, 200-page, debt and income-driven regime, measuring not whether the program is the *type* that *prepares a student for a job that pays,* but rather purporting to measure the *quality of the program based on the student's success* in obtaining a job that pays a *specific amount.* The Department's interpretation implausibly rewrites the statutory language into a program of training that "*leads* to a job" with "an *income level that exceeds their educational debt by a certain percentage* to be determined by the Department."[28] Courts must presume that Congress "says in a statute what it means and means in a statute what it says." *Dodd v. United States*, 545 U.S. 353, 357, 125 S. Ct. 2478, 2482 (2005). Here, the HEA provision at issue does not even use the words "quality," "debt," or "income." Congress's unambiguous intent, as expressed through the HEA's plain language, bars the Department's construction.

*Third,* the Department's construction violates the plain statutory language because the GE Rules exclude non-Title IV students. *See* 34 C.F.R. § 668.402. The statutory requirement to "prepare students" for "gainful employment" (20 U.S.C. §1088(b)) does not exclude "non-Title IV" students and indeed does not distinguish between types of students at all.

---

[28]   The Department, ignoring the principle that words are to be construed in context, contends that "gainful" also means "profitable," and then opines that this supports "the idea embodied in the regulations that 'gainful employment in a recognized occupation' is not just any job that pays a nominal amount but a job that pays enough to cover one's major expenses, including student loans." 79 Fed. Reg. 64,894. The Department's selective definition of "gainful" as "profitable" is inapplicable: the term "profitable employment" is not the term Congress used. Rather, as the sources above make clear, "gainful" when used in conjunction with "employment" means "providing an income <a [gainful] occupation>". Moreover, even assuming that that an outlier definition of "gainful" as "profitable" could be used in conjunction with "employment," the definition must, under *Cohen,* still be "plausible." Nothing in the Department's proffered definition plausibly gives it the right to set the level of "profit," or suggests that one looks to non-employment related expenses (such as home mortgage expenses) in setting such a level.

### 3. Numerous Canons Of Construction Establish That The Department Has Exceeded Its Statutory Authority.

If the Court concludes that the statutory language is ambiguous, the next step is to apply the canons of statutory construction to determine if these "interpretive clues" can resolve the ambiguity. *Cohen,* 498 F.3d at 121. The Department's interpretation violates numerous such canons and is inconsistent with the unmistakable intent of Congress.

        **a.**     **Retroactivity Not Authorized.** "[C]ourts should be reluctant to find such authority" for retroactive rulemaking "absent an express statutory grant." *Bowen*, 488 U.S. at 208-09, 109 S. Ct. at 471-72 (holding that agency could not retroactively "change the rules for calculating hospitals' reimbursements"); *see Sweet*, 235 F.3d at 88 (same). As noted above (*see supra* Section IV.A.4), the GE Rules are retroactive, and thus statutorily unauthorized.

        **b.**     **Identical Words Have Same Meaning.** "[I]dentical words used in different parts of the same act are intended to have the same meaning." *C.I.R. v. Keystone Consol. Indus., Inc.*, 508 U.S. 152, 159, 113 S. Ct. 2006, 2011 (1993). The HEA uses the phrase "gainful employment" at least seven other times.[29] In each, Congress used the term in a fashion consistent with the phrase's ordinary meaning – a job that pays – and inconsistent with the Department's interpretation – a job in which the graduate's income exceeds his expenses by a certain percentage. Its strained interpretation renders these provisions nonsensical.

        **c.**     **Short, Simple Phrase Does Not Authorize Fundamental Restructuring.** The Department proposes a sea-change in Title IV eligibility criteria, affecting

---

[29] For example, Congress repeatedly used the phrase to limit the type of employment a student may pursue if he or she receives a scholarship – providing that the student can continue to receive payment so long as the Secretary finds the student is "devoting essentially full time to study or research" and "is *not engaging in gainful employment other than part-time employment*." 20 U.S.C. § 1134c (emphasis added). *See also* 20 U.S.C. § 1036(e) (graduate fellowship may not be provided to an otherwise eligible individual "if the individual is engaged in gainful employment, other than part-time employment related to teaching, research, or a similar activity"); 20 U.S.C. § 1135c(d) (same); 20 U.S.C. § 1161g(d) (same); 20 U.S.C. § 2008(a) (same); 20 U.S.C. § 4706(a) (same); 20 U.S.C. § 5605(a)(2)(B) (same).

tens of thousands of educational programs, millions of students, and billions of dollars in Title IV funding.  Congressional intent to authorize such a drastic change cannot reasonably be found in the short 50-year-old phrase "to prepare students for gainful employment in a recognized profession."  Congress "does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions."  *Whitman v. Am. Trucking Ass'ns, Inc.*, 531 U.S. 457, 468, 121 S. Ct. 903, 910 (2001); *see FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133, 120 S. Ct. 1291, 1301 (2000) (court must be guided "by common sense as to the manner in which Congress is likely to delegate a policy decision of such economic and political magnitude to an administrative agency."); *Sch. Dist. of City of Pontiac v. Sec'y of U.S. Dep't of Educ.*, 584 F.3d 253, 294 (6th Cir. 2009) (Sutton, J., concurring) (same).

By contrast, when Congress has addressed eligibility requirements, it has not left those standards to the Department's discretion.  Rather, it has done so explicitly by setting its own detailed metrics.  Had Congress intended to require an eligible institution to show that its GE programs satisfied certain income and debt metrics, it would not have done so by hiding the requirement within the words "gainful employment."[30]  Moreover, in issuing the GE Rules, the Department intended to press institutions to lower their tuition.[31]  However, it is "highly unlikely that Congress would leave the determination of whether an industry will be entirely, or even substantially, rate-regulated to agency discretion . . . ."  *MCI Telecomms. Corp. v. Am. Tel. & Tel. Co.*, 512 U.S. 218, 231, 114 S. Ct. 2231-32 (1994).

---

[30] *See, e.g.,* 20 U.S.C. § 1085(m)(1) (establishing precise institutional cohort default rate metrics to determine ongoing Title IV program eligibility); 20 U.S.C. § 1094(a)(24) (establishing "90/10 rule," setting the exact percentage of institutional revenue that can be derived from Title IV funds to determine ongoing eligibility); 20 U.S.C. § 1088(b)(2) (establishing 70% graduation and placement rate requirements for certain programs).  In contrast, when Congress has expected the Department to set detailed standards, it has expressly delegated that duty.  *See* 20 U.S.C. § 1099c(c) ("The Secretary shall determine whether an institution has the financial responsibility required by this subchapter").

[31] The Department acknowledges that the D/E Rates are designed to place significant downward pressure on tuition levels.  *See* 79 Fed. Reg. 64,924 (referencing institutions' "immediate reductions in cost").

     **d.**    **Conflicts With HEA's Other Provisions And Structure.**   "In determining whether Congress has specifically addressed the question at issue," a court must "interpret the statute as a symmetrical and coherent regulatory scheme, and fit, if possible, all parts into a harmonious whole."  *FDA*, 529 U.S. at 133, 120 S. Ct. at 1301.  This canon of construction likewise establishes that the Department's interpretation fails.

     *First,* the Department's construction conflicts with 20 U.S.C. § 1099b (as well as the implementing regulations, 34 C.F.R. § 602 *et seq.*), under which Congress assigned to accreditors, not the Department, the responsibility for evaluating program quality.  Section 1099b makes it clear that Congress intended accrediting bodies, such as the New York State Board of Regents, to exercise program quality oversight, not the Department:

> the standards for accreditation of the [accrediting] agency or association assess the institution's—(A) *success with respect to student achievement in relation to the institution's mission . . . including, as appropriate, consideration of . . . job placement rates . . . .*

20 U.S.C. § 1099b(a)(5) (emphasis added).  The Department's description of some accreditation functions likewise specifically provides that the "quality" of education is a matter for accrediting bodies.[32]  The GE Rules usurp the role of accrediting agencies, contrary to Congressional intent.

     This principle has particular force with respect to the regulatory authority of the Regents. As described below (*infra* Section IV.C.1), in conflict with the Regents' policy, the GE Rules pressure New York proprietary colleges to become narrowly focused on vocational skills rather

---

[32]   *Accreditation in the United States*, U.S. Dep't of Educ., https://www2.ed.gov/admins/finaid/accred/index.html?exp=0 ("goal of accreditation is to ensure that education . . . *meets acceptable levels of quality*" and providing lists of "accrediting agencies recognized by the U.S. Secretary of Education as *reliable authorities concerning the quality of education*") (emphasis added).  "[S]ome functions of accreditation" include:  "Assisting prospective students in identifying acceptable institutions"; and "Helping to identify institutions and programs for the investment of public and private funds."  *Id.* at https://www2.ed.gov/admins/finaid/accred/accreditation_pg2.html#U.S.

than on degree programs with broad and deep general education components.  Congress did not grant the Department the authority to supplant the Regents' curricula policies.

