**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

ASSOCIATION OF PROPRIETARY COLLEGES,

Plaintiff,

v.

ARNE DUNCAN, in his official capacity as Secretary
of the Department of Education, *et al.*,

Defendants.

14 Civ. 8838 (LAK)

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR**
**CROSS-MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO**
**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

JOYCE R. BRANDA
Acting Assistant Attorney General

JENNIFER D. RICKETTS
Director

SHEILA LIEBER
Deputy Director

MARCIA BERMAN
Senior Trial Counsel

MICHELLE BENNETT
Trial Attorney

GREG DWORKOWITZ
Trial Attorney
U.S. Department of Justice

PREET BHARARA
United States Attorney for
the Southern District of New York

JOHN D. CLOPPER
Assistant United States Attorney
86 Chambers Street, 3rd Floor
New York, New York 10007
Tel. No. (212) 637-2716
Fax No. (212) 637-0033
john.clopper@usdoj.gov

## **Table of Contents**

INTRODUCTION ................................................................................................ 1

BACKGROUND ................................................................................................ 3

1.   The Statutory Requirement That Vocationally Oriented Programs Prepare
Students For Gainful Employment In A Recognized Occupation........................ 3

2.   The Recent Need For Regulatory Action................................................... 4

3.   The 2011 Rules ...................................................................................... 6

4.   The Current Gainful Employment Regulations ....................................... 7

ARGUMENT .................................................................................................... 10

I.   THE REGULATIONS DO NOT EXCEED THE DEPARTMENT'S
AUTHORITY UNDER THE HIGHER EDUCATION ACT ............................ 10

A.   The Statutory Language Is Ambiguous As To The Precise
Question At Issue………………………………………………............. 10

B.   The Structure, Purpose, And History Of The Statute Do Not
Answer The Precise Question At Issue But Rather Demonstrate
The Reasonableness Of The Department's Construction ........................ 14

II.   THE REGULATIONS DO NOT VIOLATE THE DUE PROCESS CLAUSE... 24

A.   Plaintiff's Due Process Claims Are Not Justiciable ................................. 24

B.   Plaintiff's Procedural Due Process Claim Fails......................................... 25

1.   Schools do not have a protected interest in continued eligibility to
participate in the Title IV program ..................................................... 25

2.   The regulations provide sufficient process......................................... 27

3.   Due process does not require the Department to provide schools with
MEF earnings data for individual students......................................... 31

C.   The Regulations Do Not Create An Unlawful Presumption.................... 32

D.   The Regulations Are Not Retroactive....................................................... 35

III.    THE REGULATIONS DO NOT VIOLATE THE APA ...................................... 38

    A.    The Debt-To-Earnings Rates, Which Form The Basis Of The Department's Eligibility Determinations, Are Reasonable ..................... 38

        1.    The passing thresholds are based on reasonable standards long-accepted in the education context ........................................................ 38

        2.    It was reasonable for the Department to focus on students' income and their ability to repay their loans, including in the first years after graduating ........................................................................................... 40

        3.    The Department has explained why the D/E rates differ from those in the 2011 Rules ................................................................................... 42

    B.    The Gainful Employment Rules Measure Program Effectiveness .......... 44

        1.    The rules measure student outcomes; they do not primarily measure student demographics .......................................................................... 44

        2.    The rules appropriately account for differing market conditions and student choices .................................................................................. 47

        3.    The purportedly absurd results of plaintiff's far-fetched hypothetical scenarios do not make the rules arbitrary ........................................... 48

    C.    The Department Relied On High-Quality Data ....................................... 51

    D.    The Regulations Do Not Violate 20 U.S.C. § 1015c ............................... 52

    E.    The Limitation Of The Regulations To Title IV Students Is Reasonable. 54

CONCLUSION ..................................................................................................................... 55

## Table of Authorities

**Cases**

*Am. Hosp. Ass'n v. NLRB,*
  499 U.S. 606 (1991) ............................................................................................ 49

*Am. Inst. of Design v. Riley,*
  969 F. Supp. 936 (E.D. Pa. 1997) ...................................................................... 27

*American Mining Congress v. EPA,*
  965 F.2d 759 (9th Cir. 1992)................................................................................ 35

*Am. Petro. Inst. v. EPA,*
  684 F.3d 1342 (D.C. Cir. 2012) ........................................................................... 51

*Ass'n of Accredited Cosmetology Sch. v. Alexander,*
  979 F.2d 859 (D.C. Cir. 1992) ..................................................................... passim

*Ass'n of Private Sector Coll. & Univ. v. Duncan,*
  681 F.3d 427 (D.C. Cir. 2012) ........................................................................ 3, 15

*Ass'n of Private Sector Coll. & Univ. v. Duncan,*
  870 F. Supp. 2d 133 (D.D.C. 2012)...………………………………………………… passim

*Ass'n of Private Sector Coll. & Univ. v. Duncan*
  930 F. Supp. 2d 210 (2013)............................................................... 7, 53, 54, 55

*Bd. of Regents of State Colls. v. Roth,*
  408 U.S. 564 (1972) ............................................................................................ 25

*Bell Tel. Co. v. FCC,*
  503 F.2d 1250 (3d Cir. 1974)............................................................................... 30

*Blue Cross Blue Shield of New Jersey, Inc. v. Philip Morris USA, Inc.,*
  344 F.3d 211 (2d Cir. 2003)................................................................................. 32

*Bowen v. Georgetown Univ. Hosp.,*
  488 U.S. 204 (1988) ...................................................................................... 35, 36

*Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.,*
  419 U.S. 281 (1974) ............................................................................................ 31

*Brodsky v. U.S. NRC,*
  704 F.3d 113 (2d Cir. 2013)................................................................................. 40

*Building Indus. Ass'n of Superior Cal. v. Norton,*
  247 F.3d 1241 (D.C. Cir. 2001) ........................................................................... 52

*Career Coll. Ass'n v. Riley,*
  1994 WL 396294 (D.D.C. July 19, 1994)...................................................... 35, 36

*Chauffeur's Training Sch., Inc. v. Spellings,*
  478 F.3d 117 (2d Cir. 2007)................................................................................. 30

*Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,*
  467 U.S. 837 (1984) ................................................................... 10, 11, 31, 54

*Clapper v. Amnesty Int'l USA,*
  133 S. Ct. 1138 (2013) ........................................................................ 24

*Cohen v. JP Morgan Chase & Co.,*
  498 F.3d 111 (2d Cir. 2007) ................................................ 10, 11, 13, 14

*Continental Training Services, Inc. v. Cavazos,*
  893 F.2d 877 (7th Cir. 1990) ............................................................... 26

*Cooper v. Salazar,*
  2001 WL 1351121 (N.D. Ill. 2001) ..................................................... 31

*Crawford v. Pittman,*
  708 F.2d 1028 (5th Cir. 1983) ............................................................. 17

*Daniel v. Am. Bd. of Emergency, Med.,*
  428 F.3d 408 (2d Cir. 2005) .......................................................... 11, 14

*DeMichele v. Greenburgh Cent. Sch. Dist. No. 7,*
  167 F.3d 784 (2d Cir. 1999) ................................................................ 27

*Dumas v. Kipp,*
  90 F.3d 386 (9th Cir. 1996) ...................................................... 25, 26, 27

*Envtl. Def. v. U.S. Army Corps of Engineers,*
  515 F. Supp. 2d 69 (D.D.C. 2007) ....................................................... 40

*EPA v. EME Homer City Generation, L.P.,*
  134 S. Ct. 1584 (2014) ........................................................................ 49

*FDA v. Brown & Williamson Tobacco Corp.,*
  529 U.S. 120 (2000) ...................................................................... 11, 18

*Gen. Med. Co. v. FDA,*
  770 F.2d 214 (D.C. Cir. 1985) ............................................................. 52

*General Dynamics Land Sys., Inc. v. Cline,*
  540 U.S. 581 (2004) ............................................................................ 13

*Guertin v. United States,*
  743 F.3d 382 (2d Cir. 2014) .......................................................... 38, 40

*Gustafson v. Alloyd Co., Inc.,*
  513 U.S. 561 (1995) ............................................................................ 12

*Harper v. Lindsay,*
  616 F.2d 849 (5th Cir. 1980) ............................................................... 31

*Hatalmud v. Riley,*
  1997 WL 223075 (S.D.N.Y. May 2, 1997) .......................................... 16

*Henry v. Gross,*
  803 F.2d 757 (2d Cir. 1986) ................................................................ 30

*In re. Acad. for Jewish Educ.,*
  1994 WL 1026087 (Dep't of Educ. Mar. 23, 1994) ............................. 13

*Jones v. Flowers*,
   547 U.S. 220 (2006) .................................................................................................... 30

*Keams v. Tempe Technical Inst., Inc.*,
   110 F.3d 44 (9th Cir. 1997) .......................................................................................... 16

*Keams v. Tempe Technical Inst.*
   39 F.3d 222 (9th Cir. 1994) .......................................................................................... 23

*Land Council v. Martin*,
   529 F.3d 1219 (9th Cir. 2008) ...................................................................................... 52

*Landgraf v. USI Film Products*,
   511 U.S. 244, (1994) .................................................................................................... 36

*Lavine v. Milne*,
   424 U.S. 577 (1976) ...................................................................................................... 32

*Lujan v. Defenders of Wildlife*,
   504 U.S. 555 (1992) ...................................................................................................... 24

*Lujan v. Nat'l Wildlife Fed'n*,
   497 U.S. 871 (1990) ...................................................................................................... 24

*Marjorie Webster Junior Coll., Inc. v. Middle States Ass'n of Colls. and Secondary Sch., Inc.*,
   432 F.2d 650 (D.C. Cir. 1970) ...................................................................................... 16

*Mathews v. Eldridge*,
   424 U.S. 319 (1976) ...................................................................................................... 27

*MCI Telecomm. Corp. v. Am. Tel. & Tel. Co.*,
   512 U.S. 218 (1994) ...................................................................................................... 18

*Medley v. City of Milwaukee*,
   969 F.2d 312 (7th Cir. 1992) ........................................................................................ 27

*Methodist Hosp. of Sacramento v. Shalala*,
   38 F.3d 1225 (D.C. Cir. 1994) ...................................................................................... 52

*Mildred Elley Bus. Sch., Inc. v. Riley*,
   975 F. Supp. 434 (N.D.N.Y. 1997) .............................................................................. 26

*Mississippi v. EPA*,
   744 F.3d 1334 (D.C. Cir. 2013) .................................................................................... 51

*Mitchell v. Lara*,
   2011 WL 5075117 (S.D.N.Y. Oct. 25, 2011) .............................................................. 51

*Mordukhaev v. Daus*,
   457 Fed. Appx. 16 (2d Cir. 2012) ................................................................................ 26

*Morrissey v. Brewer*,
   408 U.S. 471 (1972) ...................................................................................................... 27

*Mt. Diablo Hosp. v. Shalala*,
   3 F.3d 1226 (9th Cir. 1993) .......................................................................................... 52

*N.Y. State Nat'l Org. for Women v. Pataki,*
  261 F.3d 156 (2d Cir. 2001) ........................................................................ 29

*Natale v. Town of Ridgefield,*
  170 F.3d 258 (2d Cir. 1999) ........................................................................ 25

*Nat'l Ass'n of Broadcasters v. FCC,*
  740 F.2d 1190 (D.C. Cir. 1984) ................................................................... 51

*Nat'l Ass'n of Indep. Television Producers & Distribs. v. FCC,*
  502 F.2d 249 (2d Cir. 1974) ........................................................................ 36

*Nat'l Cable & Telecomms. Ass'n v. FCC,*
  567 F.3d 659 (D.C. Cir. 2009) ............................................................... 35, 36

*Ohio Bell Tel. Co. v. Pub. Utils. Comm'n,*
  301 U.S. 292 (1937) ..................................................................................... 31

*Parks Sch. of Bus., Inc. v. Symington,*
  51 F.3d 1480 (9th Cir. 1995) ....................................................................... 27

*Plaquemines Parish Sch. Bd. v. United States,*
  415 F.2d 817 (5th Cir. 1969) ....................................................................... 17

*Plaza Health Labs., Inc. v. Perales,*
  878 F.2d 577 (2d Cir. 1989) ........................................................................ 26

*Ponce Paramedical Coll., Inc. v. U.S. Dep't of Educ.,*
  858 F. Supp. 303 (D.P.R. 1994) ............................................................. 15, 35

*Pro Schs., Inc. v. Riley,*
  824 F. Supp. 1314 (E.D. Wis. 1993) ........................................................... 35

*Ramirez v. Ahn,*
  843 F.2d 864 (5th Cir. 1988) ....................................................................... 29

*Reynolds v. United States,*
  292 U.S. 443 (1934) ..................................................................................... 35

*Robinson v. Shell Oil Co.,*
  519 U.S. 337 (1997) ............................................................................... 11, 13

*RRI Realty Corp. v. Inc. Vill. of Southampton,*
  870 F.2d 911 (2d Cir. 1989) ........................................................................ 26

*Salt Inst. v. Thompson,*
  345 F. Supp. 2d 589 (E.D. Va. 2004) .......................................................... 51

*Sch. Dist. of City of Pontiac v. Sec'y of U.S. Dep't of Educ.,*
  584 F.3d 253 (6th Cir. 2009) ....................................................................... 18

*Sherman Coll. of Straight Chiropractic v. U.S. Comm'r of Educ.,*
  493 F. Supp. 976 (D.D.C. 1980) .................................................................. 16

*Spreckels v. Helvering,*
  315 U.S. 626 (1942) ..................................................................................... 30

*Town of Castle Rock v. Gonzales*,
  545 U.S. 748 (2005) .................................................................................................. 25

*United States ex rel. Main v. Oakland City Univ.*,
  426 F.3d 914 (7th Cir. 2005) .................................................................................. 15

*United States v. Ben Zvi*,
  242 F.3d 89 (2d Cir. 2001) ...................................................................................... 24

*United States v. Fernandez-Antonia*,
  278 F.3d 150 (2d Cir. 2002) .................................................................................... 31

*United States v. Mandycz*,
  447 F.3d 951 (6th Cir. 2006) .................................................................................. 31

*Usery v. Turner Elkhorn Mining Co.*,
  428 U.S. 1 (1976) ...................................................................................................... 32

*Vermont Yankee Nuclear Power Corp. v. NRDC*,
  435 U.S. 519 (1978) ................................................................................................ 52

*Vila v. Holder*,
  480 Fed. Appx. 6 (2d Cir. 2012) ............................................................................ 31

*Western & A.R.R. v. Henderson*,
  279 U.S. 639 (1929) ............................................................................................ 32, 33

*Whitman v. Am. Trucking Ass'ns*,
  Inc., 531 U.S. 457 (2001) ........................................................................................ 17

*Williston Basin Interstate Pipeline Co. v. FERC*,
  165 F.3d 54 (1999) .................................................................................................. 32

*WPIX, Inc. v. IVI, Inc.*,
  691 F.3d 275 (2d Cir. 2012) .................................................................................... 19

## Statutes

20 U.S.C. § 1001 ................................................................................................................ 13

20 U.S.C. § 1002 ........................................................................................................ passim

20 U.S.C. § 1015c ............................................................................................................ 53

20 U.S.C. § 1070 et seq. ...................................................................................................... 3

20 U.S.C. § 1085 ................................................................................................................ 15

20 U.S.C. § 1088 ...................................................................................................... 1, 4, 13

20 U.S.C. § 1092b ............................................................................................................ 53

20 U.S.C. § 1094 ........................................................................................................ 26, 30

20 U.S.C. § 1099b .................................................................................................. 15, 16, 23

20 U.S.C. § 1161l-3 .......................................................................................................... 18

20 U.S.C. § 1232a ............................................................................................................ 17

20 U.S.C. §§ 1221e-3 .......................................................................................................... 3

