UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
ASSOCIATION OF PROPRIETARY COLLEGES,

                              Plaintiff,


              –against–                                          14-cv-8838 (LAK)


ARNE DUNCAN, in his official capacity as Secretary
of the Department of Education, *et al.*,

                              Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


# OPINION


Appearances:


              Michael D. Hays
              Jonathon Glass
              Alyssa T. Saunders
              William J. Schwartz
              Michael A. Blasie
              COOLEY LLP
              *Attorneys for Plaintiff*


              John D. Clopper
              Assistant United States Attorney
              PREET BHARARA
              UNITED STATES ATTORNEY

              Marcia Berman
              Michelle Bennett
              Greg Dworkowitz
              United States Department of Justice

              *Attorneys for Defendants*

LEWIS A. KAPLAN, *District Judge.*

Colleges and universities operated for profit play "an important role in serving traditionally underrepresented populations of students" such as those who are older, poorer, or less well educated, in addition to those who are women, Black, Hispanic, or single parents.[1]  Many of these institutions offer classes online, as well as in-person classes at convenient times and locations.[2]  For these reasons, among others, the for-profit educational sector "has experienced tremendous growth in recent years,"[3] and there is no dispute that for-profit colleges and universities make education more accessible to millions of students across the country.

And yet, despite these not insignificant benefits, the surging popularity of proprietary institutions during the recent recession exposed, in the view of the U.S. Department of Education ("DOE" or the "Department"), some "troubling outcomes and practices" in the industry.[4]  For-profit schools often charge higher tuition than comparable public institutions—in some cases up to four times higher—and students enrolled at proprietary colleges take on correspondingly more educational debt than their peers at public schools.[5]  Attendees of for-profit colleges generally are

---

[1]

  Program Integrity: Gainful Employment, 79 Fed. Reg. 64,890, 65,032 (Oct. 31, 2014) (to be codified at 34 C.F.R. pts. 600, 668).

[2]

  *See id.*

[3]

  *Id.*

[4]

  *Id.*

[5]

  *See id.* at 65,032-65,033; *see also* STAFF OF S. COMM. ON HEALTH, EDUC., LABOR AND PENSIONS, 112TH CONG., REP. ON FOR PROFIT HIGHER EDUCATION: THE FAILURE TO SAFEGUARD THE FEDERAL INVESTMENT AND ENSURE STUDENT SUCCESS 35 (Comm. Print 2012) [hereinafter, REP. ON FOR PROFIT HIGHER EDUCATION].

less likely than attendees of traditional schools to graduate or otherwise complete their programs and more likely to be unemployed.[6]   They make less money than students who attend not-for-profit schools, and their career earning potential is lower.[7]   It is no surprise, then, that those who attend for-profit schools have substantially higher short- and long-term default rates on their student loan debt than their peers at comparable not-for-profit schools.[8]

These prospects notwithstanding, prospective students continue to enroll at for-profit colleges and universities in droves, lured in many cases by what DOE views as "deceptive or otherwise questionable information about graduation rates, job placement, or expected earnings."[9] Proprietary schools are businesses; unlike public and non-profit schools, they are operated by private companies whose continued profitability depends in large part on enrollment growth.   Accordingly, for-profit colleges, having incentives as they do to enroll as many students as possible, often devote

---

[6]   Not only do students attending for-profit schools take on more debt than students who attend community colleges or public four-year universities, but more students who attend for-profit schools take on debt.   Indeed, up to 96 percent of students who attend proprietary institutions take out student loans.   *See* REP. ON FOR PROFIT HIGHER EDUCATION 112-13. By contrast, about 13 percent of community college students and 48 percent of four-year public university students take on student loan debt to finance their educations.   *See* Tamar Lewin, *Senate Committee Report on For-Profit Colleges Condemns Costs and Practices*, N.Y. TIMES, July 30, 2012, at A12.

[7]   *See* 79 Fed. Reg. at 65,033-34; REP. ON FOR PROFIT HIGHER EDUCATION 72-75.

[8]   *See* 79 Fed. Reg. at 65,033-34; REP. ON FOR PROFIT HIGHER EDUCATION 72-75.

*See* 79 Fed. Reg. at 65,032-33; REP. ON FOR PROFIT HIGHER EDUCATION 112-17.

DOE found that about 19 percent of borrowers who attend for-profit schools default on their federal student loans within three years of entering repayment.   *See* 79 Fed. Reg. at 65,033. That contrasts with borrowers who attend public institutions, where the figure is about 13 percent.   *See id.*

[9]   *Id.* at 65,034 (internal quotation marks omitted).

substantial resources to recruiting and marketing, spending more money on those pursuits than they do on academic instruction or on student support services.[10]  Those recruiting and marketing practices sometimes are suspect; there is evidence that proprietary institutions often engage in "aggressive sales practices" that provide "misleading information" to prospective students.[11]  And as enrollment at for-profit colleges and universities has increased, some such schools have increased their profit margins by setting tuition using "sophisticated market strategies designed to maximize revenue without regard to the poor academic and employment outcomes faced by students."[12]

To finance their educations, students enrolled at for-profit trade and vocational schools are eligible, by virtue of the Higher Education Act of 1965[13] ("HEA") and the National Vocational Student Loan Insurance Act of 1965,[14] for federal financial aid if, among other things, the institutions they attend "prepare students for gainful employment in a recognized occupation."[15]  Concerned about the "growing evidence that many for-profit programs may not be preparing students for careers as well as comparable programs at public institutions" and about the ability of students who attend proprietary institutions to repay their considerable educational debt,[16] DOE has promulgated

---

[10]
    *Id.* at 65,033.

[11]
    *Id.*

[12]
    REP. ON FOR PROFIT HIGHER EDUCATION 35.

[13]
    20 U.S.C. §§ 1001-1107.

[14]
    20 U.S.C. §§ 961-996.

[15]
    20 U.S.C. § 1002(b)(1)(A)(i), (c)(1)(A); *see also* 20 U.S.C. § 1088(b)(1)(A)(I).

[16]
    79 Fed. Reg. at 65,033.

4

regulations (the "GE Rules") designed to curtail federal financial aid to those students who choose

programs whose graduates regularly are  un- or under-prepared for "gainful employment in a

recognized occupation" and have "unaffordable levels of loan debt in relation to their earnings."[17]

These regulations, scheduled to go into effect July 1, 2015, establish a framework by

which DOE will evaluate programs subject to the "gainful employment" provisions of the HEA—that

is, "nearly all educational programs at for-profit institutions . . . , as well as non-degree programs

at public and private non-profit institutions such as community colleges"—with the ultimate goal

of confining eligibility for federal financial aid to students attending programs that satisfy criteria

intended to measure the ability of those programs to prepare their students for gainful employment.[18]

The Association of Proprietary Colleges ("APC"), a collection of 23 degree-granting

for-profit institutions with 34 campuses in New York State, here challenges the GE Rules.  APC

contends principally that the GE Rules (1) deprive its members of procedural due process; (2)

exceed DOE's statutory authority under the HEA; and (3) are arbitrary and capricious in violation

of the Administrative Procedure Act ("APA").  The matter is before the Court on cross-motions for

summary judgment.

---

[17]        *Id.* at 64,890.

[18]        *See id.*

*I.      The Statutory and Regulatory Scheme*

Every year, Congress provides hundreds of billions of dollars through loan and grant programs to help students finance their post-secondary education.[19]  These programs, which were established under the HEA, are administered by DOE which, in fiscal year 2014, paid almost $134 billion in federal aid to nearly 13 million students enrolled at more than 6,100 schools across the country.[20]  For proprietary colleges and universities—unlike for most public and private non-profit institutions of higher education, which draw their funding primarily from taxes and/or endowments—this federal student aid is a significant source of revenue.[21]   In the 2009-2010 academic year, for example, students attending for-profit institutions received $32 billion in federal loans and grants authorized under the HEA—money students used to pay their educational expenses and which represented, by some estimates, nearly 80 percent of proprietary colleges' revenue that year.[22]  In fact, for-profit programs rely so heavily on federal financial aid that the HEA prohibits them from deriving more than 90 percent of their revenue from DOE sources.[23]

---

[19]
See *Ass'n of Private Colls. & Univs. v. Duncan*, 870 F. Supp. 2d 133, 137 (D.D.C. 2012) [hereinafter, *APCU*].

[20]
FED. STUDENT AID, U.S. DEP'T OF EDUC., ANNUAL REPORT FY 2014, at 81, 100 (2014).

[21]
See 79 Fed. Reg. at 64,957; REP. ON FOR PROFIT HIGHER EDUCATION 24.

[22]
See REP. ON FOR PROFIT HIGHER EDUCATION 24-25; Lewin, *supra* note 5.

[23]
See 20 U.S.C. § 1094(a)(24).

Students, of course, must repay their loans, but when they are unable to do so—which happens with alarming frequency among attendees of proprietary institutions[24]—the costs of their unpaid loans are borne not by the schools they attended but by U.S. taxpayers.  In the absence of regulation, then, schools could "receive the benefit of accepting tuition payments from students receiving federal financial aid, regardless of whether those students are ultimately able to repay their loans."[25]  Congress therefore included in the HEA various requirements that schools must satisfy to remain eligible for ongoing participation in federal student aid programs.  The statutory provision at issue here—which affects only for-profit institutions and public or non-profit post-secondary vocational institutions—is one such requirement.  It limits eligibility for federal financial aid to students attending programs that "prepare students for gainful employment in a recognized occupation."[26]

---

[24]
     For-profit college students comprise about 13 percent of student loan borrowers but 47 percent of defaulters.  *See* REP. ON FOR PROFIT HIGHER EDUCATION 13.

[25]
     *Ass'n of Private Sector Colls. & Univs. v. Duncan*, 681 F.3d 427, 435 (D.C. Cir. 2012).

[26]
     20 U.S.C. § 1002(b)(1)(A)(i), (c)(1)(A); *see also* 20 U.S.C. § 1088(b)(1)(A)(i).

A.      *Statutory Background*[27]

As originally enacted, the HEA rendered only those students attending "public or other non-profit" institutions eligible for federal financial aid.[28]  The National Vocational Loan Insurance Act of 1965 worked in tandem with the HEA and extended eligibility to students at for-profit schools but limited it to those attending programs of "postsecondary vocational or technical education designed to fit individuals for useful employment in recognized occupations."[29]  When Congress merged the two statutes in 1968, it retained their separate definitions of eligibility—schools previously subject to the HEA became "institution[s] of higher education," while those previously subject to the National Vocational Loan Insurance Act of 1965 became "vocational schools"—and made all programs—public, non-profit, and for-profit—eligible to participate in federal financial aid programs under Title IV of the HEA, subject, in the case of for-profit institutions, to the "useful employment" language noted above.[30]

In 1992, Congress revised the eligibility rules, splitting "vocational schools" into (1) "'proprietary institution[s] of higher education,'" *i.e.*, for-profit schools, and (2) "'post-secondary vocational institution[s],'" *i.e.*, non-degree training and vocational programs at public and non-profit

---

[27]

The court in *Association of Private Colleges & Universities v. Duncan*, 870 F. Supp. 2d 133 (D.D.C. 2012), took a more comprehensive look at the statutory history of the relevant provisions of the HEA and the National Vocational Student Loan Insurance Act of 1965. *See id.* at 138-41.  This Court need not repeat that thorough analysis here.

[28]

*Id.* at 138-39 (internal quotation marks omitted).

[29]

*Id.* at 139 (internal quotation marks omitted).

[30]

*See* Higher Education Amendments of 1968, Pub. L. No. 90-575, § 116(a), 82 Stat. 1014; *see also APCU*, 870 F. Supp. 2d at 140.