*Second,* government agencies are "bound, not only by the ultimate purposes Congress has selected, but by the means it has deemed appropriate" as well.  *Colo. Indian Tribes v. Nat'l Indian Gaming Comm'n*, 466 F.3d 134, 139 (D.C. Cir. 2006); *see Hearth, Patio & Barbecue Ass'n v. U.S. Dep't of Energy,* 706 F.3d 499, 506 (D.C. Cir. 2013) (agency could not regulate product in the face of a methodically drafted statutory scheme).  As noted above, the D/E Rates seek to indirectly impose restrictions on student loan levels to force lower tuition levels, even though Congress has "occupied the field" by setting student loan limits.[33]  Congress did not give the Department the power to regulate tuition levels,[34] and has asserted its authority to set student loan amounts.  *See* 20 U.S.C. § 1087e(a)(1).

*Third,* Congress could not have intended the "gainful employment" requirement to be measured based on the ability of Title IV recipients to repay their loans, as the GE Rules provide, because the "gainful employment" requirement also applies to schools for purposes unrelated to Title IV student loan eligibility, such as eligibility for federal grants or institutional loans.  *See* 20 U.S.C. § 1161l-3(g)(4) (subjecting institutions to the same "gainful employment" requirement to be eligible to receive institutional loans).[35]

---

[33] A Congressionally-established statutory framework specifies maximum loan amounts that institutions must make available to qualified students for every year of study, as well as thresholds for institutional loan cohort default rates.  *See* 20 U.S.C. § 1087e(a)(1); 20 U.S.C. § 1085(m)(1).

[34] The legislative history cited by the Department further demonstrates that Congress never intended for the Department to set tuition levels.  *See National Vocational Student Loan Insurance Act of 1965: Hearings Before the Select Subcomm. on Education of the Comm. on Education and Labor Eighty-Ninth Cong. First Session on H.R. 6468*, 89th Cong. 26 (1965) (testimony of Dr. R. Dugger) (HEW witness assured the panel that it was making "no attempt whatsoever" to "set what the tuition charges must be.")

[35] In 1963, Congress applied the same "gainful employment" requirement to institutions seeking eligibility for federal grants under the Vocational Education Act.  *See* Vocational Education Act, Pub. L. No. 88-210, § 8, 77 Stat. 403, 408-409 (1963) (defining "vocational education" as "a program designed to fit individuals for gainful employment . . . in recognized  s").  Just as with 20 U.S.C. § 1161l-3, the grants

*Fourth,* Congress's placement of the gainful employment requirement within the HEA's structure as a definitional *prerequisite* to initial Title IV eligibility in 20 U.S.C. § 1002(b)[36] forecloses the Department's proposed construction for the same reason.   Under 20 U.S.C. § 1002(b), as a *prerequisite* to Title IV eligibility, the institution must have been offering programs "to prepare students for gainful employment" for *two years* prior to seeking initial eligibility,[37] long *before* any of their students could receive Title IV loans.  This fact rebuts any contention that Congress intended the "gainful employment" requirement to authorize the Department to measure graduates' ability to repay loans.

*Fifth,* where Congress has intended that an institution satisfy a metric to qualify for Title IV eligibility, Congress explicitly says so.[38]   Here, there is no explicit statutory directive.  *See Franklin Nat'l Bank v. New York*, 347 U.S. 373, 378, 74 S. Ct. 550, 553-54 (1954) (finding no intended Congressional restrictions, when it had done so by express language in other instances).

   **e.**   **Department's Prior Interpretations.**   "[W]hen Congress revisits a statute giving rise to a longstanding administrative interpretation without pertinent change, the congressional failure to revise or repeal the agency's interpretation is persuasive evidence that the interpretation is the one intended by Congress."  *Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833, 846, 106 S. Ct. 3245, 3254 (1986) (citations omitted).  Prior to issuing the

---

did not involve student loan repayment, and thus Congress could not have intended the phrase to authorize a regime measuring the excess of income over educational expenses.

[36]  Where Congress intends to subject institutions to requirements that they must satisfy for *continuing eligibility*, it typically places the requirements in 20 U.S.C. § 1094, which sets forth the requirements a school must meet annually under its program participation agreement.

[37]  The Department's regulations implementing this requirement similarly require that the institution have provided a continuous program to prepare students for gainful employment for the two years prior to applying for eligibility.  34 C.F.R. § 600.5(a)(7), (b)(1)(i).

[38]  *See supra* n.30.

GE Rules, the Department had consistently used "gainful employment" in accordance with its ordinary meaning, "a job that pays."[39]

Congress has amended the HEA to implement Title IV funding safeguards nine times since 1965, but has never questioned the Department's earlier, limited interpretation. If Congress believed the Department's prior interpretation of "gainful employment" was improper, these amendments offered an obvious legislative mechanism to enact a different regime. Congress did not do so, which is persuasive evidence that Congress intended the prior Department interpretation – a job that pays – to continue.

### 4. The Legislative History Establishes That Congress Did Not Intend To Empower The Department To Deny Eligibility Based On Its Conclusion Regarding The Quality Of An Educational Program.

If the statutory meaning remains ambiguous after applying canons of construction, the court considers "legislative history" to "reveal Congress's intent." *New York ex rel. New York State Office of Children & Family Servs. v. U.S. Dep't of Health & Human Services' Admin. for Children & Families,* 556 F.3d 90, 97 (2d Cir. 2009). In its quest for legislative history supporting its expansive interpretation, the Department relies on hearing testimony of a single witness, Professor Kenneth Hoyt from Iowa, quoted in a Senate Report regarding the National Vocational Student Loan Insurance Act of 1965. *See* 79 Fed. Reg. 64,893; *see also* S. Rep. No. 89-758, at 8, 11 (1965). This reliance is misplaced. The legislative history actuality establishes the opposite: Congress never intended to empower the Department to deny eligibility based on its conclusion regarding program quality.

---

[39] For example, to satisfy the 70% placement rate under 20 U.S.C. § 1088(b)(2)(A)(ii), the Department's rules require institutions to determine the number of students "who obtained gainful employment," but as evidence thereof does not require data regarding students' income. 34 C.F.R. §§ 668.8(g)(1)(ii), (g)(2). Further, in a prior administrative proceeding interpreting the "gainful employment" requirement, the Department considered whether the primary goal of a program was to prepare students for work; it did not consider student debt or income level. *See In re Acad. for Jewish Educ.*, No. 94-11-EA, 1994 WL 1026087, at *3 (Dep't of Ed. Mar. 23, 1994).

*First,* the Department oddly relies on witness testimony, which resides (if at all) at the bottom of the legislative history hierarchy and is accorded virtually no weight, while completely ignoring the statements of the Committees themselves, which are considered "a particularly good indicator of congressional intent." *Pierpoint v. Barnes*, 94 F.3d 813, 817 (2d Cir. 1996); *see* Statutes and Statutory Construction (Sutherland Statutory Construction), Norman J. Singer and J.D. Shambie Singer, at 570-572 (Thomson West, 7th ed. 2007). The Senate and House Reports, using essentially the same language, show that the Committees concluded that the accreditation and the two-year-in-existence requirements fully resolved Congress's concerns regarding program quality as an eligibility factor:

> [T]he definition of 'eligible institution' . . . was intended . . . [to] be as liberal as possible . . . . It was the determined intent, however, that the 'fly by night' institutions of the post-World War II era be explicitly eliminated from eligibility. *The subcommittee resolved this problem by adding an eligibility feature which requires an institution to have been in existence for 2 years. It further clarified the accrediting provisions by accepting a nationally recognized accrediting agency listed by the Commissioner as the first criterion for accreditation.*[40]

*Second*, if individual statements are to be considered, surely that of Congressman John Dent, the bill's author and Chairman of the Select Subcommittee, is more persuasive as to legislative intent than one from Professor Hoyt from Iowa. Chairman Dent's statement to the Select Subcommittee is directly opposite to the Department's interpretation:

> *I do not intend that the Department, by rule or regulation, should, in any way, build barriers that will keep the students from attending the so-called privately owned schools if it is their desire to do so.*[41]

*Third,* the testimony of Dr. Roy W. Dugger (a Health, Education, and Welfare Deputy Director with a vital role in drafting the bill), before the same Select Subcommittee as Dr. Hoyt,

---

[40]  S. Rep. No. 89-758 at 12 (1965) (emphasis added); *see* H. Rep. No. 89-308 at 9 (1965).