20 U.S.C. §3474 ................................................................................................ 3

26 U.S.C. § 6103 ................................................................................... 9, 28, 30

5 U.S.C. § 553 ................................................................................................ 52

5 U.S.C. §706 ................................................................................................. 10

## **Regulations**

34 C.F.R. § 402 ................................................................................................ 8

34 C.F.R. § 668.16 ......................................................................................... 26

34 C.F.R. § 668.181-668.217 ........................................................................ 30

34 C.F.R. § 668.403 ............................................................................. 9, 10, 44

34 C.F.R. § 668.404 ........................................................................ 8, 9, 37, 44

34 C.F.R. § 668.405 ............................................................................. 9, 28, 31

34 C.F.R. § 668.406 ......................................................................... 24, 29, 34

34 C.F.R. § 668.410 ....................................................................................... 55

34 C.F.R. § 668.8 ........................................................................................... 13

## **Federal Register**

75 Fed. Reg. 43616 (July 26, 2010) ......................................................... 13, 44

76 Fed. Reg. 34386 (June 13, 2011) ............................................................... 6

78 Fed. Reg. 38963 (June 28, 2013) ............................................................. 54

79 Fed. Reg. 16426 (Mar. 25, 2014) ........................................... 7, 46, 47, 55

79 Fed. Reg. 64890 (Oct. 31, 2014) ...................................................... passim

## **Legislative**

*National Vocational Student Loan Insurance Act of 1965,*
  Pub. L. 89-287, 79 Stat. 1037 .................................................. passim

*NVSLIA Hearings Before the Select Subcomm. on Educ. of the Comm. on Educ. and Labor,*
  89th Cong. (1965) ............................................................. 21, 22, 23

H.R. Rep. No. 89-308 (1965) ................................................ 4, 20, 21, 22, 23

H.R. Rep. No. 102-447 (1992) .......................................................................30

S. Rep. No. 89-758 (1965) ...................................................... 4, 20, 21, 22

S. Rep. No. 102-58 (1991) ........................................................................ 23

**Other Authorities**

N.Y. Lab. Law § 537 ................................................................................................................ 30

Black's Law Dictionary (4th ed. 1951)…………………….………………………….....12

Webster's New International Dictionary 1026 (2d ed. 1958)………………….………….……12

New Standard Dictionary (Funk & Wagnalls Co. 1946)……………………..………..……12

Oxford English Dictionary Volume IV (1978)……………………..………………....……12

Webster's New Collegiate Dictionary (1975)………………..………………………………12

*Fiscal Year 2015 Budget Summary, U.S. Department of Education*,
    http://www2.ed.gov/about/overview/budget/budget15/summary/15summary.pdf......................3

*N.Y. Dep't of Labor, Data Sharing Under Labor Law § 537*,
    http://labor.ny.gov/data-sharing/PDFs/nysdol-ui-data-sharing-presentation.pdf.................... 30

*N.Y. Dep't of Labor, UI Information Sharing FAQs*,
    http://www.labor.ny.gov/data-sharing/data-sharing-faqs.shtm.................................................. 30

*The Higher Education Amendments of 1992: Resolving the Conflict Over Diversity Standards
    and Institutional Eligibility for Title IV Aid*,
    30 Harv. J. on Legis. 253 (Winter 1993)................................................................................. 16

## INTRODUCTION

Under Title IV of the Higher Education Act of 1965 ("HEA"), the entities that ultimately receive the billions of dollars of federal student loan money—the educational institutions—are not obligated to pay the money back if their services are ineffective; the risk of defaults on student loans is borne entirely by the students and taxpayers. While Congress does not require schools to repay student loan proceeds if the students are unable to, it does impose restrictions on schools to hold them accountable for the services provided and to prevent abuse of the Title IV program. Among those restrictions is a requirement that certain postsecondary programs— specifically, vocationally oriented programs—"prepare students for gainful employment in a recognized occupation." *See* 20 U.S.C. §§ 1002(b)(1)(A)(i), 1002(c)(1)(A), 1088(b)(1)(A)(i). The Department of Education ("Department") has reasonably interpreted this statutory requirement to mean providing training that will lead to earnings that will allow students to pay back their student loan debts. In this lawsuit, plaintiff Association of Proprietary Colleges challenges that interpretation and the Department's regulations implementing it, known as the Gainful Employment rules, 79 Fed. Reg. 64890 (Oct. 31, 2014). Plaintiff lodges a multitude of attacks on the regulations, but none withstands scrutiny.

First, plaintiff challenges the Department's statutory authority to promulgate these regulations. Plaintiff claims that Congress defined the phrase "prepare students for gainful employment in a recognized occupation" to mean preparation for any job that pays, in contrast to volunteer work, unambiguously foreclosing the Department's construction of the phrase. Congress did not, however, speak to whether the Department may measure this requirement with respect to students' ability to repay their federal student loans—the precise question at issue here—but rather left the construction of this ambiguous phrase up to the Department to fill in,

based on its expertise.  In a well-reasoned decision, another district court reached this very

conclusion.  *Ass'n of Private Sector Coll. & Univ. v. Duncan* ("*APSCU I*"), 870 F. Supp. 2d 133,

146 (D.D.C. 2012).  Nor do the structure, purpose, and history of the statute compel the

conclusion that Congress spoke to this particular question, as plaintiff argues.  Instead, they

support the reasonableness of the Department's construction of the phrase.  In particular, there is

persuasive legislative history that Congress intended that in authorizing federal student loans for

vocational training, schools would provide training that would lead to jobs that would allow their

graduates to repay the federal loans they incurred to attend the programs.

Second, plaintiff claims that the regulations violate the Due Process Clause because the

Department does not provide affected schools with the underlying earnings data used to calculate

the two debt-to-earnings rates ("D/E rates") that assess whether a program prepares its students

for gainful employment in a recognized occupation.  This argument fails at the threshold,

because plaintiff has not alleged any imminent injury with respect to this claim, nor do schools

have a protected interest in continued eligibility for federal student loan programs.  Even if these

threshold problems did not exist, the procedures provided for in the regulations minimize any

risk of erroneous deprivation from schools not having access to individual earnings data, which

is protected by law.  The regulations are also not impermissibly retroactive because they have

only future effect.

Third, the regulations are not arbitrary or capricious, or otherwise in violation of the

Administrative Procedure Act ("APA").  The D/E rates are supported by substantial expert

opinion about the appropriate level of education debt; the rules reasonably measure whether

programs have prepared students for jobs that will allow them to repay their student debt when it

becomes due, rather than with earnings accumulated over the course of a lifetime; the

Department demonstrated that the rules measure student outcomes, not demographics; and the

Department adequately explained why the rules differ from a past, now-vacated, regulatory

effort.  The Court should reject plaintiff's challenge and uphold the regulations.

## **BACKGROUND**

1.     The Statutory Requirement That Vocationally Oriented Programs Prepare Students
       For Gainful Employment In A Recognized Occupation

Under Title IV of the HEA, 20 U.S.C. § 1070 *et seq.*, the Department can enter into

participation agreements with postsecondary schools that allow students at those schools to

receive federal grants and loans.  Students must repay any federal loans they receive.  The loans

are guaranteed by the United States government, and the Department (and thus the taxpayer) is

ultimately responsible for paying off defaulted student loans with federal funds.  *See Ass'n of*

*Private Sector Coll. & Univ. v. Duncan*, 681 F.3d 427, 433 (D.C. Cir. 2012).  In award year

2013-14, the Department provided some $164.2 billion in Title IV aid to almost 13.4 million

postsecondary students and their families.[1]  The Department has broad authority to promulgate

regulations to administer the HEA and Title IV.  *See* 20 U.S.C. §§ 1221e-3, 3474.

As originally enacted, the HEA provided loan eligibility only for the college-bound

student—that is, for students earning traditional degrees at traditional colleges and universities.

Congress extended loan eligibility to students at for-profit trade and vocational schools through

the National Vocational Student Loan Insurance Act of 1965, Pub. L. 89-287, 79 Stat. 1037

(1965) ("NVSLIA").  Congress was concerned, however, that these students would not be able to

repay their loans after graduating.  Congress voted in favor of extending loan eligibility to these

students after receiving assurances that a high percentage of them completed their training and

---

[1] Fiscal Year 2015 Budget Summary, U.S. Department of Education, *available at*
http://www2.ed.gov/about/overview/budget/budget15/summary/15summary.pdf.

found jobs related to their training that paid wages sufficient to allow them to repay any loans. S. Rep. No. 89-758, at 3-12 (1965); H.R. Rep. No. 89-308, at 3-9, 11 (1965).

Reflecting these concerns, the NVSLIA defined an "eligible institution" as one providing "a program of postsecondary vocational or technical education designed to fit individuals for useful employment in recognized occupations." Pub. L. 89-287, § 17(a). The NVSLIA loan insurance program has since been merged into the HEA, which conditions eligibility for Title IV aid for vocationally oriented programs on their "prepar[ing] students for gainful employment in a recognized occupation." *See* 20 U.S.C. §§ 1002(b)(1)(A)(i), 1002(c)(1)(A), 1088(b)(1)(A)(i).

2.      The Recent Need For Regulatory Action

Programs that are subject to the gainful employment requirement ("GE programs") provide training for occupations in fields such as cosmetology, business administration, medical or dental assisting, and massage therapy. 79 Fed. Reg. at 65025. While institutions of higher education in all sectors—public, private nonprofit, and private for-profit—offer GE programs, private for-profit schools enroll a disproportionately large share of the students attending such programs. *Id*. at 65028-29. The Department determined that the challenged regulations, which give teeth to the "gainful employment in a recognized occupation" requirement, were necessary because a number of factors, discussed below, suggested that many programs, particularly those offered by for-profit schools, are not preparing students for gainful employment in a recognized occupation, leaving them instead with debts they cannot afford and poor employment prospects, and leaving the federal government on the hook for their unpaid loans. *Id*. at 65031-35.

For-profit schools typically offer flexible course schedules and online programs that serve nontraditional students. *Id*. at 65032. But they are generally more expensive to attend than their public counterparts. *Id*. Students attending two-year for-profit schools face an average

4

tuition and fee charge that is about four times that of their peers at public schools of the same length.  *Id*.  Higher tuition makes students significantly more likely to assume debt to attend a for-profit school than other types of colleges or universities.  *Id*. at 65033.  66% of students at for-profit schools borrowed to finance their education in 2011-12.  *Id*.  In contrast, only 20% of students at two-year public schools borrowed.  *Id*.  Not only do students at for-profit schools borrow at a greater rate than their peers, on average, the amount they borrow is greater.  *Id*.  The median loan amount borrowed during 2011-12 for students enrolled in associate degree programs at for-profit schools was $7,583, as compared to $4,467 at public schools.  *Id*.

Students who attend for-profit schools also have lower earnings, and are more likely to be idle (*i.e.*, not working or in school), six years after beginning their education than students who attend other types of colleges or universities.  *Id*. at 65034.  Students at for-profit schools are less likely than their peers at other schools to complete their programs and graduate.  *Id*. at 65033.  And many for-profit schools devote greater resources to recruiting and marketing than to instruction or student support services.  *Id*.

As a result of these factors, students at for-profit schools have worse repayment outcomes than their peers at other schools.  Approximately 19% of borrowers at for-profit schools default on their loans within 3 years of entering repayment as compared to about 13% of borrowers at public schools.  *Id*.  The average lifetime default rate is 50% for two-year for-profit schools as compared to 35% for other schools of the same length.  *Id*.

The consequences for students of defaulting on their loans are severe.  They include substantial collection and interest charges; adverse credit reports that hinder their ability to rent or buy a home, buy a car, or get a job; garnishment of wages; and the loss of tax refunds and even Social Security benefits.  *Id*. at 65031.  The consequences of student loan defaults for

schools, on the other hand, are nil.  Their revenues are based on how many students they enroll, not on whether those students are able to repay their loans.  The schools get the benefit of the loans being made without bearing any of the costs of students not being able to repay the loans.[2]

3.      The 2011 Rules

        The Department first promulgated regulations regarding the "prepare students for gainful employment in a recognized occupation" statutory requirement in 2011.  *See* 76 Fed. Reg. 34386 (June 13, 2011) ("2011 Rules").  The 2011 Rules and the regulations challenged here set minimum standards to assess the ability of students to repay their loans as an indication that a program prepares students for gainful employment in a recognized occupation, reflecting the common-sense idea that if students have to spend an undue amount of their income to pay back loans, their employment is not truly gainful.  The 2011 Rules established a repayment rate metric, a debt-to-discretionary income rate metric, and a debt-to-annual earnings rate metric.  *APSCU I*, 870 F. Supp. 2d at 144.  A program that failed all three metrics for three out of four years would lose eligibility.  *Id*.

        The 2011 Rules were challenged, although not by plaintiff here, in *APSCU I*.[3]  The court determined that the 2011 Rules fit well within the Department's statutory authority as a reasonable interpretation of the ambiguous statutory command to provide Title IV funding only to vocationally oriented schools that prepare students for gainful employment in a recognized occupation.  *APSCU I*, 870 F. Supp. 2d at 145-49.  The court also concluded that the passing thresholds chosen by the Department for the debt-to-discretionary income rate and the debt-to-annual earnings rate were the product of reasoned decisionmaking.  *Id*. at 152-54.  The baseline

---

[2]  In rare instances, a school may lose eligibility if for three consecutive years, at least 30% of its students default within two years after the year they enter repayment, but they still would not have to pay back student loans.

[3]  The Association of Private Sector Colleges and Universities has also challenged the current gainful employment rules.  *See APSCU v. Duncan*, No. 14-cv-01870-JDB (D.D.C.).

percentages, which the Department had increased by 50%, were supported by "experts [who] suggested that 20% was the maximum affordable ratio of debt payments to discretionary income" and that "8% is a commonly used industry standard for a manageable ratio of debt to total income." *Id*. at 152.

In contrast, the court determined that the Department had not adequately supported its choice of a passing threshold for the repayment rate with any expert studies or industry practices. *Id*. at 154. Moreover, because the Department had explicitly and "repeatedly emphasized the ways in which the [three gainful employment metrics] were designed to work together," the court concluded that it could not sever the repayment rate measure from most of the remaining portions of the 2011 Rules. *Id*. The court, therefore, vacated the 2011 Rules in large part.[4] *Id*.

4.     The Current Gainful Employment Regulations

Because of continuing concerns about these programs, the Department conducted another negotiated rulemaking. *See generally* 79 Fed. Reg. 16426 (Mar. 25, 2014) (Notice of Proposed Rulemaking ("NPRM")). The resulting gainful employment requirements have three goals: (1) to assess whether programs indeed prepare students to earn enough to repay their loans, or are sufficiently low cost, such that students are not unduly burdened with debt, (2) to ensure that schools have a meaningful opportunity and reasonable time to improve their programs after the regulations take effect, and (3) to safeguard the federal investment of Title IV student aid dollars. 79 Fed. Reg. at 64891.[5]

---

[4]  The court upheld portions of the 2011 Rules' disclosure requirements. *See APSCU I*, 870 F. Supp. 2d at 155-57; *Ass'n of Private Sector Coll. & Univ. v. Duncan* ("*APSCU II*"), 930 F. Supp. 2d 210 (D.D.C. 2013).

[5]  The regulations also have a transparency component, which requires schools to disclose certain information about their programs to students and prospective students. 79 Fed. Reg. at 64890. The disclosures are intended to benefit students, the public, and schools by increasing the quality and availability of information about the outcomes of students enrolled in GE programs. *Id*.

Despite plaintiff's reference to an "elaborate, 200-page . . . regime," (Pl.'s Mot. at 21) the regulations are quite modest, taking up a mere 18 pages in the Federal Register, *see id*. at 65007-24. Most of the final rule is devoted to responding to comments as well as the Regulatory Impact Analysis and other required elements of any

The regulations establish two debt-to-earnings rate measures to assess whether a program prepares its students for gainful employment in a recognized occupation.  The D/E rates in the current rule are very similar to the 2011 Rule's debt-to-discretionary income and debt-to-annual earnings rates approved by the court in *APSCU I*.  The D/E rates evaluate the amount of debt students who completed a GE program incurred to attend that program in comparison to those same students' discretionary and annual earnings after completing the program.  34 C.F.R. § 668.404.  The amount of debt is the lesser of only those borrowing costs under a school's control (tuition, fees, books, equipment, and supplies) or the actual loan amount.  79 Fed. Reg. at 64918.  Under the discretionary income rate, a portion of annual earnings—the amount equal to 150% of the Poverty Guideline for a family size of one—is considered protected to enable students to meet basic living costs, and the remaining amount of annual earnings is considered available to make loan payments.  79 Fed. Reg. at 64934.