8

schools, and requiring that all such institutions "'prepare students for gainful employment in a recognized occupation.'"[31]  It is DOE's interpretation of this language, which remains unchanged in the current version of the HEA,[32] that APC now challenges.

       B.     *The 2011 GE Rules*

       The GE Rules at issue here are not the first trip around this track.  Consistent with its broad authority to issue regulations implementing HEA programs, DOE promulgated gainful employment rules in 2011 similar in some ways to those at issue here (the "2011 Rules").[33]  Among other things, the 2011 Rules would have assessed whether various post-secondary programs provide training that leads to gainful employment by applying three tests—two based on debt-to-income ratios measuring graduates' ability to repay their loans and one based on repayment rates designed to measure whether all attendees (*i.e.*, not just graduates) actually were repaying their student loan debts.[34]

---

[31]

     *APCU*, 870 F. Supp. 2d at 140 (quoting Higher Education Amendments of 1992, Pub. L. No. 102-325, § 481, 106 Stat. 448, and 20 U.S.C. § 1088(b)(1), (c)(1) (1994)).

     Whereas the National Vocational Loan Insurance Act of 1965 (and the HEA as it existed between 1968 and 1992) required for-profit schools to prepare students for "useful employment," the HEA has since 1992 required such schools, among others, to prepare students for "gainful employment."

[32]

     *See* 20 U.S.C. § 1002(b)(1)(A)(i), (c)(1)(A); *see also* 20 U.S.C. § 1088(b)(1)(A)(i).

[33]

     *See* Program Integrity: Gainful Employment—Debt Measures, 76 Fed. Reg. 34,386 (June 13, 2011) (promulgating 34 C.F.R. § 668.7); *see also* 20 U.S.C. § 1221e-3.

[34]

     *See APCU*, 870 F. Supp. 2d at 141-42.

DOE set a minimum standard for the debt repayment rate and maximum standards for the two debt-to-income ratios—which compared debt payments to each of (1) annual earnings, and (2) discretionary income, and which were the same in virtually all other meaningful respects as the tests now at issue[35]—and set up a regime by which a program "fail[ed]" if its final figures fell above (or below) all three standards.[36]  Failing programs were rendered "ineligible" for continued participation in federal student aid programs under the HEA if they fell above (or below) all three standards for three out of the four most recent fiscal years.[37]

The Association of Private Colleges and Universities, an organization not unlike APC, challenged the 2011 Rules in the federal district court in Washington, D.C., arguing, among other things and as APC does here, that the debt repayment rate and debt-to-income ratios exceeded DOE's statutory authority and that they were arbitrary and capricious in violation of the APA.[38]

Judge Contreras's 2012 opinion in *Association of Private Colleges & Universities v. Duncan*[39] had something in it for both sides.  It found that the statutory phrase "gainful employment" was ambiguous, and that the 2011 Rules were "a reasonable interpretation" of that "ambiguous

---

[35]

*See id.*

The current debt-to-income ratios are not identical to those set forth in the 2011 Rules, and the Court will address the relevant distinctions in due course.

[36]

76 Fed. Reg. at 34,452; *see also APCU*, 870 F. Supp. 2d at 144.

[37]

76 Fed. Reg. at 34,452; *see also APCU*, 870 F. Supp. 2d at 144.

[38]

*APCU*, 870 F. Supp. 2d at 145, 149.

[39]

870 F. Supp. 2d 133 (D.D.C. 2012).

statutory command."[40]  It then all but upheld the debt-to-income ratios under the APA on the theory that they "were the product of a 'rational connection between the facts found and the choice made.'"[41]

Nonetheless, Judge Contreras concluded that the debt repayment rate violated the APA's prohibition on arbitrary and capricious agency action because it "was not based upon any facts at all."[42]  Having decided that the debt repayment rate test could not be severed from the (reasoned and lawful) debt-to-income ratios, Judge Contreras vacated both tests and sent most of the 2011 Rules back to DOE.[43]

### C.    The Current GE Rules

DOE then commenced a new rulemaking that produced the GE Rules here at issue. It took its cues from Judge Contreras and jettisoned the debt repayment metric of the 2011 Rules, and the GE Rules now rely substantially on similar versions of the two debt-to-income ratios that Judge Contreras found were "based upon expert studies and industry practice—objective criteria upon which the Department could reasonably rely" to evaluate whether certain vocationally-oriented programs are complying with the HEA by "prepar[ing] students for gainful employment in a recognized occupation."

---

[40]

   *Id.* at 146, 149.

[41]

   *Id.* at 153-54 (quoting *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

[42]

   *Id.* at 154.

[43]

   *See id.*

These two debt-to-income ratios, also called debt-to-earnings ratios ("D/E rates"), are, then, the driving force behind the GE Rules.  Broadly speaking, they measure graduates' educational debt loads as percentages of their annual earnings and of their discretionary income as a way of assessing students' ability to repay their loans.[44]  The D/E rates are calculated using data provided by schools and by the Social Security Administration, and they measure programs in light of their graduates' mean or median figures.[45]

For a program to satisfy the requirements of the GE Rules, its graduates—measured in two-year cohorts—need meet only a certain threshold on one of the two D/E rates.  A program "passes" if its graduates' average annual loan payments are less than or equal to 20 percent of discretionary income *or* eight percent of annual earnings.  A program "fails" if its graduates' average annual loan payments are more than 30 percent of discretionary income *and* 12 percent of annual earnings.[46]  Programs that neither pass nor fail—that is, programs that do not pass but which have at least one D/E rate in between the pass/fail numbers—are "in the zone."  A program becomes ineligible to participate in federal aid programs under Title IV of the HEA if it fails for any two of three consecutive years or if it fails or is "in the zone" for four consecutive years.[47]

---

[44]

See 34 C.F.R. § 668.404; 79 Fed. Reg. at 64,950.

[45]

See 34 C.F.R. §§ 668.404-.405.

[46]

According to DOE, the "the passing thresholds" for the D/E rates—*i.e.*, the eight and 12 percent figures for debt-to-annual earnings and debt-to-discretionary income, respectively—are based on "industry practices and expert recommendations."  79 Fed. Reg. at 64,919.

[47]

See 34 C.F.R. § 668.403.

The central matter before the Court is whether the GE Rules, which represent DOE's interpretation of the statutory phrase "prepare students for gainful employment in a recognized occupation," withstand scrutiny under the Constitution and under various principles of administrative law and statutory construction.

## II.    Standard of Review

Where, as here, "a party seeks review of agency action under the APA, the district judge sits as an appellate tribunal," and "[t]he entire case on review is a question of law."[48]  And while the usual summary judgment standard under Federal Rule of Civil Procedure 56 does not apply in such cases,[49] summary judgment nonetheless is "generally appropriate," as "[t]he question whether an agency's decision is arbitrary and capricious . . . is a legal issue amenable to summary disposition."[50]  Indeed, "district courts reviewing agency action under the APA's arbitrary and capricious standard do not resolve factual issues."[51]  Instead, they address legal questions in deciding whether the agency acted arbitrarily, capriciously or in some other way that violates 5 U.S.C. § 706.

---

[48]

    *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001) (internal quotation marks omitted); *see also Just Bagels Mfg. v. Mayorkas*, 900 F. Supp. 2d 363, 372 n.7 (S.D.N.Y. 2012) (quoting *Thompson*).

[49]

    *See UPMC Mercy v. Sebelius*, 793 F. Supp. 2d 62, 67 (D.D.C. 2011).

[50]

    *Noroozi v. Napolitano*, 905 F. Supp. 2d 535, 541 (S.D.N.Y. 2012) (alteration and ellipsis in original) (internal quotation marks omitted).

[51]

    *James Madison Ltd. ex rel. Hecht v. Ludwig*, 82 F.3d 1085, 1096 (D.C. Cir. 1996).

*III.    Discussion*

APC characterizes the two D/E rates as "novel, untested, and complex financial calculations" and the GE Rules as "economically non-sensical regulations that good programs cannot pass."[52]  It accuses DOE of promulgating the regulations "in a fit of anti-proprietary school zealotry," and contends that some of the regulatory requirements are so vague that "institutions are left entirely in the dark with respect to what the GE Rules will actually require."[53]  Ultimately, APC argues, "the GE Rules simply reflect[] the Department's anti-proprietary school bias" and are designed specifically to shutter for-profit colleges.[54]

APC challenges the GE Rules three ways.  It asserts that they (1) violate the Due Process Clause; (2) exceed DOE's statutory authority under the Higher Education Act of 1965; and (3) run afoul of the APA prohibition on arbitrary and capricious agency rulemaking.[55]  The Court addresses each of APC's arguments in turn.  As we shall see, if either side is guilty of any "fit of . . . zealotry" or "bias," it is not DOE.

---

[52]

   Compl. ¶¶ 22, 72.  Elsewhere, APC calls the GE Rules "methodologically unsound."

[53]

   *Id.* ¶¶ 22, 92-93.

[54]

   *Id.* ¶ 90.

[55]

   APC argues also that the GE Rules require institutions to report information regarding students' private, non-federal loans and that this provision violates 20 U.S.C. § 1015c, which prohibits the creation or maintenance of federal databases containing personally identifiable student data.  *See id.* ¶¶ 126-129.

A.      *Due Process*[56]

APC's constitutional argument is predicated on the idea that institutions of higher education that currently are eligible to participate in federal funding programs under Title IV of the HEA, for-profit colleges among them, "have a property and liberty interest in continued . . . eligibility that entitles them to protection under the Due Process Clause of the United States Constitution."[57]  It contends, among other things, that the GE Rules create a regulatory framework by which schools may be stripped of their HEA eligibility based on evidence—in this case, earnings data provided to DOE by the Social Security Administration—that the schools never get to see. APC argues also (1) that the Social Security Administration earnings data on which DOE and the GE Rules rely is flawed; (2) that the GE Rules are impermissibly retroactive because they determine compliance based in part on data for periods that precede the rulemaking; and (3) that the GE rules are so vague and ambiguous that for-profit colleges "cannot reasonably determine what is expected of them."[58]

---

[56]

The Court is mindful of the doctrine of constitutional avoidance and of the "general principle that dispositive issues of statutory and local law are to be treated before reaching constitutional issues."  *Wolston v. Reader's Digest Ass'n*, 443 U.S. 157, 160 n.2 (1979). However, because the Court rejects each of APC's arguments and therefore must reach the constitutional question before it sooner or later, it chooses to do so sooner for organizational and conceptual purposes.

[57]

Compl. ¶ 94.  APC elsewhere refers to this alleged constitutionally protected interest as a "vested right in the Title IX eligibility of its educational programs."  *Id.* ¶ 104.

[58]

*Id.* ¶ 112.

*1.      Justiciability*[59]

Before proceeding to APC's due process challenge, the Court pauses to consider a threshold question: whether, as DOE argues, APC's due process claim is unripe for adjudication based on the theory that APC has not alleged an imminent injury but rather merely speculated as to the scope and effect of the pending regulations.

"To be justiciable, plaintiffs' claims must be ripe for federal review."[60]  Ripeness, fundamentally, is a question of timing; the doctrine's "basic rationale is to prevent the courts, through premature adjudication, from entangling themselves in abstract disagreements."[61]  Any

---

[59]

Neither party has raised the issue of whether APC has standing to bring this action. "Because the standing issue goes to this Court's subject matter jurisdiction," however, "it can be raised *sua sponte*." *Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care LLC*, 433 F.3d 181, 198 (2d Cir. 2005).