[41]  *National Vocational Student Loan Insurance Act of 1965: Hearings Before the Select Subcomm. on Education of the Comm. on Education and Labor Eighty-Ninth Cong. First Session on H.R. 6468*, 89th Cong. 13 (1965) (statement of Chairman John H. Dent) (emphasis added).

establishes that the Department had decided to protect students through an *accreditation* requirement, not added government regulation, a position the Committees adopted.[42]

## C.   THE GE RULES ARE ULTRA VIRES BECAUSE THEY VIOLATE OTHER NON-GAINFUL EMPLOYMENT PROVISIONS OF THE HEA.

### 1.   The GE Rules Violate Federal Law Deferring To The Educational Standards Of State Authorities, Such As The Board Of Regents.

Congress, fearful of the "federalization" of education (*Wheeler v. Barrera*, 417 U.S. 402, 416, 94 S. Ct. 2274, 2282 (1974)), expressly prohibited the Department from intruding upon state and local decisions regarding curricula:

> No provision . . . shall be construed to authorize any department, agency, officer, or employee of the United States *to exercise any direction, supervision, or control over the curriculum, program of instruction, administration, or personnel* of any educational institution, school, or school system . . . . [43]

The GE Rules violate these clear limits on the Department's authority by reaching down *to the program level* to effectively dictate which programs schools can offer.  In particular, the GE Rules directly conflict with the New York State Board of Regents' standards and will have a significant impact on programs offered in New York.  APC member colleges must obtain the Regents' approval for each program, a process that requires institutions to undergo a thorough examination of each program's curriculum.[44]  Importantly, the Regents also require all degree programs to offer a minimum number of general education credits to prepare students "through

---

[42]  *Id.* at 20 (testimony of Dr. R. Dugger) (Q:  Do you gentlemen both feel that this law has sufficiently stringent *accreditation provisions* to prevent the abuse of this law by diploma mills and by bogus and marginal educational institutions typical of the post-World War II era?  Dr. Dugger:  *Yes, sir*) (emphasis added).

[43]  20 U.S.C. § 1232a (emphasis added).  Further, in establishing the Department, Congress stated that it did not intend to "increase the authority of the Federal Government over education or diminish the responsibility for education which is reserved to the States and local schools systems and other instrumentalities of the States."  20 U.S.C. § 3403(a).

[44]  N.Y. Educ. Law § 5001 (2014); N.Y. Comp. Codes R. & Regs. tit. 8, § 52.1 (2014).  Based on these standards, the federal government recognized the Board of Regents as an "approved" accreditor in 1952 and its accreditation is sufficient to establish eligibility to participate in Title IV programs, making it the only state board of education that also serves as an approved accreditor.

quality education, to develop ethical, intellectual, and social values; effectively contribute to society and the workplace; and engage in lifelong learning."[45]   In direct conflict with the Regents' policy, the GE Rules pressure New York proprietary colleges to become more narrowly focused on purely vocational instruction.[46]   In essence, rather than continuing to prepare students for long-term, successful careers (with increased earnings over time), the Department is forcing New York State institutions to focus on instruction that prepares students for jobs that pay the most money 18 months after graduation, when the GE metrics begin to test debt and earnings.  It is a complete re-write of New York State curricula.

The HEA's plain language forbids the Department to supersede the role of state agencies and impose debt metrics that ultimately dictate the content of educational programs.  The GE Rules undermine the Regents' established regulatory standards by imposing metrics that disqualify programs that the Regents have found to be of high academic quality, violating the HEA's express limits on the Department's authority.

### 2.   The GE Rules Violate Congress's Prohibition On The Creation Of Student Information Databases.

To calculate the D/E Rates, the Department is impermissibly expanding the scope of information in the National Student Loan Data System ("NSLDS") to include information on students' private loans.  *See* 79 Fed. Reg. 65,037.  20 U.S.C. § 1015c bars the Department's attempt to collect this new information and to compel schools to report it.

20 U.S.C. § 1015c prohibits the creation of new "Federal database[s] of personally identifiable information" about students at postsecondary institutions unless the "system" "is

---

[45]   *Summary of New York Statutory and Regulatory Provisions Relating to Higher Education,* NYSED, http://www.highered.nysed.gov/swp/#summary.
[46]   *See Policy Statement on Liberal Arts and Sciences*, NYSED, http://www.highered.nysed.gov/ocue/lrp/liberalarts.htm.

necessary for the operation of" federal financial aid programs, and "was in use by the Secretary" in 2008.  20 U.S.C. § 1015c(a), (b).  Congress passed this statute in 2008 to end the Department's push to expand its database of private student information.  *See Ass'n of Private Sector Colls. & Univs. v. Duncan,* 930 F. Supp. 2d 210, 216-217 (D.D.C. 2013)("*APSCU II*").

The *APSCU II* court addressed this issue in 2013 following the Department's first failed attempt to promulgate the GE Rules.  The court found that the Department's attempt to collect and add new private student loan data to the existing NSLDS database violated 20 U.S.C. §1015c(b)(2).  *Id.* at 221.  It determined that "some additions [of student information] to existing databases are barred by statute" and that expanding the database in a way that conflicts with the purpose of the NSLDS was impermissible because the database would no longer qualify as a system in use by the Secretary in 2008.  *Id.* at 218-19, 221.

The Department has again violated Congress's statutory prohibition by promulgating new rules that would require the collection of private loan information wholly outside the express purpose of the NSLDS statute.  The NSLDS system is a database containing information "*regarding loans made, insured or guaranteed*" under certain federal loan programs.  20 U.S.C. § 1092b(a) (emphasis added).  As in the *APSCU II* case, the addition of private loan data to the NSLDS database impermissibly expands and changes its character, effectively making it a new system that was not in use in 2008.  The Department cannot "graft such a system onto a pre-existing database of students . . . ."  *APSCU II*, 930 F. Supp. 2d at 221.

### 3.    The GE Rules Violate The HEA By Denying Institutions The Statutory Right To A Hearing Prior To A Limitation Of Eligibility.

The GE Rules violate 20 U.S.C. § 1094(c)(1)(F), which instructs the Department to provide "for *reasonable notice and opportunity for hearing*" before penalizing an institution by limiting "participation in any [Title IV] program" for violating "any" Department regulation.  *Id.*

(emphasis added).   The Secretary's determination that a program is "ineligible" under the D/E

Rates is a limitation of institutional eligibility, precluding the disbursement of Title IV funds to

students in that program.   *See* 34 C.F.R. § 668.410(b).   The Department defines a hearing as a

"presentation of arguments and evidence conducted by a hearing official" and it is clear that the

hearing official must be someone other than the Secretary or other ED official.   34 C.F.R. §

668.88.   But, in violation of 20 U.S.C. § 1094(c)(1)(F), the procedure for challenging the D/E

Rates omits these important procedural protections.   The GE Rules bar institutions from

challenging the accuracy of the SSA data before an impartial tribunal.   *See supra* Section IV.A.2.

**D.**      **THE GE RULES VIOLATE THE ADMINISTRATIVE PROCEDURE ACT.**[47]

**1.**      **The Administrative Procedure Act Standard Of Review.**

The Administrative Procedure Act ("APA") requires that a court set aside agency actions

that are "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law" or

"without observance of procedure required by law."   5 U.S.C. §§ 706(2)(A), (D).   To satisfy this

standard, the Department "must examine the relevant data and articulate a satisfactory

explanation for its action including a 'rational connection between the facts found and the choice

made.'"   *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29,

43, 103 S. Ct. 2856, 2866 (1983) (citation omitted).   Both the result of the rulemaking and "the

process by which [the Department] reaches that result must be logical and rational."   *Allentown*

*Mack Sales & Serv., Inc. v. NLRB*, 522 U.S. 359, 374, 118 S. Ct. 818, 826 (1998).

An agency decision will be "set aside if it 'has relied on factors which Congress had not

intended it to consider, entirely failed to consider an important aspect of the problem, offered an

---

[47]   An overview of the serious flaws and absurd results of the GE Rules is provided in the APC video
entitled *Gainful Employment's Failing Grade* (submitted to Office of Management and Budget on Oct. 9,
2014 as part of their review of the GE Rules), http://gainfulemployment.apc-colleges.org/gainful-
employments-failing-grade/.

explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *Guertin v. U.S.,* 743 F.3d 382, 386 (2d Cir. 2014).  If an agency changes course, the agency must "explain the basis for that change," and "show that there are good reasons for the new policy."  *F.C.C. v. Fox Television Stations, Inc*., 556 U.S. 502, 515, 549, 129 S. Ct. 1800, 1811, 1830 (2009).  *See Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 981, 125 S. Ct. 2688, 2699 (2005) ("unexplained inconsistency" is arbitrary and capricious).