D/E rates for a particular award year are calculated based on the debt and earnings of students who completed the GE program during what the regulations define as the "two-year cohort period."  34 C.F.R. § 668.404(b), (c).  For most programs, the "two-year cohort period" encompasses the third and fourth award years prior to the award year for which D/E rates are being calculated.  *Id*. § 668.402.  For example, D/E rates for award year 2014-15 will be calculated based on the debt and earnings of students who completed the GE program during award years 2010-11 and 2011-12.  *Id*.  For programs that require a medical or dental internship or residency, the "two-year cohort period" encompasses the sixth and seventh award years prior to the award year for which D/E rates are being calculated.  *Id*.  The regulations also include a five-to-seven year transition period, depending on the length of the program, that allows

---

rulemaking.  Indeed, the 100 or so pages devoted to responding to comments reflects the breadth and depth of the comments the Department received and the thoughtfulness and care it exercised in responding to them.

programs to improve their D/E rates by reducing borrowing by current students or costs.  *Id*. §
668.404(g).  During the transition period, the debt of students who completed a program during
the most recently completed award year may be used to calculate the D/E rates, instead of the
debt of students from the applicable two-year cohort period.  *Id*.

To obtain the mean or median annual earnings of a program's graduates for the
denominator of the D/E rates, the Department compiles a list of students (including name, Social
Security Number ("SSN"), and date of birth) who completed a program during the applicable
two-year cohort period and received Title IV funding, based on information provided by the
school.  *Id*. § 668.405.  Schools have an opportunity to review the list of their students and make
any necessary corrections before the Department provides it to the Social Security
Administration ("SSA").  *Id*.  SSA then compares the list to data in its SSN database, Numident,
to determine if the name, SSN, and date of birth match those of an individual who applied for a
SSN.  79 Fed. Reg. at 64950.  SSA obtains earnings data for all matched students from its Master
Earnings File ("MEF").  *Id*.  Because the earnings data for individual students in the MEF is
obtained from various tax forms, SSA is prohibited by law from disclosing it to schools or the
Department.  *See* 26 U.S.C. § 6103.  Instead, SSA provides the Department with aggregate data,
*i.e.*, the mean and median aggregate earnings of the program's graduates for the relevant cohort
period.  34 C.F.R. § 668.405(d).  The Department then uses the higher of the mean or median to
calculate a program's D/E rates.  *Id*. § 668.404(a).

A program need only pass one of the two D/E rates to satisfy the gainful employment
requirements.  *Id*. § 668.403(c).  A program passes if its average annual loan payment is less than
or equal to 20% of discretionary income or 8% of annual earnings.  *Id*.  A program fails if its
average annual loan payment is more than 30% of discretionary income and 12% of annual

earnings. *Id*. A program that does not pass and has at least one D/E rate in between these figures is in the zone. *Id*. A program loses eligibility for Title IV funds if it fails the D/E rates for 2 out of 3 consecutive years, or has a combination of D/E rates that are in the zone or failing for 4 consecutive years. *Id*. § 668.403(c)(4). The Department estimates that "the great majority of programs" will remain eligible, including those in the for-profit sector, 79 Fed. Reg. at 64908, and that the substantial majority of students in zone or failing programs will find alternatives. *Id*. at 65074.

## ARGUMENT

I. THE REGULATIONS DO NOT EXCEED THE DEPARTMENT'S AUTHORITY UNDER THE HIGHER EDUCATION ACT

Under the APA, a district court may set aside formal agency action, such as the promulgation of the regulations challenged here, only if "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. §706(2)(A). Plaintiff argues that the Gainful Employment regulations exceed the Department's statutory authority under the HEA, ignoring the finding to the contrary by the *APSCU I* court. Pl.'s Mot. at 18-29. As were the 2011 Rules, the challenged regulations are a permissible interpretation of an ambiguous statutory requirement, and should therefore be upheld under the analysis set forth in *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984).

A. The Statutory Language Is Ambiguous As To The Precise Question At Issue

Under *Chevron*, a court must first determine "whether Congress has directly spoken to the precise question at issue." 467 U.S. at 842. *See also Cohen v. JP Morgan Chase & Co.*, 498 F.3d 111, 116 (2d Cir. 2007). If Congress has done so, that is the end of the inquiry, as the court "must give effect to the unambiguously expressed intent of Congress." *Chevron*, 467 U.S. at 843. The court looks to the statutory text, the specific context in which that language is used, the

broader context of the statute as a whole, canons of statutory construction, and legislative history to determine Congress's intent with respect to the precise question at issue.  *See, e.g.*, *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997); *Cohen*, 498 F.3d at 116; *Daniel v. Am. Bd. of Emergency Med.*, 428 F.3d 408, 423 (2d Cir. 2005).  If the court determines the statute is silent or ambiguous on the precise question at issue, it must uphold the agency's construction of the statute it administers so long as it is reasonable.  *Chevron*, 467 U.S. at 843-44; *Cohen*, 498 F.3d at 116.  Such deference is warranted "because the responsibilities for assessing the wisdom of such policy choices and resolving the struggle between competing views of the public interest are not judicial ones, . . . and because of the agency's greater familiarity with the ever-changing facts and circumstances surrounding the  subjects regulated."  *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 132 (2000)  (internal quotations and citations omitted).

Here, the precise question at issue is whether the Department may require that for a program to meet the statutory requirement that it "prepare students for gainful employment in a recognized occupation," the program should prepare students for employment that allows them to repay the federal debt incurred to attend the program in the first place.  79 Fed. Reg. at 64893. Plaintiff contends that not only did Congress address this precise question, it unambiguously answered it "no."  According to plaintiff, there is only one meaning of the phrase "gainful employment"—a job that pays—and this is what Congress meant by using that phrase.  Under this theory, any job that pays $1.00 (or even one cent) a year would qualify, because the key is the distinction from volunteer work.  Pl.'s Mot. at 20.  Plaintiff bases this argument on dictionary definitions of "gainful" and "gainful employment," which, as an initial matter, concedes that *Congress* did not provide any definition for what it means to "prepare students for gainful employment in a recognized occupation," or any of that phrase's subparts.

Plaintiff is wrong that there is but one, "standard" definition for "gainful employment" such that the phrase has a common, clear meaning.  Pl.'s Mot. at 20.  Plaintiff's reliance on certain dictionaries to support its argument that "gainful employment" unambiguously means "a job that pays" is belied by other dictionaries that define "gainful" as "profitable" or "lucrative."  *See* Black's Law Dictionary 807 (4th ed. 1951); Webster's New International Dictionary 1026 (2d ed. 1958); New Standard Dictionary 1000 (Funk & Wagnalls Co. 1946); Oxford English Dictionary Volume IV 13 (1978); Webster's New Collegiate Dictionary 469 (1975).  Profitable, in turn, means the excess of returns over expenditures, or having something left over after one's expenses are paid.  Black's Law Dictionary 1376; Webster's New International Dictionary 1976; New Standard Dictionary 1979; Webster's New Collegiate Dictionary 919.  This definition supports the idea embodied in the regulations that "gainful employment in a recognized occupation" is not just any job that pays a nominal amount but a job that pays enough to cover one's major expenses, including student loans.  Moreover, "employment" itself is defined as "a job that pays wages or a salary."  Webster's New Collegiate Dictionary 373.  *See also* Black's Law Dictionary 618 (4th ed. 1951) (employment defined as "the act of hiring, implying a request and a contract for compensation"); Webster's New Internat'l Dictionary 839 (2d ed. 1958) ("employ is used to emphasize the idea of . . . wages to be paid").  Thus, under plaintiff's definition, "gainful" becomes superfluous.  *See Gustafson v. Alloyd Co., Inc.*, 513 U.S. 561, 574 (1995) (court should avoid a reading of a statute that renders a word redundant).  As the district court determined in *APSCU I*, there is "no unambiguous meaning of what makes employment 'gainful': the phrase need not mean 'any job that pays.'"  870 F. Supp. 2d at 146.[6]

---

[6] Nor has the Department previously interpreted the phrase "prepare students for gainful employment in a recognized occupation" to mean any job that pays.  *See* Pl.'s Mot. at 26-27.  Prior to the promulgation of the challenged regulations and the 2011 Rules, the Department had not issued regulations defining or describing what

Moreover, the operative statutory phrase is "prepare students for gainful employment *in a recognized occupation*," not merely "gainful employment."  20 U.S.C. §§ 1001(b)(1), 1002(b)(1)(A)(i), 1002(c)(1)(A) (emphasis added); *see also id.* § 1088(b)(1)(A)(i) ("recognized profession"); 79 Fed. Reg. at 64892, 64894.  This expanded phrase connotes employment in an established occupation, not just any job that pays.  79 Fed. Reg. at 64894.  Plaintiff ignores the full import of this phrase, violating "'the cardinal rule that statutory language must be read in context since a phrase gathers meaning from the words around it.'"  *Cohen*, 498 F.3d at 117 (quoting *General Dynamics Land Sys., Inc. v. Cline*, 540 U.S. 581, 596 (2004)); *see also* Pl.'s Mot. at 20.  Plaintiff instead emphasizes "prepare," but "the Department's regulations are an attempt to assess whether certain programs in fact provide such preparation," which the statute does not tell the Department how to determine.  *APSCU I*, 870 F. Supp. 2d at 146.  The modifying language "in a recognized occupation" also distinguishes the phrase from other provisions of the HEA that just use the words "gainful employment," *see* Pl.'s Mot. at 22 & n.29, and that, in any event, serve different purposes, such as providing requirements for fellowships for graduate study, as opposed to for entrance into a recognized occupation.  *See Robinson*, 519 U.S. at 343 ("that the term 'employees' may have a plain meaning in the context of a particular section [does not mean] that the term has the same meaning in all other sections and in all other

---

this requirement means.  *See* 75 Fed. Reg. 43616, 43619 (July 26, 2010).  In *In re. Acad. for Jewish Educ.*, 1994 WL 1026087 (Dep't of Educ. Mar. 23, 1994), cited by plaintiff (Pl.'s Mot. at 27 n.39), the Department merely ruled that because the aim of a program in Jewish culture was assimilation into a particular culture, not preparation for a specific area of employment, it did not prepare its students for gainful employment in a recognized occupation.  That hardly amounts to finding that "prepare students for gainful employment in recognized occupations" means any job that pays.  Indeed, the administrative law judge in that case recognized that "[i]t is difficult to objectively assess what, *per se*, prepares one for 'gainful employment in a recognized occupation.'"  *Id.* at *2.  That the Department did not consider students' debt and income levels in reaching its determination is not surprising.  *APSCU I*, 870 F. Supp. 2d at 150.  "Nor is the Department's regulation requiring schools to report whether *individual students* have *attained* gainful employment counter to its attempt to use the debt measures to identify *programs* that offer *adequate preparation* for such employment."  *Id.*  *See* Pl.'s Mot. at 27 n.39 (citing 34 C.F.R. § 668.8(g)(1)(ii), (g)(2)).

contexts"); *APSCU I*, 870 F. Supp. 2d at 146; 79 Fed. Reg. at 64894.[7]

Accordingly, "[t]he means of determining whether a program 'prepare[s] students for gainful employment in a recognized occupation' is a considerable gap," which Congress left to the Department to fill. *APSCU I*, 870 F. Supp. 2d at 146. The fact that Congress did not use the words "quality," "debt," or "income," or set specific debt and income metrics, does not "bar[] the Department's construction" (Pl.'s Mot. at 21, 26); the absence of those things does not tell us what Congress unambiguously intended the words it *did* use to mean.[8]

**B.    The Structure, Purpose, And History Of The Statute Do Not Answer The Precise Question At Issue But Rather Demonstrate The Reasonableness Of The Department's Construction**

The structure, purpose, and history of the statute do not "compel a particular conclusion" about Congress's intent as to the precise question at issue either (*i.e.*, whether the Department may measure the requirement that a program "prepare students for gainful employment in a recognized occupation" with reference to former students' ability to repay federal student loan debt). *Cohen*, 498 F.3d at 120-21. But the Department's construction is in fact consistent with

---

[7]    Plaintiff makes a "plain language" argument about the fact that the pertinent statutory phrase does not exclude non-Title IV students, but the regulations do. Pl.'s Mot. at 21. But the precise question at issue for purposes of *Chevron* is whether the Department may measure the requirement that a program "prepare students for gainful employment in a recognized occupation" with reference to former students' ability to repay federal student loan debt. If the statute is ambiguous as to this precise question, the Department's construction must be upheld if reasonable. As explained at *infra* pp. 44-55, it is reasonable for the Department to limit the D/E rate measures to assess outcomes of only students who receive Title IV program funds. Even if the precise question is further refined to whether the Department may measure the gainful employment requirement with reference to former *Title IV* students' ability to repay their federal loans, the statute is ambiguous on that question as well. *See Robinson*, 519 U.S. at 341 (holding that term "employees" in Title VII of the Civil Rights Act of 1964 is ambiguous as to whether it excludes former employees). Plaintiff's retroactivity argument (Pl.'s Mot. at 22) is similarly derivative of other arguments it makes—specifically, its due process argument—because the regulations are not, in fact, impermissibly retroactive. *See infra* pp. 35-37.

[8]    What it means to "prepare students for gainful employment in recognized occupations" is more ambiguous than the statutory language held ambiguous in *Cohen*, 498 F.3d at 117 (statute prohibiting anyone from charging "any portion, split, or percentage" of a fee in connection with a mortgage other than for services actually performed was ambiguous as to whether it also prohibited charging an unearned fee that was not split or divided among two or more persons), and lacks the clarity of the language held unambiguous in *Daniel*, 428 F.3d at 423-24 (phrase "in such cases" in venue provision of antitrust statute plainly refers to cases qualifying for venue in the immediately preceding clause).

these indicia of Congressional intent, and they support the reasonableness of the Department's

construction under *Chevron*.  *See APSCU I*, 870 F. Supp. 2d at 147-49.

Many provisions of the HEA are aimed at ensuring the integrity, and preventing abuses,

of the federal student aid program.  For example, high default rates at proprietary schools

prompted Congress to enact the Cohort Default Rate ("CDR") provision of the HEA, which

denies eligibility to institutions whose students had chronically high default rates.  *See* 20 U.S.C.

§ 1085(a)(2); *Ass'n of Accredited Cosmetology Sch. v. Alexander*, 979 F.2d 859, 860-61 (D.C.

Cir. 1992).  Congress also prohibited schools from providing compensation based on recruiting

prospective students, to prevent recruiters paid by the head from "sign[ing] up poorly qualified

students who will derive little benefit from the subsidy and may be unable or unwilling to repay

federally guaranteed loans."  *United States ex rel. Main v. Oakland City Univ.*, 426 F.3d 914,

916 (7th Cir. 2005).  *See also* 20 U.S.C. § 1094(a)(20); *APSCU*, 681 F.3d at 435-36.  Substantial

misrepresentations to improperly induce prospective students are also banned.  20 U.S.C. §

1094(c)(3)(A); *APSCU*, 681 F.3d at 436.  Congress further provided that institutions be

accredited by private accrediting agencies as a check on the quality of funded schools.  20 U.S.C.

§ 1099b(a).  And Congress limited the amount of revenue proprietary institutions may derive

from Title IV funds to require them to attract students based upon the quality of their programs,

not solely because they offer federal student financial aid.  *See* 20 U.S.C. § 1094(a)(24); *Ponce*

*Paramedical Coll., Inc. v. U.S. Dep't of Educ.*, 858 F. Supp. 303, 307, 311 (D.P.R. 1994).