"When an association asserts standing solely as the representative of its members, it 'must allege that its members, or any one of them, are suffering immediate or threatened injury as a result of the challenged action of the sort that would make out a justiciable case had the members themselves brought suit.'" *Disability Advocates, Inc. v. N.Y. Coal. for Quality Assisted Living, Inc.*, 675 F.3d 149, 156-57 (2d Cir. 2012) (quoting *Warth v. Seldin*, 422 U.S. 490, 511 (1975)).  Under Supreme Court precedent, "an association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977).  The Court is satisfied that this case falls squarely within the three-part test set forth in *Hunt*.  APC has standing to bring this action.

[60]

*Thomas v. City of N.Y.*, 143 F.3d 31, 34 (2d Cir. 1998).

[61]

*Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 580 (1985) (internal quotation marks omitted).

analysis of ripeness must consider two factors: (1) "the hardship to the parties of withholding court consideration," and (2) "the fitness of the issues for judicial decision."[62]

While facial challenges seeking pre-enforcement review of agency regulations are warranted only in "limited situations," and "principally when an individual would, in the absence of court review, be faced with a choice between risking likely criminal prosecution entailing serious consequences, or forgoing potentially lawful behavior,"[63] there are other considerations that favor deciding this case now.  The "parties agree that the issue tendered is a purely legal one."[64]  Both sides have moved for summary judgment, "and no claim is made here that further administrative proceedings are contemplated."[65]  Perhaps more importantly, the GE Rules are almost certainly a "final agency action" under the meaning of the APA.[66]  There is "no hint that this regulation is informal . . . or tentative," and it is scheduled to go into effect, absent judicial intervention, in a matter of weeks.[67]  Finally, the impact of the GE Rules on APC and its member institutions is

---

[62]

*Abbott Labs. v. Gardner*, 387 U.S. 136, 149 (1967), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977).

[63]

*Thomas*, 143 F.3d at 35.

[64]

*Abbott Labs.*, 387 U.S. at 149.

[65]

*Id.*

[66]

5 U.S.C. § 704; *see also Abbott Labs*, 387 U.S. at 149; *CBS v. United States*, 316 U.S. 407, 418-19 (1942) (holding that where regulations "have the force of law before their sanctions are invoked as well as after," and where "the expected conformity to them causes injury cognizable by a court of equity," they are "appropriately the subject of attack") .

[67]

*Abbott Labs*, 387 U.S. at 151 (citations omitted).  By contrast, a pre-enforcement challenge "directed at possibilities and proposals only, not at a concrete plan which has been formally promulgated and brought into operation" may indeed be unripe for review.  *Isaacs v. Bowen*, 865 F.2d 468, 477 (2d Cir. 1989).  That, of course, is not the case at hand.

"sufficiently direct and immediate as to render the issue appropriate for judicial review at this stage."[68]   As in *Abbott Laboratories v. Gardner*, the regulations at issue here "purport to give an authoritative interpretation of a statutory provision that has a direct effect on the day-to-day business of" many for-profit vocationally-oriented institutions.[69]   The Court concludes that this case is ripe for review.

### 2.    *Procedural Due Process*

The Constitution imposes "constraints," ordinarily in the form of notice and a pre-deprivation hearing, on "governmental decisions which deprive individuals of 'liberty' or 'property' interests within the meaning of the Due Process Clause" of the Fifth and Fourteenth Amendments.[70] However, because the requirements of procedural due process "apply *only* to the deprivation of interests encompassed by the [Constitution's] protection of liberty and property" and because "the range of interests protected by procedural due process is not infinite,"[71] the "first inquiry in every due process challenge is whether the plaintiff has been deprived of a protected interest in 'property' or 'liberty.'"[72]   Only upon a finding that the plaintiff has been deprived of such an interest do courts

---

[68]
    *Abbott Labs.*, 387 U.S. at 152.

[69]
    *Id.*

[70]
    *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976); *see also Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 569 (1972); *Barrows v. Burwell*, 777 F.3d 106, 113 (2d Cir. 2015).

[71]
    *Roth*, 408 U.S. at 569-70 (emphasis added).

[72]
    *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 59 (1999).

18

look to see if the government's procedures comport with due process.[73]  In evaluating whether a particular interest is constitutionally protected, courts look "to the nature of the interest at stake."[74]

### a.    Property Interest

The Due Process Clause's "procedural protection of property is a safeguard of the security of interests that a person has already acquired in specific benefits."[75]  And while such interests may take many forms, "not all benefits programs create constitutional property interests."[76] Nor does a property interest "exist solely because of the importance of the benefit to the recipient."[77] Indeed, "[t]o have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it.  He must have more than a unilateral expectation of it.  He must, instead, have a legitimate claim of entitlement to it."[78]

To determine whether a given regime yields a "legitimate claim of entitlement" to benefits, courts consider "whether the statutes and regulations governing the distribution of benefits," state or federal, "'meaningfully channel[] official discretion by mandating a defined administrative

---

[73]    *See id.*

[74]    *Roth*, 408 U.S. at 570-71.

[75]    *Id.* at 576.

[76]    *Kapps v. Wing*, 404 F.3d 105, 113 (2d Cir. 2005).

[77]    *Kelly Kare, Ltd. v. O'Rourke*, 930 F.2d 170, 175 (2d Cir. 1991).

[78]    *Roth*, 408 U.S. at 577; *see also Barrows*, 777 F.3d at 113; *Kapps*, 404 F.3d at 113.

outcome.'"[79] Where they do—that is, where the statutory or regulatory scheme "sets fixed eligibility criteria for the receipt of . . . benefits"—a property interest often will be found,"[80] and "any procedures that the state establishes for the revocation of that interest must comport with federal procedural due process requirements."[81] On the other hand, where "the statute, regulation, or contract in issue vests in the state significant discretion over the continued conferral of [a] benefit, it will be the rare case that the recipient will be able to establish an entitlement to that benefit.[82] Thus, "[w]here the administrative scheme does not require a certain outcome, but merely authorizes particular actions and remedies, the scheme does not create 'entitlements' that receive constitutional protection" under the Due Process Clause.[83]

       The Supreme Court regularly has found constitutionally protected property interests in the continued receipt of benefits flowing from social welfare programs where eligibility for those

---

[79]     *Barrows*, 777 F.3d at 113 (quoting *Sealed v. Sealed*, 332 F.3d 51, 56 (2d Cir. 2003)); *see also Kapps*, 404 F.3d at 113.

    Property interests, of course, are not created by the Constitution. Instead, "they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law." *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 538 (1985) (internal quotation marks omitted).

[80]     *Kapps*, 404 F.3d at 113-14; *see also Town of Castle Rock v. Gonzales*, 545 U.S. 748, 756 (2005) ("[A] benefit is not a protected entitlement if government officials may grant or deny it in their discretion."); *Natale v. Town of Ridgefield*, 170 F.3d 258, 263 (2d Cir. 1999).

[81]     *Kelly Kare*, 930 F.2d at 175.

[82]     *Id.*

[83]     *Sealed*, 332 F.3d at 56.

benefits is defined by a statutory and/or administrative framework.[84]  So, too, it usually has found

that public school officials have a protected property interest in their continued employment.[85]  But

it has deemed other purported property interests—including, for example, a woman's interest in

continued police enforcement of a restraining order—unworthy of constitutional protection.[86]

      While the Second Circuit on more than one occasion has said that a healthcare

provider lacks a constitutionally protected property interest in continued participation in a Medicaid

program,[87] neither it nor the Supreme Court has addressed the question whether a school has a

recognizable property interest in continued eligibility to participate in programs that provide federal

aid money to students.  At least two other circuits have, however, and their answers to the question

differ.  The D.C. Circuit has said that "schools have no 'vested right' to future eligibility to

participate in [federal student loan] programs," regardless of whether those schools "expected to be

---

[84]

      *See, e.g.*, *Mathews*, 424 U.S. 319 (Social Security disability benefits); *Goldberg v. Kelly*, 397 U.S. 254 (1970) (welfare benefits).

[85]

      *See, e.g.*, *Connell v. Higginbotham*, 403 U.S. 207 (1971) (teacher with clearly implied promise of continued employment); *Slochower v. Bd. of Higher Educ.*, 350 U.S. 551 (1956) (tenured college professor); *Wieman v. Updegraff*, 344 U.S. 183 (1952) (staff dismissed during terms of contract).  *But see Roth*, 408 U.S. at 578 (holding that a non-tenure track professor who was not rehired at the expiration of a one-year contract lacked a protected property interest in continued employment).

[86]

      *See Town of Castle Rock*, 545 U.S. at 766-67.

[87]

      *See Kelly Kare*, 930 F.2d at 175-76; *Plaza Health Labs., Inc. v. Perales*, 878 F.2d 577, 582 (2d Cir. 1989).

      According to the Second Circuit, while healthcare providers have a property interest in their status as providers *qualified* to participate in Medicaid programs, *see Patchogue Nursing Ctr. v. Bowen*, 797 F.2d 1137 (2d Cir. 1986); *Case v. Weinberger*, 523 F.2d 602 (2d Cir. 1975), they do not have an interest in continued *participation* in such programs.  *See Kelly Kare*, 930 F.2d at 175-76; *Plaza Health Labs.*, 878 F.2d at 582.

eligible in the future," because the schools were not "promised or even led to believe that there [would] be no background changes in the federal law governing the [federal student loan] program."[88]  The Seventh Circuit, by contrast, has said that schools have a constitutionally protected property interest in "certification or eligibility status" because the "eligibility standards in the HEA provide the sort of substantive predicate the courts have required before finding that property interests exist."[89]

This Court agrees with the D.C. Circuit for a number of reasons.

*First*, though they are heavily dependent upon federal financial aid, proprietary colleges are not, of course, direct beneficiaries of the funding programs administered under the HEA.  Rather, they are no more than third party beneficiaries; they receive the federal dollars on which they rely only if, and when, their students do.  As "indirect beneficiaries of government programs," APC and its member institutions have no procedural due process claim.[90]

---

[88]

      *Ass'n of Accredited Cosmetology Sch. v. Alexander*, 979 F.2d 859, 864 (D.C. Cir. 1992).

[89]

      *Cont'l Training Servs, Inc. v. Cavazos*, 893 F.2d 877, 893 (7th Cir. 1990) (internal quotation marks omitted).

[90]

      *O'Bannon v. Town Court Nursing Ctr.*, 447 U.S. 773, 787 (1980); *see also Dumas v. Kipp*, 90 F.3d 386, 392 (9th Cir. 1996) ("Procedural due process protections do not extend to those who suffer indirect harm from government action.  Thus, indirect beneficiaries of government programs have no due process rights." (citation omitted)).

      The Court recognizes that the Seventh Circuit said in dictum in *Continental Training Services, Inc. v. Cavazos* that "an indirect beneficiary of student aid programs" had a property interest in its continued eligibility status under the HEA.  893 F.2d at 893.  But *Cavazos* does not even mention *O'Bannon*, and the case on which *Cavazos* relies, *Northlake Community Hospital v. United States*, 654 F.2d 1234, 1242-43 (7th Cir. 1981), contradicts neither the Supreme Court in *O'Bannon* nor this Court here.  The reasoning of *Cavazos* therefore is unpersuasive to this Court.

*Second*, the HEA does not "channel[] official discretion by mandating a defined administrative outcome."[91]   Rather, it gives DOE latitude to decide whether to confer Title IV funding eligibility on a particular program.  For example, a school must demonstrate to DOE that it "is capable of adequately administering" a federal funding program under Title IV of the HEA if it wishes to "begin and to continue to participate" in such a program.[92]   In evaluating whether a particular school has the requisite administrative capability, DOE considers many factors, including whether the institution designates a "capable individual to be responsible for administering all the Title IV, HEA programs in which [the institution] participates."[93]  In addition to considering relevant certification requirements, DOE "may consider other factors in determining whether an individual is capable, including, *but not limited to*, the individual's successful completion of Title IV, HEA program training . . . and previous experience and documented success in administering the Title IV, HEA programs properly."[94]   Further, administrative capability determinations may turn also on whether the relevant institution "[a]dministers Title IV, HEA programs with *adequate checks and balances* in its system of internal controls."[95]   Under the HEA, then, DOE retains "significant

---

[91]

    *Barrows*, 777 F.3d at 113 (internal quotation marks omitted).