Finally, an "agency is bound to follow procedures required by its own regulations." *Bergamo v. Commodity Futures Trading Comm'n*, 192 F.3d 78, 79 (2d Cir. 1999).  *See Picca v. Mukasey*, 512 F.3d 75, 79 (2d Cir. 2008) (vacating agency decision where it was evident "that the agency failed to adhere to [its] regulations"); *Mitchell v. Lara*, 11 CIV. 1540 LBS, 2011 WL 5075117, at *4-6 (S.D.N.Y. Oct. 25, 2011) (reversing decision re petition where there was evidence that Bureau of Prisons "failed to follow the internal regulatory guidelines").  Thus, the Department's Information Quality Guidelines ("Quality Guidelines")[48] are relevant in determining whether the GE Rules are arbitrary and capricious.  Here, as shown below, the Department violated not only the APA but its own Quality Guidelines, by failing:  to utilize "state of the art methodologies;" to document the reliability of data; to use "modern statistical techniques suitable for hypothesis testing;" and to subject products to "peer review."  *Id.* at 5-7.

### 2.    The GE Rules Are Arbitrary And Capricious Because There Is No Evidence They Measure Program Quality.

Under the APA, an agency is required to "examine the relevant data," make a "rational connection between the facts found and the choice made" and "'cogently explain why it has

---

[48]        *Information    Quality    Guidelines,*   U.S.    Dep't    of    Educ., http://www2.ed.gov/policy/gen/guid/iq/infoqualguide.pdf.   The Quality Guidelines impose especially rigorous requirements with respect to "influential information," such as the GE Rules.  *Id.* at 9.

exercised its discretion in a given manner.'" *Motor Vehicle*, 463 U.S. at 43, 48, 103 S. Ct. at 2866, 2869; *APSCU*, 870 F. Supp. 2d at 149.  There is no rational connection between the purported purpose of the GE Rules and the GE Rules themselves.  The Department claims the GE Rules are supposed to measure whether gainful employment programs provide "*quality education and training to their students*" to enable them "to pay back their student loan debts." 79 Fed. Reg. 64,890.  As shown below, they do not.

Astonishingly, the Department offers *no evidence at all* of the relationship between the D/E Rates and program quality.  Perhaps this giant hole in the Department's rationale is attributable to the fact that measuring program quality is far beyond the Department's expertise or authority;[49] rather, Congress delegated this responsibility to state regulators and accreditors, which the Department recognizes "*as reliable authorities concerning the quality of education*" (*see supra* Section IV.C.1).  In fact, the only study the Department performed to evaluate the factors affecting the D/E Rates establishes that the D/E Rates largely measure student characteristics, such as family income or minority status, rather than a program's ability to prepare students for gainful employment.  *See* 79 Fed. Reg. 65,052.

Importantly, prior to the public comment period, the Department's initial flawed regression analysis found that only 2% of the variance in the annual D/E Rate was attributable to student characteristics of Pell Grant status (as a proxy for income) and minority status, and 36% of the variance was attributable to a mixture of student characteristics and other variables such as educational sector (i.e., public, non-profit, for-profit).  79 Fed. Reg. 65,041-42.  However, after public comment and APC's submission of the Parthenon Report demonstrating the D/E Rates primarily measure student demographics, the Department ran a second regression analysis, this

---

[49]  *See* 79 Fed. Reg. 64,915 (Department also "disagreed that programs should be evaluated according to each program's curriculum" and "quality of instruction").

time demonstrating that 44% of the variance in the annual D/E Rates was attributable to non-program quality factors, principally student demographics.   79 Fed. Reg. 65,053.   The Department has now twice admitted that its initial analysis was incorrect; first in the 2011 litigation, and again now.  It's analysis on this important issue simply cannot be trusted.

Indeed, Parthenon's expert report addressed the flaws in the Department's methodology and tested the true relationship between student characteristics and D/E Rate outcomes. Parthenon ran a more robust regression analysis correcting for variables that the Department had previously found affected student outcomes but improperly omitted in its initial analysis.[50]  The Parthenon analysis, which the Department does not dispute, determined that student characteristics, including minority status, gender, age, Pell eligibility, average aid, enrollment status, and degree level, explained 47% of the variance in the annual D/E Rates:[51]



**Annual Debt to Earnings**
**Institution-Level Data Regression**

---

[50]  The Department's 1995 NCES report identified seven major risk factors for student success:  "delayed enrollment, part-time attendance, financial independence, having dependents other than a spouse, being single parents, working full time while enrolled, and failing to graduate from high school."  Chris Ross & Nigel Gault, *Gainful Employment Rule Measures the Characteristics of the Students, Not the Effectiveness of the Programs* (May 2014) ("Parthenon Rpt."), at 6 (AR-H-109144).   Similarly, the Department's 2012 regression analysis of student characteristics showed that they significantly impacted the likelihood of completing a degree, with the odds being 32% lower for males, 43% lower for black students, and 25% lower for Hispanic students.  *Id.* (AR-H-109144).   Yet the GE Rules ignore these factors.

[51]  *See* Parthenon Rpt. at 14 (AR-H-109152).

As Parthenon explained:

> *Our finding demonstrates that the annual debt-to-earnings rate that ED has included in the GE Rule[s] is a good measure of student characteristics, but it fails as a measure of whether the programs prepare their students for gainful employment.*

*Id.* at 13 (AR-H-109151) (emphasis added).

But the difference between the Department's view and Parthenon's is of no moment. Whether the variance is 44% (as the Department contends) or 47% (as Parthenon shows), in either case the GE Rules are arbitrary and capricious.  Indeed, in determining the proper time period and the proper cohort size, the Department found that far smaller statistical probabilities of mischaracterization were unacceptable.  The Department ultimately opted for a cohort size of 30 and a multiple-year cohort period because a "0.7%" statistical probability of mis-measurement was too high given the "substantial" consequences regarding program eligibility. 79 Fed. Reg. 64,947.  And yet, the Department blithely proceeded with D/E Rates that do not measure what they are supposed to measure at least 44% of the time.  Under these circumstances, the GE Rules cannot establish the necessary rational connection between the facts found and the choice made to survive review.

And that is just the starting place.  The Department offers no evidence as to other factors that logically would account for the remaining 53% of program variance, such as macroeconomic factors, local economic conditions, and student's personal choices,[52] and it failed to submit its limited analysis to peer review.  These facts alone, combined with its history of

---

[52] *See, e.g.*, James H. Stock and Mark W. Watson, *Introduction to Econometrics: First Edition* (2003), at 144 (discussing "omitted variable bias").  For example, after completing a GE program, a student may choose to accept a lower salary for numerous reasons unrelated to the quality of the education, such as non-profit sector work, childbirth, care of a sick relative, illness, or low-paying apprenticeship that promises higher pay in the long term.  *See* APC Comments at 58 (AR-H-109088).  Denying the obvious, the Department claims that the D/E Rates do not "hold[] schools responsible for a student's career decisions."  79 Fed. Reg. 64,895.  But that is exactly what they do.

flawed analyses, must lead the impartial observer to conclude that the Department is not engaging in methodologically sound practices, but rather in result-driven statistical shenanigans.

And that is indeed the case.  The Department improperly used *single* variable regression analysis to argue that the "regulations do not *primarily* measure student demographics because indicators of many student characteristics have similar passing rates across quartiles."  79 Fed. Reg. 65,052 (emphasis in original).  If by "*primarily*," the Department means more than 50%, then the Department's argument is a meaningless distinction.  In any event, the whole point of conducting a statistically sound *multivariate analysis* such as that employed by the Department in explaining 44% of the variance in outcomes, rather than such a single factor analysis, is to look at the impact of factors jointly.[53]

### 3.    The GE Rules Employ An Irrational Methodology.

The APA and the Department's own Quality Guidelines require the Department to use a "logical and rational" process (*Allentown*, 522 U.S. at 374, 118 S. Ct. at 826), including a "state of the art methodology" or "modern statistical technique."  Quality Guidelines at 5-7.[54]  Instead, it employed a methodology, which it failed to have peer reviewed, that illogically focuses on student income at its lowest just a few years after graduation.  An expert report submitted in the rulemaking concluded not only that was it "economically irrational" for the Department to rely on student earnings measured shortly after graduation given the well-documented increases in

---

[53]   Similarly, while admitting that "many of the demographic variables are statistically significant" the Department claims that "the magnitude of the coefficients is sufficiently small indicating that these [race/ethnicity] factors have little impact on annual earnings rates . . . ."  79 Fed. Reg. 65,054.  Again, however, the Department's response is misleading.  It is inapposite to the Parthenon Report's finding that 47% of the variance in the annual D/E Rate is due to the *constellation of student characteristic factors* (not just race/ethnicity) that the Department has identified as affecting student success.

[54]   *See Friends of Boundary Waters Wilderness v. Bosworth*, 437 F.3d 815, 824 (8th Cir. 2006) (agency's reliance on methodology that was "unreliable or inadequately explained" was "arbitrary and capricious.") (internal quotation omitted); *High Sierra Hikers Assn v. Weingardt*, 521 F. Supp. 2d 1065, 1075 (N.D. Cal. 2007) ("if the [agency's] methodology is unreliable, the choice of that methodology and decisions based thereon are arbitrary and capricious").

graduates' income that continue for decades, but also that Department's D/E Rates were contrary to universally accepted economic methodology.  Bradford Cornell, *First Expert Report of Professor Bradford Cornell Regarding Proposed Gainful Employment Regulation* (May 27, 2014) ("First Cornell Rpt."), at 4 (AR-H-109168).