The requirement that certain programs "prepare students for gainful employment in a

recognized occupation" is one more way in which Congress sought to protect students and the

student loan program from abuse.  *See* 79 Fed. Reg. at 64894.  Congress enacted multiple tools

to protect the integrity of the program, and while the various mechanisms overlap, they differ in

their primary purposes.  For example, accreditation, on which plaintiff places heavy emphasis (Pl.'s Mot. at 2, 7, 24, 28-29, 34), takes into account, *inter alia*, an institution's job placement rates and student loan default rates, 20 U.S.C. § 1099b(a)(5)(A), (J), but it primarily assesses the institution's success with respect to student achievement in relation to the institution's mission. *Id*. § 1099b(a)(5)(A).  Accreditation focuses on whether an institution meets its own standards and the standards set by the institutions that make up the accrediting agency's membership, as opposed to whether the institution prepares students for gainful employment in a recognized occupation.  *See Marjorie Webster Junior Coll., Inc. v. Middle States Ass'n of Colls. and Secondary Sch., Inc.*, 432 F.2d 650, 657 (D.C. Cir. 1970) ("Accreditation means that the institution has achieved quality within the context of its own aims and program"); *Sherman Coll. of Straight Chiropractic v. U.S. Comm'r of Educ.*, 493 F. Supp. 976, 977 (D.D.C. 1980) (accrediting agency's standards are set by member institutions); *Hatalmud v. Riley*, 1997 WL 223075, at * 1, 3 (S.D.N.Y. May 2, 1997) (even though school had to be accredited to participate in student aid program, it did not have as its primary purpose the preparation of students for gainful employment in a recognized occupation); *The Higher Education Amendments of 1992: Resolving the Conflict Over Diversity Standards and Institutional Eligibility for Title IV Aid*, 30 Harv. J. on Legis. 253, 268 (Winter 1993) ("[A]ccrediting associations do not view themselves as 'gatekeepers for student grants and loans.'  Rather, they view themselves as peer-review organizations formed to encourage self-improvement through qualitative criteria and subjective judgments, as well as to ensure that institutions are achieving their individual goals and missions."); *Kearns v. Tempe Technical Inst., Inc.*, 110 F.3d 44, 47 (9th Cir. 1997) (accrediting agencies owed no duty of care to students of institutions they accredited).  Accreditation was not intended to supplant the Department's role in determining whether a program prepares students

16

for gainful employment in a recognized occupation.

Nor does the Department's construction conflict with other provisions of the HEA, such as Congress's determination that the Government not set tuition rates or control curriculum choices.  Pl.'s Mot. at 23, 29-30.  The regulations do not require institutions to lower their tuition.  While doing so may result in a program's meeting the D/E rates thresholds, there are many other ways to do so, including improving job placement efforts and better tailoring a program to existing job opportunities.  *See* 79 Fed. Reg. at 64895.

Similarly, the rules do not dictate the content of educational programs but rather measure student outcomes.  20 U.S.C. § 1232a, which prohibits the federal government from exercising "direction, supervision, or control over the curriculum, program of instruction, administration, or personnel" of any school system," "refers only to management, curriculum dictation and other details of local school administration that the federal government is not equipped to handle." *Plaquemines Parish Sch. Bd. v. United States,* 415 F.2d 817, 830 (5th Cir. 1969) (interpreting predecessor statute, 20 U.S.C. § 884).  Nothing in § 1232a was intended to prevent the government from enforcing requirements as a condition of receipt of federal student aid, including that programs prepare students for gainful employment in a recognized occupation. *See Crawford v. Pittman,* 708 F.2d 1028, 1036 (5th Cir. 1983) (holding that § 1232 does not undermine requirement of the Education for All Handicapped Children Act that disabled children receive individualized consideration in state-run educational programs that receive federal aid). Nor is it inconsistent for a program to prepare its students for "long-term, successful careers" and for jobs that enable them to repay their loans when they become due.  Pl.'s Mot. at 30.  Thus, there is no conflict between the challenged regulations and the New York State Board of

Regents' standards that plaintiff points to (nor would such a conflict be one with federal law).[9]

Plaintiff further argues that Congress unambiguously precluded the Department's construction because Congress "does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions—it does not, one might say, hide elephants in mouseholes." *Whitman v. Am. Trucking Ass'ns, Inc.*, 531 U.S. 457, 468 (2001); Pl.'s Mot. at 23.  The *Whitman* Court cited to *Brown & Williamson*, 529 U.S. 120, on which plaintiff relies as well, for that proposition.  In *Brown & Williamson*, the Court held that the Food and Drug Administration's asserted jurisdiction under the Food, Drug, and Cosmetic Act to regulate tobacco as a drug, after having expressly disavowed any such authority since its inception, was fundamentally inconsistent with Congress's overall regulatory scheme.  The issue of banning tobacco was a hugely important public policy issue.  The court concluded that "Congress could not have intended to delegate a decision of such economic and political significance to an agency in so cryptic a fashion."  *Id*. at 160.  In *MCI Telecomm. Corp. v. Am. Tel. & Tel. Co.*, 512 U.S. 218 (1994), also cited by plaintiff, the Court held that the Federal Communications Commission's statutory authority to "modify any requirement" did not authorize it to do away with an essential feature of the regulation of common carriers—the requirement that they file their rates and charge only those rates.  It was highly unlikely that Congress would have meant to effectuate such a "fundamental revision of the statute" through the permission-to-modify language.  *Id*. at 231.[10]

---

[9]  Nor does the Department's construction conflict with Congressional authorization of an emergency relief loan program to benefit institutions of higher education impacted by disasters.  Pl.'s Mot. at 25 (citing 20 U.S.C. § 1161l-3(g)(4)).  The fact that the emergency relief loan program defines "institution of higher education" with reference to 20 U.S.C. § 1001 is not unusual.  All that that definition reasonably signifies is Congressional intent to limit the emergency loans to institutions participating in federal student aid programs, not any intent about the meaning of the phrase "prepare students for gainful employment in a recognized occupation."

[10]  In *Sch. Dist. of City of Pontiac v. Sec'y of U.S. Dep't of Educ.*, 584 F.3d 253, 294 (6th Cir. 2009), cited in plaintiff's brief at p. 23, Judge Sutton wrote in a concurring opinion that interpreting the Unfunded Mandates

As the *APSCU I* court found in rejecting this very argument, "[n]either the elephant nor the mousehole is present here." 870 F. Supp. 2d at 148. Unlike these cases, there is no fundamental conflict between the regulations challenged here and Congress's regulatory scheme. *See* 79 Fed. Reg. at 64894. Rather than fundamentally alter the statutory scheme, the regulations fit comfortably within it as another means of protecting the integrity of the student loan program, as described above. *See APSCU I*, 870 F. Supp. 2d at 148 ("Although the Department's regulation is significant, it does not approach the scale of the elephantine interventions described [in *Brown & Williamson* and *MCI*]. . . . Concerned about inadequate programs and unscrupulous institutions, the Department has gone looking for rats in ratholes— as the statute empowers it to do.").

The legislative history of the predecessor to the statutory requirement that certain programs "prepare students for gainful employment in a recognized occupation" does not, as plaintiff claims, foreclose the Department's construction. To the contrary, the Department's construction furthers, and is consistent with, legislative history showing Congress's intent that federal loans for business, trade, technical, and other vocational training be a sound credit risk. *See WPIX, Inc. v. IVI, Inc.*, 691 F.3d 275, 282 (2d Cir. 2012) (consulting legislative history to determine if agency interpretation furthers the statutory purpose). In 1965, Congress extended federal loan eligibility to for-profit schools but limited it to institutions providing "a program of postsecondary vocational or technical education designed to fit individuals for useful employment in recognized occupations." NVSLIA, § 17(a).[11] This limitation on eligibility for

---

provision of the No Child Left Behind Act as excusing states from their obligation to comply with the Act's requirements if the costs of compliance were not covered by federal funds, would fundamentally change the basic bargain underlying the Act—that states comply with the Act's requirements in exchange for federal funding, even if they have to spend their own money to do so.

    [11]  As noted above, the NVSLIA loan insurance program has since been merged into the HEA, and the HEA conditions eligibility for Title IV aid for vocationally oriented programs on their "prepar[ing] students for

institutions reflected Congress's concern that students who attend these types of programs, as opposed to traditional colleges and universities, be able to obtain jobs that would enable them to repay the federal debt they incurred to attend the programs, thereby minimizing the risk of default to the taxpayers.  *See* 79 Fed. Reg. at 64893.

Congress heard from several witnesses who testified that students who attend these types of programs, despite often being from lower-income socioeconomic backgrounds, were likely to be able to repay loans made to them if Congress authorized the loan program.  *See* S. Rep. No. 89-758, at 3-11; H.R. Rep. No. 89-308, at 3-7.  Dr. Hoyt, a professor of education at the University of Iowa who ran a "national research program aimed at studying students who attend a trade, technical, or business school at the post-high-school level," S. Rep. No. 89-758, at 3; H.R. Rep. No. 89-308, at 2-3, posed two critical questions in his testimony:  "If loans were made to these kinds of students, is it likely they could repay them following training?  Would loan funds pay dividends in terms of benefits accruing from the training students received?  It would seem that any discussion concerning this bill must address itself to these questions."  S. Rep. No. 89-758, at 7; H.R. Rep. No. 89-308, at 4.  Dr. Hoyt reported that over 95% of the students in his study who sought employment found it and, further, that a large majority of the students found employment related to their training; he also detailed the median weekly income of students' first jobs post-training.  S. Rep. No. 89-758, at 7-8; H.R. Rep. No. 89-308, at 4-5. Dr. Hoyt concluded:

> It seems evident that, in terms of this sample of students, sufficient numbers were working for sufficient wages so as to make the concept of student loan [repayment] to be rapid following graduation a reasonable approach to take. . . . [A]ll data presented here support the reasonableness of making loan funds

---

gainful employment in a recognized occupation."  For a detailed history of the NVSLIA and the HEA, and how the phrase "designed to fit individuals for useful employment in recognized occupations" became "prepare students for gainful employment in a recognized occupation," see *APSCU I*, 870 F. Supp. 2d at 138-40.

> available to students attending trade, technical, and business schools.  I have
> found no reason to believe that such funds . . . would represent a poor financial
> risk.

H.R. Rep. No. 308, at 5-6; S. Rep. No. 89-758, at 8 [first alteration in House version].  *See also*

79 Fed. Reg. at 64893.

The committee reports also summarized similar assurances Congress received from

industry representatives, such as the executive vice president of the Capitol Radio Engineering

Institution who testified that "the students receiving loans will, in almost every case, be enabled

to repay them out of the added income resulting from their better educational status."  S. Rep.

No. 89-758, at 11.  The president of the Lincoln Technical Institute testified that "[t]he relatively

short enrollment period in most private trade and technical schools coupled with the

demonstrated effectiveness of their placement departments assures the lending agency of a better

than average credit risk."  *Id*. at 9.  And Congress received data from the New York Higher

Education Assistance Corp., which was operating a guaranteed loan program in New York for

students attending postsecondary vocational institutions, showing that less than 1% of the total

amount of loans guaranteed were in default.  H.R. Rep. No. 89-308, at 6.  *See also NVSLIA*

*Hearings Before the Select Subcomm. on Educ. of the Comm. on Educ. and Labor*, 89th Cong. 56

(1965) ("NVSLIA hearings") (testimony of president of Duff's Business Institute and

administrator of Pittsburgh Automotive Institute) ("In view of the salaries these youngsters can

get upon graduation, a monthly repayment under the terms of the bill is no great burden . . . there

will be no drain on the taxpayer [from this bill]"), *APSCU I*, 870 F. Supp. 2d at 140 n.2.

Plaintiff gives this various testimony the back-of-the-hand, dismissing Dr. Hoyt's

testimony in particular as mere witness testimony from a professor from Iowa.  Pl.'s Mot. at 28.

This criticism ignores that portions of Dr. Hoyt's testimony were reprinted at length in otherwise

brief congressional subcommittee reports, that the other witness testimony discussed above was summarized in those reports as well, and that both subcommittees emphasized the influence of the remarks of Dr. Hoyt, whose research was extremely relevant to Congress.  *See APSCU I*, 870 F. Supp. 2d at 139 (citing reports); *see also* NVSLIA hearings at 37 (statement of Representative Scheuer) (to Dr. Hoyt:  "I think all of us will give [your testimony] great weight. . . .  It is fascinating and most compelling.").

Plaintiff puts heavy stock in two other eligibility requirements that Congress included in the NVSLIA—that an institution be in existence for two years, and that it be accredited— claiming that those requirements "fully resolved Congress's concerns regarding program quality."  Pl.'s Mot. at 28.  But neither of these requirements is directed at ensuring that programs prepare students for employment that will enable them to repay their federal student loan debt.  Rather, the purpose of the two-year requirement is to prevent "fly-by-night" institutions from springing up overnight to take advantage of the federal largesse, as happened in the aftermath of the GI bill in the post-World War II era.  S. Rep. No. 89-758, at 12 ("It was the determined intent . . . that the 'fly-by-night' institutions of the post-World War II era be explicitly eliminated from eligibility.  The subcommittee resolved this problem by adding an eligibility feature which requires an institution to have been in existence for 2 years."); H.R. Rep. No. 89-308, at 9; NVSLIA hearings at 67-68 (statement of Chairman John H. Dent) (purpose of requirement that a program be in existence for two years is "to try to keep away from all the pitfalls we ran into under the GI bill where the creation of schools overnight occurred . . .").[12]

---

[12]  As plaintiff recognizes, the requirement that an institution be in existence for two years is separate from the requirement that it prepare students for gainful employment in a recognized occupation.  Pl.'s Mot. at 28.  The two requirements remain separate in 20 U.S.C. §1002(b) (*see id.* § 1002(b)(1)(A), (E)); thus, there is no *statutory* prerequisite requiring that a program prepare students for gainful employment in a recognized occupation for two years prior to the time an institution initially applies for Title IV eligibility.  *See* Pl.'s Mot. at 26.  As plaintiff points

Accreditation, too, was meant to limit eligibility to those institutions that were "in existence for a reasonable period of time" and had the imprimatur of accreditation. *Id.* at 13 (statement of Chairman Dent).[13]  As explained above, accreditation provides a minimal check on program quality, indicating that an institution is in compliance with its own standards and the standards of like institutions that make up the accrediting association.[14]  Just because an institution is accredited simply does not mean that its graduates will be able to obtain jobs that will pay them enough to allow them to pay off their federal student debt.  *See* S. Rep. No. 102-58, 1991 WL 153999, at *17 (1991) ("[A]ccreditation is ill-equipped to prevent GSLP fraud and abuse, as evidenced by the fact that unscrupulous, dishonest, and/or inept school owners often acquire and retain accreditation with little, if any, difficulty.").[15]  Congress intended accreditation to work in tandem with the other eligibility requirements to provide a multi-layered approach to program quality under the NVSLIA, not to be a singular solution to the problem of poor program quality.  *See* NVSLIA § 17(a)(1)-(3).

Plaintiff's argument that Congress authorized loans to institutions providing vocational training programs that merely prepared their students for any job that pays (so long as they were in existence for two years and accredited) is not supported by this legislative history, let alone

---

out, to the extent such a requirement exists, it is a regulatory one, not a statutory one, and so has no bearing on Congress's intent with respect to the precise question at issue.  *Id.* at 26 n.37.

[13]  *See also id.* at 20 (statement of Dr. Blackstone of HEW) ("You have to be in operation so many years before you can be accredited.  Now, where you do not have . . . a nationally accrediting agency, then the Commissioner would, in effect, set standards which I presume would include a length of tenure of operation to prevent your opening a school on Thursday and applying for permission to have your students receive loans on Friday.").

[14]  *See also id.* at 20 (statement of Dr. Blackstone) (describing the accrediting process:  "What happens is that you get a group of schools and they want to develop some standards; they want recognition.  So, they get together and in their own manner establish these standards."); *id.* at 23 (statement of Dr. Blackstone) ("What you get is a professional organization made up of people in the field speaking on what they believe should be the standards in that particular field . . . .").