[92]

    34 C.F.R. § 668.16.

[93]

    *Id.* § 668.16(b)(1).

[94]

    *Id.* (emphasis added).

[95]

    *Id.* § 668.16(c)(1) (emphasis added).

discretion" to make Title IV eligibility determinations.[96]  The statutory scheme does not "require a certain outcome" and thus "does not create 'entitlements' that receive constitutional protection."[97]

*Third*, 20 U.S.C. § 1094(c)(1)(F) does not create a constitutionally protected property interest.  That statute provides, among other things, that DOE regulations may limit, suspend, or terminate an eligible institution's participation in a Title IV funding program "after reasonable notice and opportunity for hearing."[98]  But the very next subsection, which governs "emergency action[s]" and allows DOE to "withhold funds from [an] institution or its students" upon notice to the school, says nothing about a prior hearing.[99]  Thus, "the combination of rights reserved" by Congress, which allows DOE to withhold funds from proprietary colleges "immediately in certain circumstances, casts doubt on whether the [schools'] interest in continuing as [eligible institutions], either indefinitely or for any period without interruption, is a property right that is protected by due process."[100]

In sum, this Court holds that proprietary colleges do not have a "vested right" to continued eligibility to participate in Title IV federal funding programs under the HEA, and as a

---

[96]

*Kelly Kare*, 930 F.2d at 175.

[97]

*Sealed*, 332 F.3d at 56.

[98]

20 U.S.C. § 1094(c)(1)(F).

[99]

*See id.* § 1094(c)(1)(G).

While subsection G states that DOE "shall provide the institution an opportunity to show cause, if it so requests, that the emergency action is unwarranted," it says absolutely nothing about a pre-deprivation hearing.

[100]

*Plaza Health*, 878 F.2d at 582; *see also San Juan City Coll. v. United States*, 391 F.3d 1357, 1364 (Fed. Cir. 2004).

24

consequence, that APC has not alleged adequately the deprivation of a constitutionally protected property interest.

### b.    Liberty Interest

The Supreme Court "has not attempted to define with exactness the liberty" guaranteed by the Due Process Clause,[101] but it is "now a commonplace that an entity may have a liberty interest in its good name, and if its reputation is besmirched by governmental action, it may be entitled to a name-clearing hearing."[102]   However, while a private party may not be subjected to "public embarrassment and ridicule" by the state without receiving due process,[103] an interest in "good reputation alone, apart from a more tangible interest, is not a liberty or property interest sufficient to invoke the procedural protections of the Due Process Clause."[104]   Rather, harm to one's reputation triggers constitutional protections only if that harm "is coupled with the deprivation of a more

---

[101]

*Roth*, 408 U.S. at 572.

[102]

*Kelly Kare*, 930 F.2d at 177; *see also Wisconsin v. Constantineau*, 400 U.S. 433, 437 (1971) ("Where a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him, notice and an opportunity to be heard are essential.").

[103]

*Constantineau*, 400 U.S. at 436.

[104]

*Patterson v. City of Utica*, 370 F.3d 322, 329-30 (2d Cir. 2004); *see also Paul v. Davis*, 424 U.S. 693, 711-12 (1976); *White Plains Towing Corp. v. Patterson*, 991 F.2d 1049, 1062 (2d Cir. 1993) ("Injury to reputation alone, even when inflicted by a state official, does not deprive an individual of a liberty or property interest protected by due process, and . . . the defamation of a former public employee after the termination of the employment relationship does not trigger due process rights." (internal quotation marks, ellipsis, and citation omitted)).

tangible interest."[105]  Often this "more tangible interest" is government employment,[106] but it need not be.  Procedural due process protections "extend[] as well to defamation occurring in the course of 'termination of some other legal right o[r] status.'"[107]  The Second Circuit has referred to due process claims predicated, as this one is, on loss of reputation ("stigma") coupled with the deprivation of some "more tangible interest" ("plus"), without adequate process, as "stigma-plus" claims.[108]

Though APC does not frame it as such, its liberty interest argument amounts to a stigma-plus claim based on the reputational and financial harm it says its members will suffer if the GE Rules go into effect as written.  Based on the Seventh Circuit's opinion in *Cavazos*,[109] APC contends that "there can be little serious doubt" that the GE Rules will cause its members "financial detriment" based on proprietary colleges' "heav[y] dependen[ce] upon federal funding," and that the "publicity surrounding" those rules—not to mention some of their provisions—"poses a serious threat" to for-profit colleges' "reputational interest."[110]

This argument misunderstands the law.  APC has neither explained, persuasively or otherwise, how the GE Rules are "capable of being proved false," nor shown that they are

---

[105]

    *Patterson*, 370 F.3d at 330 (describing a "stigma-plus claim").

[106]

    *See, e.g.*, *id.* (citing cases).

[107]

    *White Plains Towing Corp.*, 991 F.2d at 1063 (second alteration in original) (quoting *Easton v. Sundram*, 947 F.2d 1011, 1016 (2d Cir. 1991)).

[108]

    *See, e.g.*, *Velez v. Levy*, 401 F.3d 75, 87 (2d Cir. 2005); *Patterson*, 370 F.3d at 330; *DiBlasio v. Novello*, 344 F.3d 292, 302 (2d Cir. 2003).

[109]

    893 F.2d 877 (7th Cir. 1990).

[110]

    *Id.* at 892.

"derogatory" in any meaningful way.[111]   And a statement that a school is ineligible to continue to participate in federal funding programs is not derogatory if it is true.  APC thus has not shown how the GE Rules would stigmatize its member institutions or otherwise cause them "reputational" harm. Moreover, even if APC could meet the "stigma" element of the stigma-plus test, it surely cannot meet the "plus" element.  The "financial detriment" that APC says its members will suffer due to the GE Rules is linked inextricably to the alleged stigma: proprietary colleges will suffer reputational harm, APC says, when they have to advise students that their federal funding may be at risk, causing those students to transfer or otherwise leave the school, taking their aid money—and for-profit schools' lifeblood—with them.  Financial loss accompanies most, if not all, defamation charges.  And yet, "financial harm . . . caused by government imposed stigma does not transform an interest in reputation into a liberty interest."[112]   Indeed, a "generalized allegation of financial harm is insufficient to meet the required 'tangible injury' element for a [due process] action based on injury to one's reputation."[113]

APC has not shown that proprietary colleges have a constitutionally protected liberty interest in their continued eligibility to participate in federal funding programs under the HEA.

---

[111]

   *Sadallah v. City of Utica*, 383 F.3d 34, 38 (2d Cir. 2004) (Sotomayor, J.).

[112]

   *Mosrie v. Barry*, 718 F.2d 1151, 1158 (D.C. Cir. 1983); *see also Strum v. Clark*, 835 F.2d 1009, 1012-13 (3d Cir. 1987).

[113]

   *Cherry v. Jorling*, 31 F. Supp. 2d 258, 265-66 (W.D.N.Y. 1998).

c.     *The Process Provided*

Even if its members had a constitutionally protected property and/or liberty interest in continued eligibility to participate in federal funding programs under Title IV of the HEA, APC's due process claim would fail because the GE Rules afford affected schools all the process that is constitutionally due.  A brief overview of the eligibility determination process—which involves DOE, the Social Security Administration, and the institutions themselves—illustrates why.

To calculate the D/E rates, DOE uses a multi-step process that involves participation by both the Social Security Administration and the institutions themselves.[114]  After DOE compiles a list of students who completed the relevant program during the appropriate time—a list it compiles using information provided by the institution—it gives the school an opportunity to correct that list.[115]  DOE then obtains annual earnings data for the students on the list from the Social Security Administration and uses that to generate draft D/E rates, which it provides to the school.[116]  In so doing, DOE provides the institution with "the mean and median annual earnings" data as well as "the individual student loan information used to calculate the rates, including the loan debt that was used in the calculation for each student."[117]  DOE allows the institution then to "challenge the accuracy of the loan debt information" (but not the annual earnings data provided by the Social Security

---

[114]

See 34 C.F.R. § 668.405.

[115]

See id. §§ 668.404(e), .405(b)-(c), .411.

[116]

See id. § 668.405(d)-(e).

[117]

See id. § 668.405(e)(3)(i).

Administration) before calculating, and informing the institution of, the final D/E rates.[118]  Upon

publication of the final D/E rates, "an  institution may file an alternate earnings appeal to request

recalculation of the program's most recent final D/E rates."[119]  The basis for such an appeal may be

"alternate earnings from an institutional survey . . . or from a State-sponsored data system."[120]

APC makes three primary arguments why the GE Rules—and, in particular, the

regulations governing calculation of the D/E rates—deprive its member institutions of due process.

First, it accuses DOE of denying schools access to the individual student earnings data that underlie

the D/E rates calculation.  This lack of access, APC says, renders for-profit colleges (and other

affected institutions) unable meaningfully to challenge an ineligibility determination.  Second, it

asserts that the GE Rules are flawed because the Social Security Administration earnings data on

which they rely are "systematically inaccurate" due to "improper[]" calculations.[121]  Third, APC

asserts that the GE Rules are "impermissibly retroactive" because they depend, at least to some

extent, upon data that precede the rules' enactment date.

"The touchstone of due process, of course, is the requirement that a person in

jeopardy of serious loss [be given] notice of the case against him and opportunity to meet it."[122]  The

---

[118]
       *See id.* § 668.405(f)-(g).

[119]
       *See id.* § 668.406.

[120]
       *See id.* § 668.406(b)(1).

[121]
       Specifically, APC takes issue with the Social Security Administration's decision to impute zero earnings to those individuals for whom data are lacking, and with its failure accurately to "capture self-employed or tip earnings of many proprietary institution graduates."

[122]
       *Spinelli v. City of N.Y.*, 579 F.3d 160, 169 (2d Cir. 2009) (alteration in original) (internal quotation marks omitted).

question of what process is due in any given situation, however, is circumstance-dependent, and "will depend on appropriate accommodation of the competing interests involved."[123]  Indeed "due process is flexible and calls for such procedural protections as the particular situation demands;"[124] "[t]here is no rigid formula that determines the constitutional sufficiency of the process employed in connection with any given deprivation of a protected interest."[125]  Accordingly, the question whether the process provided in a given situation is constitutionally sufficient "requires analysis of the governmental and private interests that are affected."[126]  In conducting this analysis, courts consider three factors: (1) "the private interest that will be affected by the official action;" (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards;" and (3) "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail."[127]  Having considered these factors, the Court concludes that the GE Rules provide constitutionally sufficient process.

The Court first considers the substantiality of APC's members' interest.  While for-profit colleges have become heavily reliant on federal student aid, that reliance is of their own creation, not of necessity.  Simply put, proprietary institutions' purported interest in remaining

---

[123]

    *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 434 (1982) (footnote and internal quotation marks omitted).

[124]

    *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972).

[125]

    *DiMichele v. Greenburgh Cent. Sch. Dist. No. 7*, 167 F.3d 784, 791 (2d Cir. 1999).

[126]

    *Mathews*, 424 U.S. at 334.