*First,* the Department arbitrarily picked the time period for measuring earnings.  It provides *no justification* for selecting the specific 18 to 30 month period in which to commence the measurement.[55]  Given the Department's admission regarding the rapid increase in graduates' earnings[56] ("as much as 43 percent between the first few years out of postsecondary education and the sixth to tenth years out") (75 Fed. Reg. 43,666)),[57] it is apparent that even an additional year in the time period selected is of critical importance because it would radically affect the D/E Rates.  Since this critical standard "was not based upon any facts at all," "the court must conclude that it was chosen arbitrarily."  *APSCU,* 870 F. Supp. 2d at 154.

*Second,* even if the Department had attempted to justify the time period it selected, it could not pass APA review.  There is no "rational connection" between the rapid increase in student earnings and "the choice made" to begin testing the value of education in so short a period as 18 to 30 months after graduation.  *Motor Vehicle*, 463 U.S. at 43, 103 S. Ct. at 2866.

*Third,* and most important, the Department's D/E Rate methodology is "fundamentally flawed" and "economically irrational."  First Cornell Rpt. at 5 (AR-H-109169).  Basic, well-

---

[55]  This period to measure earnings will begin as early as 18 months after graduation for the many students on a traditional academic calendar who complete in June of one year, since the calendar year beginning on the second succeeding January 1 will be "the most currently available" year that the SSA will use to provide earnings data.  *See* 34 C.F.R. § 668.404(c).

[56]  The Department conceded that numerous publicly available studies are to the same effect, including those of the U.S. Census Bureau.  79 Fed. Reg. 64,914.

[57]  Similarly, NCES data shows that there is 37% increase from the first year to the fourth year after graduation for bachelor degree graduates.  *See* Susan Choy et al., *Ten years After College: Comparing the Employment Experiences of 1992-93 Bachelor's Degree Recipients With Academic and Career-Oriented Majors,* NCES (Feb. 2008), http://nces.ed.gov/pubs2008/2008155.pdf.

established economic theory as applied by, among others, Noble Prize laureate Gary Becker and Federal Reserve Bank of New York researchers,[58] provides that the value of an educational investment must be measured by the income provided *as a result of the investment over its lifespan*. Thus, to properly measure an educational program's value, one must examine the difference *over the course of their working lives* between (a) the income of individuals who did not obtain the additional education and (b) the income of those who did. This delta in lifetime income (reduced to present value) is then compared to the debt incurred, the difference being the net present value ("NPV") of the investment. If the NPV is positive, then basic economic theory teaches that it makes sense to undertake the investment. First Cornell Rpt. at 10-12 (AR-H-109174-109176).

By contrast, the Department's GE methodology is "irrational" and "fundamentally flawed" because "it values the programs based on the graduates' income for just a few short years after graduation." First Cornell Rpt. at 5 (AR-H-109169). There is no rational connection between the Department's purpose of measuring "program quality" and the methodology it selected. The Department's proposed shorter time periods do not begin to capture this long-term economic benefit of earning a degree, and falsely indicate that "investment in post-secondary education at proprietary institutions would almost always appear to be a losing proposition." *Id.*

---

[58]  *See* Gary S. Becker, *Human Capital: A Theoretical and Empirical Analysis with Special Reference to Education* (2d ed. 1975), at 104, http://www.nber.org/chapters/c3734.pdf ("The rational decision is to select a path that maximizes the present value of 'profits'; that is, the present value of the difference between these benefits and costs [of investment]."); Brian P. McCall, "Human Capital," *Encyclopedia of Educ. Econs. & Fin.* (2014), at 392 ("Because costs and benefits occur at these different times, one key element in human capital theory is the notion of present value of future earnings that adjusts for these time differences using a specified discount rate."); Jaison R. Abel & Richard Deitz, *The Value of a College Degree*, http://libertystreeteconomics.newyorkfed.org/2014/09/the-value-of-a-college-degree.html#.VMFsvkfF_HV. Courts likewise have long relied on the NPV methodology. *See, e.g., Taylor v. Am. Specialty Retailing Grp., Inc.*, No. CIV.A. 19239, 2003 WL 21753752, at *3 (Del. Ch. July 25, 2003) (court used NPV methodology); *Grimes v. Vitalink Commc'ns Corp.*, No. 12334, 1997 WL 538676, at *1 (Del. Ch. Aug. 28, 1997) (same).

39

at 20 (AR-H-109184).  As the chart Professor Cornell submitted to the Department demonstrates, a proprietary college education provides substantial NPV even after financing costs are taken into account:



Note: This analysis uses the expected federal student loan interest rate of 4.66% for the 2014-15 academic year for undergraduate students as the financing cost to calculate the net present value.
Sources: U.S. Census Bureau's Current Survey 2006-2008; the College Board; U.S. Bureau of Labor Statistics; Survey of Professional Forecasters; US Treasury Department; New America Foundation

*See* First Cornell Rpt. at 21 (AR-H-109185).[59]

The Department's response in its commentary makes no sense.  It acknowledges that measuring "earnings gains" (i.e., NPV) "may provide some information on program quality" and that "the return on investment from training may well be experienced over a lifetime . . . ."  79 Fed. Reg. 64,913-14.  Indeed, the Department does not dispute any of Professor Cornell's methodological analysis, and the *coup de grace* for its contention that the D/E Rates properly measure preparation for gainful employment is its admission in the draft framework for its Postsecondary Institutional Ratings System ("Ratings Plan") that "long-term earnings outcomes

---

[59]   Federal Reserve researchers Abel and Deitz likewise concluded that there is a very substantial net present value to a college degree.  *See supra* n. 58.

more closely correlate with an individual's lifetime earnings and are thus a better proxy for career success"[60] than are short term measures.

But the Department's about-face position with respect to the GE Rules is that it doesn't care: "[R]egardless of the benefits that may accrue to them over their entire career," the "benefits ultimately available over a lifetime may not accrue soon enough to enable the individual to repay the student loan debt under and within the schedules available under the title IV HEA programs." 79 Fed. Reg. 64,914. Thus, even though investment in an education program yields substantial benefits to students far exceeding the cost, and even if none of the students default, if the investment does not have a short-term immediate return that the Department feels is sufficient, then a program will fail the D/E Rates, while similar results may get another institution a high mark under the Department's new college ratings plan.

Having abandoned its proposed "pCDR" metric (which would have directly measured whether students were repaying their loans on a program basis) because it needed "further study" (79 Fed. Reg. 64,915), the Department necessarily abandoned any real attempt to justify the GE Rules on the basis that they somehow protect the public fisc. Indeed, the Department never disputes, because it cannot, that the annual D/E Rate is *negatively correlated* with the pCDR, meaning that programs that *fail the D/E Rates are more likely to pass the pCDR* (thus evidencing acceptable default levels).[61] So the Department, recognizing that it needs some alternative justification, delves into a range of psychological/social effects that in its wildest imaginings it cannot actually believe Congress intended to consider in connection with the term "gainful

---

[60] *A New System of College Ratings– Invitation to Comment,* U.S. Dept. of Educ. (Dec. 2014), at 12 http://www2.ed.gov/documents/college-affordability/framework-invitation-comment.pdf.

[61] *See* CRA Rpt. at 45 (AR-G-001868). The D/E Rates are also inconsistent with the Department's alleged concern over unmanageable debt not payable "within the [Title IV] schedules" (79 Fed. Reg. 64,914) because those rates exclude how much students actually pay, including consideration of Department-sponsored income based repayment ("IBR") plans, under which payments are tied to a percentage of the graduate's income, usually 15%. *Id.* at 42 (AR-G-001865).

employment," including:  graduates' problems with their "marriage," "signing up for utilities," and "obtaining insurance."  79 Fed. Reg. 64,913-14.  Congress never gave the Department authority to micro-manage students' lives, or to dictate that they lower their sights and sacrifice long-term gain for short-term advantage.  With typical bureaucratic heavy-handedness, the Department has denied millions of students the right to make a decision to pursue a program that will benefit them in the long term.

### 4. The D/E Rates' Use Of 8 Percent And 20 Percent Thresholds, Based On Irrelevant Mortgage Practices, Is Arbitrary And Capricious.

The Department's use of the 8% annual D/E Rate and the 20% discretionary D/E Rate threshold for programs to pass is arbitrary and capricious.  When an agency selects a fixed figure bright-line rule, it must provide "substantial evidence" to support its choice and respond to substantial criticism of that figure.[62]  The Department has done neither.