[15]  In 1992, Congress amended the HEA's accreditation policies by, *inter alia*, adding criteria that accrediting agencies must meet in order to be recognized by the Department.  20 U.S.C. § 1099b(a).  If an accrediting agency fails to meet the criteria, it would not be listed as a recognized accrediting agency by the Department, but it can still continue accrediting schools.  *Keams v. Tempe Technical Inst.*, 39 F.3d 222, 226-27 (9th Cir. 1994).

unambiguously compelled by it (as plaintiff claims).  The statute is ambiguous as to how the Department is "to determine which programs actually prepare their students [for gainful employment in a recognized occupation] and which programs do not," *APSCU I*, 870 F. Supp. 2d at 146, and the challenged regulations are a reasonable interpretation of the ambiguous statutory command, for all of the reasons set forth above.  *Id*. at 149.

## II.     THE REGULATIONS DO NOT VIOLATE THE DUE PROCESS CLAUSE

### A.     Plaintiff's Due Process Claims Are Not Justiciable

To establish standing, a plaintiff "must have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical."  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). "[T]hreatened injury must be *certainly impending* to constitute injury in fact, and . . . allegations of *possible* future injury are not sufficient."  *Clapper v. Amnesty Int'l USA*, 133 S. Ct. 1138, 1147 (2013) (quotations omitted).  Moreover, "a regulation is not ordinarily considered . . . 'ripe' for judicial review . . . until the scope of the controversy has been reduced to more manageable proportions, and its factual components fleshed out, by some concrete action applying the regulation to the claimant's situation in a fashion that harms or threatens to harm him."  *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 891 (1990).

Plaintiff has not alleged any imminent injury with respect to its due process claims.  The regulations permit a failing or zone program to recalculate its D/E rates using alternative earnings data.  34 C.F.R. § 668.406.  Plaintiff can do no more than speculate that any of its members' programs will fail both D/E rates no matter what source of earnings data is used.  Nor can plaintiff show that its members' programs will fail both D/E rates at a time when the debt of past students is used in the calculation.  *See United States v. Ben Zvi*, 242 F.3d 89, 99 (2d Cir.

2001) (concluding that potential denial of discretionary relief in possible future immigration proceedings was "too speculative . . . for Article III standing").  The Court, therefore, lacks jurisdiction over plaintiff's due process claims.

      B.      Plaintiff's Procedural Due Process Claim Fails

            1.      Schools do not have a protected interest in continued eligibility to participate in the Title IV program

The threshold question in any procedural due process claim is whether the plaintiff was deprived of a liberty or property interest protected by the U.S. Constitution.  *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 569 (1972).  Plaintiff's due process claim fails at this first step, because schools do not have a protected interest in continued eligibility for federal student loan programs.  *See Ass'n of Accred. Cosmetology Schs.*, 979 F.2d at 864; *Dumas v. Kipp*, 90 F.3d 386, 392 (9th Cir. 1996); *APSCU I*, 870 F. Supp. 2d at 154 n.7.

     "To have a property interest in a benefit, a person clearly must have more than an abstract need or desire and more than a unilateral expectation of it.  He must, instead, have a legitimate claim of entitlement to it."  *Town of Castle Rock v. Gonzales*, 545 U.S. 748, 756 (2005) (quotations omitted).  The existence of a legitimate claim of entitlement "turns on whether the issuing authority lacks discretion to deny [the benefit], *i.e.*, is required to issue it upon ascertainment that certain objectively ascertainable criteria have been met."  *Natale v. Town of Ridgefield*, 170 F.3d 258, 263 (2d Cir. 1999).  As the D.C. Circuit explained in refusing to find a protected interest in this context, schools are not "promised or even led to believe that there will be no background changes in the federal law governing [federal student loan programs]."  *Ass'n of Accredited Cosmetology Schs.*, 979 F.2d at 864.  Indeed, the participation agreement that schools must sign explicitly provides that schools "must comply with all the relevant program statutes and regulations and that each Agreement (hence each school's

eligibility) automatically terminates . . . [o]n the date the institution no longer qualifies as an eligible institution."  *Id.* (internal citation and quotations omitted).

Moreover, under the HEA and implementing regulations, the Department "retains significant discretion to deny [eligibility] based on subjective criteria."  *Mordukhaev v. Daus*, 457 Fed. Appx. 16, 19 (2d Cir. 2012).  For example, the Department is required to consider a school's financial responsibility and administrative capability, *see* 20 U.S.C. § 1094(a)(3), (c), and, in assessing the latter, the Department looks at, *inter alia*, whether the school "[d]esignates a capable individual," "[u]ses an adequate number of qualified persons to administer [Title IV programs]," maintains "adequate checks and balances," and "shows no evidence of significant problems that affect, as determined by the Secretary, the institution's ability to administer [Title IV programs]," 34 C.F.R. § 668.16.  These subjective criteria, which the Seventh Circuit did not consider in *Continental Training Services, Inc. v. Cavazos*, 893 F.2d 877 (7th Cir. 1990) (relied upon by plaintiff), are similar to those that led the Second Circuit to conclude there was no property interest at stake in *Mordukhaev*.  *See Mordukhaev*, 457 Fed. Appx. at 19-20 (pointing to requirements of "good moral character" and "unsatisfactory" "physical condition" or "knowledge of the city"); *see also RRI Realty Corp. v. Inc. Vill. of Southampton*, 870 F.2d 911, 919 (2d Cir. 1989).[16]

Schools also lack a protected interest because students, not schools, are the direct beneficiaries of federal student loan programs.  *See Dumas*, 90 F.3d at 392.  "Indirect

---

[16]  *Continental Training* is not persuasive for the additional reason that it assessed schools' purported interest under the HEA prior to Congress's 1992 amendment of the statute.  In 1992, Congress substantially modified the participation agreement requirements and authorized the Department to set time limits and conditions on schools' participation, further undermining any claim of entitlement to participate in the Title IV program.

*Mildred Elley Bus. Sch., Inc. v. Riley*, 975 F. Supp. 434 (N.D.N.Y. 1997), is also not persuasive, as its *dicta* acknowledging a property interest relies solely on *Continental Training*, without any independent analysis.  *Id.* at 439.  Moreover, whether state law creates a legitimate claim of entitlement to a particular benefit (*see* Pl.'s Mot. at 9 n.13) does not answer the question of whether federal law creates such a claim with respect to a different benefit.  *See Plaza Health Labs., Inc. v. Perales*, 878 F.2d 577, 581 (2d Cir. 1989) (explaining that the focus is on "the relevant statute, regulation, or contract establishing eligibility for the government benefit at issue").

beneficiaries of government programs have no due process rights." *Id.*; *see Am. Inst. of Design v. Riley*, 969 F. Supp. 936, 951-952 (E.D. Pa. 1997).[17]

2.      The regulations provide sufficient process

Even if participating schools have a protected interest in continued eligibility for the Title IV program, the regulations provide sufficient process.  "There is no rigid formula that determines the constitutional sufficiency of the process employed."  *DeMichele v. Greenburgh Cent. Sch. Dist. No. 7*, 167 F.3d 784, 791 (2d Cir. 1999).  Rather, "due process is flexible and calls for such procedural protections as the particular situation demands."  *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972).  Courts consider "the private interest that will be affected by the official action"; "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards"; and "the [g]overnment's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail."  *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976).

Balancing these factors demonstrates that the regulations provide schools with all the process that is constitutionally required before a program loses eligibility.  First, a school's interest in the continued eligibility for Title IV funding of one of its programs is relatively modest.  As noted above, the Title IV program is intended to benefit students, not schools. *Dumas*, 90 F.3d at 390-91; *Parks Sch. of Bus., Inc. v. Symington*, 51 F.3d 1480, 1484 (9th Cir. 1995).  Moreover, because schools can (and typically do) offer multiple programs, a loss of eligibility for one program will not prevent the school from receiving Title IV funding for other

---

[17]   Even the Seventh Circuit itself has questioned the validity of the *dicta* in *Continental Training* acknowledging a liberty interest.  *See Medley v. City of Milwaukee*, 969 F.2d 312, 317 (7th Cir. 1992) ("[W]e are unaware of any" "cases where a court has found a liberty interest in a private party's participation in a government assistance program designed to provide benefits for a third party.").

programs that meet the gainful employment requirements.  And nothing prevents a school from continuing to offer (and profit from) a program that has lost eligibility; students attending the program merely must use sources other than Title IV funding to finance their education.  *See* 20 U.S.C. § 1002(b)(1)(E) (requiring that for-profit schools be in existence for at least 2 years before they can become eligible for the Title IV program).

Second, the procedures provided for in the regulations minimize any risk of erroneous deprivation.[18]  The regulations permit schools to make any necessary corrections to the list of students that the Department provides to SSA for purposes of obtaining earnings information.  34 C.F.R. § 668.405(c).  SSA then matches the list of students with earnings data contained in its Master Earnings File and provides the Department with the mean and median earnings of the students on the list, which the Department then uses to calculate the denominator in the D/E rates.  *Id*. § 668.405(d); 79 Fed. Reg. at 64950-51.  Because the earnings data for individual students in the MEF is obtained from various tax forms, SSA is prohibited by law from disclosing it to schools or the Department.  *See* 26 U.S.C. § 6103.

Contrary to plaintiff's argument, the MEF is reliable and does not create a high risk of error.  It is used to calculate Social Security benefit amounts for individuals, as well as for policy analysis and research both within and outside SSA.  *See* Social Security Administration's Master Earnings File: Background Information, U.S. Social Security Administration, AR-G-002825-41.  It is populated using earnings information reported to SSA and the Internal Revenue Service on various tax forms under penalty of law.  *Id*.  Approximately 96% of the 245 million wage reports SSA receives each year are successfully posted to the MEF after computerized routines are applied to remedy any mismatches (*i.e.*, when the name and SSN on a wage report do not match

---

[18]  Plaintiff does not object to the procedure for challenging the annual loan payment in the numerator of the D/E rates, so the Department does not address that procedure here.

28

information in SSA's file of individuals with SSNs).  AR-G-002833; 79 Fed. Reg. at 64953.

Although some of the remaining mismatches may be due to clerical errors by employees or

employers (e.g., transposing numbers when reporting a SSN or misspelling a name), many of

them result from the employment of unauthorized non-citizens who are not eligible for federal

student aid.  Therefore, these mismatches (which may have earnings associated with them, *see*

Pl.'s Mot. at 14 n.20) would not affect a program's D/E rates.  79 Fed. Reg. at 64953.

Moreover, there are systems in place to address any remaining clerical-type mismatches.

SSA sends letters to all employees and many employers when a mismatch occurs to alert them to

the error; all workers receive an annual Social Security Statement that shows earnings that have

been posted to the MEF so that they may correct any errors that could affect their Social Security

benefits; and SSA continually performs reinstate processes to reconcile any mismatches.  AR-G-

002833; 79 Fed. Reg. at 64953.  Any risk of error from mismatches causing reports of zero

earnings or from underreported income or tips also is minimal for the reasons discussed *infra* pp.

32-34.  *See Ramirez v. Ahn*, 843 F.2d 864, 869 (5th Cir. 1988) (noting that procedural due

process "does not mandate error-free decision making").

If a school nevertheless believes that the mean or median earnings reported by SSA that

give a program a failing or zone rate are inaccurate, it may file an appeal using alternate earnings

data from an institutional survey or State-sponsored data system, which is then used to

recalculate the program's D/E rates.  34 C.F.R. § 668.406; *see N.Y. State Nat'l Org. for Women

v. Pataki*, 261 F.3d 156, 168 (2d Cir. 2001) (concluding process was sufficient where "the

availability of other procedures" mitigated any potential harm).  Plaintiff purports to object to the

institutional survey standards (Pl.'s Mot. at 12 n.18), but those standards are still being

developed in consultation with schools and other interested parties, *see* 79 Fed. Reg. at 64962.

Thus, any claim regarding their inadequacy is not ripe.  And plaintiff's unsupported assertion that New York does not have a database that collects income information (Pl.'s Mot. at 12) is false.  *See* N.Y. Lab. Law § 537.[19]

Third, the government has a strong interest in ensuring that students are not saddled with debt they cannot afford and in safeguarding the taxpayer's investment in the federal student loan program.  Plaintiff does not identify any additional or substitute procedural safeguards that would serve the government's purposes (*see infra* pp. 32-34 (explaining why plaintiff's proposal to impute earnings is inconsistent with the purposes of the gainful employment regulations)), other than providing schools with SSA earnings data for individual students that SSA is barred by law from disclosing, even to the Department.  26 U.S.C. § 6103.  The government's interest in protecting the privacy of tax return information is compelling and outweighs any burden on schools of using alternative earnings data if a program is unable to pass the D/E rate measures based on the MEF data.  *See Henry v. Gross*, 803 F.2d 757, 768 (2d Cir. 1986) (concluding additional procedures were not required where they were infeasible or would impose "significant administrative difficulty").[20]

---

[19]  *See also* N.Y. Dep't of Labor, Data Sharing Under Labor Law § 537, *available at* http://labor ny.gov/data-sharing/PDFs/nysdol-ui-data-sharing-presentation.pdf; N.Y. Dep't of Labor, UI Information Sharing FAQs, *available at* http://www.labor.ny.gov/data-sharing/data-sharing-faqs.shtm.

[20]  Contrary to plaintiff's assertion (Pl's Mot. at 31-32), 20 U.S.C. § 1094(c)(1)(F) does not require a different procedure.  Section 1094(c)(1)(F)'s requirement of an "opportunity for hearing" is ambiguous and does not clearly mandate an evidentiary-type hearing "conducted by . . . someone other than the Secretary or other ED official" (Pl's Mot. at 32).  *See Bell Tel. Co. v. FCC*, 503 F.2d 1250, 1264 (3d Cir. 1974) (explaining that "opportunity for hearing" is an "ambiguous phrase").  Indeed, a prior version of § 1094(c)(1)(F) required an "opportunity for hearing on the record," but Congress amended the statute, confident that schools would "still receive adequate due process without the cumbersome and lengthy process that often results from 'on the record' hearings."  H.R. Rep. No. 102-447, at 83 (1992), *reprinted in* 1992 U.S.C.C.A.N. 334, 416; *see also Chauffeur's Training Sch., Inc. v. Spellings*, 478 F.3d 117, 131 (concluding that even prior version containing "on the record" language "did not require an oral evidentiary hearing").  Although the Department has required the 34 C.F.R. § 668.88 procedures that plaintiff references in some circumstances, it has determined that the procedures set forth in 34 C.F.R. §§ 668.405-668.406 provide the necessary opportunity for hearing to challenge the calculation of D/E rates.  *See Spreckels v. Helvering*, 315 U.S. 626, 628 (1942) (observing that a specific regulation controls over a general regulation); *see also* 34 C.F.R. § 668.181-668.217 (establishing specific procedures for challenging cohort default rates); *cf. Jones v. Flowers*, 547 U.S. 220, 223 (2006) (observing that due process requires "notice and

3.      Due process does not require the Department to provide schools with MEF earnings data for individual students

Plaintiff asserts that a school's inability to obtain SSA earnings data for individual students is a *per se* violation of due process.  But the Due Process Clause requires only that schools "be apprised of the factual material *on which the agency relies* for decision."  *Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*, 419 U.S. 281, 288 n.4 (1974) (emphasis added); *see also e.g., Ohio Bell Tel. Co. v. Pub. Utils. Comm'n*, 301 U.S. 292, 300, 302 (1937) (the Commission rendered a decision "upon the strength of information . . . never . . . disclosed" and "even now we do not know the . . . evidential facts . . . on which [the Commission] rested its conclusion[.]").  The Department does not have access to, and thus does not rely on, individual earnings data in the MEF.  Instead, it rests its decision on the mean and median aggregate earnings figures provided to it by SSA.  34 C.F.R. § 668.405(d).  Schools are provided with those mean and median earnings figures, *id*. § 668.405(e)(3)(i), and they have "an opportunity to offer a contrary presentation" using earnings data from an institutional survey or State-sponsored data system, *Bowman*, 419 U.S. at 288 n.4.  That is all due process requires.[21]  *See, e.g., Vila v. Holder*, 480 Fed. Appx. 6, 8 (2d Cir. 2012) (concluding that plaintiff's ability to review country reports relied on by decisionmaker—but not necessarily data and materials underlying those reports—and to rebut the reports with his own evidence was sufficient to satisfy due process); *Cooper v. Salazar*, 2001 WL 1351121, at *7 (N.D. Ill. 2001) (providing complainant with investigator's report, but not investigator's witness notes, violated due process because agency

---

opportunity for hearing *appropriate to the nature of the case*" (emphasis added)).  The Department's reasonable interpretation of § 1094(c)(1)(F)'s ambiguous statutory command is entitled to deference.  *Chevron*, 467 U.S. at 843.