[127]

    *Id.* at 335.

eligible to participate in federal student aid programs under Title IV does not hold a candle to the private interests traditionally afforded strong protections under the *Mathews* test, such as the continued receipt of welfare and unemployment benefits, the retention of one's job, or even freedom from imprisonment.[128]   For-profit colleges would not be in such dire straits were their programs deemed ineligible under the GE Rules.  Most proprietary colleges offer multiple programs, and an ineligibility determination for one has no bearing on the eligibility of others.  Further, a program deemed ineligible is ineligible only for Title IV purposes; it remains free to enroll students able to finance their education in other ways.  There may be a case in which a determination that a third-party beneficiary is ineligible to continue to participate in a benefits scheme constitutes a deprivation of the indirect beneficiary's "livelihood," such that there is a strong private interest in procedural due process protections, but this is not that case.[129]

By contrast, DOE has a strong interest in ensuring that students—who are, after all, the direct (and Congress's intended) beneficiaries of Title IV federal aid programs—attend schools that prepare them adequately for careers sufficient for them to repay their taxpayer-financed student loans.  As noted above, when students are unable to repay their debt, the cost of their unpaid loans is borne by U.S. taxpayers, making DOE's asserted interest in ensuring that "students are not unduly

---

[128]

       *See, e.g.*, *Turner v. Rogers*, 131 S. Ct. 2507, 2510-11 (2011) (freedom from imprisonment); *Gilbert v. Homar*, 520 U.S. 924 (1997) (job retention); *Fusari v. Steinberg*, 419 U.S. 379 (1975) (unemployment benefits); *Goldberg*, 397 U.S. 254 (welfare benefits).

[129]

       *FDIC v. Mallen*, 486 U.S. 230, 243 (1988) (noting that the Supreme Court has "repeatedly recognized the severity of depriving someone of his or her livelihood").

burdened with debt" one and the same with its interest in "safeguard[ing] the Federal [*i.e.*, taxpayer] investment in the [federal student aid] program."[130]

Finally, there is no greater risk of an erroneous eligibility determination under the GE Rules than there would be if there were "additional or substitute procedural safeguards"—in this case, primarily, giving proprietary colleges' access to the Social Security Administration earnings data that underlie the D/E rates.  It is, of course, worth noting that the GE Rules give institutions a number of opportunities to participate in the process, thus guarding against the risk of an unsound ineligibility determination.  The institutions submit the data used to create the list of students used to calculate the D/E rates.  They have an opportunity to correct that list.  They receive mean and median annual earnings data, as well as individual student loan data, for the students on that list at the same time they are notified of the draft D/E rates.  They may challenge the loan data *before* DOE calculates the final D/E rates and, once the final rates are published, they may challenge an unfavorable determination by filing an appeal based on alternate earnings figures.[131]

In light of all that, APC has not shown that the marginal benefit of providing its members with individualized earnings data would decrease any risk of an erroneous eligibility determination.  For example, it contends that the Social Security Administration data is unreliable because it depends, at least in part, on earnings reported to the IRS and "many people do not report all of their income."  Even if that were true, and APC has offered scant evidence to show that it is, it would not matter.  APC has not shown how providing its members access to the individualized Social Security Administration earnings data would cure any problems associated with people who

---

[130]

      79 Fed. Reg. at 64,891.

[131]

      *See* 34 C.F.R. §§ 668.405-.406.

misrepresent their income to the IRS.  If the point is that for-profit colleges could cross-check their own records of graduates' incomes with the Social Security Administration figures, APC has offered no proof that people who under report their income to the IRS do not under report their income to their alma maters (in the unlikely event that they report it to their alma maters at all).  Furthermore, a school that doubts the accuracy of the mean and/or median annual earnings data for its students may appeal those figures if it can cite to others showing different results.

In the last analysis, APC seeks a glut of pre-eligibility-determination process for its member institutions.  And while the Supreme Court has required rigorous pre-deprivation process on occasion,[132] it has held also that the Constitution does not always demand it.  In *Mathews v. Eldridge*,[133] for example, the Court held that Social Security disability benefits could be terminated without a pre-deprivation hearing, that due process required no "oral presentation" of any kind, and that various pre-deprivation "written submissions" satisfied all that the Constitution commanded.[134] The private interest at stake here—for-profit colleges' continued eligibility to participate in federal student loan programs under the HEA—unquestionably is weaker than the private interest at stake in *Mathews*, the continued receipt of disability benefits.  As the Seventh Circuit said in a case upon which APC relies heavily: "If predeprivation written submissions suffice for disability claimants, then it is hard to argue that a provider of services, whose interest is less, should be entitled to more

---

[132]

    *See, e.g.*, *Goldberg*, 397 U.S. at 264.

[133]

    424 U.S. 319 (1976).

[134]

    *Id.* at 345-47, 349.

process."[135]  The GE Rules give affected institutions at least three opportunities to make submissions to DOE, and two of those are *pre*-eligibility determination.  The procedures contained in the GE Rules are constitutionally sufficient.

### 3.    Retroactivity

Before addressing APC's final due process argument—that the GE Rules are unconstitutionally retroactive because the D/E rates rely, in part, on student loan debt incurred before the Rules go into effect—it is helpful to explain how the D/E rates are determined.

DOE calculates the D/E rates for any given year using the average student loan debt and average annual earnings of students who completed the relevant program during what the regulations define as the "cohort period."[136]  For most, but not all, programs subject to the GE Rules, the "cohort period" is two years, and the relevant years for D/E rate calculation purposes are the "third and fourth award years prior to the award year for which the D/E rates are calculated."[137]  For example, D/E rates for award year 2015-2016 are calculated using data from award years 2011-2012 and 2012-2013.[138]

---

[135]

    *Cavazos*, 893 F.2d at 894.

[136]

    34 C.F.R. § 668.404(b), (c); *see also id.* § 668.402.

[137]

    *Id.* § 668.402.

    On some occasions, DOE uses a four-year cohort period covering the "third, fourth, fifth, and sixth award years prior to the award year for which the D/E rates are calculated."  *See id.*  On other occasions, the cohort period, whether two or four years, represents award years as many as nine years prior to the award year for which the D/E rates are calculated.  *See id.*  For purposes of this analysis, however, these distinctions are immaterial.

[138]

    *See id.*

The GE Rules include also a five-, six-, or seven-year transition period (depending on the length of the relevant program), that DOE says will "allow institutions to pass the D/E rates measure by reducing the loan debt of currently enrolled students."[139]  During the transition period, DOE calculates "transitional draft D/E rates" for any program that fails or is in the zone based on the traditional, cohort period-based D/E rates.[140]  The transitional draft D/E rates ignore the average loan debt of the relevant cohort period and instead consider the average loan debt of the students who completed the relevant program during the immediately preceding award year.[141]  "For any award year for which [DOE] calculates transitional draft D/E rates for a program, [it] determines the final D/E rates for the program based on the lower of the draft or transitional draft D/E rates," and a program may challenge or appeal the transitional draft D/E rates under the same procedures by which it may challenge draft D/E rates.[142]

APC asserts that the GE Rules are "impermissibly retroactive" in that they "impair (or terminate) an institution's vested right in its Title IV eligibility" based on debt incurred as long ago as 2005.  It argues further that the transition period "provides no relief" because it does not cure the "retroactivity problem."  These arguments, too, miss the mark.

---

[139]

　　79 Fed. Reg. at 64,891; *see also* 34 C.F.R. § 668.404(g).

[140]

　　*See* 34 C.F.R. § 668.404(g).

[141]

　　*See id.*

　　While the transitional D/E rates disregard the cohort period's average student loan debt, they do depend, like the traditional D/E rates, on the cohort period's average annual earnings. *See id.*

[142]

　　*Id.*; *see also id.* §§ 668.405, .406.

A regulation is unconstitutionally retroactive if it "alter[s] the *past* legal consequences of past actions"[143] or, put another way, if it "would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed."[144]  Thus, whether a regulation "operates retroactively turns on 'whether the new provision attaches new legal consequences to events completed before its enactment.'"[145]  It is, however, "well-settled that '[a] statute is not rendered retroactive merely because the facts or requisites upon which its subsequent action depends, or some of them, are drawn from a time antecedent to the enactment.'"[146]  Nor is a statute impermissibly retroactive simply because it "upsets expectations based in prior law."[147]

APC is right that a regulation may not "take[] away or impair[] vested rights acquired under existing laws."[148]  But APC's member institutions have no "vested right" to continued eligibility to participate in Title IV funding programs.[149]  And even if they did, the regulations here

---

[143]

*Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 219 (1988) (Scalia, J., concurring); *see also Guaylupo-Moya v. Gonzales*, 423 F.3d 121, 129-30 (2d Cir. 2005).

[144]

*Landgraf v. USI Film Prods.*, 511 U.S. 244, 280 (1994).

[145]

*Centurion v. Holder*, 755 F.3d 115, 121 (2d Cir. 2014) (quoting *Landgraf*, 511 U.S. at 270).

[146]

*Morgan Guar. Trust Co. of N.Y. v. Republic of Palau*, 971 F.2d 917, 921 (2d Cir. 1992) (alteration in original) (quoting *Reynolds v. United States*, 292 U.S. 443, 449 (1934)).

[147]

*Landgraf*, 511 U.S. at 269.

[148]

*INS v. St. Cyr*, 533 U.S. 289, 321 (2001) (internal quotation marks omitted); *see also Hizam v. Kerry*, 747 F.3d 102, 109 (2d Cir. 2014) (citing *St. Cyr*).

[149]

*See Ass'n of Accredited Cosmetology Schs.*, 979 F.2d at 864 ("Member schools have no 'vested right' to future eligibility to participate in the [federal student loan] program.").

at issue would not impair that right.  The GE Rules have only future effect.  They neither affect programs' past eligibility for Title IV funding, nor require schools to refund federal student aid money received before the regulation's effective date.  Instead, they merely "look to the recent performance of a program's former students in order to determine whether that program will be eligible, *in the future*, to receive Title IV funds."[150]  During the transition period, moreover, the effect of pre-enactment graduates' student loan data may be reduced, in certain circumstances, at the request of the program.

APC insists that the Supreme Court's decision in *Landgraf v. USI Film Products*[151] controls this case.  But *Landgraf* does not sustain the weight that APC puts on it.  Indeed, *Landgraf* and *Bowen v. Georgetown University Hospital*[152] illustrate the important distinction between regulations that apply directly to past conduct and those that merely "aris[e] from conduct antedating the [regulation's] enactment."[153]  In *Bowen*, for example, the Supreme Court invalidated a Department of Health and Human Services regulation that would have "requir[ed] private hospitals to *refund* Medicare payments for services rendered *before* promulgation of the rule."[154]  By contrast, students attending an institution deemed ineligible under the GE Rules would be unable to obtain

---

150

APCU, 870 F. Supp. 2d at 151 (emphasis added).  Judge Contreras concluded that terminating "schools' *future* participation in the Title IV . . . programs based on their past track record" does not "amount to retroactive application."  *Id.* (ellipsis in original).

151

511 U.S. 244 (1994).

152

488 U.S. 204 (1988).

153

*Landgraf*, 511 U.S. at 269.

154

*Id.* at 264-65 (emphasis added); *see also Bowen*, 488 U.S. at 207.

federal financial aid *in the future*; funds received before the regulation's effective date would be unaffected. Ultimately, a regulation that relies on data concerning the past to govern *future* conduct, as this one does, is a far cry from one that reaches back to penalize *past* conduct, like the HHS regulation at issue in *Bowen*. The GE Rules "may unsettle expectations and impose burdens on past conduct," but that does not make them unconstitutionally retroactive.[155]

This Court's decision in *Abreu v. Callahan*[156]—which in relevant part held that the Social Security Administration improperly had applied the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 ("Welfare Reform Act"),[157] a federal law that disqualified many lawful resident aliens from receiving supplemental security income benefits and food stamps, to applicants who filed claims (or appeals of denied claims) for benefits before the statute's effective date[158]—does not warrant a different result.