*First*, while acknowledging the critical importance of "expert opinion" in justifying it metrics,[63] the Department's contention in the Notice of Proposed Rulemaking that it based the passing thresholds for its D/E Rates upon such "expert recommendations" is false.  79 Fed. Reg. 64,919.  The Department's response to a FOIA request stated that it "unfortunately" could locate no records of any communication with a *single outside expert* regarding the thresholds.[64]

---

[62]  *Islander E. Pipeline Co., LLC v. Conn. Dep't of Envtl. Prot.*, 482 F.3d 79, 100 (2d Cir. 2006); *see Yale-New Haven Hosp. v. Leavitt*, 470 F.3d 71, 86 (2d Cir. 2006) (same); *Nat'l Audubon Soc'y. v. Hoffman*, 132 F.3d 7, 17 (2d Cir. 1997) (same).

[63]  In declining to revive the Repayment Rate metric, the Department noted that:  "We have not identified any expert opinion, nor has any statistical analysis demonstrated, that a particular level of repayment should serve as an eligibility standard."  79 Fed. Reg. 64,915.  However, that did not stop the Department from implementing this metric as part of the 2011 GE Rules, and the Department is now attempting the same with the revised D/E Rates.

[64]  Ltr. from Dept. to N. Carroll, dated Sept. 15, 2014.  The Department's failure to consult appropriate experts violated its Quality Guidelines, which required the GE Rules "undergo peer review" (Quality Guidelines at 6), and reveals that it either feared that outside experts would reject its approach or acted without a sufficient level of care.

*Second,* the Department admits that it based the D/E Rates on "mortgage industry practices" (79 Fed. Reg. 64,919), but *it offers no explanation why mortgage practices are relevant to measuring program quality for recent graduates*.  For its D/E Rate metrics, the Department principally relies on a 2006 study by Baum & Schwartz.[65]  That study recites that the 8% mortgage standard is based on the difference between:  (a) the so-called "front-end" percentage (projected mortgage payments divided by gross income) and (b) the "back-end" percentage (total credit commitments divided by gross income), the difference between those percentages being 8%.  This projected difference is theoretically the sum available to pay non-mortgage debt, such as student loans.

However, the Baum & Schwartz study concluded that mortgage practices have no relevance to educational debt:

> [Using] ratios historically used for mortgage qualification as a benchmark for manageable student loan borrowing *has no particular merit or justification*.

Baum & Schwartz at 3 (AR-G-000300) (emphasis added).  Thus, the Department's primary "experts" contradict the Department's use of their research.[66]  Professor Cornell also found that the "Department's reliance on mortgage practices for its selection of the 8% and 20% metrics is

---

[65]  Sandy Baum & Saul Schwartz, *How Much Debt Is Too Much?  Defining Benchmarks For Managing Student Debt,* The College Board (2006) ("Baum & Schwartz") (AR-G-000292).  The Department also cites several additional studies, but all of these sources are older than Baum & Schwartz, cite to Baum & Schwartz for the 8% standard, and/or acknowledge that a threshold higher than 8% would be acceptable, with some studies suggesting the student loan payment-to-income ratio could be 15% or even 18%.  *See, e.g.,* Sandy Baum & Marie O'Malley, *College on Credit: How Borrowers Perceive Their Education,* Journal of Student Financial Aid (2003), at 4-5 (AR-G-000278) (federal income contingent loan program allows for payment-to-income ratios of 15% to 18%, depending on the borrowers' income); *Increasing College Access or Just Increasing Debt? A Discussion About Raising Student Loan Limits and the Impact on Illinois Students,* Illinois Student Assistance Commission (2001), at 18 (AR-G-001982) (up to 15% of income could be used for student loan payments).

[66]  Baum & Schwartz (the Department's only source for the 20% metric) (79 Fed. Reg. 64,919), characterized the 20% metric as "somewhat *arbitrary*," and cautioned that it "should be used thoughtfully with modification for family size, geographical location, age, and family background," which of course the Department did not do.  Baum & Schwartz at 12 (AR-G-000309) (emphasis added).  Indeed, there is no substantial evidence supporting the 20% metric.  *See* APC Comments at 52 (AR-H-109082).

economically irrational and entirely unsupported" because the "Department offers no data to support its assumption that mortgage debt has any relevance to students a few years out of school . . . ."[67]

Importantly, not only is the Department's basic assumption that mortgage debt has relevance to students recently out of school wholly unfounded, it is false.  As a recent Federal Reserve Bank of New York study found, *almost 80% of recent graduates do not own a home and thus have no mortgage payments, rendering mortgage ratios totally irrelevant*.[68]  But the Department wholly failed to address this dispositive issue, let alone provide any explanation.

*Third,* the Department's application of mortgage practices to a rule relating to student loans just a few years after graduation is irrational because "mortgage practices do not consider the fact that a graduate's income is expected to increase substantially over the fifteen years following graduation," making it "easier for that graduate to make payments on that debt," and reflecting "the long-term value of the educational program."  Second Cornell Rpt. at 10 (AR-H-109221).  Baum & Schwarz, on which the Department relies, reached the same conclusion.[69]  Consequently, programs that fail the GE Rules' metrics for graduates a few years out of school will pass those metrics later.  *See* Second Cornell Rpt. at 12 (AR-H-109223).[70]

---

[67]  Bradford Cornell, *Second Expert Report of Professor Bradford Cornell Regarding Proposed Gainful Employment Regulation* (May 27, 2014) ("Second Cornell Rpt."), at 5, 9-10 (AR-H-109216, 109220-109221).

[68]  *See* Meta Brown et al., *Just Released: Young Student Loan Borrowers Remained on the Sidelines of the Housing Market in 2013*, Federal Reserve Bank of New York: Liberty Street Economics (May 13, 2014), http://libertystreeteconomics.newyorkfed.org/2014/05/just-released-young-student-loan-borrowers-remained-on-the-sidelines-of-the-housing-market-in-2013.html#.U4Tm2_ldW4I (in 2013, less than 22% of people nationwide age 27 to 30 who had student loans also had home-secured debt), cited in APC Comments at 48 (AR-H-109078).

[69]  Baum & Schwartz at 12 (AR-G-000309) (finding that the 8% metric fails to account for the fact that student borrowers are likely to have much higher incomes over time and that "[t]he percentage of income that borrowers can reasonably be expected to devote to student debt repayment increases with income.").

[70]  The use of mortgage practices is also flawed because "[m]ortgage payments are a consumption expenditure," while education is a capital good investment.  Second Cornell Rpt. at 12 (AR-H-109223).

*Fourth*, even if mortgage practices could conceivably be relevant (which they are not) the Department inexplicably chose to rely on 8% and 20% thresholds that are at least 10 years out of date. Current debt-service-to-earnings ratios have evolved – reaching 45% under current Fannie Mae guidelines and 43% under the Consumer Financial Protection Bureau standards for a qualified mortgage, which are higher than the ratios that Baum & Schwartz used in their 2006 study.[71] Moreover, without any supporting evidence, the Department reaches the 8% and 20% figures by assuming that graduates take out the maximum amount on their (non-existent) home loans. This assumption is likewise false.[72]

*Fifth*, the Department is required to provide a "reasoned explanation" for a change in policy. *See, e.g., Brand X*, 545 U.S. at 1000-01, 125 S. Ct. at 2700. Here, the Department acted arbitrarily by altering the thresholds for passing the D/E Rates that it had proposed in the 2011 GE Rulemaking. Under the 2011 GE Rules, a program passed if it had an annual D/E Rate below 12% or a discretionary D/E Rate below 30%. 76 Fed. Reg. 34,448. By tightening those thresholds to 8% and 20%, the new GE Rules require that program graduates increase their earnings *by 50%* to pass the same test.

The Department's explanations for this dramatic 50% change in the passing thresholds do not survive arbitrary and capricious review. *First*, the Department argues that it "believe[s] it would be very difficult for an individual earning $18,000 to manage that [12%] level of debt,"

---

[71]  *See* Second Cornell Rpt. at 15-16 (AR-H-109226-109227) (citing *Selling Guide: Debt-to-Income Ratios*, Fannie Mae (2014), https://www.fanniemae.com/content/guide/selling/b3/6/02.html); *see also Summary of the Ability-to-Repay and Qualified Mortgage Rule And The Concurrent Proposal*, Consumer Financial Protection Bureau, http://files.consumerfinance.gov/f/201301_cfpb_ability-to-repay-summary.pdf.

[72]  Recipients of an associate degree or bachelor degree pay between 24% and 26% of their pre-tax income toward housing. *See* Second Cornell Rpt. at 16 (AR-H-109227). Thus, "[i]f a mortgage lending practice were to be used to determine a D/E Rate, the [Bureau of Labor Statistics] data implies that a significantly higher threshold for student debt service, in the range of 18% to 20%, would be supportable." *Id.*

but cites no supporting data.  79 Fed. Reg. 64,920.  Indeed, it does not even argue that any significant percentage of those recent graduates making $18,000 have any mortgage debt at all.