[21] Plaintiff's attempted analogies to wiretaps and criminal proceedings (Pl.'s Mot. at 11 & n.17) are unavailing.  They implicate Fourth and Sixth Amendment principles that do not apply (and have not been raised) here.  *See, e.g., United States v. Mandycz*, 447 F.3d 951, 962 (6th Cir. 2006) ("Criminal cases offer many due process protections . . . that civil proceedings . . . do not."); *United States v. Fernandez-Antonia*, 278 F.3d 150, 156 (2d Cir. 2002); *Harper v. Lindsay*, 616 F.2d 849, 858 (5th Cir. 1980) ("Procedural due process in the administrative setting does not always require application of the judicial model.").

could rely on either report or witness notes in reaching its decision); *cf. Blue Cross Blue Shield of New Jersey, Inc. v. Philip Morris USA, Inc.*, 344 F.3d 211, 227 (2d Cir. 2003) (rejecting due process claim where defendant was held liable based on aggregated proof and denied an opportunity to cross examine each harmed individual).[22]

C.    The Regulations Do Not Create An Unlawful Presumption

The regulations do not create a presumption that MEF data accurately represents the earnings of program graduates. They merely make clear that schools, rather than the Department, bear the burden of demonstrating eligibility for the Title IV program, through an alternative earnings appeal, if necessary. *See Lavine v. Milne*, 424 U.S. 577, 579, 583-84 (1976) (holding that statute did not create a presumption where it "deemed" a person who applied for welfare assistance within 75 days after voluntarily terminating his employment to have done so for the purpose of qualifying for welfare assistance "in the absence of evidence to the contrary supplied by [the] person"). "Outside the criminal law area, . . . the locus of the burden of persuasion is normally not an issue of federal constitutional moment." *Id.* at 585.

Furthermore, even if the regulations could be viewed as creating a rebuttable presumption, they would not violate due process. A presumption is lawful unless it is arbitrary, meaning there is no rational connection between the fact to be proved and the fact to be inferred. *See Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1, 28 (1976); *Western & A.R.R. v. Henderson*, 279 U.S. 639, 642 (1929). That standard is easily satisfied here. There is a rational connection between the mean and median earnings of a program's graduates as gleaned from the MEF,

---

[22] Plaintiff mischaracterizes *Williston Basin Interstate Pipeline Co. v. FERC*, 165 F.3d 54 (1999). Pl.'s Mot. at 11. The problem in that case was not that the Commission made a projection based on data that was not provided to the plaintiff. *See id.* at 64 (explaining that the "two GDP figures" used by the Commission were in the record). Rather, the Commission did not sufficiently explain why it chose to rely on those two GDP figures instead of numerous other "estimates of GDP created by different entities" and it did not provide the plaintiff with an opportunity to present and advocate for other estimates. *Id.* Here, the Department has explained why the MEF is the best data source available for calculating the D/E rates and has provided schools with a procedure for presenting alternative earnings data. *See* 79 Fed. Reg. at 64950-63.

which is populated using earnings information reported to the government under penalty of law,

and the actual mean and median earnings of a program's graduates.  Indeed, millions of

taxpayers, as well as the government, rely on the earnings data in the MEF to control hundreds of

billions of dollars annually in Social Security benefit payments.  79 Fed. Reg. at 64957.

*Compare Western & A.R.R.*, 279 U.S. at 642-43 (concluding it is arbitrary to infer from the mere

fact of a collision between a railway train and a vehicle at a highway crossing that the accident

was caused by the railway company's negligence).

     Plaintiff maintains there is a disconnect between the MEF data and actual earnings

because SSA assumes zero earnings when no wage report is matched to an individual and

because self-employment income and tips are sometimes unreported or underreported.  The

Department thoroughly considered these issues, and its analysis (which is set forth more fully in

the final rule at 79 Fed. Reg. at 64950-59) demonstrates that reliance on the MEF is not arbitrary.

     If SSA does not match any wage report to a particular individual, the MEF will show

zero earnings for that individual.  *See* 79 Fed. Reg. at 64953-55.  The absence of a match could

mean that the individual is unemployed (and thus no wage report was submitted) or that a

mismatch occurred and has not been corrected despite the many safeguards discussed *supra* pp.

28-29.  *See id*.  To ensure that the latter possibility did not render the MEF unreliable as a data

source for calculating D/E rates, the Department compared the number of individuals who

showed zero earnings in the instances in which it had previously obtained aggregate earnings

data from SSA with the unemployment rate in the relevant years.  *Id*.  That analysis showed that

occurrences of zero earnings were consistent with unemployment rates, including the

unemployment rates for the age groups most likely to be encompassed by the relevant cohort of students. *Id.*[23]

The Department also considered the imputed earnings approach advocated by Dr. Bettinger but determined it was not appropriate for calculating D/E rates.  Dr. Bettinger imputed earnings, even for unemployed graduates of a program, based on data from the Current Population Survey ("CPS"), which is derived from surveys of households.  79 Fed. Reg. at 64956.  Dr. Bettinger "extrapolate[d] from earnings reported by those survey recipients who identify their occupation as one that appears related to GE programs of that general type, and then project[ed] an increase in aggregate earnings for all GE programs in the category of programs that appears to include that occupation."  *Id.*  Thus, any inference drawn from the CPS data would improve the D/E rates for every program in a particular category, "mask[ing] poorer performing programs and thwart[ing] a major purpose of the GE assessment."[24]  *Id.*

The Department is not aware of, and no commenter identified, any data source available to the Department that would allow it to impute earnings or account for unreported or underreported self-employment income or tips in a way that would distinguish between programs, which is the purpose of the challenged regulations.  *Id.*  Accordingly, the MEF data is the most reliable data available and the Department's use of it is not arbitrary, particularly where schools may file an appeal using alternative earnings data.  *See id.*[25]

---

[23]  In addition to the mean and median aggregate earnings figures provided to it by SSA, the Department will also inform schools of the number of instances of zero earnings for the relevant cohort of students.  *See* 79 Fed. Reg. at 64950.  A school that believes the instances of zero earnings are not reflective of its unemployed graduates may file an alternative earnings appeal.  *See* 34 C.F.R. § 668.406.

[24]  The final rule also explains why Dr. Bettinger's examples of agencies imputing data for missing information, including the "48 states [that] impute income" (Pl.'s Mot. at 14) *for noncustodial parents in child support cases*, are distinguishable and do not justify imputation here.  *See* 79 Fed. Reg. at 64957-58.

[25]  Additionally, the Department's decision not to "prorat[e] partial-year incomes" was not arbitrary.  *See* Pl.'s Mot. at 46.  "Annualizing earnings—attributing to a student earnings that the individual did not actually receive or otherwise ignoring periods of unemployment—would contravene the Department's goal to assess the actual outcomes of students" and also is "impracticable."  79 Fed. Reg. at 64952.

D.       The Regulations Are Not Retroactive

The regulations are not retroactive because they have only future effect.  They do not undo any program's past eligibility for Title IV funding; they merely require consideration of the debt of past students in determining a program's future eligibility.  *See Reynolds v. United States*, 292 U.S. 443, 449 (1934) ("A statute is not rendered retroactive merely because the facts or requisites upon which its subsequent action depends, or some of them, are drawn from a time antecedent to the enactment.").  Regulations that do not alter "the *past* legal consequences of past actions" are not retroactive.  *Nat'l Cable & Telecomms. Ass'n v. FCC*, 567 F.3d 659, 670 (D.C. Cir. 2009) (quoting *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 219 (1988) (Scalia, J., concurring)) (emphasis added).  Indeed, the district court in *APSCU I* rejected the same challenge to the 2011 Rules, 870 F. Supp. 2d at 151-52, and numerous other courts have done the same with respect to retroactivity challenges to similar regulatory schemes under the HEA, *see Ass'n of Accredited Cosmetology Schs.*, 979 F.2d at 865-66 (holding that cohort default rate regulations, which required the Department to consider the loan default rates of students who exited a school before the regulations were issued, were not retroactive); *Pro Schs., Inc. v. Riley*, 824 F. Supp. 1314, 1319 (E.D. Wis. 1993) (same); *Career Coll. Ass'n v. Riley*, 1994 WL 396294, *5 n.7 (D.D.C. July 19, 1994) (concluding regulations that required at least 15% of a school's revenues to be derived from non-Title IV sources were not retroactive even though they applied to accounting periods that were closed when the regulations were announced); *Ponce Paramedical Coll., Inc.*, 858 F. Supp. at 311 (same); *see also American Mining Congress v. EPA*, 965 F.2d 759, 770 (9th Cir. 1992) (concluding that rule regulating discharges of

contaminated storm water was not retroactive even though "the present contamination is the result of past mining activities").[26]

The regulations also do not have secondary retroactive effects.  Secondary retroactivity exists where a regulation "impair[s] the future value of a past bargain," by, for example, altering the value of a contract or license entered into under a prior regulatory scheme.  *Nat'l Cable & Telecomm. Assoc.*, 567 F.3d at 670; *see Bowen*, 488 U.S. at 220 (Scalia, J., concurring).  Because plaintiff does not (and cannot) point to any prior bargain or contract that has been devalued as a result of the regulations, the regulations are not secondarily retroactive.  *See APSCU I*, 870 F. Supp. 2d at 152; *Career College Ass'n*, 1994 WL 396294, *5.

Nevertheless, even if there were some secondary retroactive effects, the regulations should be sustained because they are reasonable.  *See Bowen*, 488 U.S. at 220 (Scalia, J., concurring) (citing *Nat'l Ass'n of Indep. Television Producers & Distribs. v. FCC*, 502 F.2d 249, 255 & n.10 (2d Cir. 1974)).  The Department considered the benefits of the regulations as well as any burden imposed on schools by reliance—for the first few years of implementation—on the debt of students who left a program before the regulations were promulgated.  79 Fed. Reg. at 64947-49.  The Department determined that the need to remove poorly performing programs from Title IV eligibility was too great to delay implementation for the number of years that would be necessary to fully address this concern.  *Id.*  In particular, six years would be needed for students to enroll and complete a four-year program before earnings would be measured under the D/E rates, and that period would double for students enrolled on a half-time basis.  The Department, however, did create a transition period to provide poorly performing programs with

---

[26]  Contrary to plaintiff's assertion, the regulations do not "attach[] new legal consequences to events *completed* before [their promulgation]." *Landgraf v. USI Film Products*, 511 U.S. 244,  270 (1994) (emphasis added).  The earnings of a program's graduates, which are used to calculate the denominator of the D/E rates, always postdate the effective date of the regulations.

an opportunity to improve their D/E rates before they lost eligibility.  *Id.*  During the transition period, the debt of students who completed the program during the applicable cohort period will be replaced by the debt of students who completed the program during the most recently completed award year.  *Id.*; *see* 34 C.F.R. § 668.404(g).  The transition period allows schools to improve the D/E rates for a program by reducing costs, and therefore borrowing, for current students.  79 Fed. Reg. at 64948.

Moreover, in response to concerns that the four-year transition period proposed in the NPRM would not give programs sufficient time to improve, the Department extended the transition period for five to seven years depending on program length.  79 Fed. Reg. at 64947-48; *see* 34 C.F.R. § 668.404(g).  A program's D/E rates, therefore, are not "baked-in."  *See* Pl.'s Mot. at 17.  And, contrary to plaintiff's assertion, there are steps schools can take now to improve their D/E rates before they lose eligibility.  Replacing or reducing the loan debts of current students for the remainder of their program with scholarships or tuition discounts, would have a dramatic impact on D/E rates under the transition period calculation by significantly decreasing the annual loan payment in the numerator of the D/E rates.  79 Fed. Reg. at 64948-49.  Of course, schools may take less drastic measures, like decreasing the costs of their programs.  Schools also may work to improve the quality of their programs and their job placement services in an effort to increase their student's earnings in the denominator of the D/E rates.  The Department's decision not to extend the transition period even further, as plaintiff urges, was not unreasonable, because it would harm both students and taxpayers to permit programs that are unable or unwilling to improve to continue to subsist on federal funding.  *Id.*

37

III.     THE REGULATIONS DO NOT VIOLATE THE APA

Plaintiff raises a host of claims that the challenged regulations violate the APA.  Pl.'s

Mot. at 32-53.  Under the APA's "deferential standard of review, [courts] must assess . . .

whether the decision was based on a consideration of the relevant factors and whether there has

been a clear error of judgment."  *Guertin v. United States*, 743 F.3d 382, 385-86 (2d Cir. 2014)

(quotation marks and citation omitted).  An "agency decision will thus only be set aside if it has

relied on factors which Congress had not intended it to consider, entirely failed to consider an

important aspect of the problem, offered an explanation for its decision that runs counter to the

evidence before the agency, or is so implausible that it could not be ascribed to a difference in

view or the product of agency expertise."  *Id.* at 386 (quotation marks and citation omitted).

A.       The Debt-To-Earnings Rates, Which Form The Basis Of The Department's
         Eligibility Determinations, Are Reasonable

1.       The passing thresholds are based on reasonable standards long-
         accepted in the education context

Plaintiff challenges the 8% annual earnings D/E rate threshold, arguing primarily that the

number derives from a mortgage-industry standard having "no relevance to educational debt."

Pl.'s Mot. at 43.  The 8% threshold is not, however, a standard thoughtlessly borrowed from

mortgage practice.  It is true that "many [mortgage] lenders typically recommend that all non-

mortgage loan installments not exceed 8 percent of the borrower's pretax income."  *Id.* at 64919.

It is also true, however, that the 8% annual earnings threshold "has long been referred to as a

limit for student debt burden."  *Id.*  The Department identified "[s]everal studies of student debt

[that] have accepted the 8 percent standard," citing four in particular.  *Id*. at 64919 & nn.100-03.

It further noted that some States established guidelines based on this limit and that "the National

Association of Student Financial Aid Administrators identified 8 percent of gross income as a

limit for excessive debt burden." *Id.* "Finally, based on a study that compared borrowers' perception of [their education] debt burden versus their actual debt-to-earnings ratios, Baum and O'Malley determined that borrowers typically feel overburdened when that ratio is above 8 percent." *Id.*

The *APSCU I* court recognized the reach and significance of the 8% figure, noting that "8 percent is a commonly used industry standard." 870 F. Supp. 2d at 152. Even the two authors plaintiff holds out as having rejected the Department's approach, *see* Pl.'s Mot. at 43 (discussing Baum and Schwartz), "acknowledge the widespread acceptance of the 8 percent standard" in the education context, and state that the 8% threshold is "'not . . . unreasonable,'" 79 Fed. Reg. at 64919 (alteration in original) (citation omitted); *see also* AR-G-000299-300.[27]

Plaintiff also argues that "[c]urrent debt-service-to-earnings ratios have evolved – reaching 45% under current Fannie Mae guidelines and 43% under the Consumer Financial Protection Bureau standards." Pl.'s Mot. at 45. What plaintiff does not note, however, is that the lion's share of this debt—up to 31%—goes toward housing, "leaving 12 percent for all other debt, including student loan debt, car loans, and all other consumer debt." 79 Fed. Reg. at 64919.[28] Of that 12%, credit card debt consumes 2.25%, leaving 9.75% for other consumer debt, including student loans, making 8% is an appropriate minimum standard for student loan debt. *Id.* Both D/E rates (8% and 20%) are also reasonable in light of the fact that they only include

---

[27] Plaintiff wrongly asserts that the Department could not have relied on expert recommendations because the Department located no records responsive to a FOIA request for records of communications with outside experts about the thresholds. Pl.'s Mot. at 42. The expert views that informed the rulemaking were those expressed in the sources cited by the Department in the rulemaking. *See, e.g.*, 79 Fed. Reg. at 64919 & nn.97-112. The Department was under no obligation to communicate with those experts in order to rely upon their views.