The benefits at issue in *Abreu* provided "subsistence-level income for the most disabled and financially needy members of our society."[159] Such benefits were akin to the welfare assistance at issue in *Goldberg v. Kelly*,[160] and they raised more substantial due process concerns

---

155

      *Landgraf*, 511 U.S. at 269 n.24 ("If every time a man relied on existing law in arranging his affairs, he were made secure against any change in legal rules, the whole body of our law would be ossified forever." (internal quotation marks omitted)).

156

      971 F. Supp. 799 (S.D.N.Y. 1997).

157

      Pub. L. No. 104-193, 110 Stat. 2105, 2262 (codified at 8 U.S.C. § 1612).

158

      *Abreu*, 971 F. Supp. at 825.

159

      *Id.* at 803.

160

      397 U.S. 254 (1970).  Indeed, the supplemental security income benefits in *Abreu* were "given to persons on the very margin of subsistence."  *Mathews*, 424 U.S. at 340.

38

than the alleged "benefit" at issue here.[161]  Further, the question in *Abreu* was whether the Social

Security Administration constitutionally could interpret the Welfare Reform Act to deprive certain

beneficiaries of welfare-type benefits accrued, though not yet received, *before* the statute's effective

date.[162]  Here, by contrast, the question is whether DOE may use historical data to inform *future*

eligibility determinations.  Pre-enactment eligibility is unaffected entirely.  Indeed, the Court cannot

conceive of an institution "accruing" eligibility to participate in a federal student aid program in the

future.[163]

    *B.*    *Statutory Authority*

        APC contends next that DOE acted "in excess of statutory . . . authority" under the

HEA when it promulgated the GE Rules,[164] and that it has "transmogrified" the phrase "prepare

students for gainful employment in a recognized occupation" into "an unrecognizable behemoth."

This is, in effect, a two-part claim—*first*, that the statutory phrase "gainful employment" has a plain

and unambiguous meaning: "a job that pays," and, *second*, that even if the meaning of "gainful

---

161

      *See Abreu*, 971 F. Supp. at 825 ("[Supplemental security income claimants] have more than
a mere expectation of receiving benefits.  They have a legally protected right to accrued
preadjudication benefits . . . .").

162

      *See id.* at 824.

163

      It is worth nothing also that the Court in *Abreu* did not address an issue that more closely
resembles the question presented by this action.  The Welfare Reform Act required the
Social Security Administration to "redetermine" the eligibility of previously-eligible alien
beneficiaries and to terminate benefits for those who failed to satisfy the newly enacted
statutory requirements.  *See* 8 U.S.C. § 1612(a)(D)(i); *Abreu*, 971 F. Supp. at 804.

164

      5 U.S.C. § 706(2)(C).

employment" were ambiguous, DOE's interpretation of that language would be unreasonable and contrary to clear congressional intent.

Courts evaluate such arguments under the framework first established in *Chevron U.S.A. v. Natural Resources Defense Council*.[165] Under *Chevron*, a court reviewing "an agency's construction of the statute which it administers . . . is confronted with two questions."[166] The first question, *Chevron* step one, asks "whether Congress has directly spoken to the precise question at issue."[167] If it has—that is, if Congress's intent is clear—"that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress."[168] If congressional intent is unclear, however, courts address the second question, *Chevron* step two, which asks "whether the agency's [interpretation] is based on a permissible construction of the statute."[169] Courts should defer to the agency's statutory interpretation as long as it is "reasonable,"[170]

---

[165]

467 U.S. 837 (1984).

[166]

*Id.* at 842.

[167]

*Id.*

[168]

*Cohen v. JP Morgan Chase & Co.*, 498 F.3d 111, 116 (2d Cir. 2007) (internal quotation marks omitted).

To ascertain congressional intent, courts look first to the statutory text and, if the text is ambiguous, to traditional canons of statutory construction and, as a last resort, to legislative history.  *See Daniel v. Am. Bd. of Emergency Med.*, 428 F.3d 408, 423 (2d Cir. 2005).

[169]

*Chevron*, 467 U.S. at 843.

[170]

*Cohen*, 498 F.3d at 116 (internal quotation marks omitted).

for "ambiguities in statutes within an agency's jurisdiction to administer are delegations of authority to the agency to fill the statutory gap in reasonable fashion."[171]

APC's statutory authority argument differs little, if at all, from one asserted by the Association of Private Colleges and Universities in 2012.  In his decision vacating the 2011 Rules, Judge Contreras rejected that argument wholesale, concluding, among other things, (1) that "[t]here is no unambiguous meaning of what makes employment 'gainful': the phrase [*i.e.*, 'gainful employment'] need not mean 'any job that pays';" (2) that the structure, purpose, and legislative history of the HEA do "not unambiguously foreclose the agency's interpretation;" and (3) that "[t]he gainful employment regulations are a reasonable interpretation of an ambiguous statutory command."[172]  The Court finds Judge Contreras's analysis thorough, his application of *Chevron* faithful to Supreme Court precedent, and his logic and reasoning persuasive.  Accordingly, the Court feels no need to replow old ground; instead, with respect to *Chevron* step one, it incorporates the portions of Judge Contreras's opinion reproduced below, with appropriate alterations:

> "[APC] argues that 'gainful employment' unambiguously means 'a job that pays,' and that the Department's attempt to define the phrase in terms of debt and income therefore exceeds its statutory authority. [APC] points to contemporary dictionaries, which define 'gainful' as ['used to describe useful work that you are paid for'] or 'providing an income.' *See, e.g.*, WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY [928 (1965)].  It also notes that the phrase 'gainful employment' is used many times in Title 20, *see* 20 U.S.C. §§ 1036(e)(1)(B)(ii), 1134c(a), 1135c(d)(2) . . . , 1161g(d)(5)(B), 2[0]08(a), 4706(a), 5605(a)(2)(B)—and each of those uses, [APC] argues, means 'a job that pays.' . . .

---

171

    *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 980 (2005) ("Filling these gaps . . . involves difficult policy choices that agencies are better equipped to make than courts.").

172

    *APCU*, 870 F. Supp. 2d at 146, 149 (alterations and internal quotation marks omitted).

The Department replies that Congress did not provide a precise definition of what it means to 'prepare students for gainful employment in a recognized occupation.' The Department cites to many contemporary dictionaries that define 'gainful' as 'profitable' or 'lucrative,' thereby implying (the Department argues) an excess of returns over expenses. *See, e.g.*, BLACK'S LAW DICTIONARY 807 (4th ed. 1951); WEBSTER'S NEW INTERNATIONAL DICTIONARY 1026 (2d ed. 1958); NEW STANDARD DICTIONARY 1000 (Funk & Wagnalls Co. 1946). It also argues that the operative statutory phrase is not simply 'gainful employment' but rather 'gainful employment *in a recognized occupation*,' and suggests that the fuller phrase connotes employment in an established occupation—and therefore, presumably, a decently paying one. It further argues that 'gainful employment' means something different in the context of fellowships for graduate study, for example, the recipients [of] which are generally barred from such employment, *see, e.g.*, 20 U.S.C. § 1036(e)(1)(B)(ii), than in the context of training for entrance into a recognized occupation[, thus distinguishing the phrase 'gainful employment in a recognized occupation' from the mere use of 'gainful employment' in other provisions of the HEA]. The Department therefore concludes that the phrase 'gainful employment in a recognized occupation' is ambiguous and that in enacting it Congress delegated interpretive authority to the Department, whose interpretation ought therefore to be evaluated under step two of the *Chevron* analysis.

The court agrees. There is no unambiguous meaning of what makes employment 'gainful': the phrase need not mean 'any job that pays.' 'Gainful employment' does not unambiguously encompass work for minimal gain, nor does it necessarily describe the gross profits from a given activity rather than the net gains derived therefrom. Moreover—and more importantly—the relevant statutory command is that a given program 'prepare students for gainful employment in a recognized occupation.' The Department's regulations are an attempt to assess whether certain programs in fact provide such preparation. *See, e.g.*, [79 Fed.Reg. at 64,890 ("The [D/E rates] define[] what it means to prepare students for gainful employment by establishing measures that assess whether programs provide quality education and training to their students that lead to earnings that will allow students to pay back their student loan debts.").] The real question, then, is not how much gain is enough but rather how much preparation is enough. The Department has attempted to answer that question by reference to the economic success of a program's former students. The statute does not 'unambiguously foreclose[] the agency's interpretation,' [*Brand X*, 545 U.S. at 982-83], because it does not tell the Department how to determine which programs actually prepare their students and which programs do not. 'The power of an administrative agency to administer a congressionally created . . . program necessarily requires the formulation of policy and the making of rules to fill any gap left, implicitly or explicitly, by Congress." *Chevron*, 467 U.S. at 843 (ellipsis in original) [(internal quotation marks omitted)]. The means of determining whether a program 'prepare[s] students for gainful

employment in a recognized occupation' is a considerable gap, which the Department has promulgated rules to fill."[173]

That brings us to *Chevron* step two, which in this case requires the Court to determine whether the GE Rules are "based on a permissible construction of the statute."[174]

APC musters many arguments that DOE's interpretation of the HEA is unreasonable. It contends first that the GE Rules, and specifically the D/E rates, constitute an "'elephant in a mousehole'—a policy change so large that Congress could not have meant to authorize it in the statutory language on which the Department relies."[175] Indeed, APC characterizes the GE Rules as a "sea-change in Title IV eligibility criteria, affecting tens of thousands of educational programs, millions of students, and billions of dollars" in federal student loan funds, and asserts that Congress would not have hidden such a "drastic change" in the "vague terms" of the phrase "prepare students for gainful employment in a recognized occupation."

Here, too, the Court relies on Judge Contreras, who considered and rejected a substantially identical argument in his 2012 opinion vacating the 2011 Rules:

> "The [GE Rules] are a significant regulatory intervention, but they do not suggest that the Department has found 'an elephant in a mousehole.' That phrase entered the lexicon of administrative law in *Whitman v. American Trucking Associations, Inc.*,

---

173    *See id.* at 145-46 (some alterations in original) (emphasis added) (some citations, alterations, and internal quotation marks omitted).

    APC's argument that the GE Rules improperly exclude non-Title IV students is unpersuasive. First, the whole point of the GE Rules is to evaluate programs' performance for the purpose of continuing eligibility for Title IV funds. Second, and more importantly, DOE is barred from collecting data on students who do not receive Title IV funds. *See Ass'n of Private Sector Colls. & Univs. v. Duncan*, 930 F. Supp. 2d 210, 221 (D.D.C. 2013).

174    *Chevron*, 467 U.S. at 843.

175    *APCU*, 870 F. Supp. 2d at 147.

531 U.S. 457 (2001), when the Supreme Court said that "Congress . . . does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions—it does not, one might say, hide elephants in mouseholes." *Id.* at 468. The *Whitman* Court cited to *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120 (2000), for that proposition; there, the Court held that Congress had not delegated to the Food and Drug Administration the authority to regulate tobacco as a 'drug' under the Food, Drug, and Cosmetic Act, 21 U.S.C. § 301 *et seq.*—a power that the agency had always disavowed. The Court concluded that 'Congress could not have intended to delegate a decision of such economic and political significance to an agency in so cryptic a fashion.' *Id.* at 160. The *Whitman* Court also invoked *MCI Telecommunications Corp. v. AT&T Co.*, 512 U.S. 218 (1994), to establish that elephants do not hide in mouseholes. In *MCI*, the Court held that the Federal Communications Commission's statutory authority to 'modify any requirement' did not empower it to alter the requirement underpinning the rate regulation of common carriers. *Id.* at 231 ("It is highly unlikely that Congress would leave the determination of whether an industry will be entirely, or even substantially, rate-regulated to agency discretion—and even more unlikely that it would achieve that through such a subtle device as permission to 'modify' rate-filing requirements."). In *Whitman* itself, the Court concluded that since the power to consider costs when setting air quality standards was an 'elephant'—that is, a major issue of public policy—and the statutory command to set those standards with 'an adequate margin of safety' a 'mousehole,' it was 'implausible that Congress would give to the EPA through these modest words the power to determine whether implementation costs should moderate national air quality standards.' 531 U.S. at 468.