*Second*, the Department claims that "zone programs are much more similar to their failing counterparts than their passing counterparts," and thus they should be "ultimately treated the same."  79 Fed. Reg. 64,920.  This analysis fails because it uses discredited metrics to compare the three program groups (those passing, those in the zone, and those failing). Unbelievably, the Department compares the performance of these groups under the "repayment rate," a metric that the *APSCU* court rejected as "arbitrary."  *APSCU*, 870 F. Supp. 2d at 137.[73]

*Third*, the Department illogically states that a buffer is unnecessary because the zone "lowers the probability to close to zero that passing programs will lose eligibility because they are mischaracterized as being in the zone as a result of atypical factors."  79 Fed. Reg. 64,920. But this is a total non sequitur.  Even if a program is not mischaracterized, if it is in the "zone" for four years, it still loses eligibility.

### 5.    The D/E Rates' Use Of SSA Data Is Arbitrary And Capricious.

The Department's use of SSA data in the GE Rules is arbitrary and capricious for at least three reasons.  *First,* the GE Rules provide no means to adjust the D/E Rates for graduates who obtain employment in the middle of year by prorating partial-year incomes.[74]  Instead, the GE Rules treat programs that produce graduates who earn $60,000 annually (or $5,000 a month) but began working in the last two months of the year (because of maternity leave, illness, or personal choice) the same as programs whose graduates worked a full year but earn $10,000 annually.

---

[73]   Moreover, the Department's contention does not support its line-drawing.  A program with a 9% or even a 9.99% annual D/E Rate is still closer to passing than to failing.

[74]   The GE Rules instruct the Department to calculate the D/E Rates "[f]or each award year," which runs from July 1 to June 30.  34 C.F.R. § 668.403(b).  Yet the Department calculates the earnings portion of the D/E Rates by obtaining from SSA the most currently available "annual earnings" (presumably calendar year) of the applicable students.  34 C.F.R. § 668.404(c); *see* 79 Fed. Reg. 64,929.

*Second,* the GE Rules use of loan data for periods preceding the GE Rules' effective date renders the GE Rules impermissibly retroactive.  *See supra* Section IV.A.4.[75]  *Third,* the GE Rules improperly grant the SSA data a presumption of accuracy.  *See supra* Section IV.A.3.

### 6.   The GE Rules Produce Irrational Results.

At the heart of the APA standards is the requirement that agencies engage in "reasoned decisionmaking."  *Allentown*, 522 U.S. at 374, 118 S. Ct. at 826.  An agency's "adherence to a formula . . . that causes *unreasonable results* is further evidence that the [agency's] determinations were arbitrary and capricious."  *Veltri v. Abbott Severance Pay Plan for Employees of Kos Pharms.*, Civ. A. No. 08-00915 (PGS), 2013 WL 396127, at *22 (D.N.J. Jan. 30, 2013) (emphasis added); *see Zia Hospice, Inc. v. Sebelius*, 793 F. Supp. 2d 1289, 1299-1300 (D.N.M. 2011) (same).[76]  The GE Rules are irrational, producing absurd results that belie their stated purposes of evaluating program quality, for the following reasons.

*First*, the GE Rules allow programs to pass with a 0% graduation rate, a 0% placement rate, and/or a very high default rate because they use median debt figures, meaning any program in which fewer than 50% of the covered graduates took out loans gets an automatic pass.  Thus, a program with 100 graduates in the cohort, where 51 have no loans will get a free pass, even if all the remaining 49 borrowers default, have a 20% annual D/E rate, and earn low if any salaries.  This violates the Department's supposed purpose to prevent institutions from saddling students with debt they cannot afford.  Similarly, a program that does not graduate a single student would (and does) pass the D/E Rates because the debt and earnings of non-graduates are not evaluated.

---

[75]  Retroactive rulemaking also violates the APA because a school cannot conform its conduct to the GE Rules.  *See, e.g., Rock of Ages Corp. v. Sec'y of Labor*, 170 F.3d 148, 158 (2d Cir. 1999) ("We are prohibited from applying a regulation to conduct that took place before its enactment in the absence of clear congressional intent").

[76]  *See also Yepes-Prado v. U.S. I.N.S.*, 10 F.3d 1363, 1370 (9th Cir. 1993), as amended (Nov. 12, 1993) ("Agencies abuse their discretion no less by arriving at plausible decisions in an arbitrary fashion than by reaching unreasonable results."); *Andre v. Chater*, 910 F. Supp. 1352, 1365 (S.D. Ind. 1995) (same).

*See* 34 C.F.R. § 668.404(b)(1)(i), (c).   The rules do, however, protect many programs at community colleges where fewer than 50% of the covered graduates took out loans since their tuition is subsidized by other sources.[77]   Further, programs with a low graduation rate pass simply because they do not graduate enough students to be subject to the Rules.

Conversely, the GE Rules will fail a program with a documented 100% graduation rate and a documented 0% default rate, where the students graduate in or near a recession, or where they make personal choices (such as raising a family or caring for a sick relative) that do not immediately lead to a high paying job.  This is not rational decisionmaking.

*Second,* the GE Rules directly conflict with and undermine the Regents' regulatory scheme, which regulates APC colleges and the content and quality of their degree programs.  *See supra* Section IV.C.1.

*Third,* the GE Rules cannot be a reasonable measure of program quality because a growing number of reports establish that degree programs at most colleges cannot pass the D/E Rates.  *See* APC Comments at 19-21 (AR-H-109049-109051).   For example, an NCES study using a comparable methodology determined that the *nationwide average* annual D/E Rate for bachelor degree programs *at all schools* is a failing 13%.[78]   These facts establish that the Department's methodologically improper estimate of the number of students enrolled in

---

[77]   *See* Mark Kantrowitz, *U.S. Department of Education Proposes Stricter Gainful Employment Rule* (April 2014), at 9 (AR-G-002091) ("basing amortization on median debt (which is zero when less than half of students borrow) . . . effectively grant[s] a free pass to most programs at public colleges."); *Comments on Gainful Employment Rule*, Association of Community College Trustees & American Association of Community Colleges (May 27, 2014), at 1-2 (AR-H-072868-072869) ("only nine percent [of certificate students at public two-year institutions] take out federal loans."   Indeed, the Department made this explicit by assuring these public colleges that 61% of all these programs would have zero median debt and automatically pass on that basis.  79 Fed. Reg. 64,900.

[78]   APC Comments at 19 (AR-H-109049).  A study of graduates from flagship University of Texas by the former Commissioner of the NCES, Dr. Mark Schneider, demonstrated that 28% of all programs in the study would fail or score in the warning zone, rising to 54% if the calculations are based on those graduates who borrowed to finance their education.  *See* Mark Schneider, *Are Graduates from Public Universities Gainfully Employed?*, American Enterprise Institute (May 2014), at 4 (AR-G-002910).

programs that will not pass woefully understates the devastating effect of the GE Rules, depriving "between 2 and 7.5 million students" of the chance at higher education in the next 10 years.[79]

The Department had access to a wide range of data and could have easily done an analysis of *all programs* to test the D/E Rates' rationality and expected results. Instead, consistent with its choice to evade any peer review of its methods, it chose to stick its head in the sand. It simply does not want its D/E Rate metrics to face such scrutiny. So the Department's response was to criticize these studies on the very basis that it should have considered them: that their data focuses "on studying all undergraduate students rather than just students who attend GE programs . . . ." *Id.* This is especially surprising given that students often choose between identical GE and non-GE programs, but the Department provides no data for the non-GE programs. The Department has failed to heed the Supreme Court's admonition to "examine the relevant data." *Motor Vehicle*, 463 U.S. at 43, 103 S. Ct. at 2866. *See* Second Cornell Rpt. at 12-13 (AR-H-109224-109225).

*Fourth*, the GE Rules mislead students because they require extensive disclosures respecting programs at proprietary colleges (*see* 34 C.F.R. §668.412), while failing to require the same disclosures from identical public and non-profit degree programs. The effect will be to encourage students to attend public and non-profit programs, even if they perform poorly on metrics that are far more relevant by any sensible academic measure. This particularly concerns APC colleges that offer degree programs that not only compete with non-profit and public colleges, but also in many cases achieve superior results based on well-established metrics such

---

[79] CRA Rpt. at i (AR-G-001816).

as graduation rates, default rates, and others.[80]   The Department admits that its failure to require

such disclosure impairs students' "ability to compare degree programs" (79 Fed. Reg. 64,978),

but offers no explanation why it chose not to require such disclosures.

Furthermore, the GE Rules will mislead students because the disclosure requirements

improperly require institutions to disclose the fatally flawed Repayment Rate and pCDR metrics.