[28] That many recent graduates may not have mortgages—a fact plaintiff stresses (Pl.'s Mot. at 44)—is irrelevant because they no doubt still have significant housing expenses in the form of rent. *See, e.g.*, AR-H-000148 (average Associate's degree recipient pays 27% of income toward housing costs).

debt within an institution's control, potentially reducing the numerator (debt) and thus the rate, in comparison to commentators' proposed higher rates based on total student debt. *Id*. at 64918.[29]

Plaintiff's challenge to the 20% discretionary income rate, in a footnote, should also be rejected. Pl.'s Mot. at 43 n.66. The economists who conducted the relevant research proposed that "borrowers have no repayment obligations that exceed 20 percent of their [discretionary] income, a level they found to be unreasonable under virtually all circumstances." 79 Fed. Reg. at 64919. Though plaintiff points to the economists' viewpoint that the threshold should perhaps be flexible, it was reasonable for the Department to set the threshold at the upper limit identified by them. *See APSCU I*, 870 F. Supp. 2d at 152 ("[E]xperts suggested that 20 percent was the maximum affordable ratio of debt payments to discretionary income."); AR-G-000309 ("[T]he payment-to-income ratio should never exceed 18 to 20 percent.").

      2.      **It was reasonable for the Department to focus on students' income and their ability to repay their loans, including in the first years after graduating**

The Department's decision to measure students' income shortly after graduating, instead of considering income over a student's lifetime, was also reasonable. *See* Pl.'s Mot. at 38-41. As an initial matter, measuring income as early as eighteen months after graduation improves the quality of information available to prospective students—a central purpose of the rules—by providing them with current information about a program's student outcomes. *See* 79 Fed. Reg. at 64931; *APSCU I*, 870 F. Supp. 2d at 152 ("[T]he Department rationally concluded that considering a significantly longer earnings window in calculating the debt-to-income tests could

---

[29] Plaintiff's opinion that the thresholds should have been higher is simply not relevant to its APA challenge. *See Envtl. Def. v. U.S. Army Corps of Engineers*, 515 F. Supp. 2d 69, 82 (D.D.C. 2007) ("Th[e government's] reasoning is disputed, but the dispute presents a battle of experts—a battle conducted in an arena that is off limits to APA judicial review."). Nor may this Court substitute its view of what the thresholds should be for that of the Department. *See Guertin*, 743 F.3d at 386. The only relevant inquiry is whether the Department's selection of the 8% threshold was reasonable, and reasonably explained. *See Brodsky v. U.S. NRC*, 704 F.3d 113, 119 (2d Cir. 2013). As demonstrated above, it was.

weaken or sever the connection between earnings and education." (quotation marks and citation omitted)).  The shorter measurement window adopted by the Department also provides more meaningful feedback to institutions to use to improve their programs, while still allowing students time to become employed.  79 Fed. Reg. at 64931.

More fundamentally, the Department's decision to measure earnings within a short period after graduation, rather than over the students' lifetime, furthers the purpose of the rules.  It is reasonable for the Department to conclude that programs are not preparing students for gainful employment in a recognized occupation if their cost is so great, and the income from any subsequent job so modest, that students will not be able to make their monthly loan payments.  As the Department explained, although completing a program may result in increased earnings over the course of a lifetime, "[b]orrowers are still responsible for managing debt payments, which begin shortly after they complete a program, even in the early stages of their career."  *Id*. at 64914.[30]  The Department's reasoning is sound:  "[B]enefits ultimately available over a lifetime may not accrue soon enough to enable the individual to repay the student loan debt under and within the schedules available under the title IV, HEA programs."  *Id*.[31]

Plaintiff dismisses the Department's concern that students be able to pay back their loans when they become due by claiming that the Department abandoned this concern when it eliminated the pCDR rate as an eligibility metric.  Pl.'s Mot. at 41.  But the Department clearly

---

[30]  The Department's recognition that earnings may increase for program graduates over the course of their lifetimes is, contrary to plaintiff's argument, consistent with its statements regarding the Postsecondary Institutional Ratings System.  *See* Pl.'s Mot. at 40-41.  In a solicitation for public comment on a proposed new system to rate colleges, the Department said it was "considering pairing a short-term indicator of 'substantial employment' with a longer-term more specific earnings measure," explaining that "[s]hort-term labor market outcomes provide higher frequency feedback to stakeholders about institution performance," while "long-term earnings outcomes more closely correlate with an individual's lifetime earnings and are thus a better proxy for career success."  U.S. Dep't of Educ., A New System of College Ratings—Invitation to Comment 12 (Dec. 2014).

[31]  Many investments that are profitable in the long-term are not good choices for an individual who cannot afford them.  For example, a three-bedroom condominium in a posh New York City high-rise may appreciate over time—and may accordingly be a sound investment for a person who can afford to pay 20% down and thirty years of principal, interest, taxes and insurance.  But the same investment would be a decidedly poor choice for the person who would finance 99% of the purchase and default on the loan a few months after moving in.

factored default rates into its selection of the D/E rates despite the elimination of the pCDR rate. The 8% and 20% D/E rates were based in part on the fact that borrowers from programs that pass these thresholds have an average default rate of 19% and an average repayment rate of 45%, as compared to borrowers from programs that fail these thresholds or are in the zone, who have a significantly higher average default rate (25-28%) and a significantly lower average repayment rate (32%).  79 Fed. Reg. at 64920.  Far from being a concocted justification for the D/E rates, the Department's concern with students' ability to repay their federal loan debt lies at the heart of the challenged regulations.[32]

> 3.     The Department has explained why the D/E rates differ from those in the 2011 Rules

Plaintiff complains as well that the present rules improperly differ from the 2011 Rules. Pl.'s Mot. at 45-46.  The Department has, however, explained at length its reasons for diverging from the 2011 Rules.  As described above, both D/E rates (8% and 20%) are well-supported.  *See* 79 Fed. Reg. at 64917-19.  While it was reasonable for the Department to increase these thresholds by 50% in the 2011 Rules to build in a tolerance, *see id.* at 64920; *see also APSCU I*, 870 F. Supp. 2d at 153 (concluding that 2011 ratios with the tolerance, "were based upon expert studies and industry practice—objective criteria upon which the Department could reasonably rely"), such a cushion is not required.  In any event, the new rules continue to incorporate a tolerance by setting 12% and 30% as the upper bounds of the zone.  *See* 79 Fed. Reg. at 64920.

The Department explained that its present approach is based on data that was not available when the 2011 Rules were promulgated—specifically, the 2012 GE informational rate

---

[32] Plaintiff derides the Department for considering the potential consequences of unmanageable student debt, such as bankruptcy, denial of credit, inability to pay bills on time, and difficulty signing up for utilities, obtaining insurance, or renting an apartment.  Pl.s' Mot. at 41-42 (citing 79 Fed. Reg. at 64913-14).  But to the many graduates for whom student debt is overwhelming, such consequences are devastatingly real, and the promised earnings "may not accrue soon enough," *e.g.*, 79 Fed. Reg. at 64914.  *See also* 79 Fed. Reg. at 65031 ("Student loan debt now stands at over $1,096.5 billion nationally and rose by 80 percent, or $463.2 billion, between FY2008 and FY2013, a period when other forms of consumer debt were flat or declining." (footnotes omitted)).

data.  *Id*. at 64920.  Using this data, the Department determined that "zone programs are much

more similar to their failing counterparts than their passing counterparts."  *Id.* and *supra* p. 42*,*

discussing how borrowers from failing, passing, and zone programs default on, and repay,

federal loans.[33]  The Department had ample data before it demonstrating that zone programs are

resulting in "poor student outcomes" and not leading to gainful employment.  *Id.*  Because

programs in the zone are doing only slightly better than failing programs, *id.*, the regulations give

programs in the zone a longer time to loss of eligibility than those that fail the thresholds.  *Id.* at

64920, 64924.  The Department determined that this approach was preferable to that embodied in

the 2011 Rules, which would have passed programs now in the zone.  Giving zone programs four

years before losing eligibility made it "unnecessary to create buffer by raising the passing

thresholds as was done in the 2011 Prior Rule."  *Id.* at 64920.

The challenged regulations also are not arbitrary for relying on "a single metric," in

contrast to the 2011 Rules' use of a repayment rate measure and D/E rates.  Pl.'s Mot. at 52.

There is nothing arbitrary about the Department's decision to abandon the repayment rate

measure for lack of expert opinion or statistical analysis supporting an appropriate threshold

level.  *See* 79 Fed. Reg. at 64915; *id*. at16426, 16445.  Indeed, this was the very reason that the

court in *APSCU I* found the 2011 repayment rate threshold arbitrary and capricious:  because no

expert study or industry standard supported the 35% repayment rate selected by the Department

as the eligibility standard.  870 F. Supp. 2d at 154.  In the current rules, the Department

concluded that further study was necessary before adopting another method for assessing the

---

[33]  Plaintiff suggests that the Department's consideration of repayment rates is impermissible because the *APSCU I* court rejected that measure as arbitrary.  Pl.'s Mot. at 46, 50.  But the *APSCU I* court did not say that it was arbitrary for the Department to consider repayment rates, it just concluded that the Department had not satisfactorily explained the specific passing threshold it selected.  870 F. Supp. 2d at 154.  For similar reasons, the Department's decision to require disclosure of a program's pCDR, but not to use pCDR as an accountability measure, was reasonable.  *See* Pl.'s Mot. at 50.  A program's pCDR conveys important information about default rates and the outcomes of non-completers that the Department believes should be provided to prospective students, even if further study is needed before pCDR is used as an accountability measure.  *See* 79 Fed. Reg. at 64915.

repayment performance of former students, such as the pCDR. 79 Fed. Reg. at 64915. It is obviously reasoned decision making for an agency not to adopt standards that it believes are not presently supported by sufficient evidence, and the Department was entirely transparent about its reasons for not including a repayment measure in the current regulations. The Department, however, did continue to consider repayment data in setting the D/E rates, consistent with its views on the importance of this information. *See id.* at 64920.

Nor did the Department previously suggest that the debt-to-earnings measures alone would be insufficient to assess whether programs are preparing their students for gainful employment in a recognized occupation. Its statements about researchers' belief that there can be no "single percentage that answers the question of how much students can borrow without risking repayment difficulties," *APSCU v. Duncan*, No. 1:11-cv-01314-RC, ECF No. 20, Dep't Reply at 11 (D.D.C. Feb. 2, 2012), and about multiple measures giving schools more flexibility, 75 Fed. Reg. at 43618, are consistent with the fact that the D/E rates consist of *two* measures, either of which a program must pass to be eligible for Title IV aid—the debt-to-annual-earnings rate or the debt-to-discretionary-income rate. 34 C.F.R. § 668.403(b), (c)(1), 404; *see also APSCU I*, 870 F. Supp. 2d at 152; 79 Fed. Reg. at 64920.

B.     The Gainful Employment Rules Measure Program Effectiveness

      1.     The rules measure student outcomes; they do not primarily measure student demographics

The Department conducted a statistical analysis of the D/E rates metric. Responding to questions raised by commenters at the time, and plaintiff now, *see* Pl.'s Mot. at 33-37, it included in that analysis a review of the demographic composition of passing, zone, and failing programs, using, among other things, the 2012 GE informational rate data. 79 Fed. Reg. at 65043. This

comparison showed that "passing, zone, and failing programs have very similar proportions of low-income, non-traditional, female, white, Black, and Hispanic students." *Id*. at 65045.

The Department also analyzed "the degree to which individual demographic characteristics might be associated with a program's annual earnings rate while holding other characteristics constant." *Id*. at 65052. The Department conducted a multivariate regression analysis using annual earnings rate as the dependent variable, and "percent white, Black, Hispanic, Asian, Indian, two or more races, female, zero EFC [estimated family contribution, an indicator of socioeconomic status], independent, and mother completed college, institutional sector and type, and program credential level" as independent variables. *Id.* at 65043. The analysis showed that programs whose students have certain characteristics had slightly lower annual earnings rates (including programs with greater proportions of Hispanic graduates, Asian graduates, or graduates with no expected family contribution), and programs whose students have certain other characteristics had slightly higher annual earnings rates (including programs with greater proportions of Black graduates, female graduates, or graduates whose mothers completed college). *Id.* at 65054. The Department explained that "the magnitude of the coefficients is sufficiently small indicating that these factors have little impact on annual earnings rates and that it would be unlikely for a program to move from passing to failing solely by virtue of enrolling more students with these characteristics." *Id.*[34] From this analysis and others that the Department performed, it reasoned that it "cannot conclude that the D/E rates measure is unfair towards programs that graduate high percentages of students who are minorities, low-income, female, or nontraditional or that demographic characteristics are largely determinative of results." *Id*. at 65057. *See also APSCU I*, 870 F. Supp. 2d at 150-51 (finding similar conclusion about the 2011 Rules, based upon similar analyses, not arbitrary).

---

[34] This conclusion was not limited to race and ethnicity as plaintiff argues. Pl.'s Mot. at 37 n.53.

Plaintiff provides no substantive response to this analysis, relying instead on a chart in the final rules, labelled "Annual earnings rate regression- with race/ethnicity variables," showing an "R-squared" of 0.44.  Pl.'s Mot. at 35-37 & n.53 (citing 79 Fed. Reg. at 65053).  While this number does indicate that 44% of the variance in program annual earnings rates can be explained by the variables used in the analysis (*see id*. at 65042), those variables included non-student demographic variables, such as the credential level of a program and the sector of an institution, that clearly correlate with annual earnings (whether a student earns a certificate, bachelor's degree, or master degree obviously correlates with how much money she earns post-graduation).  Thus, plaintiff's contention that the Department concluded that 44% of the variance in annual earnings rates is due just to student demographics (Pl.'s Mot. at 35) is wrong.  In fact, when the Department ran a regression for the NPRM that looked at how minority status and Pell-grant eligibility correlate with annual earnings, it found that those two variables account for less than 2% of the variation in annual earnings rates.  79 Fed. Reg. at 16544.

Plaintiff's sole reliance on R-squared is further flawed because it ignores the *magnitude* of the demographic coefficients.  *See* AR-G-001850 (commenter explaining that "the R-squared statistic . . . is not the appropriate statistic" for determining "the extent to which student demographic factors explain program performance" (quotation marks and citation omitted)).  In order to understand any impact of a demographic characteristic, one must consider the "degree to which individual demographic characteristics might be associated with a program's annual earnings rate."  79 Fed. Reg. at 65052.  As noted above, the Department did this, and concluded that the measured variables had "little impact on annual earnings rates."  *Id*. at 65054.[35]

---

[35]  Plaintiff's criticism of the Department for running a second, different regression analysis in between the NPRM and the final rule (Pl.'s Mot. at 35-36) only shows that the Department considered and responded to public comments and conducted further study of issues after questions were raised, as it is supposed to do under the APA.  *See* 79 Fed. Reg. at 64910; *APSCU I*, 870 F. Supp. 2d at 153.  Plaintiff also attempts to resurrect an error the

2.      The rules appropriately account for differing market conditions and student choices

Plaintiff further argues that the rules arbitrarily make no allowance for economic or local market conditions.  Pl.'s Mot. at 52-53.  But the HEA requirement that certain programs must prepare students for gainful employment in a recognized occupation contains no exception for market conditions or economic downturns.  It accordingly is reasonable for the Department to expect GE programs to be responsive to regional labor market needs and prepare students for jobs that are obtainable in the present market.  79 Fed. Reg. at 64926.  Nor does the APA require the Department to excuse programs from this statutory requirement during a lackluster economy. *See APSCU I*, 870 F. Supp. 2d at 151 ("[T]he fact that the debt measures may perform differently at different points in the economic cycle does not make them arbitrary on their face.").