Neither the elephant nor the mousehole is present here. Although the Department's regulation is significant, it does not approach the scale of the elephantine interventions described above. Nor is the statutory language the Department invokes especially broad or obscure. Concerned about inadequate programs and unscrupulous institutions, the Department has gone looking for rats in ratholes—as the statute empowers it to do."[176]

APC argues also that the GE Rules "conflict[] with the . . . statutory framework" of the HEA by "usurp[ing] the traditional role of accrediting bodies," like the New York Board of Regents, in evaluating student achievement and in determining the acceptable educational standards for proprietary institutions. Indeed, APC accuses DOE of "reaching down to the program level to effectively dictate which programs schools can offer" and characterizes the GE Rules as "a complete

---

[176]

*Id.* at 147-48 (some citations, alterations, and internal quotation marks omitted).

re-write of New York State curricula"—a "re-write" that "supersede[s] the role of state agencies and impose[s] debt metrics that ultimately dictate the content of educational programs" and that operates in "direct[] conflict with the New York State Board of Regents' standards."  Ultimately, APC contends, DOE has "undermine[d] the [New York Board of] Regents' established regulatory standards by imposing metrics that disqualify" otherwise high-performing programs.

This argument is quite surprising, but not for its merit.  It is surprising because it is at best ill-conceived and at worst misleading.

The GE Rules say nothing whatsoever about the *content* of educational programs. They are concerned only with the *quality* of those programs as measured by graduates' ability to repay their loans.  Federal law does prevent DOE from dictating state schools' curricula or otherwise micro-managing their day-to-day operations,[177] but it says nothing about prohibiting DOE from conditioning schools' eligibility for federal student aid on performance-based metrics measuring graduates' success.  APC seeks to create a conflict with 20 U.S.C. § 1232a out of whole cloth.

APC contends also that the GE Rules, and what they are designed to measure, are not a reasonable construction of the statutory requirement that programs "*prepare* students for gainful employment in a recognized occupation."  But "the adequacy of a program's preparation is difficult to measure—and it is reasonable to consider students' success in the job market as an indication of whether those students were, in fact, adequately prepared.  If 'a program of training to prepare

---

[177]     *See* 20 U.S.C. § 1232a (prohibiting the federal government from, among other things, exercising "any direction, supervision, or control over the curriculum, program of instruction, administration, or personnel of any educational institution, school, or school system").

students for gainful employment' does not in fact lead to jobs for any of its students, it is reasonable to conclude that those students were not truly prepared."[178]

Finally, APC criticizes DOE for its allegedly selective reliance on the legislative history of the HEA, which APC says establishes that "Congress never intended to empower the Department to deny eligibility [to participate in Title IV funding programs] based on [the Department's] conclusion regarding program quality." APC argues, in effect, that the GE Rules gave too much weight to the testimony of a single witness and not enough to various other sources, including committee reports and the testimony of other, purportedly more persuasive witnesses.

Whatever its value in divining congressional intent, it is undeniable that "legislative history is itself often murky, ambiguous, and contradictory."[179] Indeed, that is the case here. Portions of the legislative history of the HEA, including congressional reports and witness testimony from two people involved in drafting the legislation, support APC's claim that "accreditation [and another statutory requirement] fully resolved Congress's concerns regarding program quality as an eligibility factor."[180] But other portions do not.[181] Taking heed, then, of the Supreme Court's warning that "[j]udicial investigation of legislative history has a tendency to become . . . an exercise in looking

---

[178]

> *APCU*, 870 F. Supp. 2d at 147 (citation omitted).

[179]

> *Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 568 (2005).

[180]

> *See, e.g.*, S. REP. NO. 89-758, at 12 (1965), *reprinted in* 1965 U.S.C.C.A.N. 3742, 3753 (discussing, among other things, the accreditation requirements of the HEA).

[181]

> *See, e.g., id.* at 5-6 (addressing congressional concern about graduates' earnings and asserting that it would be "reasonable" to consider the pace at which student loans are repaid after graduation when determining eligibility to participate in Title IV funding programs).

over a crowd and picking out your friends,"[182] the Court concludes only that the legislative history of the HEA sheds at best an inconsistent light on what Congress meant when it directed DOE to provide Title IV funding only to schools that "prepare students for gainful employment in a recognized occupation."[183]  In cases such as these, however, ambiguity in the statute—the tie, as it were—goes to the agency.[184]

The Court holds that the GE Rules are a reasonable interpretation of an ambiguous statutory command.[185]  It turns now to APC's argument that the GE Rules are arbitrary and capricious in violation of the APA.

## C.    *Administrative Procedure Act*

APC's last argument is that the GE Rules violate the APA because they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law"[186] and that they are not supported by substantial evidence in the record.

---

[182]

*Allapattah Servs.*, 545 U.S. at 568 (internal quotation marks omitted).

[183]

APC asserts a number of other arguments, regarding, among other things, an alleged conflict between the GE Rules and the role APC says is reserved for various accrediting bodies; alleged overreach by DOE in seeking indirectly to regulate tuition at GE programs; and Congress's alleged acquiescence to what APC characterizes as DOE's "consistent[]" interpretation of the phrase "gainful employment" as meaning "a job that pays."  The Court has considered these arguments and concluded that each is without merit.

[184]

*See Cohen*, 498 F.3d at 116 (noting that *Chevron* step two "instructs [courts] to defer to an agency's interpretation of [a] statute, so long as it is reasonable." (internal quotation marks omitted)).

[185]

*See APCU*, 870 F. Supp. 2d at 149.

[186]

5 U.S.C. § 706(2)(A).

Judicial review of agency action is "deferential"[187] and its scope "narrow."[188]  Thus, while judicial inquiry into agency decisionmaking must be "searching and careful,"[189] a reviewing court "may not 'substitute its judgment for that of the agency.'"[190]  The critical question in such cases is merely whether the record shows that the agency "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action."[191]  Put another way, "the agency's decision must reveal a 'rational connection between the facts found and the choice made'"[192] such that a reviewing court may conclude that the agency's action "was the product of reasoned decisionmaking."[193]

Courts reviewing agency action "must assess, among other matters, whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment."[194]  Agency action generally will be set aside "if the agency has relied on factors

---

[187]

     *Guertin v. United States*, 743 F.3d 382, 385 (2d Cir. 2014) (internal quotation marks omitted).

[188]

     *Nat'l Audubon Soc'y v. Hoffman*, 132 F.3d 7, 14 (2d Cir. 1997).

[189]

     *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 378 (1989) (internal quotation marks omitted).

[190]

     *Natural Res. Def. Council v. EPA*, 658 F.3d 200, 215 (2d Cir. 2011) (quoting *Citizens to Pres. Overton Park v. Volpe*, 401 U.S. 402, 416 (1971), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977)).

[191]

     *State Farm*, 463 U.S. at 43.

[192]

     *Natural Res. Def. Council v. FAA*, 564 F.3d 549, 555 (2d Cir. 2009) (quoting *State Farm*, 463 U.S. at 43).

[193]

     *State Farm*, 463 U.S. at 52.

[194]

     *Bechtel v. Admin. Review Bd.*, 710 F.3d 443, 446 (2d Cir. 2013) (quoting *Judulang v. Holder*, 132 S. Ct. 476, 484 (2011)); *see also State Farm*, 463 U.S. at 43.

48

which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."[195]  Finally, while "an agency changing its course" is in some circumstances "obligated to supply a reasoned analysis for the change," agencies "must be given ample latitude to adapt their rules and policies to the demands of changing circumstances."[196]

      APC asserts a litany of reasons why the GE Rules are arbitrary and capricious, and its reasons broadly fall into three categories: (1) DOE relied on flawed or irrelevant data, failed to consider relevant data, and employed unreliable and biased methods in formulating the GE Rules; (2) the GE Rules will confuse the public and yield absurd results due to their disproportionate impact on for-profit colleges; and (3) DOE's "ideologically driven" GE Rules are inconsistent with—and more restrictive than—an earlier version of those rules.

      With respect to its first claim—that there are problems with the data DOE considered (and chose not to consider) and with the methodology underlying the GE Rules—APC contends, among other things, that there is "no evidence at all of the relationship between the D/E rates and program quality" and, similarly, that there is no rational connection between the facts before DOE and the GE Rules.  According to APC, in fact, the GE Rules are the product not of sound research, but of "result-driven statistical shenanigans"—shenanigans that APC says are evident in DOE's

---

[195]

       *State Farm*, 463 U.S. at 43; *see also NRDC v. EPA*, 658 F.3d at 215.

[196]

       *State Farm*, 463 U.S. at 42 (internal quotation marks omitted); *see also Brand X Internet Servs.*, 545 U.S. at 981 ("Unexplained inconsistency is, *at most*, a reason for holding an interpretation to be an arbitrary and capricious change from agency practice under the Administrative Procedure Act." (emphasis added)).

"flawed" regression analyses. Rather than measure program quality, APC says, the GE Rates "largely measure student characteristics, such as family income or minority status." In effect, APC suggests, the programs most likely to fail the GE Rules are not those whose students are unprepared for gainful employment in a recognized occupation, but rather those that enroll more minorities and/or poor students. The (asserted) fact that the GE Rules disproportionately will punish the most demographically diverse institutions rather than those institutions falling short of the HEA's statutory command, APC says, renders the regulations arbitrary and capricious.

Putting aside for the moment that Judge Contreras correctly (in this Court's view) rejected this very claim in his 2012 opinion with respect to the 2011 Rules,[197] APC's argument on this point appears utterly to disregard the extensive statistical analyses underlying the GE Rules. In response to commenters who asserted the same thing that APC now does—*i.e.*, "that the proposed regulations primarily measure student characteristics instead of program quality"—DOE conducted a series of multivariate regression analyses before promulgating the final regulations.[198] From these analyses, DOE concluded, among other things, that "passing, zone, and failing programs have very similar proportions of low-income, non-traditional, female, white, Black, and Hispanic students" and that the GE Rules "do not *primarily* measure student demographics because indicators of many student characteristics have similar passing rates across quartiles."[199] DOE's "determination that

---

[197]

See *APCU*, 870 F. Supp. 2d at 150-51 (concluding that DOE's "determination that the debt measures appropriately measured whether a program prepared its students for gainful employment in a recognized occupation rather than a program's demographics" was "not arbitrary" in light of, among other things, DOE's performance of "a series of multivariate regression analyses").

[198]

See 79 Fed. Reg. at 65,043-52.

[199]

*Id.* at 65,045, 65,052.

50

the [GE Rules] appropriately measure[] whether a program prepare[s] its students for gainful employment in a recognized occupation rather than a program's demographics was therefore not arbitrary."[200]

APC finds fault also with what it characterizes as DOE's failure to follow its own Information Quality Guidelines—which APC says require DOE not only to use a "state of the art methodology" but to have that methodology peer reviewed—and with its decision to calculate D/E rates based on graduates' income as soon as 18 months after graduation, when earnings generally are lowest, and which APC says is too soon adequately to assess the lifetime value of an education.