The 2011 GE Rules were vacated on the grounds that the Repayment Rate threshold metric "was

not based upon any facts at all" and was "chosen arbitrarily."  *APSCU*, 870 F. Supp. 2d at 154.

The Department also admitted that "further study is necessary before we adopt pCDR . . . ."  79

Fed. Reg. 64,915.[81]   Thus, requiring disclosure of these clearly flawed metrics is irrational.

*Fifth*, the student warnings (34 C.F.R. § 668.410(a)(2)) require a statement that "[t]he

Department based these standards on the amounts students borrow for enrollment in this program

and their reported earnings."  This warning is arbitrary and capricious because it is false in that:

(i) by choosing a "median" student debt standard the Department has taken care to avoid

capturing the amount that all students borrow or the earnings of all graduates; and (ii) by basing

the D/E Rates only on students who receive Title IV funding, the Department is further limiting

the population of students whose debt and earnings figures are reflected in the D/E Rates.

### 7.   The GE Rules Improperly Exclude Non-Title IV Students.

The GE Rules exclude from the D/E Rates calculations students who do not receive Title

IV funds.  This exclusion improperly skews the D/E Rates and places programs with low counts

of Title IV students at higher risk.  *See* APC Comments at 58-60 (AR-H-109088-109090).

---

[80]  *See supra* Section II.C; APC Submission to U.S. Office of Management and Budget (Oct. 9, 2014) (AR-A-000476) (Compl. Ex. 2) (list of the 58 community colleges with default rates higher than graduation rates, none of which have programs that fail under the GE Rules).

[81]  Further, the pCDR is an arbitrary and capricious metric because it substantially measures factors irrelevant to how well an educational program prepares students for gainful employment, as established by the unrefuted Parthenon Report, which found that 63% of the variance in the pCDR was based on student characteristics.  *See* Parthenon Rpt. at 18 (AR-H-109156).

*First,* evaluating GE programs based on a fraction of a program's students is arbitrary and capricious because it will inaccurately drive up D/E Rates. The excluded students not receiving Title IV funds must have other resources to pay for their tuition and fees,[82] and also have far less debt. The Department told the *APSCU* court that inclusion of non-Title IV students was so important to the integrity of the GE Rules that *it could not proceed* with the GE Rules without the non-Title IV data because it would be "unable to calculate a program's repayment rate and debt-to-income ratios, even for informational purposes," without that data. *APSCU II,* 930 F. Supp. 2d at 221. But now the Department proceeds to do so anyway.

*Second,* the Department concedes that the new GE Rules contradict its prior policy by limiting the definition of "student" to those individuals who received Title IV funds, and admits that this is "a significant difference between the proposed regulations and the 2011 Final Rules." 79 Fed. Reg. 16,433. The Department attempts to justify its new approach by asserting it "is aligned with the court's interpretation in *APSCU*" regarding the Department's limited authority to maintain records in NSLDS. 79 Fed. Reg. 64,899. However, the Department cannot use a court decision holding that it could not legally collect private student loan information to legitimize proceeding without data that it has admitted is crucial.

*Third,* the Department claims that by limiting the D/E metrics to students who receive Title IV funds, it can "effectively evaluate how the GE program is performing with respect to the students who received the Federal benefit that we are charged with administering." 79 Fed. Reg. 64,899. This contention is also false. The GE Rules' stated purpose is to measure whether programs prepare students for gainful employment. It is irrelevant whether students receive Title

---

[82] *See* Schneider at 4 (AR-G-002910) (excluding more affluent students "could reduce the overall earnings of graduates, suppressing measures of the labor market success of program graduates.").

IV funds or not, and the Department provided no analysis to show that the D/E Rates accurately measure anything about these programs if non-Title IV students are excluded.[83]

### 8.    The GE Rules Are Arbitrary And Capricious Because They Are Inconsistent With The Department's Prior Interpretation.

As shown previously, the GE Rules improperly depart from the Department's prior position in numerous ways with no adequate explanation.[84]  In addition, it decided to use only one set of metrics, the D/E Rates, rejecting the pCDR as needing "further study."  79 Fed. Reg. at 64,915.  But its reliance on one metric contradicts its previous judgment that two GE metrics were required because two such measures provided a "balanced approach that gives institutions flexibility in how to demonstrate that they prepare students for gainful employment."  75 Fed. Reg. 43, 618.  *See also APSCU v. Duncan*, No. 1:11-cv-01314-RC, ECF No. 20, Dep't Reply, at 11 (D.D.C. Feb. 2, 2012).  It offers no explanation why one measure is now sufficient, although the answer seems evident:  it cannot divine a second measure that it believes will pass legal scrutiny.  Its reliance on a single metric, despite its prior admission, is arbitrary and capricious.

### 9.    The D/E Rates Irrationally Make No Allowance For Economic Cycles.

The GE Rules are irrational because they make no allowance for economic cycles, such as the recent recession, or for local market conditions.  The result is that good programs fail during periods of high unemployment or in locations where the labor market is weak, while bad programs pass during expansions or in a market with a strong local economy.  The same program with the same students could fail simply based on macroeconomic conditions having nothing to do with program quality or the long-term prospects of the students.

---

[83]  Moreover, as discussed *supra* Section IV.B.3, the HEA's language does not even remotely hint that Congress intended for the gainful employment clause to apply only to this subset of students.

[84]  *See infra* Sections IV.D.4 (addressing the change to 8% and 20% metrics); IV.D.7 (addressing change to exclude non-Title IV students).

The D/E Rates are sensitive to economic cycles because the earnings figure used in the calculation decreases for each unemployed/underemployed graduate.[85]  A recent study found that "a large recession reduces earnings by 11 percent" in the first year for the average graduate, which clearly will have a substantial negative effect on D/E Rates.[86]

The Department's explanation for disregarding economic cycles, a recurring element of our economy, is that it is "unlikely" that "[a]n otherwise passing program" would "fall in the zone for four consecutive years due to an economic downturn or fluctuations within the local labor markets" because "recessions have, on average, lasted 11.1 months since 1945."  79 Fed. Reg. 64,920, 64,924, 64,926.  This explanation falls flat.  *First,* the Department misconstrues the operation of its own regulation.  Students graduating into a recession may well be included in four consecutive rates in the case of a four-year cohort and in two consecutive rates in the case of two-year cohorts.[87]  Since a program that fails in two years out of any three loses eligibility, and failure in one year requires the school to issue student warnings that essentially encourage students to enroll elsewhere, it is readily apparent that a one-year recession can unfairly ruin a program.  *Second,* the Department totally ignores the well-established fact that the loss of income resulting from a recession lasts for years after the recession ends.[88]  *Third,* the Department's explanation is wholly inapposite to local market conditions, where a weak local economy can persist for many years, as is well known by the people in sections of upstate New York.[89]

---

[85]  First Cornell Rpt. at 16 (AR-H-109180).

[86]  CRA Rpt. at 52 (AR-G-001875).

[87]  *See* 34 C.F.R. § 668.402 (defining "two-year cohort period" as the "third and fourth award years prior to the award year for which the D/E rates are calculated.")  Thus, if students from that third preceding year graduate into a recession, their results will depress at least two set of D/E Rates.

[88]  *See* CRA Rpt. at 51 ("earnings loss persists" for years) (AR-G-001874).

[89]  For example, in Oswego and Jefferson Counties in upstate New York, more than four years after the recession, the unemployment rates remained higher than their pre-recession levels, and higher than the national and state-wide rates.  *See Labor Force and Unemployment Data*, New York State Dep't of

## V. CONCLUSION

For the foregoing reasons, APC respectfully requests that the Court grant summary judgment in its favor.

Dated:   New York, New York              Respectfully submitted,
         January 23, 2015

                                         /s/ Michael D. Hays
                                             Michael D. Hays

                                         COOLEY LLP
                                         Michael D. Hays
                                         Jonathon Glass
                                         Alyssa T. Saunders
                                         Admitted Pro Hac Vice
                                         1299 Pennsylvania Ave, N.W.
                                         Suite 700
                                         Washington, D.C. 20004-2400
                                         Tel:  (202) 842-7800
                                         Fax:  (202) 842-7899
                                         Email: mhays@cooley.com
                                                jglass@cooley.com
                                                asaunders@cooley.com

                                         William Schwartz
                                         Michael Blasie
                                         1114 Avenue of the Americas
                                         New York, NY 10036-7798
                                         Tel:     (212) 479-6200
                                         Fax:     (212) 479-6275
                                         Email: wschwartz@cooley.com
                                                mblasie@cooley.com

                                         Attorneys for Plaintiff
                                         Association of Proprietary Colleges

Labor,  http://labor.ny.gov/stats/LSLAUS.shtm; *Labor Force Statistics from the Current Population Survey*, BLS, http://data.bls.gov/timeseries/LNS14000000 (2008-2014 U.S. unemployment data).