The rules, however, do take account of market conditions, in a number of ways.  First, zone programs, which the Department's data demonstrates are "producing poor outcomes," 79 Fed. Reg. at 64924, are given four years before they are determined to be ineligible.  This is plenty of time for a well-functioning program to meet the baseline level of competence reflected in the modest D/E passing thresholds, *see id.* at 64926 ("The zone protects passing programs from losing their eligibility . . . where their increase in D/E rates was attributable to temporary fluctuations in local labor market conditions."), and it is reasonable for the Department to determine that a program is falling short of the statutory standard if it fails to obtain a passing D/E score at least once in four straight years.  *See id.* ("Most economic downturns are far too short to cause a program that would otherwise be passing to have D/E rates in the zone for four consecutive years," noting that recessions have, on average, lasted 11.1 months since 1945). Second, D/E rates are calculated on the basis of two- or four-year cohorts, which "reduces the

---

Department made with respect to the 2011 Rules.  Pl.'s Mot. at 35.  That error had no effect on those rules and is entirely irrelevant here.  *See APSCU I*, 870 F. Supp. 2d at 150 n.5.

impact of short term fluctuations in the economy that may affect a particular cohort of graduates but not others." *Id.* Third, the D/E rates are calculated as means and medians, which "mitigate the effects of economic cycles by measuring central tendency and reducing the influence of students who may have been most impacted by a downturn." *Id. See also id.* at 64933.

Plaintiff also suggests that the rules hold programs responsible for the idiosyncratic choices of their graduates. Pl.'s Mot. at 36 & n.52. The rules do not measure whether each student who completed a program obtains a job that enables that student to pay back his or her loans, but rather measure this for a particular *cohort* of students, minimizing the impact of the outcomes of isolated students. 79 Fed. Reg. at 64895. It is also reasonable to evaluate a program on the basis of its graduates' performance, since programs can surely influence student outcomes. *See Ass'n of Accredited Cosmetology Sch.*, 979 F.2d at 860 (explaining that it was "clearly rational" for the Department to "solve the problem of increasing . . . defaults by eliminating schools evidencing a disproportionately large share of the defaults"); *APSCU I*, 870 F. Supp. 2d at 151 (the Department's "decision to promulgate tests affected by students' professional choices [was not] arbitrary"); 79 Fed. Reg. at 65032 ("The causes of excessive debt, high default rates, and low earnings of students at GE programs include aggressive or deceptive marketing practices, a lack of transparency regarding program outcomes, excessive costs, low completion rates, deficient quality, and a failure to satisfy requirements such as licensing, work experience, and programmatic accreditation requirements needed for students to obtain higher paying jobs in a field.").

> 3. The purportedly absurd results of plaintiff's far-fetched hypothetical scenarios do not make the rules arbitrary

Plaintiff hypothesizes several purportedly absurd results, which it claims render the challenged regulations invalid. Pl.'s Mot. at 47-48. This argument runs afoul of the governing

law:  on "a challenge to the validity of [an] entire rule in all its applications," the "fact that

petitioner can point to a hypothetical case in which the rule might lead to an arbitrary result does

not render the rule 'arbitrary or capricious.'"  *Am. Hosp. Ass'n v. NLRB*, 499 U.S. 606, 619

(1991).  *See also EPA v. EME Homer City Generation, L.P.*, 134 S. Ct. 1584, 1609 (2014)

(stating that entity may later "bring a particularized, as-applied challenge," as needed, to a rule

upheld on its face, "along with any other as-applied challenges it may have"); *APSCU I*, 870 F.

Supp. 2d at 148-49 ("[plaintiff's] argument that the regulation may produce absurd results in

certain circumstances is better suited to an as-applied challenge arising out of such claims.").

Plaintiff's argument also should be rejected on the merits, as its hypotheticals do not

show absurd results, just the operation of reasonable features of the rules and limitations on the

Department's authority.  Plaintiff's principal scenario, concerning programs "with a 0%

graduation rate, a 0% placement rate, and/or a very high default rate," Pl.'s Mot. at 47, simply

reflects the decision to calculate D/E rates using median debt, which ensures that "programs in

which a majority of [graduates] do not have any title IV loans . . . would pass," in keeping with

the goal of protecting the Title IV program.  79 Fed. Reg. at 64923; *see also id.* at 64899.  It is

also unlikely that a program would, as plaintiff hypothesizes, be so affordable that the majority

of its completers would graduate with zero debt, while the minority of graduates who did borrow

would be so overwhelmed by their student debt that they could not afford to repay their loans.

Plaintiff's second scenario ("a program that does not graduate a single student," Pl.'s

Mot. at 47) reflects the decision to consider only program *completers* in the D/E rates.  Non-

completers are excluded from the rates because their earnings arguably do not reflect the

program's training, nor is it practical to distinguish between noncompleters based on their

reasons for withdrawing.  79 Fed. Reg. at 64928-29.  Additionally, including the debts of non-

completers "could have the perverse effect of improving the D/E rates of some of those programs because students who drop out early may accrue relatively lower amounts of debt." *Id*. at 64929.

Plaintiff's final scenario (programs that "do not graduate enough students to be subject to the Rules," Pl.'s Mot. at 48) also reflects the rules' focus on completers, as well as the Department's decision to measure only programs with at least thirty graduates.  This issue is one of sample size:  evaluating programs with fewer graduates brings increased risk of mischaracterizing passing programs as zone programs or failing programs, or rendering a passing program ineligible.  79 Fed. Reg. at 64946-47.  But with a 30-graduate minimum, it is nearly impossible for a passing program to be so mischaracterized.  *Id.* at 64947.  The manner in which the Department has chosen to weigh the possibility of good programs being rendered ineligible against the possibility of poor programs passing is entitled to deference.  *See id.* ("Although [the Department's approach . . . may result in more programs with high D/E rates remaining eligible . . . , we believe the consequences of mischaracterizing programs due to statistical imprecision outweighs this concern.").[36]

Plaintiff finally asserts that the rules are arbitrary because "degree programs at most colleges cannot pass the[m]."  Pl.'s Mot. at 48.  The GE rules are promulgated pursuant to statutory authority requiring vocational programs to prepare students for gainful employment in a recognized occupation, and as such, may not lawfully reach the bachelor degree programs to which plaintiff refers.  79 Fed. Reg. at 64904 ("The Department does not have the authority in this rulemaking to regulate other higher education institutions or programs, even if such

---

[36]  Plaintiff also complains that the rules "protect many programs at community colleges where fewer than 50% of the covered graduates took out loans since their tuition is subsidized by other sources."  Pl.'s Mot. at 48.  If fewer than 50% of a program's graduates take out loans, that program will pass, as explained above.  In addition, plaintiff's tacit suggestion that the rules are biased against for-profit colleges is contradicted in the record.  *See* 79 Fed. Reg. at 64908 ("[T]here is some indication that even when controlling for government subsidies, for-profit institutions charge more than their public counterparts.").

institutions or programs would not pass the accountability metrics."). An agency does not

violate the APA by adhering to its statutory authority.[37]

C.      The Department Relied On High-Quality Data

Plaintiff argues that the data the Department used to analyze the rules' effects was

insufficient, referring to the Department's Information Quality Guidelines. *See, e.g.*, Pl.'s Mot.

at 33. Those Guidelines "reflect the Department's policy and procedures for reviewing and

substantiating the quality of information it disseminates, (*e.g.*, reports, studies, and summaries)."

Guidelines at 2. They are not regulations to which the Department must conform its behavior,

however, and are not binding. Rather, they "represent a performance goal for the Department

and are intended only to improve the internal management of the Department"; they "do not

create any private right of action to be used . . . against the government in a court of law." *Id.*

The Guidelines do not provide the standards that govern this case. *See, e.g.*, *Mississippi*

*v. EPA*, 744 F.3d 1334, 1347 (D.C. Cir. 2013) ("EPA's . . . guidelines . . . purport to provide only

'non-binding policy and procedural guidance'"); *Am. Petro. Inst. v. EPA*, 684 F.3d 1342, 1349

(D.C. Cir. 2012) ("No doubt the EPA believes peer review is important and it intended to

impress that value upon its staff, but the agency did not bind itself to a judicially enforceable

norm."); *Salt Inst. v. Thompson*, 345 F. Supp. 2d 589, 601 (E.D. Va. 2004) (noting "Congress's

intent that any challenges to the quality of information disseminated by federal agencies should

take place in administrative proceedings before federal agencies and not in the courts"), *aff'd*,

440 F.3d 156 (4th Cir. 2006); *cf. Mitchell v. Lara*, 2011 WL 5075117, at *6 (S.D.N.Y. Oct. 25,

2011) (stating that agency must "follow its own binding regulations"). The APA does, and the

---

[37]   The Department's decision to limit the disclosure requirements to GE programs also is not arbitrary or capricious. *See* Pl.'s Mot. at 49-50. "Reform may take place one step at a time, addressing itself to the phase of the problem which seems most acute to the [regulatory] mind." *Nat'l Ass'n of Broadcasters v. FCC*, 740 F.2d 1190, 1207 (D.C. Cir. 1984). The Department, moreover, explained why the disclosures are valuable to students despite some limitations in the ability to compare some programs. *See* 79 Fed. Reg. at 64978.

administrative record makes clear that the Department has abided by the APA's requirements by employing "the most reliable data available," even if imperfect.  *Methodist Hosp. of Sacramento v. Shalala*, 38 F.3d 1225, 1230 (D.C. Cir. 1994); *see also Mt. Diablo Hosp. v. Shalala*, 3 F.3d 1226, 1233 (9th Cir. 1993); *Gen. Med. Co. v. FDA*, 770 F.2d 214, 224 (D.C. Cir. 1985); *APSCU I*, 870 F. Supp. 2d at 150 n.5.

Plaintiff's primary complaint about the Department's compliance with the Guidelines—that the Department failed to have its work peer reviewed (Pl.'s Mot. at 37)—ignores that the APA requires agencies promulgating substantive rules to give the public notice thereof, 5 U.S.C. § 553(b), and then allow "interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments," *id.* § 553(c).  The APA requires no more.  *See Vermont Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519, 524 (1978) (explaining that Supreme Court has "held that generally speaking [§ 553] establishe[s] the maximum procedural requirements which Congress was willing to have the courts impose upon agencies in conducting rulemaking procedures").  *Cf. Land Council v. Martin*, 529 F.3d 1219, 1226 (9th Cir. 2008) ("We find no legal requirement that a methodology be 'peer-reviewed or published in a credible source.'"); *Building Indus. Ass'n of Superior Cal. v. Norton*, 247 F.3d 1241, 1247 (D.C. Cir. 2001) ("[W]e reject appellants' claim that the listing's validity is undermined by its failure to comply with the Service's peer review policy.").

D.     The Regulations Do Not Violate 20 U.S.C. § 1015c

The Department's collection of information on private loans received by students who also receive Title IV funding does not violate 20 U.S.C. § 1015c.  Pl.'s Mot. at 30-31.  Section 1015c prohibits the development, implementation, or maintenance of a federal database of personally identifiable information on individuals receiving federal student aid.  The prohibition,

however, does not apply to "a system (or a successor system) that–(1) is necessary for the operation of programs authorized [under Title IV]; and (2) was in use by the [Department as of August 13, 2008]."  20 U.S.C. § 1015c(b).  Private loan information that the Department collects on Title IV students for purposes of calculating the D/E rates and implementing the disclosure requirements will be incorporated into the National Student Loan Data System ("NSLDS").  79 Fed. Reg. at 64975-76.  The NSLDS "clearly" fits within 1015c(b)'s exception, and "the Department is obviously not barred from maintaining it."  *APSCU II*, 930 F. Supp. 2d at 218.

Relying on *APSCU II*, plaintiff nevertheless argues that private loan information is so far afield from the type of information that Congress authorized the Department to collect in the NSLDS that it amounts to the creation of a new database in violation of § 1015c.  But plaintiff mischaracterizes *APSCU II*.  The court did not find any fault with the Department's collection of private loan information on students receiving Title IV funds, which the 2011 Rules also required.  *See APSCU II*, 930 F. Supp. 2d at 214.  Instead, the court determined that the Department was prohibited from collecting information on *non*-Title IV students because the overall purpose of the NSLDS was focused on students receiving Title IV funding.  *Id.* at 221. In accordance with the court's decision in *APSCU II*, the Department has limited the information it collects under the challenged regulations to Title IV students.  *See* 79 Fed. Reg. at 64899, 64975-76.  And private loan information on Title IV students is consistent with the type of information already collected in the NSLDS such that its inclusion cannot be said to create an entirely new database.  *See* 20 U.S.C. § 1092b(a)-(b) (providing non-exhaustive list of information the NSLDS should contain, including, a borrower's name and social security number; characteristics of the borrower such as family income; institutions attended; the amount and type of loans received; other assistance received; the payment status of loans; and the

remaining balances of outstanding loans); *see also* 79 Fed. Reg. at 64975-76; *Chevron*, 467 U.S. at 843 (deferring to agency's interpretation of ambiguous statute).[38]

E.      The Limitation Of The Regulations To Title IV Students Is Reasonable

After claiming that private loan data cannot be added to the NSLDS database, plaintiff argues that the challenged regulations should include non-Title IV students.  Pl.'s Mot. at 50-52. Plaintiff cannot have it both ways.  In any event, the regulations simply cannot do the latter in light of the *APSCU II*'s ruling barring the Department from collecting data on students who do not receive Title IV funds.  The reasonableness of an agency's structuring its regulations to avoid violating a federal court decision should be obvious.  The limitation of the regulations to Title IV students is also directly aligned with the goal of the rules to evaluate a program's performance for the purpose of continuing eligibility for Title IV program funds.  79 Fed. Reg. at 64899.  And contrary to plaintiff's argument, the current rules can proceed without data for non-Title IV students, unlike the 2011 Rules, because the current rules no longer include non-Title IV students in the definition of student.  *Id*.

While there may be benefits to broadening the assessment of a program by including students who do not receive Title IV student funds (as the Department did in the 2011 Rules, *see id*. at 64975), that is not the question before the Court.  Rather, the question is the reasonableness of the Department's conclusions that if it cannot legally collect information on non-Title IV students in the NSLDS, then it cannot as a practical matter include those students in these regulations, and that the information it does collect regarding Title IV students allows it to

---

[38]  It is not uncommon for the Department to add new data points into the NSLDS to meet the changing requirements and needs of its student aid programs.  For example, a new provision was added to the HEA in 2012 that limits the amount of time for which a student may obtain a subsidized federal student loan to no more than 150% of the stated length of the educational program in which the student is enrolled. Pub. L. No. 112-141, 126 Stat. 405 (2012).  To implement this requirement, the Department added new data points to the NSLDS regarding the program in which a Title IV student is enrolled, including its credential level and length.  *See* NSLDS Systems of Records Notice, 78 Fed. Reg. 38963 (June 28, 2013).

accurately assess whether a program prepares students for gainful employment in a recognized

occupation.  These determinations were indeed reasonable.[39]

## CONCLUSION

For all of the foregoing reasons, the Department respectfully requests that the Court grant

defendants summary judgment in their favor on the claims at issue.

Dated:   New York, New York
         February 20, 2015

                                        Respectfully submitted,


JOYCE R. BRANDA                          PREET BHARARA
Acting Assistant Attorney General        United States Attorney for the
                                         Southern District of New York
JENNIFER D. RICKETTS                     Attorney for Defendants
Director
                                   By:    /s/ John Clopper
SHEILA LIEBER                            JOHN D. CLOPPER
Deputy Director                          Assistant United States Attorney
                                         86 Chambers Street, 3rd Floor
By:   /s/ Marcia Berman                  New York, New York 10007
      MARCIA BERMAN                      Tel.     (212) 637-2716
      Senior Trial Counsel               Fax      (212) 637-0033
      MICHELLE BENNETT                   john.clopper@usdoj.gov
      Trial Attorney
      GREG DWORKOWITZ
      Trial Attorney
      U.S. Department of Justice
      Civil Division,
      Federal Programs Branch
      20 Massachusetts Avenue, N.W.
      Washington, DC  20001
      Tel.: (202) 514-2205

---

[39]  Contrary to plaintiff's assertion (Pl.'s Mot. at 50), the student warning required by the challenged regulations, which is intended to be in plain language for the benefit of students (*see* 79 Fed. Reg. at 64965), is not false.  The median debt, and mean or median earnings, of a program's graduates who receive Title IV funding, which are used to calculate the D/E rates, are "based . . . on" the amounts students borrow and their reported earnings.  34 C.F.R. § 668.410(a).