APC's argument that the GE Rules run afoul of DOE's Information Quality Guidelines misunderstands the purpose and limitations of those guidelines, which "are intended only to improve the internal management of the Department" and "do not create any private right of action to be used by any party against the government in a court of law or in an administrative hearing."[201]   Indeed, APC's challenge is brought under the APA, which requires only that agencies provide the public with notice of any proposed substantive rulemaking as well as an opportunity to comment thereon.[202]   The APA says absolutely nothing about a requirement that a proposed rulemaking be peer reviewed or based on a "state of the art methodology," whatever that means.[203]

---

[200]

      *APCU*, 870 F. Supp. 2d at 151.

[201]

      U.S. DEP'T OF EDUC., INFORMATION QUALITY GUIDELINES 2 (2002), *available at* http://www2.ed.gov/policy/gen/guid/iq/infoqualguide.pdf.

[202]

      *See* 5 U.S.C. § 553(b), (c).

[203]

      *See Vt. Yankee Nuclear Power Corp. v. Natural Res. Def. Council*, 435 U.S. 519, 524 (1978) (noting that 5 U.S.C. § 553 "established the maximum procedural requirements which Congress was willing to have the courts impose upon agencies in conducting

The Court rejects also APC's argument that DOE "arbitrarily picked the time period for measuring earnings" and that it should have engineered the GE Rules to consider the value of an education over decades rather than beginning to focus on earnings as soon as 18 months after graduation.  APC asserts that DOE "provides *no justification*" for its decision but it forgets to mention that the Court may "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned."[204]  Here, that path is easily discernible.  Measuring income shortly after graduation, DOE found, provides a clearer picture of the "current or recent performance of the program" and is a far better indicator than lifetime earnings of whether a recent graduate is capable of paying off student debt when that debt becomes due.[205]  Put another way, income earned in the first few years after graduation is more obviously tied to one's training than income earned decades after one leaves school, as Judge Contreras found in dismissing this very argument in his 2012 opinion.[206]

APC takes issue also with the D/E rates' eight percent annual earnings and 20 percent discretionary income passing thresholds, which it says are arbitrary and irrational because they are based on mortgage data that have little to no relevance to recent graduates.

---

rulemaking procedures").

[204]

*State Farm*, 463 U.S. at 43 (internal quotation marks omitted).

[205]

79 Fed. Reg. at 64,931; *see also id.* at 64,914 ("[T]he return on investment from training may well be experienced over a lifetime, but benefits ultimately available over a lifetime may not accrue soon enough to enable the individual to repay the student loan debt under and within the schedules available under the title IV, HEA programs.").

[206]

*See APCU*, 870 F. Supp. 2d at 152 ("[T]he Department rationally concluded that considering a significantly longer earnings window in calculating the debt-to-income tests could weaken or sever the connection between earnings and education." (internal quotation marks omitted)).

This argument mischaracterizes the GE Rules and the findings on which they are based.  It is true that eight percent "has been a fairly common mortgage-underwriting standard."[207] It is equally true, however, that "the 8 percent cutoff has long been referred to as a limit for student debt burden," and DOE not only cites to at least four studies that have accepted this standard in the context of student debt, but refers also to various states—and the National Association of Student Financial Aid Administrators—that have established their own student loan debt guidelines based on the eight percent threshold.[208]  Similarly, economists on which DOE relied in promulgating the GE Rules "proposed a benchmark for a manageable debt level of not more than 20 percent of discretionary income," having concluded that a higher ratio would be "unreasonable under virtually all circumstances."[209]  The annual earnings and discretionary income thresholds, in other words, "were based upon expert studies and industry practice—objective criteria upon which the Department could reasonably rely."[210]  Bearing this in mind, the Court logically cannot conclude that DOE acted arbitrarily or capriciously in setting those thresholds.[211]

APC contests the annual earnings and discretionary income thresholds for another reason: it says DOE "acted arbitrarily" when it lowered the thresholds for passing those metrics from

---

[207]

79 Fed. Reg. at 64,919.

[208]

*Id.* at 64,919 & nn.100-03.

[209]

*Id.* at 64,919.

[210]

*APCU*, 870 F. Supp. 2d at 153.

[211]

*See id.* at 153-54 ("The debt to income standards were the product of a 'rational connection between the facts found and the choice made.'" (quoting *State Farm*, 463 U.S. at 43)).

53

12 and 30 percent, respectively, in the 2011 Rules, to eight and 20 percent, respectively, in the current GE Rules.[212]

This argument misses the mark for several reasons. *First*, it is not inherently problematic for an agency to change its position. Indeed, "[a]n initial agency interpretation is not instantly carved in stone. On the contrary, the agency . . . must consider varying interpretations and the wisdom of its policy on a continuing basis, for example, in response to changed factual circumstances."[213] Indeed, agencies "must be given ample latitude to adapt their rules and policies to the demands of changing circumstances."[214] *Second*, what APC terms a "dramatic" change is really a change in name only. The 2011 Rules never went into effect. They established no "settled rule" to which institutions were expected to adhere,[215] and institutions did not actually rely on them by committing to a "'settled course of behavior'" governed by those rules.[216] *Third*, DOE *did* provide a "reasoned explanation" for changing the passing thresholds from 12 and 30 percent in the 2011 Rules to eight and 20 percent in the current GE Rules.[217] Upon receiving additional data

---

212

      *Compare* 76 Fed. Reg. at 34,448 (outlining the 12 and 30 percent passing thresholds in the 2011 Rules), *with* 79 Fed. Reg. at 65,037 (outlining the eight and 20 percent passing thresholds in the current GE Rules).

213

      *Brand X Internet Servs.*, 545 U.S. at 981 (ellipsis in original) (citation and internal quotation marks omitted); *see also id.* at 1001 (noting that an agency is "free within the limits of reasoned interpretation to change course if it adequately justifies the change").

214

      *State Farm*, 463 U.S. at 42 (internal quotation marks omitted).

215

      *Id.* at 41-42 (internal quotation marks omitted).

216

      *See FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 550 (2009) (Breyer, J., dissenting) (quoting *State Farm*, 463 U.S. at 41-42).

217

      *Brand X Internet Servs.*, 545 U.S. at 1000-01.

showing default and repayment rates for graduates from a wide range of programs—data it obtained *after* promulgating the 2011 Rules but *before* drafting the current GE Rules—DOE determined that programs whose graduates were averaging payments between 8-12 percent of annual earnings and 20-30 percent of discretionary income "are much more similar to their failing counterparts than their passing counterparts."[218]  These programs, DOE concluded, "may not all be resulting in egregious levels of debt in relation to earnings," but "still exhibit poor outcomes and unsustainable debt levels."[219]  Based on this additional data, it was neither arbitrary nor capricious for DOE to conclude that "the stricter thresholds would more effectively identify poorly performing programs."[220]  Nor was it unreasonable for DOE to justify eliminating the statistical "buffer" included in the 2011 Rules based on its conclusion that the "three-tier pass, zone, fail construction" in the GE Rules provides sufficient protection against the possibility that "atypical factors," such as an unrepresentative cohort of students or a struggling economy, could doom an otherwise high-performing program.[221]

      APC's remaining APA arguments fall flat, many for reasons already discussed here and/or provided by Judge Contreras in his opinion with respect to the 2011 Rules.  For example, APC offers a number of purportedly absurd results as proof that the GE Rules are arbitrary and capricious.  But APC's challenge is facial, not as-applied, and the fact that APC can "point to a hypothetical case in which the rule might lead to an arbitrary result does not render the rule

---

[218]
    79 Fed. Reg. at 64,920.

[219]
    *Id.*

[220]
    *Id.*

[221]
    *See id.*

'arbitrary or capricious.'"[222]  As Judge Contreras said, APC's "argument that the regulation may produce absurd results in certain circumstances is better suited to an as-applied challenge arising out of such circumstances."[223]

APC's argument that the GE Rules fail to adjust for economic cycles is not just a red herring—the HEA says nothing about DOE considering fluctuations in the market—it is also untrue. DOE found that "recessions have, on average, lasted 11.1 months since 1945," while the GE Rules give struggling programs multiple years to improve their results before they lose HEA eligibility.[224] Moreover, the D/E rates are calculated as means and medians, which DOE found "mitigate the effects of economic cycles by measuring central tendency and reducing the influence of students who may have been most impacted by a downturn."[225]

Also unpersuasive is APC's argument that the GE Rules' use of a single metric (D/E rates) to calculate Title IV eligibility is arbitrary in light of the 2011 Rules' use of two metrics (D/E rates plus the repayment rate that Judge Contreras found was "not based upon any facts at all"). Several points bear mentioning here.  The D/E rates *do* consist of multiple metrics—one comparing

---

[222]

*Am. Hosp. Ass'n v. NLRB*, 499 U.S. 606, 619 (1991).

[223]

*APCU*, 870 F. Supp. 2d at 148.

The fact that, according to APC, "degree programs at most colleges cannot pass the D/E Rates" is, even if true, of no moment.  The relevant provision of the HEA speaks only to vocational programs; DOE lacked the authority when promulgating the GE Rules "to regulate other higher education institutions or programs, even if such institutions or programs would not pass the accountability metrics."  79 Fed. Reg. at 64,904.

[224]

79 Fed. Reg. at 64,926; *see also APCU*, 870 F. Supp. 2d at 151 ("[T]he fact that the debt measures may perform differently at different points in the economic cycle does not make them arbitrary on their face.").

[225]

79 Fed. Reg. at 64,926.

debt to annual earnings and another comparing debt to discretionary income—and a program "passes" if it satisfies the relevant threshold on *either* one.  Moreover, in considering whether to replace the voided repayment rate metric—which measured whether all attendees (*i.e.*, not just graduates) were actually repaying their student loan debts—DOE analyzed a number of options but ultimately decided that "further study is necessary before we adopt [an] accountability metric that would take into account the outcomes of students who do not complete a program."[226]  If anything, DOE would have risked violating the APA had it included one of these unproven metrics in the D/E rates calculus.  That it chose not to shows restraint and careful consideration, not arbitrariness or capriciousness.  Finally, while there is no repayment rate metric, or anything like it, in the current GE Rules, DOE did consider repayment data in formulating the passing thresholds for the D/E rates.[227]  In light of all this, the idea that DOE acted arbitrarily in relying on the D/E rates alone to determine eligibility for Title IV funding purposes simply does not hold water.

The Court concludes, in all the circumstances, that the GE Rules—and the D/E rates contained therein—were the product of "reasoned decisionmaking."[228]

---

[226]

   *Id.* at 64,915.

[227]

   *See id.* at 64,920.

[228]

   *State Farm*, 463 U.S. at 52.

   The Court has already rejected two of APC's other assertions: that the GE Rules (1) "conflict with and undermine" the New York Board of Regents' regulatory scheme, and (2) improperly exclude non-Title IV students.  *See supra* Part III.B.  There is no reason to repeat that analysis here.

   Finally, the Court rejects APC's argument that the GE Rules violate 20 U.S.C. § 1015c's prohibition on "the development, implementation, or maintenance of a . . . database of personally identifiable information on individuals receiving" federal student aid.  The provisions of section 1015c do "not apply to a system (or a successor system) that (1) is

*Conclusion*

For the foregoing reasons, the Association of Proprietary Colleges' motion for summary judgment [DI 22] is denied.  The Department of Education's cross-motion for summary judgment dismissing the complaint [DI 32] is granted.  The Clerk of Court shall enter judgment and close the case.

SO ORDERED.

Dated:      May 27, 2015

Lewis A. Kaplan
United States District Judge

(The manuscript signature above is not an image of the signature on the original document in the Court file.)

---

necessary for the operation of programs authorized by [Title IV of the HEA]; and (2) was in use by the Secretary . . . as of the day before August 14, 2008."  20 U.S.C. § 1015c(b). DOE intends to store the relevant information in the National Student Loan Data System, which has been in use since 1993 and thus fits well within section 1015c(b)'s exception.